Keith M. Woodwell (#7353)
Joseph D. Watkins (#16979)
CLYDE, SNOW & SESSIONS, P.C.
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 322-2516
Facsimile: (801) 521-6280
kmw@clydesnow.com
jdw@clydesnow.com

Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll
Megan K. Kistler
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
mkistler@cohenmilstein.com

*Additional Counsel on Signature Page*

*Attorneys for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PLURALSIGHT, INC., et al.<br><br>Defendants. | AMENDED COMPLAINT<br><br>Case No. 1:19-cv-00128-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 11

III. PARTIES ..... 12
- A. Lead Plaintiffs ..... 12
- B. Exchange Act Defendants ..... 13
  - 1. Corporate Defendant Pluralsight ..... 13
  - 2. The Officer Defendants ..... 14
  - 3. Relevant Executive Officer ..... 17
- C. Securities Act Defendants ..... 18
  - 1. Corporate Defendant ..... 18
  - 2. Signer Defendants ..... 18
  - 3. Underwriter Defendants ..... 21

IV. EXCHANGE ACT ALLEGATIONS ..... 22
- A. Factual Allegations ..... 22
  - 1. From Its Inception as a Public Company, Pluralsight Was Unable to Report Profitability, So Instead It Repeatedly Touted Dramatic "Billings Growth" ..... 22
  - 2. Pluralsight Repeatedly Told Investors Its Sales Force Was The Lynchpin Of Its Dramatic Billings Growth, Sparking Intense Investor Interest in its Sales Force ..... 25
  - 3. During the Class Period, Defendants Made Misleading Positive Statements Regarding Pluralsight's Sales Force and Omitted That Sales Representative Capacity and Infrastructure Were Woefully Insufficient to Sustain Billings Growth ..... 30
  - 4. On July 31, 2019, Defendants Admitted the Shocking Truth That Deficiencies Had Existed in the Sales Force Since the Beginning of 2019 and Caused Dramatic Decline in Billings Growth ..... 44
  - 5. The Market Was Blindsided by the Disclosure of an Insufficient Sales Force and the Admission that this Fact Was Known but Not Disclosed During the Class Period ..... 49
- B. Scienter Allegations ..... 52
  - 1. Defendants' Scienter is Reflected in The Officer Defendants' Admissions That Since January 2019, They Had Known That Pluralsight Had Too Few Ramped Sales Representatives ..... 53
  - 2. Defendants' Scienter is Further Demonstrated By Highly Suspicious Insider Trading during the Class Period ..... 54

3. Defendants' Scienter Is Further Demonstrated By The Officer Defendants' Admissions That They Focused on the Precise Issues That They Did Not Disclose ........ 65
4. Defendants' Scienter Is Evidenced By the Officer Defendants' Knowledge that the Status of Pluralsight's Sales Capacity Was Vital to its Investors and its Stock Price ........ 68
5. Defendants' Scienter is Demonstrated By Their Prior Admissions That the Capacity of the Sales Force to Generate Billings Was at the Core of Pluralsight's Business Model ........ 69

C. Defendants' Materially False and Misleading Statements and Omissions of Material Facts ........ 70
1. January 16, 2019 Pluralsight at Needham Growth Conference ........ 70
2. February 13, 2019 Earnings Announcement ........ 73
3. February 21, 2019 10-K ........ 75
4. March 4-7, 2019 SPO Offering Documents ........ 82
5. May 1, 2019 Earnings Announcement ........ 85

D. Defendants Violated Items 303 and 105 of Regulation S-K By Failing to Disclose Unfavorable Known Trends or Uncertainties ........ 92

E. Loss Causation ........ 96

F. Presumption of Reliance ........ 99

G. Inapplicability of The Statutory Safe Harbor ........ 100

H. Claims for Relief Under The Exchange Act ........ 101

COUNT I ........ 101

COUNT II ........ 103

COUNT III ........ 104

V. SECURITIES ACT ALLEGATIONS ........ 105

A. Background Facts ........ 106
1. Prior to the SPO, Unable to Demonstrate Profits, Pluralsight Focused Investors on Its Billings Growth ........ 107
2. Billings Growth Was Dependent on the Sales Force ........ 108
3. In August 2018, Budge told Analysts and Investors That the Company's Investment In Its Growing Sales Force Was Generating Efficiencies ........ 110
4. On Their October 24, 2018 Earnings Call, Skonnard and Budge Told Investors that the Sales Force Was Well-Ramped and Executing at "Scale" Heading Into 2019 ........ 112
5. At a January 16, 2019 Conference, Budge Told Investors that the Sales Force Was "Killing It" and the Sales Infrastructure was "At Scale" ........ 113

6. Just Prior to the SPO, in February 2019, Pluralsight and Budge Continued to Emphasize the Sales Force's Growth, Productivity, Efficiency, and Effectiveness .......... 114

B. At the Time of the SPO, Undisclosed Adverse Facts Showed that Pluralsight Was Months Behind On Its Plan For Hiring and Ramping Sales Representatives .......... 115

C. The SPO Offering Documents Contained Material Misstatements and Omitted Material Facts .......... 116

1. The Offering Documents' Statements about an Expanded Sales Force Having Increased Effectiveness and Productivity Were Materially False and Misleading, and Contained Material Omissions .......... 118

2. The Offering Documents' "Risk Factors" Supposed Warnings of *Possible* Adverse Conditions Contained Material Omissions and Misstatements of Fact .......... 120

D. On July 31, 2019, the Truth Emerged .......... 124

1. The Second Quarter Results Revealed a 21% Drop in B2B Billings Growth in Just Three Months .......... 124

2. Budge and Skonnard Disclosed that the Sales Force Deficiencies Existed Since the Beginning of 2019 .......... 125

3. Budge and Skonnard Disclosed that the Company's Investments in Sales Infrastructure Were Inadequate to Support the Company's Long-Term Growth Trajectory .......... 128

4. Pluralsight, Budge and Skonnard's Disclosures Demonstrated That the Securities Act Defendants Negligently Omitted Key Information About the Sales Force From the Offering Documents .......... 129

E. The False and Misleading Statements and Omissions Were Material .......... 130

1. The Impact of the Omitted Facts About the Sales Force on the Second Quarter 2019 Results Demonstrate the Materiality of the Omitted Facts in the Offering Documents .......... 131

2. Pluralsight's and its Officers' July 31, 2019 Disclosures Demonstrate the Materiality of the Omitted Facts in the Offering Documents .......... 132

3. The Stock Price Reaction to the July 31, 2019 Sales Force Disclosures Demonstrates the Materiality of the Omitted Facts in the Offering Documents .......... 133

4. The Reaction of Analysts to the July 31, 2019 Sales Force Disclosures Demonstrates the Materiality of the Omitted Facts in the Offering Documents .......... 134

F. Pluralsight Violated Items 303 and 105 of Regulation S-K .......... 135

COUNT IV ........................................................................................................ 138

COUNT V ........................................................................................................ 141

COUNT VI ........................................................................................................ 142

VI. CLASS ACTION ALLEGATIONS ........................................................................ 144

VII. PRAYER FOR RELIEF ........................................................................ 147

VIII. JURY DEMAND ........................................................................ 147

Court-appointed Lead Plaintiffs the Indiana Public Retirement System ("INPRS") and the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") (collectively, the "Pluralsight Institutional Investors Group" or "Lead Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, *inter alia*, the investigation of counsel, which includes review and analysis of (i) regulatory filings made by Pluralsight, Inc. ("Pluralsight" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by, disseminated by, or concerning the Company; (iii) securities analyst reports and advisories concerning the Company; (iv) transcripts of Pluralsight's investor conference calls and events; and (v) other public information regarding the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Lead Plaintiffs bring this federal securities class action against Defendant Pluralsight, Inc. and its Chief Executive Officer ("CEO") and Chairman Aaron Skonnard and Chief Financial Officer ("CFO") James Budge (Skonnard and Budge together, the "Officer Defendants") (collectively with Pluralsight, the "Defendants") under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5. These claims are brought on behalf of all persons other than Defendants and their affiliates who purchased Pluralsight Class A common stock between January 16, 2019, and July 31, 2019, inclusive (the "Class Period") and were damaged thereby.

2. Lead Plaintiff INPRS also brings claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons, other than the Securities Act Defendants (defined *infra*) and their affiliates, who purchased shares of Pluralsight Class A common stock pursuant or traceable to Pluralsight's $456 million secondary public offering on March 7, 2019, (the "SPO" or "Secondary Offering")[1] and were damaged thereby. The shares sold in the SPO were those of certain "selling stockholders," including Defendants Skonnard and Budge.

3. In addition to Defendant Pluralsight, the Securities Act claims are brought against the Officer Defendants, Skonnard and Budge, and Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell, who are members of the Company's current board of directors and who were signatories to the registration statement filed in connection with the SPO (the "Signer Defendants"). The Securities Act claims are also brought against the SPO's co-lead underwriters, Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC (the "Underwriter Defendants") (collectively with the aforementioned Defendants listed in this paragraph, referred to herein as the "Securities Act Defendants"). The Securities Act Defendants violated the Securities Act as the Registration Statement and Prospectus (collectively, the "Offering Documents") for the SPO were inaccurate and misleading, contained untrue statements of material facts, omitted other facts necessary to make the statements made not misleading, and omitted material facts required

[1] The SPO registration statement was filed with the SEC on Form S-1 on March 4, 2019 and was declared effective by the SEC on March 6, 2019 (the "Registration Statement"). The Registration Statement included a preliminary prospectus, which was amended by a free writing prospectus filed with the SEC on March 7, 2019, and a final prospectus filed with the SEC pursuant to Rule 424(b)(4) on March 7, 2019 (the "Prospectus").

to be stated therein. The Securities Act claims are based solely on strict liability and negligence, and do not allege, arise from, or sound in, fraud. Lead Plaintiff INPRS specifically disclaims any allegation of fraud as to the Securities Act claims.

4. Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. The Company sells subscriptions to its platform to business customers and individuals. The platform provides customers access to a library of thousands of technology skills courses taught by Pluralsight-approved authors; skill and role assessments; learning paths designed to help users master particular subject areas; and business analytics tools to enable business customers to track and address the technology skills of their employees.

5. From Pluralsight's inception as a public company in May 2018, through the Class Period (January 16, 2019, through July 31, 2019), it never achieved profitability. Instead, Pluralsight reported ever-increasing net losses.[2] Unable to attract investors by operating profitably, Pluralsight generated investor interest by repeatedly emphasizing that it consistently achieved exponential growth based on the metric of "billings." Billings, as explained by the Company, represented not merely revenue recognized ratably for the period subscription services were provided, but also new subscriptions and subscription renewals in future quarterly periods. Investors used the metric to evaluate the Company's deal volume and the amount that the Company would recognize as revenue over the next several fiscal quarters. For eight straight quarters leading up to the second quarter of 2019, Pluralsight achieved approximately 40-50%

[2] In 2017, 2018 and 2019, Pluralsight reported net losses of ($96.53 million), ($128.58 million) and ($163.57 million).

year-over-year billings growth, and, through the Class Period, told investors that this level of billings growth was built into the Company's long-term business model.

6. While touting its billings growth, the Company made clear that billings were highly dependent on the capacity, including headcount, experience, efficiency and productivity of its sales force. When the Company presented its billings growth to investors in its SEC filings prior to and during the Class Period, the Company noted that at least 85% of its billings were derived from business customers and that sales to these business customers were achieved by Pluralsight's direct sales force.

7. Because so much of the Company's positive spin on its financial performance was dependent on its sales force, the growth and capacity of the sales force was the subject of intense interest by securities analysts. To allay investor concerns prior to the Class Period, Defendants made detailed, positive statements about the growth in the number of sales representatives and about the sales force's increasing productivity and effectiveness. As early as August 2018, Defendants asserted that the Company achieved year-over-year billings growth because they had grown the sales force from approximately 80 to 250 quota-bearing sales representatives. The Company also assured investors that because there was at least a six-month lag time between the hiring of a sales representative and when that representative would achieve full productivity in terms of being able to meet his or her sales quotas (or being "ramped"), it carefully tracked not only the absolute number of sales representatives, but also, importantly, ***when*** each of those sales representatives began work. Since the Company knew at any given point in time the status of the seasoning of its sales force, it also knew the sales force's true effectiveness and ability to achieve billings growth. As a result, it became highly relevant to investors to know if there were any

material delays in hiring and ramping sales representatives, because those delays would necessarily impact sales force productivity and thus future billings growth.

8. During the Class Period, in speaking on that precise topic, Defendants repeatedly failed to disclose a critical adverse fact: that by the end of 2018, Pluralsight was significantly behind in its own plan for the number of seasoned sales representatives and attendant sales infrastructure needed to sustain its 40-50% billings growth. Throughout the Class Period, the Company and the Officer Defendants did not merely omit this highly material adverse fact, but they also issued numerous positive statements regarding Pluralsight's sales force and sales infrastructure that were blatantly false and misleading.

9. At the January 16, 2019 Needham Growth Conference, for instance, Budge told securities analysts that Pluralsight sales representatives were "***killing it***" and that the "***great infrastructure around them***" had "***improved our retention massively and we're now at scale***".

10. On the February 13, 2019 conference call with securities analysts and investors to discuss year-end 2018 financial results, Defendants reiterated their plan to grow the sales force in 2019 "***similar to what we did in 2018. So more reps to come, more on quota on the street and more goodness from them.***"

11. The Company's Form 10-K filed on February 21, 2019, painted a picture of the large size and increased productivity and effectiveness of the sales force, stating: "We have a ***large direct sales force***" that has shown "***substantial increases in [its] productivity and effectiveness***."

12. The SPO Offering Documents, issued to investors from March 4-7, 2019, reiterated the same positive message. The Company stated, "***[w]e have significantly expanded***

***our direct sales force*** to focus on business sales," and "***have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel*** over time as they gain more experience selling subscriptions to our platform."

13. Finally, in an earnings call with securities analysts and investors on May 1, 2019, for the quarter ended March 30, 2019, Skonnard and Budge were exuberant about the purported strength and efficacy of the salesforce. Budge told investors: "***we like where we are with our sales reps***"; "***love our growth there***"; "***We have a plan to grow . . .which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force***"; "***we do have a pace to*** **[*hiring*]**"; "***we're on pace***"; and "***we like the direction we're going***."

14. The timing of these material omissions and misrepresentations regarding Pluralsight's sales force during the Class Period was no coincidence. Rather, they were issued during the precise concentrated period of time in the Class Period when Skonnard and Budge, as well as the Company's Chief Revenue Officer, Joe DiBartolomeo (who headed Pluralsight's sales operations), were selling massive quantities of their own shares of Pluralsight stock at peak prices. In November and December 2018, Pluralsight's Class A common stock price traded as low as $19.01. By the end of 2018, all three individuals had created 10b5-1 trading plans through which massive quantities of their Pluralsight shares were sold during the Class Period. These planned sales, however, were highly suspicious. The quantities were far greater than the amount of stock the officers sold either before or after the Class Period, represented significant percentages of their respective holdings, and occurred within a concentrated period.

15. Moreover, because of the magnitude of these sales and the potential for enormous profits, Skonnard and Budge were highly motivated to make false positive statements and conceal adverse facts regarding the sales force during the Class Period. This is exactly what happened. Defendants' material omissions and false statements allowed for a meteoric ***58% rise*** in Pluralsight's Class A common stock share price ***in just two months, from $19.01 on December 24, 2018, to $29.99 on February 15, 2019***. With prices peaking, the Company's most senior officers began to unload their shares. On January 28, 2019, Skonnard sold ***$1.47 million***[3] in Pluralsight shares at an average price of $29.36. Between February 19 and 22, 2019, Budge ***sold $9.99 million*** in Pluralsight shares at an average price of $29.44. On February 15 and 22, 2019, DiBartolomeo sold ***$7.93 million*** in Pluralsight shares at an average price of $29.81.

16. Not satisfied with these enormous insider sales in January and February 2019 and the profits realized therefrom; Skonnard, Budge and DiBartolomeo proceeded to unload additional amounts of their holdings through the SPO that followed a short time later. On March 4 through 7, 2019, the Company filed the SPO Offering Documents with the SEC, selling to the investing public an additional 13,558,464 shares (as well as granting the underwriters the right to purchase up to an additional 2,033,770 shares), or $456 million of Class A common stock, held by certain "selling shareholders." The SPO offering price was at $29.25 per share—***a 95% increase*** over the Company's $15 share price in its initial public offering just nine months earlier and a 54% increase over the Company's $19.01 share price in December 2018, just three months earlier. The SPO resulted in yet another insider trading windfall for Skonnard and Budge as well as for DiBartolomeo, with Skonnard selling an additional ***$13.63 million*** in shares; Budge selling

[3] Unless otherwise noted, selling stockholders' alleged proceeds are net proceeds.

an additional ***$5.04 million*** in shares; and DiBartolomeo (who, again, was responsible for sales team productivity and thus intimately familiar with the true condition of the Company's sales force at the time of his insider sales) selling an additional ***$1.7 million*** in shares. The Offering Documents, through which the three executive officers made these additional insider sales at the inflated price of $29.25 per share, reiterated and echoed the prior material misstatements and omissions about the sales force: that its size had been "significantly expanded" and that it was performing with substantially increased "productivity" and "effectiveness" to sustain billings growth in 2019, when, in fact, as of January 2019, there were too few ramped, seasoned sales representatives to sustain billings growth in the coming quarters.

17. In total, the material non-disclosure and false statements regarding Pluralsight's sales force allowed Pluralsight's three most senior officers, Defendants Skonnard and Budge and DiBartolomeo, to ***sell $22.2 million, $15.1 million and $9.7 million of stock, respectively, at peak prices in the seven-month Class Period.***

18. On July 31, 2019, after all the massive insider trading was completed at inflated prices—including an additional $2.57 million of insider sales by Skonnard on July 26, 2019, at $30.47 per share—Pluralsight, Skonnard, and Budge disclosed the true condition of the Company's sales force. During the Company's second quarter 2019 earnings call, Budge disclosed to securities analysts and investors that Pluralsight's sales force had lacked "***ramped capacity***" in the "***first and second quarter***," and that this "***expressed itself with the outcome you saw in the second quarter***": a ***43.8% collapse*** in B2B billings growth, from 48% to 27%, in just three months. Budge further revealed that as of the "***end of last year*** [2018]" the Company had "***needed to bring on board***" "***dozens of reps***" "***so they would ramp and become fully productive***

***in the second quarter*** " but instead had been "***a few months behind***." Likewise, Skonnard also admitted that there "***was not enough capacity in the system to sustain our high-growth expectations as we entered the year*** [2019]" and that the Company had fallen off its "***annual sales ramp capacity plan***," meaning that since the start of the year, the Company had lacked the ramped sales representatives needed to maintain its planned level of billings growth in 2019.

19. This disclosure was so fundamentally contrary to what Pluralsight, Budge, and Skonnard had told analysts and investors about the sales force over the last seven months that analysts and investors were shocked and troubled by the failure to disclose these adverse facts. A J.P. Morgan securities analyst on the call directly asked why Defendants had not disclosed these crucial issues (which Budge and Skonnard admitted had existed as of the beginning of 2019) at the very least on the May 1, 2019 earnings call: "***I know I'm playing Monday morning quarterback on this by*** [sic] ***why is this – when we're hearing it, why didn't we hear this on last quarter's call?***" Budge's immediate response revealed that Defendants essentially had hoped that they could mask their understaffed and underequipped sales force for as long as possible: "***Well, we were still hitting our numbers, and we felt like we had things broke, right.***"

20. The next day, SunTrust issued an analyst report titled with the stark question: "***Where Did That Come From?***" The report further characterized the under-capacity of sales representatives as revealing "***shocking sales execution issues***." J.P. Morgan noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "***hiring issue was known earlier***" and that **"*[m]anagement pointed out that it saw it was behind on sales hiring coming into the year*."**

21. A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million ***implies a sharp revenue deceleration to just 30% y/y growth***."

22. On September 4, 2019, *Seeking Alpha* published an article that again called out the Company and its senior officers for their deceit: "While sales productivity is a concern, we think there is greater concern around management's ***lack of transparency*** in information sharing." The article noted that "[i]t was revealed during Q2 earnings call that Q2's sales issue was actually an extension from Q1." The article also discussed Skonnard and Budge's evasiveness on the earnings call: "During the earnings call, we found multiple occasions where the management brushed aside concerns raised by analysts while also added a bit of an unexpected surprise." The article concluded: "***With the issue getting bigger and affecting its billings growth in Q2, there was nowhere to hide.*** To us, this is the biggest risk in Pluralsight. We are further made curious as to ***how deep this lack of transparency has probably rooted itself into the culture of the organization***."

23. The price reaction to the July 31, 2019 disclosures mirrored the shock of the securities analysts. Pluralsight's shares dropped a massive ***39.52%,*** in a single day, f***rom $30.69 to $18.56 at the close of the market on August 1, 2019***, on trading volume of 22.135 million shares, ***13 times its daily average of 1,701,468 shares per day during the Class Period***. This

collapse in Pluralsight's stock price represented a one-day market capitalization loss of ***$1.23 billion***.[4]

## II. JURISDICTION AND VENUE

24. The claims asserted in this action arise under Sections 10(b), 20A, and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t-1, and 78t(a)), SEC Rule 10b-5 (17 C.F.R. §§ 240.10b-5), and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o).

25. This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

26. Venue is proper in this District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because Pluralsight is headquartered and conducts business here, all the defendants had agents or transacted or conducted business in this District, and many of the alleged acts and omissions giving rise to the violations complained of in this action, including the preparation and dissemination to the public of materially false and misleading statements, occurred in this District.

[4] Defendants' conduct is depicted in a timeline of events annexed as Exhibit C hereto. The timeline details certain of Defendants' material misstatements and omissions regarding the Company's sales force (in green boxes above the stock price line), the artificial inflation of the Company's stock price (reflected by the blue price line), the massive insider sales by Skonnard, Budge and DiBartolomeo at inflated prices during the Class Period (reflected in red boxes below the price line), and the disclosure of the truth regarding the sales force on July 31, 2019 and its catastrophic impact on the Company stock price on August 1, 2019 (reflected in purple boxes and purple price line).

27. In connection with the acts alleged in this Amended Complaint, all the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

28. Co-Lead Plaintiff INPRS is a $34.2 billion pension fund operated for the benefit of members and retirees of public universities, schools, municipalities, and state agencies. As shown in the certification attached hereto as Exhibit A, INPRS purchased shares of Pluralsight Class A common stock during the Class Period, including shares of Pluralsight Class A common stock issued pursuant and/or traceable to the SPO. For instance, on the March 7, 2019 offering date and at the $29.25 offering price, INPRS purchased 65,200 shares of Pluralsight Class A common stock in the SPO, and directly from Morgan Stanley & Co. LLC, a lead underwriter of the SPO (and a Securities Act Defendant named herein), in the United States.

29. Co-Lead Plaintiff CTPF is a defined benefit public employee retirement system that provides retirement, survivor and disability benefits for certain certified teachers and employees of the public schools in Chicago, Illinois. CTPF maintains approximately $10.4 billion in assets. As set forth in the certification attached hereto as Exhibit B, CTPF purchased Pluralsight Class A common stock during the Class Period. These purchases included the purchase of 7,900 shares of Pluralsight Class A common stock on the same day as the SPO, March 7, 2019, from KeyBanc Capital Markets, Inc., one of the underwriters of the SPO.

30. As a result of material misstatements and omissions made by the Exchange Act Defendants and Securities Act Defendants (defined below), Lead Plaintiffs purchased or otherwise acquired Pluralsight Class A common stock at artificially inflated prices. When the relevant truth concerning these material misstatements and omissions was revealed to the market on July 31, 2019, the price of Pluralsight's Class A common stock fell, causing Lead Plaintiffs and the Class to suffer losses.

**B. Exchange Act Defendants**

**1. Corporate Defendant Pluralsight**

31. Defendant Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. Pluralsight is incorporated in Delaware and headquartered in Farmington, Utah.

32. Pluralsight has three authorized classes of common stock: Class A, Class B, and Class C. Pluralsight Class A common stock trades on the NASDAQ Global Select Market under the ticker symbol "PS." Class A common stock and Class B common stock carry one vote per share, while Class C common stock carries ten votes per share. Defendant Skonnard, personally and through associated entities, holds all of the Class C common stock and, after the SPO, held approximately 53.6% of the combined voting power of the Company's outstanding capital stock, and therefore, controls the Company. According to the Company's annual 10-K report for 2018, filed with the SEC, as of January 31, 2019, the Company had 137,488,519 shares of Pluralsight common stock outstanding, consisting of 66,639,109 shares of Class A common stock, 56,206,481 shares of Class B common stock, and 14,642,929 shares of Class C common stock.

Pluralsight sold 13,558,464 Class A shares[5] in its March 7, 2019 secondary public offering. As of June 30, 2019, according to the Form 10-Q that the Company filed with the SEC on July 31, 2019 (the last day of the Class Period), the Company had 101,096,472 shares of Class A common stock issued and outstanding; 24,664,113 shares of Class B common stock issued and outstanding; and 14,186,856 shares of Class C common stock issued and outstanding.

### 2. The Officer Defendants

#### a. Aaron Skonnard

33. Defendant Skonnard co-founded Pluralsight in 2004. He has served as its Chief Executive Officer since October 2009, and as Chairman of its board of directors since the board's inception in December 2017. According to his biography on Pluralsight's website, "[o]n a day-to-day basis, he works closely with the entire executive team in different capacities, including recruiting . . . marketing, [and] sales."

34. Throughout the Class Period, Skonnard signed Pluralsight's filings with the SEC, including the Registration Statement and Pluralsight's annual report on Form 10-K for the year ended 2018. Skonnard also signed a certification filed as part of Pluralsight's annual report on Form 10-K for the year ended 2018, attesting to the truthfulness of the Company's filings and claiming that the report "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Skonnard was one of the Pluralsight representatives principally responsible for communicating with investors, including securities analysts, both before and during the Class Period. Skonnard regularly spoke directly to analysts and investors

[5] The selling stockholders also offered an additional 2,033,770 shares to the SPO underwriters, for a total of 15,592,234 sold in the SPO.

about the details of the Company's performance and the importance of the Company's sales force, saying, for instance, that the Company was "***able to keep attracting all the talent we need***," that "***[r]evenue and billings growth continue to be strong*** with both up over 40% year over year," and "***[w]e continue to demonstrate the efficiency in our model.***"

35. In 2019 and 2018, Skonnard's primary source of compensation was from stock and option awards. In 2018, the total value of his annual compensation, including the estimated value of stock and option awards, was $12,951,975. In 2019, the total value of his annual compensation package was $6,476,664.

36. Skonnard was one of the "Selling Shareholders" in the $456 million SPO during the Class Period, selling 480,618 shares of Class A common stock at $29.25 per share ($28.37 per share net of the underwriters' discount), for net proceeds of $13,636,334.21. Including the $13.6 million that he received from the SPO, during the seven-month Class Period, Skonnard sold $22,187,840.52 in Pluralsight Class A common stock, or 171% of his total 2018 compensation and 342% of his total 2019 compensation.

**b. James Budge**

37. Defendant Budge has served as Pluralsight's Chief Financial Officer since joining the Company in April 2017. According to his biography on Pluralsight's website, Budge "acts as the financial and operational advisor to the Pluralsight executive team" and "is responsible for the company's financial, data and information technology teams."

38. Throughout the Class Period, Budge signed Pluralsight's filings with the SEC, including the Registration Statement and Pluralsight's annual report on Form 10-K for the year ended 2018. Budge also signed a certification filed as part of Pluralsight's annual report on Form

10-K for the year ended 2018, attesting to the truthfulness of the Company's filings and claiming that the report "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Budge was one of the Pluralsight representatives principally responsible for communicating with investors, including securities analysts, both before and during the Class Period. Budge regularly spoke directly to analysts and investors about the details of the Company's performance and the importance of the Company's sales force, saying, for instance, that the sales representatives were "***killing it***" and that the Company was "***on pace***" with its hiring and ramping of sales representatives.

39. In 2018, the total value of Budge's annual compensation, including the estimated value of stock and option awards, was $7,427,500; in 2019, it was $2,830,594.

40. Budge was one of the "Selling Shareholders" in the $456 million SPO during the Class Period, selling 177,854 shares of Class A common stock at $29.25 per share ($28.37 per share net of the underwriters' discount), for net proceeds of $5,046,162.62. During the seven-month Class Period, Budge sold $15,102,980.54 in Pluralsight Class A common stock, representing 203% of his total compensation in 2018 and 533% of his total compensation in 2019.

41. The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Pluralsight's reports to the SEC and investors, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading.

42. As officers and controlling persons of a publicly held company whose common stock was and is registered with the Securities and Exchange Commission pursuant to the Exchange Act, and was and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's publicly traded Class A common stock would be based on truthful and accurate information.

**3. Relevant Executive Officer**

43. DiBartolomeo served as Pluralsight's Chief Revenue Officer from when he joined the Company, in June 2016, through his resignation on August 9, 2019. According to his biography on the Pluralsight website[6], DiBartolomeo possessed "foresight" as a "super power"—"a skill that has helped him lead various regional and national sales teams to deliver triple-digit

[6] DiBartolomeo's biography is no longer on Pluralsight's website, but a cached version of the biography that was current as of March 25, 2019, is available online at: https://web.archive.org/web/20190325001211/https://www.pluralsight.com/about#executive-modal-joedibartolomeocro

growth and billions of dollars in sales." As Chief Revenue Officer, DiBartolomeo was "responsible for the Sales and Customer Success organizations." While DiBartolomeo did not make public statements to investors, as head of Pluralsight's sales organization he was responsible for sales team productivity and thus intimately familiar with the true condition of the Company's salesforce.

44. In 2018, the total value of DiBartolomeo's annual compensation, including the estimated value of stock and option awards, was $352,033; in 2019, it was $4,838,020.

45. DiBartolomeo was one of the "Selling Shareholders" in the $456 million SPO during the Class Period, selling 60,000 shares of Pluralsight Class A common stock at $29.25 per share ($28.37 per share net of the underwriters' discount), for proceeds of $1,702,350. During the seven-month Class Period, DiBartolomeo sold $9,706,761.52 in Pluralsight Class A common stock, which was 2,757% of his 2018 total compensation and 200% of his total 2019 compensation.

### C. Securities Act Defendants

#### 1. Corporate Defendant

46. The allegations regarding Corporate Defendant Pluralsight in Section III.B.1 are hereby repeated, reincorporated and re-alleged herein.

#### 2. Signer Defendants

47. The allegations in Section III.B.2 are hereby repeated, reincorporated and re-alleged herein. In addition to Officer Defendants Skonnard and Budge, who signed or authorized the signing of the Offering Documents, the following Signer Defendants are named in Plaintiffs' claims under Sections 11 and 15 of the Securities Act:

48. Defendant Gary Crittenden has been a director of Pluralsight since 2017 and is its lead independent director. Defendant Crittenden signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Crittenden exercised control over Pluralsight and the contents of the Offering Documents.

49. Defendant Scott Dorsey has been a director of Pluralsight since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Dorsey exercised control over Pluralsight and the contents of the Offering Documents. Defendant Dorsey was also a selling stockholder in the SPO. He sold 47,492 shares at a price per share of $28.37 ($29.25 less an underwriters' discount) for net proceeds of $1,347,348.04.

50. Defendant Arne Duncan has been a director of Pluralsight since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Duncan exercised control over Pluralsight and the contents of the Offering Documents. Defendant Duncan was a selling stockholder in the SPO. He sold 30,000 shares at a price per share of $28.37 ($29.25 less an underwriters' discount) for net proceeds of $851,100.

51. Defendant Ryan Hinkle has been a director of Pluralsight since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Hinkle exercised control over Pluralsight and the contents of the Offering Documents.

52. Defendant Leah Johnson has been a director of Pluralsight since October 2018. She signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of her position at Pluralsight, Defendant Johnson exercised control over Pluralsight and the contents of the Offering Documents.

53. Defendant Timothy Maudlin has been a director of Pluralsight since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Maudlin exercised control over Pluralsight and the contents of the Offering Documents.

54. Defendant Frederick Onion co-founded Pluralsight in 2004 and has served as a member of its board of directors since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Onion exercised control over Pluralsight and the contents of the Offering Documents. Defendant Onion was a selling stockholder in the SPO. He sold 1,000,000 shares at a price per share of $28.37 ($29.25 less an underwriters' discount) for net proceeds of $28,370,000.

55. Defendant Brad Rencher has been a director of Pluralsight since 2017. He signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of his position at Pluralsight, Defendant Rencher exercised control over Pluralsight and the contents of the Offering Documents. Defendant Rencher was a selling stockholder in the SPO. He sold 42,500 shares at a price per share of $28.37 ($29.25 less an underwriters' discount) for net proceeds of $1,205,725.

56. Defendant Bonita Stewart has been a director of Pluralsight since October 2018. She signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of her position at Pluralsight, Defendant Stewart exercised control over Pluralsight and the contents of the Offering Documents.

57. Defendant Karenann Terrell has been a director of Pluralsight since 2017. She signed or authorized the signing of the Offering Documents, which were materially false and misleading and omitted material facts. By virtue of her position at Pluralsight, Defendant Terrell exercised control over Pluralsight and the contents of the Offering Documents.

**3. Underwriter Defendants**

58. The underwriters listed in this section are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants are named in Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act.

59. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was the "Left Lead" underwriter for the Company's SPO. In the SPO, Morgan Stanley agreed to purchase 5,016,633 shares of the Company's Class A common stock, exclusive of the option to purchase additional shares. Morgan Stanley has offices located at 60 East South Temple, 20th Floor, Salt Lake City, Utah 84111.

60. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was a lead underwriter for the Company's SPO. In the SPO, J.P. Morgan agreed to purchase 3,796,370 shares of the Company's Class A common stock, exclusive of the option to purchase additional shares. J.P. Morgan has offices located at 201 S Main Street, 3rd Floor, Salt Lake City, Utah 84111.

61. The Underwriter Defendants participated in drafting the Offering Documents, caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the SPO, and participated in the dissemination of the Offering Documents. However, the Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the SPO and were negligent in failing to ensure that the Offering Documents were prepared properly, accurately, and were free of misstatements or omissions, and in allowing dissemination of the material misstatements and omissions contained in the Offering Documents as detailed herein. The Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Offering Documents.

## IV. EXCHANGE ACT ALLEGATIONS

### A. Factual Allegations

#### 1. From Its Inception as a Public Company, Pluralsight Was Unable to Report Profitability, So Instead It Repeatedly Touted Dramatic "Billings Growth"

62. Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. The platform provides users with a library of thousands of technology skills courses taught by Pluralsight-approved authors; skill and role assessments; learning paths designed to help users master particular subject areas; and business analytics tools to enable business customers to track and address the technology skills of their employees.

63. On May 17, 2018, Pluralsight went public in an initial public offering ("IPO"), issuing 23.8 million shares at $15 per share. The Company raised $332.1 million in net proceeds,

increasing its market capitalization to approximately $2 billion, which, as *Forbes.com* noted, "far exceed[ed] its last private valuation of about $1 billion."[7] Pluralsight used the proceeds to purchase LLC units in its holding company, Pluralsight Holdings, which the holding company then used to repay the offering's expenses, pay down Pluralsight's outstanding indebtedness, and for working capital and other general corporate purposes.

64. After becoming a public company in May 2018, the Company garnered investor interest not by its ability to achieve profitability—which it has never done—but rather by promoting the Company and its sales force's ability to achieve dramatic sales growth each quarter, as measured by its "billings."

65. The Company defined billings as "total revenue plus the change in deferred revenue in the period." As a "Software-as-a-Service" ("SaaS") business, the Company derived substantially all its revenue from the sale of annual or multi-year subscriptions to the platform to business customers (its "B2B" or "Business-to-Business" segment) and monthly or annual subscriptions to individual consumers (its "B2C" or "Business-to-Consumers" segment). Within the B2B segment, the Company had a "commercial" segment, for businesses with less than approximately 4,000 users, and an "enterprise" segment, for businesses with more than approximately 4,000 users. The B2B enterprise segment was the chief growth engine for the Company. As of the start of the Class Period, according to the SPO Offering Documents, the Company claimed as customers "more than 340 of the 2018 Fortune 500." Over the course of the

[7] Alex Konrad, *Utah Ed Tech Leader Pluralsight Pops 33% In First-Day Trading, Keeping Window Open for Software IPOs*, Forbes.com, May 17, 2018.

Class Period, Defendants repeatedly emphasized the importance of these larger "enterprise" customers to the Company's sustained growth.

66. The Company typically invoiced its customers in advance installments (annually for business customers, and monthly or annually for individuals) and recorded those up-front payments as deferred revenue, which it then recognized ratably as revenue throughout the subscription period.

67. The billings amount in a given financial quarter therefore represented the amounts invoiced to customers that quarter and reflected subscription renewals, sales of additional products or services to existing customers, and sales to new customers. While revenue in a given quarter provided investors with a snapshot in time, billings were a crucial indicator of the future revenue and cash flow that the Company would realize from deals that the sales representatives had executed in that quarter. More importantly, Defendants used billings in their dealings with analysts and investors as the key measure of Pluralsight's performance and success given that the Company had yet to turn a profit.

68. In this regard, in Pluralsight's SEC filings, earnings calls, and presentations, Defendants repeatedly told investors that billings growth was Pluralsight's "***key business metric***" and a "***key factor affecting* [*its*] *long-term performance***." From the date of the Company's IPO, and for each subsequent quarter through the end of the Class Period, Defendants touted the Company's exponential year-over-year billings growth to investors. Defendants attributed Pluralsight's dramatic billings growth rate to the capacity, experience, efficiency, and productivity of the sales force that the Company had built. The link between billings and the

sales force was clear: sales representatives were responsible for generating sales to business customers, who accounted for at least 85% of the Company's billings during the Class Period.

### 2. Pluralsight Repeatedly Told Investors Its Sales Force Was The Lynchpin Of Its Dramatic Billings Growth, Sparking Intense Investor Interest in its Sales Force

69. The Company employed a direct sales team that focused on landing new business customers, renewing existing subscriptions, and expanding usage of Pluralsight's platform within the business customers over time. It also employed a field sales team that sourced new prospects and upsell opportunities (meaning, the opportunity to encourage a customer to purchase a more expensive version of the Company's product, more licenses for the product, or more services within the product). The Company supported its sales representatives (whom the company also called "account executives") through its sales "infrastructure." This infrastructure included "sales enablement" employees who provided training, deal support, best practices insights, and other assistance to sales representatives as they joined the Company and "ramped" up to full sales-quota-carrying capacity. The Company's sales infrastructure also included its customer success management ("CSM") team, which was responsible for retaining customers won by the sales team, to cut down on the Company's customer "churn," or the loss of customers who canceled or failed to renew their subscriptions. CSM employees worked to ensure that customers were having positive experiences with the Pluralsight platform and identify and address any problems, so that customers would renew, upgrade, and expand their subscriptions, thereby further driving billings growth for the Company.

70. To grow its billings, the Company looked to expand its sales force and increase their productivity, particularly that of the new hires. With more quota-bearing sales

representatives came the ability to sell more subscriptions and generate the billings growth of near-40% to 50% from one quarter to the next that Defendants promoted to investors each financial reporting period. Because the sales force drove the Company's key business metric—billings—Defendants closely monitored the ability of Pluralsight's sales representatives to take on a "full quota." As part of its internal planning and forecasting, Defendants closely tracked a sales representative's progression from hiring through ramping up to take on a full sales quota, a process that, according to Budge, took between six months and two years. Defendants repeatedly told investors that the increased productivity of Pluralsight's sales representatives translated into greater efficiency and money saved—meaning, more value for investors.

71. Defendants fastidiously tracked the growth and ramping of the sales force toward achieving full productivity because those metrics were crucial to the Company's current and future sales activity, including Pluralsight's much-touted billings metric. Defendants used "pipelines" to closely follow the progression of deals that its sales teams were working on at any given time, from identifying a potential customer to closing the deal. The pipeline indicated how many deals were expected to close within a given amount of time and how sales representatives were performing in relation to their sales quotas. Using this information, Defendants could accurately track the Company's current and future billings growth.

**a. August 2018 Statements Attributing Billings Growth to Pluralsight's Heavy Investment in the Sales Force**

72. Well before the commencement of the Class Period, Pluralsight attributed billings growth to its sales force. On August 1, 2018, the Company announced that in the second quarter of 2018, it had achieved total billings growth of 42% and B2B billings growth of 52%–the Company's "fifth consecutive quarter of greater than 50% growth." Skonnard and Budge led the

earnings call that day with analysts and investors. In response to a question about "***the efficiency of the sales force as it matures and how you measure that***," Budge attributed the dramatic billings growth to the Company's "***heavy***" investment in "sales and marketing" and the "***efficiencies***" that resulted from having more "***tenured sales reps***."

73. Likewise, at the Company's August 2018 investor and analyst meeting at its annual conference "Pluralsight Live,"[8] Budge emphasized how the Company was able to generate billings from existing customers because of how heavily it had invested in "***all of the support functions that wrapped around***" the quota-bearing sales representatives, including the "critical" CSM team, which the Company had "***built [] out through 2017***," and which showed a "really great amount of focus."

74. Further, at the same conference, to allay any potential concerns about the Company's ability to recruit talented people—and therefore, its ability to continue to grow billings—Skonnard stated that the Company was having terrific success in this regard and that "***we'll be able to keep attracting all the talent we need***." He said that the Company was "***very proactive about bringing that talent to Utah***" and that the Company has "***access to talent everywhere, and we do a good job of managing that***."

75. These statements regarding successful investments in the sales force had the desired effect. For example, an August 2, 2018 J.P. Morgan analyst report titled "*2Q18: Companies Can Learn From PS First Quarter Post IPO*" noted: "***We believe the heavy***

[8] "Pluralsight Live" is the Company's annual conference that brings together customers, content authors, investors, and analysts for a multi-day extravaganza in Salt Lake City. The event features presentations by Pluralsight's executive officers, including a "special meeting for investors and analysts," and speeches from celebrities, public figures, and technology industry leaders.

***investments undertaken by the company last year to ramp up its sales force is starting to pay off***." In an August 29, 2018 report titled "*Lots of Positive Takeaways at Pluralsight Live; Strong Upside Potential*," SunTrust noted that the Company's strong billings growth in its B2B segment of 60% year over year, following "***an aggressive hiring cycle in 2016 and 2017, along with building out a [CSM] group, has led to overall top-line growth acceleration***." The report also flagged Defendants' much-trumpeted "***positive trends in sales force productivity***."

**b. August 2018 Statements Touting Pluralsight's Close Monitoring of its Pipeline and Quota-Bearing Sales Representatives Needed to Achieve Consistent Billings Growth**

76. Investors were also assured that management had clear visibility—five or six months in advance—regarding the deals needed to achieve consistent quarterly billings growth. On the August 1, 2018 earnings call, Budge explained that to meet its quarterly billings "targets," the Company relied on deals that he called "doubles and triples," as opposed to "home runs," and that these deals typically took "5 to 6 months" to progress through the pipeline. According to this timeline, Pluralsight could reliably approximate from at least six months before the end of a quarter the billings and revenue it could expect to achieve in that upcoming quarter. He further explained that because the Company closely monitored the composition of its billings pipeline, including the amount of time the sales team took to close deals, management felt "great" about the pipeline for the "next several quarters."

77. Significantly, at the August 2018 conference, Budge also made clear to investors that to achieve consistent billings growth, the Company well understood that it needed to take into account not just the sales representative headcount, but also whether those sales representatives were sufficiently prepared to meet their sales quotas. Budge stated that it

measured the "productivity of our sales reps" by their ability to take on a full quota, which the Company carefully tracked: "At about that . . . 15- to 18-month mark, they are producing enough annual quota to meet the internal budgets that we have. At around the 2-plus year mark, they are starting to achieve their full quota. . . . And you'll start to see that benefit pay off in the bottom line." As a result, investors were led to believe, prior to the commencement of the Class Period, that when the Company touted the size, efficiency, productivity, and effectiveness of its sales force, that it meant that the sales representatives were adequately seasoned, or "ramped," and that the Company was closely following their progression and factoring their output into evaluating the deal pipeline.

**c. On Their October 24, 2018 Earnings Call, Defendants Told Investors that the Sales Force Was Well-Ramped and Executing at "Scale" Heading Into 2019**

78. On October 24, 2018, in a conference call discussing Pluralsight's financial results for the third quarter of 2018 ("Q3 2018"), including overall billings growth of 44% year-over-year and B2B billings growth of 53% year-over-year, Skonnard began by highlighting for investors that it was the "sixth consecutive quarter of greater than 50% growth in B2B billings" and trumpeted the "***strong focus and commitment***" of the Company's sales and customer success teams.

79. When Budge was asked by an analyst on the call, "where you are in the ramping of the productivity of sales reps? And where are you in terms of your hiring plans?", Budge stated that the Company was achieving "economies of scale," or "efficiencies," meaning the Company needed to spend less on sales and marketing as a percentage of revenue to achieve exponential 53% growth in B2B billings, as it had that quarter. He concluded: "So across the

board, we're starting to see some of those efficiencies that we've talked about in past discussions, and they really came out in a big way in the third quarter, and we expect to see that continue through the fourth quarter."

80. Skonnard also promoted the effectiveness of the Company's then-existing sales team in generating new billings, telling investors that the Company was winning bigger deals because its enterprise account executives had the "***experience***" and "***capability***" to help him get "***above the power line immediately***" with C-suite-level decision-makers at Fortune 500 companies.

81. Budge and Skonnard's positive statements about the successful ramping and productivity of Pluralsight's sales force had a strong impact on analysts. J.P. Morgan, for instance, in a report titled "*3Q18: B2B Delivers Big Beat and Raise*," stated that ***"[s]ales productivity has hit an inflection point*** and deals are coming in on higher price points all leading to exceptional B2B results again this quarter with billings growth over 50%." The report also noted that "***[t]he company's investments in its channels aimed at enterprise sales over the last year are now ramping up and would continue to drive this growth as the sales force matures***."

### 3. During the Class Period, Defendants Made Misleading Positive Statements Regarding Pluralsight's Sales Force and Omitted That Sales Representative Capacity and Infrastructure Were Woefully Insufficient to Sustain Billings Growth

#### a. Misleading Positive Statements and Omissions About Sales Force Execution at January 16, 2019 Investor Conference

82. The Class Period begins on January 16, 2019, when Budge, on behalf of Pluralsight, spoke to analysts and investors at the Needham & Company, LLC Growth Conference and highlighted the strength, efficiency, and capacity of its sales force. During the

conference, according to a transcript of the session, Budge represented that the sales representatives were "***killing it***" and that the "***great infrastructure around them***," which the Company "***didn't have to keep growing***," had "***improved our retention massively and we're now at scale***."

83. Budge also emphasized the dramatic growth in the Company's sales force, particularly in the high-billings-generating B2B enterprise segment. He explained how the Company had grown from zero enterprise sales representatives and "about 80 [aggregate] quota-bearing" representatives, which was not "enough . . . quota-bearing reps on the ground," to, as 2019 began, having 120 enterprise-class sales representatives and, he claimed, about 250 aggregate quota-bearing representatives. Budge represented that the Company had a carefully calculated plan to efficiently grow its sales force to 300 aggregate quota-bearing sales representatives through 2019 while maintaining its capacity to increase billings: "while we'll continue to add a good 70 to 80 [sales representatives] a year, it's lower as a percentage of the total growth that we have, ***which is a reason why you're seeing some of the efficiencies in the model***." What Budge did not tell investors was that the Company was dozens of representatives behind in its sales ramping plan.

84. Budge also touted the existing capacity of the "infrastructure" around the sales team. He told investors that the Company went from having "little infrastructure around our sales reps" to building out "***some of the infrastructure around sales to scale***." He claimed that this past investment had resulted in "efficiencies" while maintaining a high level of B2B billings growth, and that as a result, the Company "***didn't have to keep growing***" the sales infrastructure.

**b. Misleading Positive Statements About Sales Force "Growth" and "More Goodness" to Come at February 13, 2019 Analyst Conference Call on 2018 Year-End Results**

85. On February 13, 2019, Pluralsight issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2018. In the release, which the Company filed as an exhibit to a Form 8-K, Pluralsight announced that it had grown fourth quarter billings 42%, fourth quarter billings to B2B customers 51%, and full year 2018 billings 43% year-over-year. It was the Company's "seventh consecutive quarter of greater than 50% growth in B2B billings," Skonnard said.

86. That day, the Company held an earnings call with analysts and investors. Budge continued to speak in glowing terms about the sales force's productivity and efficiency and made no mention of any capacity gaps, difficulties in growing the sales force, or threats to billings, which, as the Company later admitted, it was then experiencing. Nor did Skonnard, who was also on the call, disclose a capacity gap. Instead, Skonnard spoke about how "our teams continued to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate reaching 128%."

87. When asked directly about "hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how we should think about that in 2019," Budge gave no hint that the Company was behind on its hiring and ramping plan, but instead merely stated that the Company expected "***[t]otal quota-bearing reps***" to grow from "***around 240***" to "***probably over 300 as we roll through 2019***," concluding, "***[s]o more reps to come, more on quota on the street and more goodness from them***."

88. Budge's representations on the "hiring trends for the sales force" had the desired positive effect. On February 13, 2019, SunTrust issued a report titled "*Billings Momentum Continues in 4Q*," reiterating its "buy" rating and its price target of $40, citing the Company's "***growth investments***" as "***driving top-line growth acceleration***." On February 14, 2019, Bank of America raised its target price for the Company's stock from $32 to $35.

### c. Misleading Positive Statements and Omissions About the Sales Force's "Size," "Effectiveness," and "Productivity" in Pluralsight's 2018 Form 10-K Filed February 21, 2019

89. On February 21, 2019, the Company filed with the SEC its Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by Skonnard and Budge.[9] In the 2018 Form 10-K, Defendants presented the following chart to investors that demonstrated that not only had billings in 2018 increased 43% as compared to billings in 2017 (from $205.80 million to $293.58 million), but that ***85% of the 2018 billings were from "business customers"***—the portion of Pluralsight's business that was dependent on the capacity of the direct sales force to generate billings:

[9] On June 17, 2019, the Company filed with the SEC a Form 8-K announcing that its board of directors (of which Skonnard was the chair) had determined that the Company's 2018 Form 10-K had materially understated the Company's net losses, which was related to the incorrect timing of recognition of certain expenses beginning in the second quarter of 2018. The Form 8-K was signed by Budge. On June 27, 2019, the Company filed an amended Form 10-K for the fiscal year ended December 31, 2018, which was signed by Skonnard and Budged. In the report, the Company announced, "we identified a material weakness in our internal control over financial reporting, and as such, our disclosure controls and procedures were determined to be ineffective for the quarters ended June 30, 2018, September 30, 2018 and March 31, 2019 and for the year ended December 31, 2018."

| | Year Ended December 31, | | | | Growth Rate Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 |
| | (dollars in thousands) | | | | | | |
| Business customers (end of period) | 16,756 | 14,463 | 12,043 | 10,517 | 16% | 20% | 15% |
| Billings | $ 293,583 | $ 205,807 | $ 149,231 | $ 130,043 | 43% | 38% | 15% |
| *Billings from business customers* | $ 248,159 | $ 162,965 | $ 104,861 | $ 83,663 | 52% | 55% | 25% |
| *% of billings from business customers* | 85% | 79% | 70% | 64% | | | |

90. The Form 10-K stressed to investors that Pluralsight expected billings from business customers to continue to increase as a percentage of billings, and that this would be a "significant source of future revenue growth and a key factor affecting our long-term performance." The Company assured investors that its leaders monitored "business customers, billings, and certain related key business metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions."

91. To that end, the Company told investors, it had devoted ample resources to supporting its business customer billings growth strategy. The report stated: "***We have a large direct sales force to focus on business sales*** and have aligned our sales team's compensation structure to fit this objective. We have also been able to drive ***substantial increases in the productivity and effectiveness*** of our sales personnel over time as they gain more experience selling subscriptions to our platform."

**i. Misleading "Risk Factors" in the 2018 10-K Report Presenting Risks as Hypothetical When They Had Already Transpired**

92. The Form 10-K also contained certain "Risk Factors" that purported to adequately address the possibility that deficiencies in the Company's ability to hire, retain, and expand its sales force to drive billings growth might negatively impact its business. In representing these risks as hypothetical, however, Defendants concealed that since January 2019, they had had a

significant capacity gap of sales representatives that would cause a significant deceleration in billings growth and future revenue.

93. The Form 10-K contained a "Risk Factor" stating: "As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and ***there is no guarantee*** that our investments will succeed and contribute to additional customer acquisition and revenue growth."

94. Another "Risk Factor" captioned "Failure to effectively expand our sales and marketing capabilities ***could harm*** our ability to increase our customer base and achieve broader market acceptance of our platform," stated:

> ***If*** we are unable to hire, develop, and retain talented sales or marketing personnel, ***if*** our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time, or ***if*** our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

95. Further, the Form 10-K included a "Risk Factor" captioned: "***If*** *we fail* to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed" that stated in part: "As we expand our business, our continued success will also depend, in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base."

96. The Form 10-K also contained a "Risk Factor" captioned: "***If*** *we fail* to effectively manage our growth, our business and results of operations could be harmed" that stated in part: "We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . ***If*** *we do not achieve the*

*benefits anticipated from these investments, or* ***if*** *the achievement of these benefits is delayed*, our results of operations may be adversely affected."

97. Unapprised of the looming risk to billings growth posed by Pluralsight's undisclosed ***actual*** failure to meet its annual sales ramp capacity plan and the deficiencies that had existed in its sales infrastructure since January 2019, analysts reacted positively, and Pluralsight's share price rose. On February 27, 2019, Seeking Alpha published an article titled "*Pluralsight: The Sight Of All Of Those Beat And Raise Quarters*." The article reported that "***[t]he picture being painted remains one of hyper-growth***" and that "[s]ince touching bottom along with most everything else in early January, the shares have appreciated by about 50%."

**d. Massive Insider Selling by Company Insiders as Pluralsight's Share Price Shoots Up 56% in Just Two Months**

98. The aforementioned positive billings growth, purportedly driven by a growing and increasingly effective and productive sales force, allowed for a dramatic ***56%*** increase in the Company's stock price in less than two months: from $19.01 per share on December 24, 2018, to $29.65 per share on February 20, 2019. During that time, as Defendants made misleading positive statements and omissions about the capacity and performance of the sales force and infrastructure, and as Pluralsight's share price appreciated, its insiders began to cash out.

99. From January 7 through 9, 2019, Skonnard sold 74,600 shares of Pluralsight Class A common stock at an average price per share of $26.06, for total proceeds of $1,944,014.19. On January 28, 2019—after Budge had told investors at the Needham Conference how well the sales force was performing—Skonnard sold 50,000 shares of Pluralsight Class A common stock at an average price per share of $29.36, for a total profit of $1,468,000.08.

100. On February 15, 2019—two days after Budge responded to a question about sales force hiring trends for 2019 by telling analysts to expect "***more goodness***"—DiBartolomeo made a massive sale of his own stock. He exercised 255,720 options to acquire an equivalent number of shares of Class A Common Stock. He sold the shares that day in two tranches: 254,920 shares at an average price per share of $30.1258, and 800 shares at $30.87, for a total profit of ***$7,704,364.94***.

101. On February 19 and 20, 2019, Budge followed suit. He exercised 333,091 options to acquire the same number of shares of Class A Common Stock. Budge then sold the shares in three tranches: 199,400 shares at an average price per share of $29.2674; 133,091 shares at an average price per share of $29.67, and 600 shares at $30, for a total profit of ***$9,806,296.37***.

102. On February 22, 2019—one day after Pluralsight filed its 2018 Form 10-K touting the size and productivity of its sales force—Budge and DiBartolomeo continued to sell their stock. Budge sold 6,206 shares at an average price per share of $29.66, for a total profit of $184,072.44. DiBartolomeo sold two tranches of shares: 5,032 shares at an average price per share of $29.39 and 2,718 shares for a profit of $29.66, for a total profit of $228,500.41. Thus, ***in the span of just four days, Budge reaped over $9.9 million and DiBartolomeo made over $7.9 million in pure profits*** from selling their Pluralsight Class A common stock.

**e. Continued Misleading Positive Statements in the SPO Offering Documents Claiming the Sales Force Had Been "Significantly Expanded" And Had Shown Increased "Productivity" and "Effectiveness"**

103. On March 4, 2019, Pluralsight filed the registration statement and preliminary prospectus on a Form S-1 with the SEC, signed by Skonnard and Budge, for the secondary

public offering of 13,558,464 shares[10] of Class A common stock by company insiders, including Skonnard, Budge, and DiBartolomeo (the "SPO").[11] The Company announced that the proceeds of the SPO would go to the selling stockholders, and none would go to the Company.[12]

104. On March 7, 2019, pursuant to Rule 433, the Company filed a free writing prospectus (dated March 6) relating to its preliminary prospectus, announcing that the shares offered in the SPO would be priced at $29.25—***a 95% increase*** over the Company's $15 share price in its initial public offering just ten months earlier. The prospectus announced a trade date of March 7, 2019, and a settlement date, upon which the underwriters would deliver the shares to purchasers, of March 11, 2019. The free writing prospectus reiterated that the "selling stockholders will receive all the net proceeds from the offering of Class A Common Stock and the Issuer will not receive any proceeds from the sale of the shares in the offering of Class A Common Stock." On March 7, 2019, pursuant to Rule 424(b)(4), the Company filed a final prospectus with the SEC (the Prospectus, referred to herein with the Registration Statement, as the "Offering Documents").

---

[10] Including additional shares that the Company granted underwriters the option to purchase from the selling stockholders, the total amount of securities to be registered was 15,592,234.

[11] According to available SEC records, this was not the first time that Defendants contemplated an SPO. On September 21, 2018, Pluralsight confidentially filed a draft registration statement for a secondary offering of an as-yet-undetermined amount of Class A common stock. Through the rest of the September and October, however, the Company's share price dropped along with the share prices of other technology companies, and the Company did not follow through on a secondary offering in 2018.

[12] The Company also announced that separately but concurrently with the Class A common stock offering, it was offering to qualified institutional buyers $450 million in convertible senior notes; in its subsequent free writing prospectus and final prospectus, the Company raised the amount of that offering to $550 million, or $633.5 million if the initial purchasers exercised an option to purchase additional notes.

105. In the Offering Documents, Defendants drove home the points that billings from business customers—which were generated by the sales force—had risen to 85% of the Company's billings in 2018 and continued to increase, and that billings from business customers had grown at over 50% year-over-year in 2017 and 2018:

| | Year Ended December 31, | | | Growth Rate Year Ended December 31, | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2017 | 2018 |
| | (dollars in thousands) | | | | |
| Business customers (end of period) | 12,043 | 14,463 | 16,756 | 20% | 16% |
| Billings | $ 149,231 | $ 205,807 | $ 293,583 | 38% | 43% |
| *Billings from business customers* | $ 104,861 | $ 162,965 | $ 248,159 | 55% | 52% |
| *% of billings from business customers* | 70% | 79% | 85% | | |

106. To continue this billings growth trajectory and its sales to business customers, Defendants needed to continue to grow the sales force; accordingly, the Offering Documents assured investors that the Company was ramping its sales representatives to achieve optimal productivity and effectiveness. The Offering Documents reiterated to investors that the Company had "***significantly expanded [its] direct sales force to focus on business sales***," making no mention of the then-existing capacity gap in the Company's sales representative ramping plan.

107. The Offering Documents also repeated the 2018 Form 10-K's statement that the existing sales force was operating productively and effectively: "***We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform***." And, again omitting that, as Defendants knew, the Company was well behind in properly ramping its sales representatives on the timeline needed to sustain high billings growth and therefore lacked sufficient ramped representatives to continue to achieve that growth, the Offering Documents repeated the same

inadequate, incomplete and misleading "Risk Factors" regarding its sales force that it had included in its 2018 Form 10-K filed on February 21, 2019. *See* ¶¶ 92-96.

108. The SPO grossed approximately $456 million in proceeds for Company insiders and related parties. Skonnard sold 480,618 shares for a total of $13,636,334.20; Budge sold 177,854 shares for a total of $5,046,162.62; and DiBartolomeo sold 60,000 shares for a total of $1,702,350. Thus, taking into account the additional sales in January and February, the Officer Defendants and DiBartolomeo sold $39.8 million of their Pluralsight stock for their own personal financial benefit in just two months.

**f. Misleading Positive Statements on the May 1, 2019 Earnings Call Regarding Sales Force's "Massive" Expansion and Progression to Sustained High Billings Growth**

109. April 1 marked the start of the second quarter of Pluralsight's fiscal year 2019. As the quarter progressed, analysts continued to credit Defendants' statements about the existing strength of the Company's sales force, including the "***significantly expanded sales capacity***" Defendants touted in the SPO Offering Documents, and the sales force's ability to consistently generate high billings growth. On April 11, 2019, SunTrust issued a note titled "*List of Upside Drivers Just Got Bigger with Google Partnership; Reiterate Buy"* in which SunTrust reiterated its $40 price target. SunTrust emphasized Defendants' previous statements about their success in expanding the Company's sales force as proof of the stock's value:

> [T]he company has also benefited from ***significantly expanded sales capacity***. The company ended 2018 with approximately 240 quota-carrying sales headcount and is expected to expand to 300-plus quota-carrying sales reps in 2019. ***It is important to note increased productivity of the expanded sales force, along with partner-influenced activities and new product interest, contributed to large new billings pipeline in excess of $50 million coming out of last August's customer event.*** All of these factors

> could contribute to significant upside to billings estimates, and consequently, ***sustained high revenue growth in 2019 and 2020***.

110. SunTrust recommended the stock "as a core holding for software investors."

111. On May 1, 2019, SunTrust issued a report titled "*Customer Conversation Reflects Well on Key Growth Engine, B2B Segment; Reiterate Buy*," saying that it was "enamored with Pluralsight" and that it "believe[d] the company [could] sustain 30%-plus revenue growth and drive material upside to our estimates" in part due to its "***aggressive growth investments***." SunTrust maintained its price target of $40.

112. On May 1, 2019, after SunTrust issued its report, the Company announced its earnings for the first quarter of 2019 ("Q1 2019"), which ended on March 31, 2019. In its Form 10-Q filed with the SEC, which Skonnard and Budge signed, and in a press release filed with the SEC as an exhibit to a Form 8-K, the Company announced total billings growth of 41% compared to the same period in the previous year and B2B billings growth of 48%. In the Form 10-Q, Defendants did not bother to re-print the rote "Risk Factors" pertaining to the Company's sales force. Instead, Defendants referred investors back to the same misleading and insufficient "Risk Factors" listed in their 2018 Form 10-K report filed with the SEC on February 21, 2019, which presented as hypothetical the already-transpired threats that problems with the sales force could pose to the Company's billings and revenue. *See* ¶¶ 92-96. The Company also reported that B2B billings—which were generated by the sales force—had increased to 86% of the Company's overall billings, underscoring the importance of the capacity of the sales force to the Company's sustained 2019 billings growth:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | (dollars in thousands) | | | |
| Billings | $ | 77,928 | $ | 55,419 |
| *Billings from business customers* | $ | 67,156 | $ | 45,252 |
| *% of billings from business customers* | | 86% | | 82% |

***Billings***

113. That same day, Skonnard and Budge spoke to analysts on the earnings call, leaving no uncertainty, in their representations, as to the strength of the sales force and the Company's steady progress in expanding its capacity. According to the transcript, Skonnard told investors that "our teams ***continue to execute with strong focus and commitment to customer success*** as demonstrated by our dollar-based net retention rate of 128%." Similarly, Budge told investors: "***we like where we are with our sales reps***"; "***love our growth there***"; "***We have a plan to grow . . . which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force***"; "***we do have a pace to [hiring]***"; "***we're on pace***"; and "***we like the direction we're going***."

114. Budge's glowing assurances, which gave no hint that the Company had been behind its plan for sale representative hiring and ramping, and lacking crucial infrastructure, since January 2019, came in response to pointed questions from analysts about the sales force's status. SunTrust analyst Terrell Tilman queried Budge about Defendants' progress in sales hiring, asking him "***where are you or how are you doing in terms of the hiring to your targeted sales headcount by the end of the year***?" and to "***talk about the retention of existing sales reps***." Budge responded that "***we like where we are with our sales reps***" and that the Company's hiring and retention "***plan***" was proceeding well on track:

> ***We have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019 which continues on the really outstanding progression we've had over the last few years***

> ***where we've massively expanded our sales force*** from 80 quota bearing reps two years ago to at this point over -- at the end of this year over 300. So love our growth there. Our retention is excellent. I think compared to industry average, we'd always like it to be higher and the churn to be lower, particularly with our sales reps. But it's a function when there is a little bit more turnover in sales, often in the first quarter or so. ***We've experienced some of that. It's normal. We planned for that and that's -- we're still committed, and we see a clear path to having 300-plus reps by the time we exit the year. So the short answer is we're on pace.***

115. Budge also told investors, in response to another question about sales headcount, that the Company had a carefully calculated "***pace***" to hiring, which was well-managed by the sales enablement teams, that was designed to "***continue to drive growth of greater than 40% and near 50% on B2B***" as part of a "***long and sustainable business model***":

> We -- there's probably only so many reps we could hire in any given year. ***We do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization. And we like the direction we're going on both a top and bottom line.*** We like the fact that we've been cash flow profitable for three straight quarters now. We would like to continue that. ***As long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time. And we think that will grow a long and sustainable business model for us***.

116. Skonnard echoed this theme that the sales model was built to deliver consistently high rates of billings growth. In the earnings press release, and again on the earnings call, Skonnard conveyed to investors that, ***one month into the second quarter***, the sales model was operating efficiently, and the Company's billings growth was going strong: "Our Q1 financial results marked a great start to 2019. ***Revenue and billings growth continue to be strong*** with both up over 40% year over year. ***We continue to demonstrate the efficiency in our model*** with our third consecutive quarter of positive cash flow." On the earnings call, he added: "[O]ur teams

***continue to execute with strong focus and commitment to customer success*** as demonstrated by our dollar-based net retention rate of 128%."

117. Analysts absorbed management's positive statements about the expansion of Pluralsight's sales capacity and the sales force's efficacy. In a May 1, 2019 report titled "*1Q19: Customer Additions and 128% Net Retention Highlight the Quarter*," J.P.Morgan increased its price target from $40 to $44. On May 2, 2019, SunTrust issued another report, titled "*Reports 1Q19; Higher Growth Theme Intact; Strategic Acquisition; Reiterate Buy*," in which it maintained its price target of $40.

118. On June 24, 2019, SunTrust issued a report ("*Highlighting Three Billings/Growth Catalysts; Reiterate Buy and Raising PT*") raising its price target for Pluralsight from $40 to $41. The reported listed "***three key points*** make us incrementally more positive on ***sustained B2B billings momentum*** and overall beat-and-raise dynamics in 2019 and 2020." One of the "***key points***" was the "***benefits still to accrue from sales capacity expansion***":

> Benefits of Expanded Sales Capacity and Evolving Go-to-Market Initiatives - ***The company has expanded its sales capacity over a multi-year basis and we estimate total sales headcount to approximate 300 by the end of 2019. Several years of significant growth in sales headcount and increasing productivity from tenured sales reps bodes very well for B2B billings activity this year.*** We believe the company is also continuing to refine large enterprise sales teams that are bifurcated between new customer business and selling back to the installed base customers. We believe evolving sales processes like hunter and farmer selling and ***overall ramp in increased sales capacity bodes very well for upside performance to billings estimates this year and next***.

### 4. On July 31, 2019, Defendants Admitted the Shocking Truth That Deficiencies Had Existed in the Sales Force Since the Beginning of 2019 and Caused Dramatic Decline in Billings Growth

**a. Results Revealed a 21% Drop in B2B Billings Growth in Just Three Months**

119. On July 31, 2019, after the close of the markets, the Company announced its financial results for the second quarter of 2019, which ended on June 30, 2019. According to the Form 10-Q that Pluralsight filed with the SEC that day, which Skonnard and Budge signed, as a result of "sales execution challenges," the Company had dismal total billings growth of 23% year-over-year, and B2B billings growth of 27% year-over-year. These results were an abrupt and dramatic departure from the Company's performance in previous quarters, as demonstrated by the following charts[13]:

| | Q2 2018 | Q3 2018 | Q4 2018 | FE 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| B2B Billings | 52% | 53% | 51% | 52% | 48% | 27% |
| Total Billings | 42% | 44% | 42% | 43% | 41% | 23% |
| Revenue | 38% | 42% | 42% | 42% | 40% | 42% |




[13] The numbers in this chart are gathered from the Company's Form 10-Q and/or 10-K filings for the relevant time period and the Officer Defendants' statements on quarterly earnings calls.

120. The Form 10-Q revealed for the first time that the Company had been "slower in hiring additional sales representatives than planned for 2019" and that "[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods."

**b. Budge and Skonnard Admitted that the Sales Force Deficiencies Existed Since the Beginning of 2019**

121. Skonnard and Budge spoke on the earnings call to analysts and investors that day. A *Seeking Alpha* analyst later commented that "we have not sat in at a worse one."[14] According to the publicly available transcript of the call, Skonnard and Budge admitted that they had known that the sales force lacked capacity and was not properly ramped ***since at least the beginning of 2019***, and that this deficiency early in the year had translated into the billings collapse announced seven months later. Further, Budge admitted that the Company had taken "too long" to hire and place sales representatives and that "we suffered from that in the first half [of the year]." The analysts on the call openly struggled to understand how the Company could have had "sales execution challenges" when all they had heard from Defendants to that date was how well the sales team was executing.

122. As Skonnard admitted, there "***was not enough capacity in the system to sustain our high-growth expectations as we entered the year***." Because the Company's deal cycle lasted approximately five to six months, to sustain those high-growth expectations through June 2019, the Company would have needed to hire and place enough sales representatives to fuel its deal

[14] Tech and Growth, *Pluralsight: Good Problems to Have, But Needs to Address a Major Concern*, Seeking Alpha, Sept. 4, 2019.

pipeline as of in or around January 2019—in time for the deals in the pipeline to be ready to close in the spring of 2019.

123. Budge admitted that the quota-bearing sales representatives that the Company had needed and had planned to have ramped in time to close deals in the second quarter "***didn't come into the year early enough in the year***" and that billings had suffered dramatically as a result: "We're about 250 quota-bearing reps right now. And that's about the number of bodies ***we wanted to have at this time in the year***, ***but they didn't come into the year early enough in the year***. ***So the ramp time to get them trained up and ready to go, be effective with salaries, we're a few months behind there, that's been the big impact.***"

124. Likewise, Budge admitted that Pluralsight's sales force had lacked "***ramped capacity***" since the "***end of last year***," which had prevented the Company, "***beginning into this year***," from generating the deal pipeline activity necessary to sustain its customary and expected high level of billings growth in the second quarter of 2019:

> The productivity we're seeing on the tenured reps is the same where it historically has been. ***Simply put, there was dozen -- there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.*** The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, ***but we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter.*** Good news is we feel, with where we are, ***we're caught up to some extent.*** For the most part still, we're up by a few heads, but not a material amount like we were through Q2. So we feel like we're in a great spot going into the second half.

125. Despite having never told investors that the Company was off track with its sales force ramping in the first place, Skonnard now told investors that "***we've nearly caught up with our annual sales ramp capacity plan***, which will strengthen the balance of the year and into 2020." Budge echoed him, telling investors that the Company had "***nearly caught up on our sales capacity gaps***."

126. Given Defendants' admissions that they had known about the sales capacity problem, and the concurrent threat to billings, for ***several months***, an analyst asked a logical question: "**[*W*]hy *didn't we hear this on last quarter's call***?" Budge acknowledged that Defendants had not told analysts about the capacity problem—even when analysts directly asked them detailed questions about the status of the sales force—but it was not because they had not known about the problem. Instead, Budge indicated, Defendants had unreasonably hoped that they could paper over the "capacity gap" without having to admit that they had misled investors: "***Well, we were still hitting our numbers, and we felt like we had things broke, right***. We were still realizing what we needed with on our – what we need on our retention rates with our expand opportunities, and we were seeing kind of an accelerated productivity out of reps ***that was not sustainable in the second quarter***. ***We just needed more bodies to soak that up***."

127. Skonnard reiterated that management had monitored the sales force's retention rate and growth over the first six months of 2019 and was resolute that the billings collapse had been due to sales capacity problems, not an unexpected loss of sales representatives: "We actually -- ***we have benchmarks that we look out regularly for what happens in the software industry***, where we have historically been much better than those benchmarks and that continued through the first 6 months."

### c. Budge and Skonnard Admitted that the Company's Investments in Sales Infrastructure Were Inadequate to Support the Company's 2019 Billings Growth Trajectory

128. Defendants' repeated assurances about how well they had invested in and built out their sales infrastructure to "scale" also turned out to have been empty. Skonnard informed analysts and investors that "the type of fast growth we've enjoyed requires us to provide prescriptive and effective sales enablement, and ***we didn't invest enough in that area of our business***." After having told investors for the last several months how effectively and efficiently their sales model was executing, Skonnard now announced that the Company would be "adding key people and investing in sales operations, customer success and sales enablement to support our newly hired sales teams." Skonnard also announced that DiBartolomeo was leaving the Company after three years as CRO and that the Company needed its new leadership to help its sales teams to "execute ***more effectively***." Skonnard stated that he was "confident these are the right changes for the business and that they'll get it quickly ***back to our expected long-term growth trajectory***." Despite speaking on the topic multiple times during the Class Period, Defendants never disclosed to investors that they had fallen off that trajectory in the first place.

### 5. The Market Was Blindsided by the Disclosure of an Insufficient Sales Force and the Admission that this Fact Was Known but Not Disclosed During the Class Period

129. In response to the July 31, 2019 disclosures, Pluralsight shares plummeted, dropping a massive 39.52%, from $30.69 to $18.56 at the close of the market on August 1, 2019, on unusually high trading volume of 22 million shares. The crash entirely erased the stock's year-to-date gains and amounted to a loss in market capitalization of approximately $902 million.

130. As demonstrated by the chart attached hereto as Exhibit C, Pluralsight and the Officer Defendants' false statements during the Class Period caused the artificial inflation of the Company's share price, which Defendants took advantage of by engaging in massive sales of their own stock, as described in Sections IV.A.3.d and IV.B.2 herein.

131. As reflected by the share price's nosedive, investors and analysts were shocked by the news. On August 1, 2019, SunTrust issued a report titled: "*Where Did That Come From*?" J.P. Morgan similarly noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "***hiring issue was known earlier***" and that ***"[m]anagement pointed out that it saw it was behind on sales hiring coming into the year***, but we are now just hearing about it since they were able to deliver on 1Q19 numbers ***and hoped that quarter's execution would continue***."

132. A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that the Company had "been an investor darling for much of its lifetime as a public company" but that its "bullish case broke down" in the second quarter. Alexander observed that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million implies a sharp revenue deceleration to just 30% y/y growth."

133. On August 5, 2019, another *Seeking Alpha* article further analyzed the earnings announcement:

> [T]he 23% increase in billings to $80.6 million is a major disappointment as continued elevated spending should result in faster sales growth (and billings growth), which is now clearly falling short. While the company maintained the full year

> guidance, it is very clear that the situation is far from rosy. Not only are risks related to the full year guidance up in a major way, realistic losses still coming in rapidly above the $100 million mark, mostly because of a run rate of $85 million in stock-based compensation.

134. On September 4, 2019, *Seeking Alpha* published an article that called out Defendants for their deceit: "While sales productivity is a concern, we think there is greater concern around management's lack of transparency in information sharing." The article noted that "[i]t was revealed during Q2 earnings call that Q2's sales issue was actually an extension from Q1." The article also discussed Skonnard and Budge's evasiveness on the earnings call:

> During the earnings call, we found multiple occasions where the management brushed aside concerns raised by analysts while also added a bit of an unexpected surprise. Some of these instances were when questions about gross retention, sales productivity, and sales organization structure came up. When asked a deeper question about the possible factor causing the billings growth slowdown in Q2, for instance, the CFO indicated the lack of sales ramp capacity in Q1 that extended into Q2. This led to one of the analysts calling him out for not sharing this information as soon as it happened during the Q1 earnings call.

135. The article concluded that the material problem with the Company's sales capacity that existed early in the year had caused billings growth to evaporate by the second quarter, leaving Pluralsight with "***nowhere to hide***." The author wondered "how deep this lack of transparency has probably rooted itself into the culture of the organization."

136. On January 14, 2020, Budge returned to the Needham Growth Conference to speak to analysts and investors on behalf of the Company. Analyst Scott Randolph Berg asked him about the failures in 2019. Budge reiterated and elaborated on his prior admissions, acknowledging that the Company had known that it had too few adequately productive "quota-bearing" sales representatives from the start of the Class Period:

> ***I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned -- than we had hoped for.*** And the reason for that is we didn't -- ***while we planned for, we didn't execute to those reps***. We didn't decide where they should go early enough in 2018 leading into 2019. We were experimenting with a hunter-farmer model in 2019. ***We didn't do a good enough job planning early and enough and executing early and enough in deciding who would fit into what slot as we rolled through 2019. And as a result, we had some capacity challenges in our sales force. We just didn't have enough reps.***
>
> So we've put the gas pedal down hard in the second half in the last kind of 3 quarters in 2019. ***We came out of 2018 going into 2019 with about 200 quota-bearing sales reps***. And we're now going into 2020, a year later, with about -- we have about 320 reps right now, which is pretty close to what the target was for us going -- exiting 2019.
>
> So I think with the new leadership, and frankly, I give all the credit to the new sales leadership that we have. They've done a remarkable job. You can have a really great recruiting engine. You can have a great planning engine. ***But unless the sales leaders engage in the process of hiring high-quality sales reps, it's not going to go anywhere. And we feel much better focused from our sales leaders going into 2020 than we had going into 2019.***

137. As noted above, the aforementioned facts present a clear timeline of the Company and Officer Defendants disseminating false statements with material omissions regarding the sales force in a concentrated period of time, so as to allow the Company's most senior officers to reap massive profits from insider sales at peak prices, only for those prices to collapse in a single day when the true condition of the sales force was finally revealed. This timeline is presented in graph form in Exhibit C.

## B. Scienter Allegations

138. Defendants knowingly or recklessly misrepresented and omitted material facts about the capacity of the Company's sales program. The facts discussed above—many of which

include specific admissions by Skonnard and Budge about what they knew and when they knew it—support a strong inference of scienter and are incorporated herein by reference. In addition:

### 1. Defendants' Scienter is Reflected in The Officer Defendants' Admissions That Since January 2019, They Had Known That Pluralsight Had Too Few Ramped Sales Representatives

139. On July 31, 2019, Skonnard and Budge admitted that the problems had existed since the end of 2018 and did not deny that they had known about them since then; in fact, their statements indicated that they actually knew of the problem and deliberately chose not to tell investors:

a. Skonnard began the earnings call by telling investors that there "was not enough capacity in the system to sustain our high-growth expectations ***as we entered the year***."

b. Budge admitted that "***we just didn't have enough ramped capacity in our system in really the first and second quarter***" and that this led to the massive drop-off in billings growth:

> ***Simply put, there was dozen -- there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.*** The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, but ***we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter***.

c. When asked why Pluralsight, Skonnard and Budge did not tell investors earlier, for instance, on the Q1 2019 earnings call, that the Company was behind on its sales representative ramping, Budge did not say that they had not known about the problem. He said that they did not tell investors because the Company was "still hitting" its numbers in the first quarter.

d. Budge admitted that the problem began early in the first quarter: ***"[T]hey didn't come into the year early enough in the year.*** So the ramp time to

get them trained up and ready to go, be effective with salaries, ***we're a few months behind there, that's been the big impact***."

140. At the Needham investor conference on January 14, 2020, Budge again admitted that Pluralsight had knowledge of the sales force's under-capacity going into 2019: "***I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned -- than we had hoped for***. And the reason for that is we didn't -- while we planned for, we didn't execute to those reps. We didn't decide where they should go early enough in 2018 leading into 2019." He also admitted that "***we feel much better focused from our sales leaders going into 2020 than we had going into 2019***," implying that the sales leaders "going into 2019" had not engaged in the process of hiring high-quality sales representatives, thereby underscoring the previously admitted deficiencies in the sales infrastructure.

**2. Defendants' Scienter is Further Demonstrated By Highly Suspicious Insider Trading during the Class Period**

141. As alleged herein, Skonnard and Budge's trading activities, including those taken pursuant to 10b5-1 trading plans, which both individuals, as well as DiBartolomeo, adopted shortly before the start of the Class Period, were highly suspicious and indicate that the Officer Defendants had a motive to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making false and misleading statements and withholding material adverse facts from the market.

142. The sales of stock far exceeded the amounts the Officer Defendants and DiBartolomeo sold from when their lock-up period ended to the start of the Class Period, and during the post-class Class Period. The Officer Defendants and DiBartolomeo garnered profits

during the Class Period that far exceeded their total compensation, and they sold their shares at prices far higher than those of prior or subsequent sales. Once the Officer Defendants knew when their trades were scheduled to occur, they had every incentive to make false and misleading statements, and conceal material adverse information, to artificially boost the Company's share price. The Officer Defendants then personally profited from that inflation by engaging in massive stock sales in the first half of the year, before time ran out on their billings growth and the sales force problems were revealed to the market.

**a. Scienter Evidenced by Skonnard's Highly Suspicious Insider Trading**

**i. Skonnard's Class Period Sales Far Exceeded His Pre- and Post-Class Period Sales**

143. Skonnard's trading activity during the Class Period was suspicious in timing and amount when compared to his trading activity before and after the Class Period. Skonnard made no open market purchases of Pluralsight stock before, during, or after the Class Period. The following chart lists and summarizes the number of shares he sold, the average price at which the shares were sold, and the total proceeds that Skonnard received during each period, based on Form 4s filed with the SEC:

| Period | Date of Transaction | Number of Shares Sold | Price Per Share | Total Sale Value |
|---|---|---|---|---|
| Pre-Class Period 11/13/18 – 1/15/19 | 11/16/2018 | 25,000 | $22.14 | $553,417.50 |
| | 11/30/2018 | 409 | $24.09 | $9,852.81 |
| | 12/4/2018 | 400 | $26.03 | $10,412.00 |
| | 1/7/2019 | 18,130 | $26.06 | $472,400.72 |
| | 1/8/2019 | 100 | $26.00 | $2,600.00 |
| | 1/9/2019 | 56,370 | $26.06 | $1,469,013.47 |
| | TOTALS: | 100,409 | $25.07 | $2,517,696.50 |
| Class Period 1/16/10 - 7/31/19 | 1/28/2019 | 49,900 | $29.36 | $1,465,024.08 |
| | 1/28/2019 | 100 | $29.76 | $2,976.00 |
| | 3/11/2019 | 480,618 | $28.37 | $13,636,334.21 |
| | 4/26/2019 | 83,395 | $33.70 | $2,809,994.53 |
| | 4/26/2019 | 50,000 | $33.74 | $1,687,080.00 |
| | 6/3/2019 | 274 | $31.32 | $8,581.82 |
| | 7/26/2019 | 84,594 | $30.47 | $2,577,849.88 |
| | TOTALS: | 748,881 | $29.63 | $22,187,840.52 |
| Post-Class Period 8/1/19 – 6/3/20 | 10/25/2019 | 83,063 | $18.32 | $1,521,714.16 |
| | 12/2/2019 | 109 | $16.99 | $1,851.91 |
| | 1/27/2020 | 83,404 | $19.77 | $1,648,897.08 |
| | 3/2/2020 | 9,024 | $17.83 | $160,897.92 |
| | 4/27/2020 | 83,063 | $14.77 | $1,226,840.51 |
| | TOTALS: | 258,663 | $17.63[15] | $4,560,201.58 |

#### ii. Skonnard Sold $2.6 Million in Shares at Inflated Prices Just Five Days Prior to the July 31 Disclosure When He Obviously Knew the True Condition of the Sales Force

144. On July 26, 2019, in brazen disregard of the fact the Company was days away from shocking the market with the truth about the condition of its sales force, just ***five days before the disastrous Q2 2019 earnings call***, Skonnard sold 84,594 shares of Class A common stock at an average price of $30.47, for a total value of $2,577,849.88. Had he sold at the lowest

[15] The average trading price in the 90 days after Defendants revealed the fraud was even lower: $16.65.

point on August 1, 2019 ($18.16), he would have received $1,536,227.04—meaning that ***by trading before he disclosed the truth, he profited by an additional $1,041,622.84***.

145. Skonnard also made insider sales close to the share price high of the Class Period. In April 2019, during the second quarter, when he knew of but decided not to disclose material adverse information about the Company's sales force, Skonnard engaged in highly irregular trading. On April 26, 2019, he sold two large blocks of shares, for a total of $4,497,074.53. ***Just four days later***, on April 30, 2019, Pluralsight's stock reached its highest share price of the Class Period, of $35.49.

#### iii. Skonnard's Insider Sales Far Exceeded His Total Compensation

146. During the Class Period, Skonnard sold over $22 million in Pluralsight Class A common stock—***approximately 342% of, or 3.4 times, the value of his total compensation package in 2019*** ($6,476,664), and 171% of the value of his total compensation package in 2018 ($12,951,975).

#### iv. The Price at which Skonnard Made Insider Sales During the Class Period Was 78% Higher Than The Price He Received After the Class Period

147. The average price at which Skonnard sold his shares during the Class Period ($29.63) was 18.2% higher than the average price at which he sold before the Class Period, and 78% higher than the average end-of-day trading price in the 90 days after Defendants revealed the fraud ($16.65).

### v. Skonnard Sold a Substantial Amount of His Tradeable Holdings During the Class Period

148. During the Class Period, Skonnard sold a substantial amount of his tradeable Class A shares at inflated prices to maximize his profits. According to the Company's 2019 Proxy Statement filed with the SEC on March 14, 2019, as of January 31, 2019, Skonnard beneficially owned (personally and through an LLC that he controlled and through trusts) 841,883 shares of Class A common stock. Skonnard did so while maintaining voting control over the Company through his holdings of Class C common stock, of which he was the only shareholder. Class C common stock was not tradeable, so before Skonnard could sell on the open market, he had to convert shares of Class C common stock to Class A shares (or sell from his existing Class A shareholdings). According to the SPO Offering Documents, as of January 31, 2019, Skonnard held 14,642,929 Class C shares, and 841,883 Class A shares. Including the 50,000 shares that Skonnard held before his January 28, 2019 sale, as of the start of the Class Period, Skonnard held a total of 15,534,812 Class C and Class A shares. Overall, the total number of shares that he sold during the Class Period (748,881 shares), when calculated as a percentage of his total holdings, was relatively small: approximately 4.8%.

149. But importantly, Skonnard could not have converted and sold a large percentage of his overall shareholdings, that is, including his Class C shares, if he wanted to maintain his control of the Company. For instance, Skonnard controlled 54.7% of the total voting power of the prior to the SPO. After he sold 480,618 shares (just 3% of his total holdings) in the SPO, he controlled 53.6% of the total voting power. Therefore, he could not have sold millions of shares and held onto his majority. Instead, during the Class Period, he sold nearly as many Class A shares as he held at the beginning of it (748,881 shares out of 841,883 shares), while still

maintaining total voting power, to maximize his profits while the Company's stock was artificially inflated because of his false and misleading statements and omissions.

**b. Scienter Evidenced by Budge's Highly Suspicious Insider Trading**

**i. Budge's Class Period Sales Far Exceeded His Pre- and Post-Class Period Sales**

150. Budge's trades during the Class Period dwarfed his pre- and post-Class Period trades, and he executed them at times and in quantities that raise a strong inference of his scienter.

151. Budge has made only one purchase of shares on the open market: on December 6, 2018, he bought 750 shares at an average price of $23.29 for a total of $17,467.50 (depicted in blue in the chart below). The following chart lists and summarizes the number of shares he sold, the average price at which the shares were sold, and the total proceeds that Budge received during each period, based on Form 4s filed with the SEC:

| Period | Date of Transaction | Number of Shares Sold | Price Per Share | Total Sale Value |
|---|---|---|---|---|
| Pre-Class Period 11/13/18 – 1/15/19 | 11/30/2018 | 271 | $24.09 | $6,528.39 |
| | 12/6/2018 | 750 | $23.29 | ($17,467.50) |
| | TOTALS: | 271 | $24.09 | $6,528.39 |
| Class Period 1/16/19 – 7/31/19 | 2/19/2019 | 199,400 | $29.27 | $5,835,919.56 |
| | 2/19/2019 | 600 | $30.00 | $18,000.00 |
| | 2/20/2019 | 133,091 | $29.70 | $3,952,376.81 |
| | 2/22/2019 | 6,206 | $29.66 | $184,072.44 |
| | 3/11/2019 | 177,854 | $28.37 | $5,046,162.62 |
| | 5/22/2019 | 1,823 | $33.34 | $60,780.10 |
| | 6/3/2019 | 181 | $31.32 | $5,669.01 |
| | TOTALS: | 519,155 | $29.09 | $15,102,980.54 |
| Post-Class Period 8/1/19 -- 6/3/20 | 8/22/2019 | 1,535 | $15.72 | $24,136.80 |
| | 11/21/2019 | 1,462 | $17.78 | $25,994.36 |
| | 12/2/2019 | 109 | $16.99 | $1,851.91 |
| | 1/2/2020 | 12,082 | $17.21 | $207,931.22 |
| | 2/24/2020 | 1,462 | $19.18 | $28,041.16 |
| | 3/2/2020 | 2,650 | $17.83 | $47,249.50 |
| | TOTALS: | 19,300 | $17.37[16] | $335,204.95 |

**ii. Budge Reaped $15 Million in Three Weeks at Inflated Prices While in Possession of Material Adverse Information**

152. The timing and amounts of Budge's trades were highly suspicious. He adopted a trading plan on November 28, 2018, but according to the Forms 4 he filed with the SEC, ***he has only traded pursuant to it once, less than three months after he adopted it***, in a series of transactions on February 19 and 20, 2019, from which he made ***$9,990,368.81***. Budge executed these trades less than a week after he told investors, in response to a question about "***hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how we***

[16] The average trading price in the 90 days after Defendants revealed the fraud was even lower: $16.65.

***should think about that in 2019***," that the Company was growing its sales force according to plan and that analysts should look forward to "***more reps to come, more on quota on the street and more goodness from them***." In making these statements, knowing that he would be selling hundreds of thousands of shares just days later, Budge had every incentive not to disclose the negative trends and problems with the sales force.

153. Two weeks after these massive sales, Defendants announced the SPO, and Budge reaped another ***$5,046,162.62***, for a total of ***$15,036,531.43 in proceeds in less than three weeks***. The average price at which Budge sold these shares was $29.08—a 74.7% increase over the average end-of-day trading price in the 90 days after Defendants revealed the fraud ($16.65).

**iii. Budge's Insider Sales Far Exceeded His Total Compensation**

154. During the seven months of the Class Period, Budge made over ***$15 million*** in sales of his Pluralsight stock at artificially inflated prices, ***an amount 533.6% of, or 5.3 times, the value of his total compensation package for all of 2019***, which was $2,830,594,[17] and 203% of the value of his total compensation package for 2018, which was $7,427,500.

**iv. Budge Sold His Shares at an Average Price 74.7% Higher than the Price After the Class Period**

155. The average price per share at which Budge liquidated his holdings during the entire Class Period was $29.09—an 74.7% increase over the average end-of-day trading price in the 90 days after the disclosure.

---

[17] According to the Company's 2020 Proxy Statement filed with the SEC, his total non-stock-based compensation was $497,030. The value of Budge's stock sales during the Class Period was ***30 times*** the value of this compensation.

**v. Budge Sold a Substantial Percentage of His Holdings During the Class Period**

156. Budge also sold a substantial portion of his shareholdings, which strengthens an inference of scienter. According to the SPO Offering Documents, as of January 31, 2019, Budge held 1,094,358 Class B shares and 205,726 Class A shares, for a total of 1,300,084 shares. The Class B shares were convertible to Class A shares on a share-for-share basis. ***During the Class Period, therefore, Budge sold 39.9% of all of his shares***.[18] [19] According to his Form 4s filed with the SEC in connection with the SPO, as of March 6, 2019, Budge owned 354,412 shares of Class A common stock (which included 163,460 Class B shares that he converted to Class A shares for the SPO), and sold 177,854 shares in the offering; therefore, ***on just one day, he sold half of his then-tradeable shares***.

**c. Relevant Evidence of DiBartolomeo's Highly Suspicious Insider Trading**

**i. DiBartolomeo's Class Period Sales Far Exceeded His Pre- and Post-Class Period Sales**

[18] For sake of comparison, the percentage of Budge's total holdings that he sold after the Class Period is much lower. Beginning with the number of Class A and Class B shares that Budge held as of the start of the Class Period (1,300,084 shares) (a number that is generous to Budge, because it includes non-vested shares) and subtracting the number of shares that he sold during the Class Period (519,155 shares), Budge sold only 2.4% of his total holdings after the Class Period (19,300/780,929)—compared to 39.9% during the Class Period. This calculation does not take into account the fact that Budge was granted new stock options as part of his 2019 compensation package; as of February 2020, according to the Company's 2020 Proxy Statement, his total shareholdings were 1,204,212.

[19] According to the SPO Offering Documents, of the 1,094,358 Class B shares that Budge held, as of the SPO, 597,807 of the shares had not vested and were subject to a right of repurchase in favor of the Company, meaning that by another measure, during the Class Period, he held 496,551 Class B shares, 205,726 Class A shares and a total of 702,277 then-tradeable shares. ***Budge sold 73% of these tradeable shares during the Class Period***.

157. DiBartolomeo, who was responsible for the sales force and whom Defendants replaced following the Q2 2019 earnings results and revelations of ramping and infrastructure problems with the sales force, also cashed out at artificially high share prices during the Class Period through massive insider sales. DiBartolomeo's trading activities are relevant for comparison purposes and provide context to Budge and Skonnard's trading patterns.

158. DiBartolomeo made no open market purchases of Pluralsight stock and sold only $7,636.53 in stock prior to the Class Period. The following chart lists and summarizes the number of shares he sold, the average price at which he sold them, and the total proceeds that DiBartolomeo received during the pre-Class, Class, and post-Class Periods, based on Form 4s filed with the SEC:

| | Date of Transaction | Number of Shares | Price Per Share | Total Sale Value |
|---|---|---|---|---|
| **Pre-Class Period 11/13/18 – 1/15/19** | **11/30/2018** | **317** | **$24.09** | **$7,636.53** |
| **Class Period 1/16/19 -- 7/31/19** | **2/15/2019** | **254,920** | **$30.13** | **$7,679,668.94** |
| | **2/15/2019** | **800** | **$30.87** | **$24,696.00** |
| | **2/22/2019** | **5,032** | **$29.39** | **$147,883.44** |
| | **2/22/2019** | **2,718** | **$29.66** | **$80,616.97** |
| | **3/11/2019** | **60,000** | **$28.37** | **$1,702,350.00** |
| | **5/22/2019** | **1,247** | **$33.45** | **$41,711.65** |
| | **5/22/2019** | **691** | **$33.43** | **$23,100.61** |
| | **6/3/2019** | **215** | **$31.32** | **$6,733.91** |
| | **TOTALS** | **325,623** | **$29.81** | **$9,706,761.52** |
| **Post-Class Period 8/1/19 – 6/3/20** | | **N/A** | **N/A** | **N/A** |

**ii. DiBartolomeo Pocketed $9.6 Million at Artificially Inflated Prices In Less Than a Month**

159. The timing of DiBartolomeo's trades supports an inference that the members of Pluralsight's executive team were privy to material adverse information that they had an incentive not to disclose, to protect their own financial interests. He adopted a 10b5-1 trading plan just one month before the start of the Class Period, on December 14, 2018, at a time when Defendants have admitted that they were "***dozens***" of sales representatives behind coming into 2019 and facing a "***capacity gap***." His trading pursuant to the plan was highly irregular. In February 2019, he sold 263,470 shares, for proceeds of $7.9 million in just one week. The next time that he sold pursuant to the plan, three months later, on May 22, 2019, he only sold 1,938 shares, for proceeds of $64,812.26.

160. Including his proceeds from the SPO, in less than a month, DiBartolomeo earned $9,635,215.35 from insider trading at an average price of $29.79 per share—an 78.9% increase over the average end-of-day trading price in the 90 days after Defendants revealed the fraud ($16.65). The average price per share at which DiBartolomeo liquidated his holdings during the entire Class Period was $29.81—an 79% increase over the average end-of-day trading price after the disclosure.

**iii. DiBartolomeo's Insider Sales Far Exceeded His Total Compensation**

161. DiBartolomeo received $9.7 million in insider trading proceeds, an amount ***200% of the total value of his 2019 compensation package*** ($4,838,020) (which included an acceleration of $2,180,110 in restricted units upon his separation from the Company), and 2,757% of the total value of his 2018 compensation package ($352,033).

**iv. DiBartolomeo Sold 53% of His Holdings During the Class Period**

162. According to the SPO Registration Statement, as of January 31, 2019, DiBartolomeo held 90,113 Class A shares and 523,696 Class B shares, for a total of 613,809 shares. The Class B shares were convertible to Class A shares on a share-for-share basis. ***During the Class Period, therefore, DiBartolomeo sold 53% of his shares***.

**3. Defendants' Scienter Is Further Demonstrated By The Officer Defendants' Admissions That They Focused on the Precise Issues That They Did Not Disclose**

163. As alleged in detail above and herein, Skonnard and Budge knew or had access to facts contradicting their public statements about the capacity and execution of their sales program.

**a. Scienter From Defendants' Detailed Knowledge of Ramping of Sales Representatives**

164. On the occasions listed below and others alleged herein, Budge and Skonnard made statements on behalf of the Company evidencing their personal knowledge about the sales representative ramping process, expressing their confidence in the sales force's capacity, offering detailed headcount data, and characterizing the process as proceeding "on pace" during analyst conference calls and investor presentations:

a. **August 29, 2018**: Prior to the start of the Class Period, during a presentation at Pluralsight Live, according to a transcript of the event, Budge referring to the information being displayed to investors, commented:

> This gives you a view into the productivity of our sales reps. At about that kind of 18-month mark, 15- to 18-month mark, they are producing enough annual quota to meet the internal budgets that we have. At around the 2-plus year mark, they are starting to achieve their full quota. And with

> the experience levels that we now have as some of the folks -- all those folks that we hired in 2017 and the beginning parts of 2018, as they are starting to become -- even 2016 -- as they are starting to become more tenured, we're getting more productivity out of them, which is why we don't have to double our sales force every single year. And you'll start to see that benefit pay off in the bottom line.

b. **August 29, 2018**: According to the transcript of the Pluralsight Live investor and analyst session, Skonnard spoke extensively about the Company's success in recruiting talented employees, including sales and marketing employees, repeatedly describing the company as "winning" and describing himself and the other leaders of the Company as "very proactive" about bringing "talent" to Utah and the Company and "do[ing] a good job of managing" the hiring efforts.

c. **October 24, 2018**: According to a transcript of the earnings call that day, Budge told investors that he and the Defendants felt "really good" about the ramping of the Company's sales representatives and its hiring plans.

d. **October 24, 2018**: According to the same transcript, Skonnard told investors that "because of our enterprise account executives, who are joining the team, who have been joining the team over the last 2 years with that experience and with that capability," he personally was "getting above the power line immediately" with "the large Fortune 500 C-level execs."

e. **January 16, 2019**: According to a transcript of the Needham investor and analyst conference, Budge offered specific data regarding sales representative headcount, telling them that the Company currently had "about 250" quota-bearing sales representatives, whom he said were "killing it," and explained how the Company's hiring plan demonstrated "some of the efficiencies in the model."

f. **February 13, 2019**: According to a transcript of the Q4 2018 and full year 2018 earnings call, Budge again offered a specific headcount for the sales force: approximately 240 quota-bearing representatives and growing.

g. **May 1, 2019**: According to a transcript of the Q1 2019 earnings call, Budge reiterated that the hiring plan was "on pace" and said he "love[d] our growth there":

> ***We have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019 which continues on the really outstanding progression we've had***

***over the last few years where we've massively expanded our sales force*** from 80 quota bearing reps two years ago to at this point over -- at the end of this year over 300. ***So love our growth there.*** Our retention is excellent. I think compared to industry average, we'd always like it to be higher and the churn to be lower, particularly with our sales reps. But it's a function when there is a little bit more turnover in sales, often in the first quarter or so. ***We've experienced some of that. It's normal. We planned for that and that's -- we're still committed, and we see a clear path to having 300-plus reps by the time we exit the year. So the short answer is we're on pace.***

h. **May 1, 2019**: On the same call, Budge stated that there was a "pace" to hiring and "we like the direction we're going on both a top and bottom line" and "[a]s long as we can continue to drive growth of greater than 40% and near 50% on B2B, that's sufficient for us over time. And we think that will grow a long and sustainable business model for us."

i. **July 31, 2019**: According to a transcript of the Q2 2019 earnings call, Budge told investors that he and the other executives monitored the "***metrics around how quickly a sales rep [was] ramped***" during the Class Period. He described those "metrics" as the amount that the sales representatives sold within the first three, six, and nine months of the ramping process. He told investors that the Company would have had to have brought on "dozens" of sales representatives at the end of 2018 to have them "ramp and become fully productive in the second quarter" of 2019.

j. **July 31, 2019**: On the same call, according to the transcript, Skonnard told investors that "we have benchmarks that we look out regularly for" regarding the retention of sales representatives.

**b. Scienter From Defendants' Detailed Knowledge of the Company's Deal Pipeline**

165. Skonnard and Budge had direct access to the Company's deal pipeline and frequently commented on its strength during earnings calls and investor meetings and presentations, indicating that they were fully aware of the deals (and therefore billings and revenue) progressing through it, such that they knew how many deals were reasonably likely to

close in the second quarter of 2019. Speaking with Skonnard on the earnings calls and at investor meetings, Budge regularly discussed how "we" viewed the pipeline:

a. **August 1, 2018**: According to a transcript of the Q2 2018 earnings call, Budge told investors: "[T]he pipeline looks great and we feel really good about that for the next several quarters."

b. **August 1, 2018**: On the same call, Budge told investors: "The deal cycle . . . [is] probably measured more in 5 to 6 months and we have deals in our midmarket segment that close as quickly as a month. So I would say that's the same or similar as it's been for the last several quarters. We are seeing the same kind of velocity there."

c. **October 24, 2018**: Budge told investors that "given the results of Q3 and our outlook for Q4, we feel even more confident going into 2019."

d. **February 13, 2019**: Budge described the "emphasis we put into new [business], driving more pipeline there and sensing a lot of our sales force to drive more new, that's certainly going to be a feeder for us over time as we continue to grow."

e. **July 31, 2019**: Budge told investors that Defendants monitored the closing pace of deals and had not seen "material change in the timing of getting deals over the finish line" during the Class Period.

**4. Defendants' Scienter Is Evidenced By the Officer Defendants' Knowledge that the Status of Pluralsight's Sales Capacity Was Vital to its Investors and its Stock Price**

166. The Company's sales capacity figured prominently in earnings calls and investor meetings and presentations beginning from August 1, 2018 and continuing throughout the Class Period. Specifically, among other things, analysts asked about: "the efficiency of the sales force as it matures and how you measure that" (Q2 2018); "where are you in the ramping of the productivity of sales reps? And where are you in terms of your hiring plans?" (Q3 2018); about "hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how we should think about that in 2019" (Q4 2018); and "where are you or how are you doing in terms of the hiring to your targeted sales headcount by the end of the year?" (Q1 2019).

167. In addition, at the Pluralsight Live conference (on August 29, 2018) and the Needham Growth Conference (January 16, 2019, the first day of the Class Period), Budge offered specific headcount numbers and spoke of how Pluralsight had built out the infrastructure around the sales representatives (the sales enablement and customer success teams). He represented to investors and analysts at the conferences that this information showed how productive the sales representatives were and how the sales program was operating "at scale."

168. Analysts asked these questions, and Budge offered this information, for a reason: the growth of the sales program was inextricably linked to the growth of billings and therefore the growth of revenue. Given how important the subject was to the market, it was at a minimum reckless for Budge and Skonnard to represent to the market during the Class Period, without checking their facts, that the sales program was operating as planned and on track, when in fact it was not.

#### 5. Defendants' Scienter is Demonstrated By Their Prior Admissions That the Capacity of the Sales Force to Generate Billings Was at the Core of Pluralsight's Business Model

169. Billings were the Company's "key business metric," representative of the Company's growth to investors, and the sales force was what ultimately generated billings, which further supports a strong inference that the Officer Defendants knew, or recklessly disregarded that, their sales capacity was not what they represented to investors it was and that their sales execution problems posed a grave risk to billings and revenue through the first half of 2019.

170. In addition, the sales program and its ability to consistently deliver a high level of growth were issues of utmost importance to Defendants during the Class Period, and the Officer

Defendants repeatedly emphasized this point to analysts and investors in response to questions about headcount, retention, efficiency, and productivity. This likewise further supports a strong inference that Skonnard and Budge were aware of, or recklessly disregarded that Pluralsight was not "on track" with its sales program, despite their repeated claims that it was progressing well and on "pace".

### C. Defendants' Materially False and Misleading Statements and Omissions of Material Facts

171. The aforementioned positive statements and omissions about the Company's sales force during the Class Period were blatantly false and misleading, as set forth below.

#### 1. January 16, 2019 Pluralsight at Needham Growth Conference

172. On January 16, 2019, Budge, on behalf of Pluralsight, participated in a question-and-answer session with analysts and investors, led by Needham & Company, LLC Senior Analyst Scott Randolph Berg, as part of the annual Needham Growth Conference held in New York, NY. A transcript of the session was made publicly available after the conference.

173. Regarding the Company's past investments in its sales force, Budge said:

> [I]n 2017 through '18 -- well, first part of '18 and then the later part of '16 is when we went to a heavy investment in the enterprise, we actually saw that we had the product that would have -- and the content capabilities that would appeal to that bigger enterprise. ***At the time, we had about 80 quota-bearing reps and little infrastructure around our sales reps,*** which in the world of SaaS you want to have a robust customer success organization, CSMs as they're affectionately called pre-sales, post-sales motion, all the digital marketing to feed into that, the business development reps or inside sales reps, if you will. ***None of that infrastructure really existed at scale. Not to mention, we didn't have enough like quota-bearing reps on the ground. . . .***
>
> So we went from roughly 0 enterprise-class reps to today, we have about 120 of those reps. And the aggregate quota-bearing reps

> went from about 80 at that time ***to today we have about 250***. We'll grow that to over 300 as we go through 2019.
>
> So while we'll continue to add a good 70 to 80 a year, it's lower as a percentage of the total growth that we have, ***which is a reason why you're seeing some of the efficiencies in the model***.
>
> In the second quarter of this year -- of last year, I should say, last year 2018, it was the first quarter in the previous 8 quarters where we actually grew our B2B billings number faster than our sales and marketing line. ***So we'd kind of crossed over into where we were starting to see some of the efficiencies of our models. We built out some of the infrastructure around sales to scale. We didn't have to keep growing it. . . .***
>
> ***So it's work -- it seems to be working. So we had a lot of great sales reps. They're killing it. And a lot of great infrastructure around them that has improved our retention massively and we're now at scale, we're starting to see the efficiencies around that.***

174. Budge's statements identified in Paragraph 173 were materially false and misleading and omitted material facts, as follows:

(a) Budge's statements about how the Company went from ***not having "enough"*** quota-bearing sales representatives through 2017 and the early part of 2018, to having ***"today about 250" who were "killing it"*** were false and misleading because they created an impression for investors that the sales force had sufficient capacity to sustain Defendants' high-growth expectations as the Company entered the year. The truth was, as Defendants later admitted, that from the beginning of January 2019, there was an insufficient number of ramped, productive sales representatives capable of meeting the quotas that were necessary for the Company to continue to achieve its historic level of billings growth in 2019. In fact, in Budge's own words on July 31, 2019: "***[T]here were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter***." Further, in Skonnard's words, there "***was not enough capacity in the system to sustain our high-growth expectations as we entered the year***."

(b) Even Budge's statement about the absolute quota-bearing sales representative headcount being "***about 250***" was false because Budge later admitted to investors

that "[w]e came out of 2018 going into 2019 ***with about 200*** quota-bearing sales reps."

(c) By choosing to speak about the specific number of sales representatives and telling investors that they were "***killing it***" with their productivity and efficiency, Budge incurred a duty to speak accurately and truthfully on the topic and tell investors that the Company had begun 2019 with a "***capacity gap***" of dozens fewer sales representatives than for which it had "planned." By omitting this material information, he misled investors.

(d) Budge's statements about (i) how the Company had "***a lot of great infrastructure around***" its sales representatives and was "***now at scale***" and "***didn't have to keep growing it***", and (ii) how this "***heavy investment***" had paid off in the form of "***efficiency***" in the business model (a theme he repeated several times), created a false and misleading impression of the strength of the Company's sales infrastructure. The truth was, as Defendants announced on July 31, 2019, they had not invested enough in "***prescriptive and effective sales enablement***" and needed to hire new leaders and invest in "sales operations, customer success and sales enablement to support our newly hired sales teams." Budge's statements about the sales infrastructure also omitted the fact that Defendants were then struggling in sales enablement, by not making hiring and placement decisions in time to properly ramp the sales representatives through the first half of 2019.

(e) Budge's statements about headcount and investments in sales infrastructure conveyed a key conclusion to investors: "***it seems to be working***." The sales representatives were "***killing it***" in generating high levels of billings growth, the infrastructure around them was "***great***," and the Company was growing its sales and marketing teams "***efficiently***" (saving money) and achieving "***scale***." Behind the scenes, however, the Company had already fallen off track of its "***annual sales ramp capacity plan***" and its "***expected long-term growth trajectory***"; had approximately ***50 less sales representatives*** than the 250 sales representatives Budge claimed it did at that point in time; and was suffering from inefficiencies in its sales enablement process by taking too long to hire and place representatives. Budge's statements to the contrary concealed these material facts.

175. Budge knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its annual sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders at that time had not been focused on "hiring high-quality sales reps"; (ii) Budge later admitted that

the number of quota-bearing sales representatives that the Company "***wanted to have at this time in the year . . . didn't come into the year early enough in the year***," so that they were "***a few months behind***" in being ramped and "***trained up and ready to go***" and "***effective***"; (iii) after being confronted by analysts on the July 31, 2019 call about why Defendants did not disclose these material problems earlier, Budge never denied that he or the other Defendants had known about the sales execution problems at the beginning of 2019; (iv) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force capacity in the form of headcount, productivity, and the efficiencies in the Company's business model; (v) Budge regularly spoke extensively, often in response to analysts' questions, about the Company's investment in its sales team infrastructure; and (vi) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

### 2. February 13, 2019 Earnings Announcement

176. On February 13, 2019, Pluralsight released its financial results for the fourth quarter and full year ended December 31, 2018. That day, the Company, represented by Skonnard and Budge, held an earnings call with analysts and investors. A transcript of the call was published afterward.

177. Analyst Brian Peterson of Raymond James asked Budge: "[O]n the hiring trends for the sales force. Where did we end in the fourth quarter? And any thoughts on how we should think about that in 2019?" Budge responded: ***"Total quota-bearing reps closing in at around 240, we expect that to grow to probably over 300 as we roll through 2019. . . . So more reps to come, more on quota on the Street and more goodness from them."***

178. Budge's statements identified in Paragraph 177 were materially false and misleading and omitted material facts, as follows:

(a) These statements, which Budge made in response to a specific question of "how should we think about" "hiring trends for the sales force" in 2019, were false and misleading because they falsely indicated that the Company was on track with its hiring plan and that investors could look forward to "***more on quota on the street and more goodness from them***" through 2019. In fact, as Defendants later admitted, since the end of 2018, the Company had been off the track of its "***sales ramp capacity plan***" by "***dozens***" of sales representatives and therefore lacked a sufficient number of adequately ramped sales representatives capable of meeting the Company's targeted billings quotas. This lack of capacity, as Defendants later explained, threw the Company off its "***expected long-term growth trajectory***" of continued billings growth of "***greater than 40% and near 50%***" in 2019.

(b) In speaking specifically about the Company's ongoing hiring activity, Budge incurred a duty to speak truthfully and accurately on the topic. Instead, he omitted the material fact that Defendants were already off track with their sales representative hiring, meaning that they were in serious jeopardy of soon not being able to rack up additional consecutive quarters of the "***greater than 50% growth in B2B billings***" that they consistently promoted to investors.

179. Budge knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders at that time had not been focused on "***hiring high-quality sales reps***"; (ii) Budge later admitted that the number of quota-bearing sales representatives that the Company "***wanted to have at this time in the year . . . didn't come into the year early enough in the year***," so that they were "***a few months behind***" in being ramped, "***trained up and ready to go***" and "***effective***"; (iii) after being confronted by analysts on the July 31, 2019 call about why Defendants did not disclose these material problems earlier, Budge never denied that he or the other Defendants had known about the sales execution problems at the beginning of 2019; (iv) Budge regularly spoke extensively,

often in response to analysts' questions, about the sales force headcount, their productivity, and the efficiencies in the Company's business model; (v) Budge regularly spoke extensively, often in response to analysts' questions, about the Company's investment in its sales team infrastructure; and (vi) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

### 3. February 21, 2019 10-K

180. On February 21, 2019, Pluralsight filed with the SEC its Form 10-K for the year ended December 31, 2018 (the "2018 10-K"), which was signed by Defendants Budge and Skonnard.

181. In a section titled "***Growth Strategy***", the 10-K stated:

> ***We have a large direct sales force*** to focus on business sales and have aligned our sales team's compensation structure to fit this objective. ***We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform.*** We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship. As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase. We will continue to expand our platform capabilities to deliver additional value to our customers. Our sales force educates business customers on the strengths of our platform to help customers make informed decisions and create a customized and unified end-to-end learning experience for their businesses.

182. Defendants' statements identified in Paragraph 181 were materially false and misleading and omitted material facts, as follows:

(a) The statements created an inaccurate positive picture of the capacity of Pluralsight's sales force in terms of its size, increased productivity, and effectiveness. The Company was then experiencing significant hiring, productivity and effectiveness problems with its sales force that directly threatened the Company's sustained, high billings growth. These statements were materially false and misleading because, as Budge and Skonnard disclosed on the Q2 2019 earnings call, as of the date of the filing of the Form 10-K, the Company was off its "***annual sales ramp capacity plan***" by "***dozens***" of sales representatives, its sales infrastructure was deficient, and the Company had therefore deviated from its "***long-term growth trajectory***" that was part of "***a long and sustainable business model***" of "***greater than 40% and near 50% on B2B***" billings.

(b) Furthermore, the recitation of these false statements regarding the current condition of the sales force under the heading "***Growth Strategy***" was materially false and misleading since the "growth" the Company repeatedly emphasized to investors was 40% to 50% quarterly billings growth, and thus investors were falsely led to believe that these purportedly positive facts about the current condition of the sales force supported future 2019 quarterly billings growth at that level, which was not true.

(c) Having chosen to speak about the size, productivity, and effectiveness of the sales force, Defendants incurred a duty not to omit material adverse facts, such as that the size, productivity, and effectiveness of the sales force were in fact insufficient to sustain the Company's billings growth and had been since the Company entered 2019.

183. Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Budge and Skonnard later told analysts and investors that the sales representatives that the Company had planned on having in place to execute its 2019 "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge later admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up***

***and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure disclose these material problems earlier, Budge and Skonnard did not deny that Defendants had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts investors because they were "still hitting [their] numbers"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "all the talent we need and his own involvement in analyzing hiring trends; and (viii) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

184. The Form 10-K also contained certain "Risk Factors" that purported to address the Company's ability to hire and retain sales and marketing employees. The following "Risk Factors" were materially false and misleading because (i) they presented the risks as hypothetical when in fact the risks had already materialized and posed a direct threat to Defendants' business model, and (ii) they omitted material information that would have allowed investors to properly evaluate the risks.

185. The Form 10-K contained a "Risk Factor" that stated: "As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and ***there is no guarantee*** that our investments will succeed and contribute to additional customer acquisition and revenue growth."

186. Defendants' statement in Paragraph 185 that there was "***no guarantee***" that the Company's investments in its sales force would succeed and lead to new customers and revenue created an impression of a general, hypothetical risk, which was false and misleading because Defendants then knew or had access to specific facts that indicated that the risk had already materialized. These material omitted facts were that the Company was then suffering from sales execution failures, namely, a failure to hire, train, and place enough productive sales representatives by the end of 2018 to increase sales at a level commensurate with past quarters, and that the Company had already fallen off its "***long-term growth trajectory***" and was then struggling to catch up to its planned level of 2019 billings growth of 40-50%.

187. The Form 10-K also contained a "Risk Factor" captioned "*Failure to effectively expand our sales and marketing capabilities* ***could*** *harm* our ability to increase our customer base and achieve broader market acceptance of our platform" that stated:

> ***If*** *we are unable to hire, develop, and retain talented sales or marketing personnel,* ***if*** *our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time, or* ***if*** *our sales and marketing programs are not effective*, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

188. Defendants' statements in Paragraph 187 that the Company might not be able to "hire, develop, and retain talented sales or marketing personnel"; that its new personnel might be "unable to achieve desired productivity levels in a reasonable period of time"; and that its sales program might not be effective, were false and misleading because they were contradicted by facts known or available to Defendants at the time. The risks were not hypothetical; Defendants had already failed "to effectively expand" their "sales and marketing capabilities." Defendants were already ***months behind*** hiring, developing, and training sales personnel; they were already

significantly off track with ramping their sales representatives to desired productivity levels; and their sales program, behind the scenes, demonstrably lacked sufficient infrastructure (contrary to Defendants' statements about how well they had already built it out to support the sales team). Defendants already knew that going into 2019, their sales leaders were not adequately focused on "hiring high-quality sales representatives." By failing to disclose the mounting threat posed by these risks, Defendants created a misleading impression of the Company's sales program and its ongoing production levels for investors.

189. Further, the Form 10-K also contained a "Risk Factor" captioned: "***If we fail*** to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed" that stated in part: "As we expand our business, our continued success will also depend, in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base."

190. Defendants' statement in Paragraph 189 that their business could be harmed ***if*** the Company failed to recruit or retain qualified sales, marketing, and operation personnel was false and misleading because Defendants were ***already*** failing to recruit and retain the sales representatives and enablement employees that they needed to maintain the "***long and sustainable business model***" that Defendants had built to "***continue to drive growth of greater than 40% and near 50% on B2B***" billings. As Budge later admitted, "going into 2019," the sales leaders were not properly focused on "***the process of hiring high-quality sales reps***," and the Company was experiencing a "***capacity gap***" of "***dozens***" of sales representatives. By failing to disclose these facts to investors when they spoke of this recruitment and retention risk,

Defendants misled investors about the existing strength of the Company's sales force and infrastructure.

191. The Form 10-K also contained a "Risk Factor" captioned: "***If we fail*** to effectively manage our growth, our business and results of operations could be harmed" that stated in part: "We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . ***If*** *we do not achieve the benefits anticipated from these investments, or if the achievement of these benefits is delayed,* our results of operations may be adversely affected."

192. Defendants' statements in Paragraph 191 that their results of operations might be adversely affected if they failed to effectively manage their growth were false and misleading because in reality, their results of operations were already being adversely affected by Defendants' failure to effectively manage their growth. The risk was not hypothetical; it was substantially transpiring. From the beginning of 2019, Defendants had misled investors about their sales headcount, the quality of their sales program's infrastructure, and the Company's progress on its "***long-term growth trajectory***" toward achieving "***a long and sustainable business model***" of "***greater than 40% and near 50% on B2B***" billings. In fact, the Company had already fallen off that trajectory because its new sales representatives were not properly being ramped. Defendants' concealment of this information and their failure to disclose that their achievement of the benefits of their investment in their sales force would be substantially delayed created a materially misleading impression for investors about the likelihood of the risk to the Company's results of operations.

193. Defendants knew or recklessly disregarded that these "Risk Factor" statements in Paragraphs 185, 187, 189, and 191 were false and misleading and omitted material facts. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Budge and Skonnard later told analysts and investors that the sales representatives that the Company had planned on having in place to execute its 2019 "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge later admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure disclose these material problems earlier, Budge and Skonnard did not deny that Defendants had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts and investors because they were "still hitting [their] numbers"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "all the talent we need" and his own involvement in analyzing hiring trends; and (viii) Budge held himself out to analysts as being knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

**4. March 4-7, 2019 SPO Offering Documents**

194. In the Registration Statement filed on March 4, 2019, and the Prospectus filed on March 7, 2019, Defendants wrote: "***We have significantly expanded our direct sales force to focus on business sales*** and have aligned our sales team's compensation structure to fit this objective."

195. The Offering Documents also repeated the same materially false and misleading statements that Defendants had made in the 2018 Form 10-K filed weeks earlier. In the section titled "***Growth Strategy***", Defendants represented again:

> ***We have a large direct sales force to focus on business sales*** and have aligned our sales team's compensation structure to fit this objective. ***We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform.*** We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship. As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase. We will continue to expand our platform capabilities to deliver additional value to our customers. Our sales force educates business customers on the strengths of our platform to help customers make informed decisions and create a customized and unified end-to-end learning experience for their businesses.

196. Defendants' statements identified in Paragraphs 194 and 195 were materially false and misleading and omitted material facts, as follows:

(a) The statements that "***[w]e have significantly expanded our direct sales force to focus on business sales***"; "***[w]e have a large direct sales force***"; and that the Company had "***been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time***," were materially false and misleading because the statements created an inaccurate picture that the then-existing capacity, in terms of size, productivity, and effectiveness, of the

Company's sales force were adequate to continue to drive high billings growth. In fact, at the time these statements were made, the Company was then experiencing significant hiring, productivity and effectiveness problems with its sales force that were threatening its billings growth. Specifically, the Company was off its "***annual sales ramp capacity plan***" by "***dozens***" of sales representatives, its sales infrastructure was deficient, and the Company had therefore deviated from its "***long-term growth trajectory***" toward achieving "***a long and sustainable business model***" of "***greater than 40% and near 50% on B2B***."

(b) Furthermore, the false statements regarding the current condition of the sales force in the context of the Company's "***growth strategy***" were misleading because the growth strategy Pluralsight and the Officer Defendants presented to investors was quarterly billings growth of 40-50%, and so by speaking on this topic, Defendants incurred a duty to speak accurately and completely about impact of the undisclosed adverse facts on this strategy. Instead, they omitted these material facts—such as that the Company's strategy for achieving consistent quarterly billings growth in 2019 was significantly off track because as Defendants later admitted, from the beginning of January 2019, there was an insufficient number of adequately trained and productive sales representatives (and attendant adequate sales infrastructure) capable of meeting the Company's targeted quotas, which were necessary for the Company to continue to achieve its historic, consistent level of billing growth through 2019.

(c) Having chosen to speak about the size, productivity, and effectiveness of the sales force, Defendants incurred a duty not to omit material adverse facts, such as that the size, productivity, and effectiveness of the sales force were in fact insufficient to sustain the Company's billings growth.

197. Defendants knew or recklessly disregarded that these statements in Paragraphs 194 and 195 were false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Skonnard and Budge later told analysts and investors that the sales representatives that the Company had planned on having in place to execute its 2019 "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge later

admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure disclose these material problems earlier, Budge and Skonnard did not deny that they had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts and investors because they were "***still hitting [their] numbers***"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force's capacity, including their headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "all the talent we need" and his own involvement in analyzing hiring trends; and (viii) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

198. The Offering Documents also contained the same "Risk Factors" from the 2018 Form 10-K that purported to address the Company's ability to hire and retain sales and marketing employees. Defendants' statements identified in herein, as listed in Paragraphs 185, 187, 189, and 191 were materially false and misleading for the reasons explained in Paragraphs 186, 188, 190, and 192 above. In addition, Defendants' failure to update the risk factors as the risks to the Company's billings continued to mount demonstrated the inadequacy of the risk disclosures. Defendants knew or recklessly disregarded that these statements were false and misleading when the statements were made for the reasons identified *supra* in Paragraph 193.

### 5. May 1, 2019 Earnings Announcement

199. In Pluralsight's May 1, 2019 press release announcing its first quarter results (filed with the SEC as an exhibit to the Form 8-K signed by Budge), Skonnard stated: "Our Q1 financial results marked a great start to 2019. ***Revenue and billings growth continue to be strong with both up over 40% year over year.*** We continue to demonstrate the efficiency in our model with our third consecutive quarter of positive cash flow." Skonnard also repeated these three sentences on the earnings call with analysts, adding: "And our teams ***continue to execute with strong focus and commitment to customer success*** as demonstrated by our dollar-based net retention rate of 128%."

200. Defendants' statements in Paragraph 199 were materially false and misleading, as follows:

(a) The statements created a false impression that billings growth continued to be strong, above 40%, within Defendants' "***expected long-term growth trajectory***," and that the Company's model was operating efficiently, when in fact, the Company was already a month into the second quarter and was then generating a rate of billings growth far below 40% because of its undisclosed sales execution problems.

(b) The falsity of Defendants' portrayal of billings is further demonstrated by Defendants' descriptions of the length of the sales cycle in the Company's deal pipeline. According to Budge's statements prior to and at the end of the Class Period, the type of deals that the Company relied on to generate strong billings growth rates typically took five to six months to work through the deal pipeline. For the Company to have generated its typical level of billings growth in the second quarter of 2019 (by the end of June 2019), those deals would have had to have been in the pipeline beginning in or around January 2019. Therefore, by May 1, 2019, the deals that the Company would have relied on to meet its 40-50% billings growth rate should have been in the pipeline and, as evidenced by the massive billings miss two months later, they were not. It was therefore false and misleading for Defendants to lead investors to believe that the Company was successfully continuing along its growth trajectory when in fact it was not.

201. Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Skonnard and Budge later admitted that the sales representatives that the Company had planned on having in place to execute its 2019 "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge also admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure to disclose these material problems earlier, Budge and Skonnard did not deny that Defendants had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts and investors because they were "***still hitting [their] numbers***"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force's capacity, including its headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "***all the talent we need***" and his own involvement in analyzing hiring trends; (viii) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota; and (ix) Budge regularly spoke about how "***we***" monitored the pipeline to track deals, which as of May

2019, did not contain enough deal activity to sustain its and investors' billings growth expectations for the second quarter.

202. In the Company's 2019 first quarter Form 10-Q, also filed on May 1, 2019, signed by Skonnard and Budge, Defendants incorporated by reference the "Risk Factors" contained in Pluralsight's 2018 10-K filed with the SEC on February 21, 2019.

203. Defendants' statements identified in Paragraph 202 were materially false and misleading for the reasons explained in Paragraphs 186, 188, 190, and 192 above. In addition, by May 1, 2019—***one month into the second quarter***—the problems with the sales force, including the ramp capacity gap and ineffective infrastructure, had materialized to the point that a materially negative impact on billings in the second quarter was certain, given the ultimate magnitude of the billings miss (a 21% drop-off in B2B billings from Q1 in absolute numbers, and a 43.8% drop-off comparing the growth in Q1 to Q2). Defendants knew or recklessly disregarded that their risk disclosures were false or misleading and omitted material facts for the reasons explained in Paragraph 193 above.

204. Further, during Pluralsight's first-quarter 2019 conference call on May 1, 2019 (a transcript of which was made publicly available afterward), with analysts and investors, hosted by Budge and Skonnard, SunTrust analyst Terrell Tillman asked Budge directly about the Company's progress in hiring sales representatives: "[W]here are you or how are you doing ***in terms of the hiring to your targeted sales headcount by the end of the year***? And also maybe just talk about the retention of existing sales reps because you have been hiring a lot over the last couple of years and how retention is going?"

205. Budge responded:

> ***Look, we like where we are with our sales reps***. We're committed to continue to grow the sales force. ***We have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019 which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force*** from 80 quota bearing reps two years ago to -- at this point over -- at the end of this year over 300. So love our growth there. Our retention is excellent. I think compared to industry average, we'd always like it to be higher and the churn to be lower, particularly with our sales reps. But it's a function when there is a little bit more turnover in sales, often in the first quarter or so. ***We've experienced some of that. It's normal. We planned for that and that's -- we're still committed, and we see a clear path to having 300-plus reps by the time we exit the year. So the short answer is we're on pace.***

206. Budge's statements identified in Paragraph 205 were false and misleading and omitted material information, as follows:

(a) An analyst directly asked him where the Company was "in terms of the hiring to get you to your targeted sales headcount"—the exact same issue that, just three months later, Defendants disclosed as having caused the material negative impact to the Company's billings growth and revenue. In response, when given yet another chance to come clean, Budge falsely and misleadingly indicated that the Company was "***on pace***" and saw a "***clear path***" and that "***we've massively expanded our sales force***" and "***we like where we are with our sales reps***." These statements were false because they were contradicted by information available to him at the time. Since the end of 2018, Defendants had been off the track of their "***annual sales ramp capacity plan***" by "***dozens***" of sales representatives, were "***months behind***," were suffering from inefficient, inadequate sales infrastructure, and as a result, they had fallen of their "***expected long-term growth trajectory***" and were at that moment fruitlessly struggling to get "***caught up***."

(b) Budge's statements about the Company's progress in hiring and retaining sales representatives omitted material facts, including that the sales execution problems were having a materially negative impact on billings and therefore future revenue; that the Company had lacked "***capacity in the system to sustain [its] high-growth expectations as [it] entered the year***"; and that it was "***a few months behind***" on ramping and training its sales representatives to be effective in producing billings on schedule for the second quarter.

207. Budge knew or recklessly disregarded that these statements were false and misleading and omitted material facts. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Skonnard and Budge later admitted that the sales representatives that the Company had planned on having in place to execute its 2019 "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge also admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure disclose these material problems earlier, Budge and Skonnard did not deny that Defendants had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts and investors because they were "***still hitting [their] numbers***"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force's capacity, including its headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "***all the talent we need***" and his own involvement in analyzing hiring trends; (viii) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota; and (ix) Budge regularly spoke about how "***we***" monitored the pipeline to track deals, which, as of May

2019, did not contain enough deal activity to sustain its and investors' billings growth expectations for the second quarter.

208. During the same conference call, another analyst, Jeffrey Mueler of Robert W. Baird, followed up on Tillman's question about hiring: "And then just on the core business. What is the limiting factor ***on the pace of sales headcount growth***? I'm assuming it's not addressable market. So, is it management – ***sales management's capacity***? Is it wanting to operate around break-even or better free cash flow? Just what's the limiting factor?"

209. Budge responded in detail again, assuring investors and analysts that the Company had a pace to hiring and liked where it was heading as part of its plan to drive billings growth at 40-50%:

> Yes. Look, it's probably a combination of both of those. Not probably, it is a combination of both of those. ***We -- there's probably only so many reps we could hire in any given year***. ***We do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization. And we like the direction we're going on both a top and bottom line.*** We like the fact that we've been cash flow profitable for three straight quarters now. We would like to continue that. ***As long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time. And we think that will grow a long and sustainable business model for us***.

210. Budge's statements identified in Paragraph 209 were false and misleading and omitted material information, as follows:

(a) An analyst directly asked him about "***sales headcount growth***" and "***sales management's capacity***"—the very topics that, at that very moment, were causing a material negative impact to the Company's billings growth and revenue. In response, Budge falsely and misleadingly assured analysts that the Company was in control of the "***pace***" of its hiring plan and that "***we like the direction we're going on both a top and bottom line***." In truth, as Budge and Skonnard later admitted, from the beginning of 2019, the Company had had an insufficient

number of ramped, high-performing sales representatives (with attendant adequate sales infrastructure) capable of meeting the quotas necessary for the Company to continue to achieve its 40-50% quarterly billings growth through 2019. At the time Budge spoke, the Company was dealing with a critical "capacity gap," was significantly off its billings growth "trajectory," was "months behind" in its sales plan, and experiencing a dramatic negative impact on its billings and future revenue.

(b) Budge also falsely and misleadingly portrayed the efficiency and productiveness of "***our people team and our sales management teams***" in moving sales representatives through the hiring and ramping process. In truth, the sales infrastructure had already failed as a result of Defendants' underinvestment and sales leaders' lack of "***engage[ment] in the process of hiring high-quality sales reps***", and as a result, the Company was "***dozens***" of employees off its "***annual sales ramp capacity plan***" and struggling to get "***caught up***" to its planned growth trajectory.

(c) Budge falsely and misleadingly portrayed the Company as progressing on a continuous path to "***driv[ing] growth of greater than 40% and near 50% on B2B***" as "***sufficient***" to "***grow a long and sustainable business model***." This depiction was materially deceiving because in fact, the Company was already one month into the second quarter, and because it was missing the productivity of dozens of sales representatives, the deal activity that the Company relied on to achieve that level of billings growth in the second quarter was simply not present. Budge's statements to the contrary lacked any reasonable basis and were contradicted by these facts.

(d) In speaking about "***sales headcount growth***" and "***sales management's capacity***," Budge incurred a duty to speak accurately and completely, and he omitted the material facts described in subsections (a)-(c), which investors needed to understand the full picture of the status of the sales force and its potential impact on Defendants' billings and future revenue.

211. Budge knew or recklessly disregarded that these statements were false and misleading and omitted material facts. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders "***going into 2019***" had not been focused on ***"hiring high-quality sales reps***"; (ii) Skonnard and Budge later admitted that the sales representatives that the Company had planned

on having in place to execute its 2019 billings growth strategy and "***sales ramp capacity plan***" (Skonnard) "***didn't come into the year early enough in the year***" (Budge); (iii) Budge also admitted that from early in 2019, the Company had been "***a few months behind***" ramping their sales representatives to be "***trained up and ready to go***" to "***be effective***"; (iv) the Company, on its Q2 2019 Form 10-Q, admitted that it had been "slower in hiring additional sales representatives ***than planned for 2019***"; (v) after being confronted by analysts on the July 31, 2019 call about Defendants' failure disclose these material problems earlier, Budge and Skonnard did not deny that Defendants had known about the sales execution problems at the beginning of 2019; instead, Budge said they did not tell analysts and investors because they were "***still hitting [their] numbers***"; (vi) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force headcount, their productivity, and the efficiencies in the Company's business model; (vii) Skonnard spoke extensively about the Company's success in recruiting "***all the talent we need***" and his own involvement in analyzing hiring trends; (viii) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota; and (ix) Budge regularly spoke about how "***we***" monitored the pipeline to track deals, which as of May 2019, did not contain enough deal activity to sustain its and investors' billings growth expectations for the second quarter.

### D. Defendants Violated Items 303 and 105 of Regulation S-K By Failing to Disclose Unfavorable Known Trends or Uncertainties

212. Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires public companies, in their Form 10-K, 10-Q, and Registration Statement filings, to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

213. Pluralsight and the Officer Defendants knew that the Company's sustained billings growth rate of "***greater than 40% and near 50%***" was due to the capacity of its sales representatives to sell subscriptions to the Company's platform to new business customers, renew existing subscriptions, and expand business customers' use of the platform through the purchases of additional licenses and products. Defendants further knew that the Company's high billings growth rate was not sustainable through the first half of 2019 because, as Skonnard and Budge later admitted, during that time, the Company was months behind in hiring and ramping sales representatives according to its "***annual sales ramp capacity plan***." Defendants acknowledged this in their Q2 2019 Form 10-Q report, wherein they admitted that they had been "slower in hiring additional sales representatives ***than planned for 2019***." Defendants also knew, as demonstrated by Skonnard and Budge's repeated discussions of the Company's deal pipeline and sales cycle, the negative effect that this sales capacity gap was having on the amount of deal activity progressing through the Company's deal pipeline through the first half of 2019. As Budge later admitted, "***[w]e just didn't have enough reps***," and as a result, they did not have enough deals in the pipeline to sustain their high billings growth rate and ***Pluralsight was forced to tell investors, on July 31, 2019, that they expected the decline in billings to*** "***have a negative impact on our revenue in future periods***."

214. These trends and uncertainties were known to Pluralsight and the Officer Defendants at the time that the Company filed with the SEC its 2018 Annual Report on Form 10-K on February 21, 2019, at the time that the Company filed with the SEC its Offering Documents for the SPO on March 4 and 7, 2019, and at the time that the Company filed with the SEC its financial report for the first quarter of 2019 on Form 10-Q on May 1, 2019. As a result, Defendants caused the Company to violate Item 303 of Regulation S-K by failing to disclose these known trends and uncertainties to the marketplace.

215. Rather than disclosing these known trends and uncertainties, Defendants concealed them. Regarding their "growth strategy," in the Form 10-Q, Defendants stated:

> ***We have a large direct sales force to focus on business sales*** and have aligned our sales team's compensation structure to fit this objective. ***We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel*** over time as they gain more experience selling subscriptions to our platform.

216. On the February 13, 2019 earnings call to discuss the financial results reported on the Form 10-Q, when asked about "hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how we should think about that in 2019," Budge responded that investors could expect "***more reps to come, more on quota on the street and more goodness from them***." ¶ 177.

217. In the March 7, 2019 Offering Documents, Defendants repeated the statement about their "***large direct sales force***" and its substantially increased "***productivity***" and "***effectiveness***" cited in Paragraph ¶ 195 and added, "***[w]e have significantly expanded our direct sales force to focus on business sales***." ¶ 194. The Offering Documents were silent on the

then-existing sales execution failures and capacity gap that had caused Defendants to fall off their expected long-term growth trajectory.

218. On May 1, 2019, in discussing the financial results reported on the Form 10-Q, when asked "where are you or how are you doing in terms of the hiring to your targeted sales headcount by the end of the year?" Budge told investors: "We have a plan to grow . . . which continues on the really outstanding progression that we've had over the last few years where we've massively expanded our sales force. . . . So the short answer is, we're on pace." ¶ 205. The Form 10-Q, filed the same day, was silent on the then-existing sales execution failures and capacity gap that had caused Defendants to fall off their expected long-term growth trajectory.

219. These statements, and the omissions of material adverse facts in the 2018 Form 10-K, Offering Documents, and Q1 2019 Form 10-Q, were contrary to known trends and uncertainties that Defendants could reasonably expect to negatively impact their sales, revenue, and income from continuing operations. Defendants concealed that the Company was experiencing grave negative trends in its sales force capacity, including its size, productivity, effectiveness, and infrastructure that were undermining its billings and revenue growth. Specifically, beginning in January 2019, there was an insufficient number of ramped, productive sales representatives (with an adequate attendant sales infrastructure) capable of meeting the Company quotas necessary for the Company to continue to achieve its historic level of 40-50% quarterly billing growth through 2019. Only on July 31, 2019, did Budge and Skonnard admit that the Company was off track by "***months***" and "***dozens***" of sales representatives, that their sales infrastructure was deficient, and that Pluralsight had deviated dramatically from its "***long-***

***term growth trajectory***" of billings of at least 40-50%. Defendants' above-described SEC filings were silent on this issue.

220. Defendants caused Pluralsight to violate Item 303 of Regulation S-K by failing to disclose these known trends and uncertainties to the market.

221. Similarly, Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Item 105 required Pluralsight to "[e]xplain how the risk affects the registrant or the securities being offered" and to "adequately describe[] the risk." *Id.*

222. The Offering Documents made no mention of the substantial, materialized risks posed by the sales capacity gap to Pluralsight's billings growth, much less provided an adequate description of those risks, despite the fact that, as discussed above (¶ 193), Defendants were well aware of the risks.

223. As a result, Defendants caused Pluralsight to violate Item 105 of Regulation S-K by failing to adequately describe how the risks affected Pluralsight.

**E. Loss Causation**

224. During the Class Period, as detailed herein, Pluralsight and the Officer Defendants engaged in a scheme to defraud the market and a course of conduct that artificially inflated and/or maintained the price of Pluralsight's Class A common stock and operated as a fraud or deceit on Class Period purchasers of Pluralsight's Class A common stock. This scheme was accomplished by Defendants' failing to disclose, misrepresenting, and concealing the Company's sales execution failures and the risks associated with those failures. Defendants'

false and misleading statements and omissions had their intended effect and caused Pluralsight Class A common stock to trade at artificially-inflated and/or maintained levels throughout the Class Period, reaching as high as $35.49 on April 30, 2019. As a result of their purchases of Pluralsight Class A common stock during the Class Period and Defendants' material misstatements and omissions, Lead Plaintiffs and the other Class members suffered real economic loss, *i.e.* damages, under the federal securities laws.

225. When Defendants' July 31, 2019 corrective disclosure regarding the sales execution failures entered the market, the price of Pluralsight's Class A common stock declined precipitously as the prior artificial inflation came out of Pluralsight's Class A common stock price. Specifically, the artificial inflation in Pluralsight's stock price was removed when the sales execution failures and risks misstated and omitted by Defendants were revealed to the market on July 31, 2019. That day, Pluralsight reported shockingly bad billings growth for the second quarter of 2019, including a 43% decrease in B2B billings growth and a 44% decrease in total billings growth from their respective growth rates in the previous quarter, as demonstrated in the charts in Paragraph ¶ 119. Defendants further disclosed that "[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods."

226. In response to the July 31, 2019 disclosures, Pluralsight shares dropped nearly 40% on August 1, 2019, from $30.69 at the end of day on July 31 to $18.56 at the end of day on August 1, on heavy trading volume of more than 22 million shares traded.

227. Investors and analysts were shocked by the news. On August 1, 2019, SunTrust issued a report titled: "*Where Did That Come From*?" J.P. Morgan similarly noted in its August

1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "***hiring issue was known earlier***" and that ***"[m]anagement pointed out that it saw it was behind on sales hiring coming into the year***, but we are now just hearing about it since they were able to deliver on 1Q19 numbers ***and hoped that quarter's execution would continue***."

228. A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that the Company had "been an investor darling for much of its lifetime as a public company" but that its "bullish case broke down" in the second quarter. Alexander observed that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million implies a sharp revenue deceleration to just 30% y/y growth."

229. On August 5, 2019, another *Seeking Alpha* article further analyzed the earnings announcement:

> [T]he 23% increase in billings to $80.6 million is a major disappointment as continued elevated spending should result in faster sales growth (and billings growth), which is now clearly falling short. While the company maintained the full year guidance, it is very clear that the situation is far from rosy. Not only are risks related to the full year guidance up in a major way, realistic losses still coming in rapidly above the $100 million mark, mostly because of a run rate of $85 million in stock-based compensation.

230. Pluralsight's July 31, 2019 disclosures corrected Defendants' prior materially misleading statements and omissions concerning their sales force. The decline in Pluralsight's share price was a direct and proximate result of Defendants' scheme being revealed to investors

and to the market. The timing and magnitude of Pluralsight's stock price decline negate any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Pluralsight-specific facts unrelated to Defendants' fraudulent conduct.

**F. Presumption of Reliance**

231. At all relevant times, the market for Pluralsight's Class A common stock was efficient for the following reasons, among others:

(a) Pluralsight's stock met the requirements for listing and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

(b) As a regulated issuer, Pluralsight filed periodic public reports with the SEC and the NASDAQ Stock Market;

(c) Pluralsight regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Pluralsight was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

232. Because of the foregoing, the market for Pluralsight securities promptly digested current information regarding Pluralsight from all publicly available sources and reflected that information in the price of Pluralsight's Class A common stock. Under these circumstances, all purchasers of Pluralsight Class A common stock during the Class Period suffered similar injury through their purchase of Pluralsight Class A common stock at artificially inflated prices, and the presumption of reliance applies.

233. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are also grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Pluralsight's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the capacity of the Defendants' sales program to the Company's key business metric of billings, as alleged above, that requirement is satisfied here.

**G. Inapplicability of The Statutory Safe Harbor**

234. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Pluralsight who knew that the statement was false or misleading when made.

**H. Claims for Relief Under The Exchange Act**

235. The claims alleged in this complaint under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. § 78j(b), 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct by Pluralsight and the Officer Defendants. These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Sections 10(b), 20(a) and 20A of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against Pluralsight and the Officer Defendants (Skonnard and Budge)**

236. Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count, with the exception of Section III.C.

237. During the Class Period, Pluralsight and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged in this complaint; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Pluralsight Class A common stock at artificially inflated prices.

238. Pluralsight and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for

Pluralsight Class A common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

239. Pluralsight and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

240. During the Class Period, Pluralsight and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

241. Pluralsight and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal Pluralsight's true condition from the investing public and to support the artificially inflated prices of the Company's Class A common stock.

242. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pluralsight Class A common stock. Lead Plaintiffs and the Class would not have purchased the Company's Class A common stock at the prices they paid, or at all, had they been aware that the market prices for Pluralsight Class A common stock had been artificially inflated by Pluralsight and the Officer Defendants' fraudulent course of conduct.

243. As a direct and proximate result of Pluralsight and the Officer Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's Class A common stock during the Class Period.

244. By virtue of the foregoing, Pluralsight and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants (Skonnard and Budge)**

245. Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count, with the exception of Section III.C.

246. As alleged above, Pluralsight violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

247. The Officer Defendants acted as controlling persons of Pluralsight within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Pluralsight, the Officer Defendants had the power and ability to control the actions of Pluralsight and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

**COUNT III**
**For Violations of Section 20A of the Exchange Act**
**Against the Officer Defendants (Skonnard and Budge)**

248. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein, with the exception of Section III.C.

249. As set forth in the paragraphs above and below, the Officer Defendants committed underlying violations of Section 10(b) and Rule 10b-5 by selling Pluralsight Class A common stock while in possession of material, nonpublic information about the Company's sales capacity. Consequently, they are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.

250. On March 11, 2019, as part of the SPO, while Pluralsight's securities traded at artificially inflated and distorted prices, while in possession of adverse, material non-public information about Pluralsight, the Officer Defendants personally and illegally profited in the following amounts, by selling the following shares of Pluralsight Class A common stock, at a price of $28.3725 per share.[20]

a. Defendant Skonnard sold 480,618 shares, for a profit of $13,636,334.21; and

b. Defendant Budge sold 177,854 shares, for a profit of $5,046,162.62.

251. Under Section 20A of the Exchange Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where

[20] This amount represents the public offering price of $29.25 less the underwriters' discount.

such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a).

252. Contemporaneously with the Officer Defendants' insider sales, Lead Plaintiff INPRS purchased a total of 65,200 shares of Pluralsight Class A common stock for a total of $1,907,100, and Lead Plaintiff CTPF purchased a total of 7,900 shares of Pluralsight Class A common stock for a total of $228,016.91.

253. Lead Plaintiffs and other Class members who purchased shares of Pluralsight Class A common stock contemporaneously with the Officer Defendants' insider sales suffered damages because (i) in reliance on the integrity of the market, they paid artificially inflated prices for those shares as a result of Pluralsight and the Officer Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act; and (ii) they would not have purchased Pluralsight Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Pluralsight and the Officer Defendants' false and misleading statements and omissions.

## V. SECURITIES ACT ALLEGATIONS

254. In this Section of the Complaint, Lead Plaintiff INPRS asserts strict liability and negligence claims based on Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons and entities who purchased or otherwise acquired Pluralsight's Class A common stock registered on the NASDAQ Global Select Market in, pursuant to, and/or traceable to the SPO (defined below), and who were damaged thereby. Lead Plaintiff INPRS expressly disclaims any allegations of fraud, scienter, or recklessness in

connection with these non-fraud claims, which are pleaded separately in this Amended Complaint from Lead Plaintiffs' Exchange Act claims.

255. As alleged below, the basis of Lead Plaintiff INPRS' Securities Act claims is that the Offering Documents contained misstatements of material fact and omitted to disclose material information required to be disclosed. The allegations in Section I (¶¶ 2-12) and Sections II, III.A, and III.C of this Amended Complaint are hereby repeated, reincorporated, and re-alleged herein.

**A. Background Facts**

256. Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. The platform provides users with a library of thousands of technology skills courses taught by Pluralsight-approved authors; skill and role assessments; learning paths designed to help users master particular subject areas; and business analytics tools to enable business customers to track and address the technology skills of their employees.

257. On May 17, 2018, Pluralsight went public through an initial public offering ("IPO"), issuing 20.7 million shares at $15 per share. The Company raised $332.1 million in net proceeds, increasing its capitalization to approximately $2 billion, which, as *Forbes.com* noted, "far exceed[ed] its last private valuation of about $1 billion." Pluralsight used the proceeds to purchase LLC units in its holding company, Pluralsight Holdings, which the holding company then used to repay the offering's expenses, pay down Pluralsight's outstanding indebtedness, and for working capital and other general corporate purposes.

### 1. Prior to the SPO, Unable to Demonstrate Profits, Pluralsight Focused Investors on Its Billings Growth

258. From its inception as a public company in May 2018, the Company garnered investor interest not by its ability to achieve profitability—which it has never done—but rather by highlighting the Company's ability to achieve consistent sales growth each quarter, as measured by its "billings."

259. The Company defined billings as "total revenue plus the change in deferred revenue in the period." As a "Software-as-a-Service" ("SaaS") business, the Company derived substantially all its revenue from the sale of annual or multi-year subscriptions to the platform to business customers (its "B2B" or "Business-to-Business" segment) and monthly or annual subscriptions to individual consumers (its "B2C" or "Business-to-Consumers" segment). Within the B2B segment, the Company had a "commercial" segment, for businesses with less than approximately 4,000 employees, and an "enterprise" segment, for businesses with more than 4,000 employees. The B2B enterprise segment was the chief growth engine for the Company.

260. The Company typically invoiced its customers in advance installments (annually for business customers, and monthly or annually for individuals) and recorded those up-front payments as deferred revenue, which it then recognized ratably as revenue throughout the subscription period.

261. The billings amount in a given financial quarter therefore represented the amounts invoiced to customers that quarter and reflected subscription renewals, sales of additional products or services to existing customers, and sales to new customers. While revenue in a given quarter provided investors with a snapshot in time, billings were a crucial indicator of the future revenue and cash flow that the Company would realize from deals that the sales representatives

had executed in that quarter. Further, it was used by the Company, Budge, and Skonnard as the key measure of Pluralsight's performance and success.

262. In this regard, in their SEC filings, earnings calls, and presentations, Pluralsight, Skonnard and Budge repeatedly told investors that billings growth was Pluralsight's "***key business metric***" and a "***key factor affecting* [*its*] *long-term performance***." From the date of the Company's IPO, and for each subsequent quarter through the end of the Class Period, Defendants touted their exponential year-over-year billings growth to investors. Budge described the Company as having "***a long and sustainable business model***" focused on "***growth of greater than 40% and near 50% on B2B***" billings. For eight consecutive quarters, until the end of the Class Period, Defendants achieved B2B billings growth of at least 48% and over 50% all but once. Defendants attributed the Company's dramatic billings growth rate to the strength and productivity of the sales force that the Company had built. The link between billings and the sales force was clear: sales representatives were responsible for generating sales to business customers, who accounted for approximately 85-86% of the Company's billings during the Class Period.

**2. Billings Growth Was Dependent on the Sales Force**

263. The Company employed a direct sales team that focused on landing new business customers, renewing existing subscriptions, and expanding usage of Pluralsight's platform within the business customers over time. It also employed a field sales team that sourced new prospects and upsell opportunities (meaning, the opportunity to encourage a customer to purchase a more expensive version of the Company's product, more licenses for the product, or more services within the product). The Company supported its sales representatives (whom the company also

called “account executives”) through its sales “infrastructure.” This included “sales enablement” employees who provided training, deal support, best practices insights, and other assistance to sales representatives as they joined the Company and “ramped” up to full sales-quota-carrying capacity. The Company’s sales infrastructure also included its customer success management (“CSM”) team, which was responsible for retaining customers won by the sales team, to cut down on the Company’s customer “churn,” or the loss of customers who canceled or failed to renew their subscriptions. CSM employees worked to ensure that customers were having positive experiences with the Pluralsight platform and identify and address any problems, so that customers would renew, upgrade, and expand their subscriptions, thereby further driving billings growth for the Company.

264. To grow its billings, the Company looked to expand its sales force and increase their productivity, particularly that of the new hires. With more quota-bearing sales representatives came the ability to sell more subscriptions and generate the billings growth of near-40% to 50% from one quarter to the next that Pluralsight promoted to investors each financial reporting period. Because the sales force drove the Company’s key business metric, billings, Pluralsight and its management closely monitored the ability of Pluralsight’s sales representatives to take on a “full quota.” As part of its internal planning and forecasting, Pluralsight closely tracked a sales representative’s progression from hiring through ramping up to take on a full sales quota, a process that, according to Budge, took between six months and two years. Pluralsight, Budge and Skonnard repeatedly told investors that the increased productivity of Pluralsight’s sales representatives translated into greater efficiency and money saved – meaning, more value for investors.

265. The Company fastidiously tracked the growth and ramping of the sales force toward achieving full productivity because that information was crucial to the Company's current and future sales activity. Pluralsight used "pipelines" to closely follow the progression of deals that its sales teams were working on at any given time, from identifying a potential customer to closing the deal. The pipeline indicated how many deals were expected to close within a given amount of time and how sales representatives were performing in relation to their sales quotas. According to Budge, the deals that Pluralsight and the Officer Defendants typically relied on to meet their quarterly targets took from five to six months to progress through the pipeline. By looking at the ramped capacity of its sales representatives and the status of its deal pipeline, therefore, the Company could reliably approximate from at least six months before the end of a quarter the billings and revenue it could expect to achieve in that quarter.

266. In each quarter prior to the SPO, the Company reiterated that its past heavy investment in the sales force was paying off; that they closely monitored the ramping of its sales representatives toward achieving their full quotas, and that their expanded sales force was demonstrating increased productivity and efficiency.

### 3. In August 2018, Budge told Analysts and Investors That the Company's Investment In Its Growing Sales Force Was Generating Efficiencies

267. As early as its first earnings call as a public company, on August 1, 2018, Budge told analysts that the Company's past "heavy" investment in its sales and marketing teams had resulted in the sales representatives efficiently generating its "fifth consecutive quarter" of B2B billings growth of approximately 50%, in the quarter ended June 30, 2018.

268. These statements had the desired effect. For example, an August 2, 2018 J.P. Morgan analyst report following the Q2 2018 earnings call noted: "This is the company's fifth consecutive quarter of >50% growth y/y. We believe the heavy investments undertaken by the company last year to ramp up its sales force is starting to pay off."

269. Similarly, on August 29, 2018, at an investor and analyst meeting at its annual conference, Budge emphasized how heavily the company had invested in "all of the support functions that wrapped around" the quota-bearing sales representatives, including the "critical" CSM team, which they had "built [] out through 2017." Due to the "really great amount of focus from the CSM organization that we've built out," Budge represented, the Company was successfully retaining its business customers.

270. At the same August 2018 investor and analyst meeting, Budge also emphasized how the Company recognized that there was a lag time of as many as 18 months before a sales representative would become fully productive in meeting their sales quota, and indicated that the Company closely tracked that process:

> ***This gives you a view into the productivity of our sales reps. At about that kind of 18-month mark, 15- to 18-month mark, they are producing enough annual quota to meet the internal budgets that we have. At around the 2-plus year mark, they are starting to achieve their full quota.*** And with the experience levels that we now have as some of the folks -- all those folks that we hired in 2017 and the beginning parts of 2018, as they are starting to become -- even 2016 -- ***as they are starting to become more tenured, we're getting more productivity out of them, which is why we don't have to double our sales force every single year. And you'll start to see that benefit pay off in the bottom line.***

271. To allay any potential concerns about the Company's ability to recruit talented people—and therefore, its ability to continue to grow billings—Skonnard told analyst and

investor attendees that the Company was having terrific success in this regard and would "***be able to keep attracting all the talent we need***." Budge told investors that the Company had tripled the size of its quota-bearing sales force in recent years.

272. Securities analysts accepted these assurances. In an August 29, 2018 report titled "*Lots of Positive Takeaways at Pluralsight Live; Strong Upside Potential*," SunTrust noted that the Company's strong billings growth in its B2B segment of 60% year over year, following "***an aggressive hiring cycle in 2016 and 2017, along with building out a [CSM] group, has led to overall top-line growth acceleration***." The report also flagged Pluralsight's much-trumpeted "***positive trends in sales force productivity***."

#### 4. On Their October 24, 2018 Earnings Call, Skonnard and Budge Told Investors that the Sales Force Was Well-Ramped and Executing at "Scale" Heading Into 2019

273. On October 24, 2018, Pluralsight announced its financial results for the third quarter of 2018 ("Q3 2018"), including overall billings growth of 44% year-over-year and B2B billings growth of 53% year-over-year (its sixth consecutive quarter of greater than 50% growth in B2B billings). The Company, represented by Skonnard and Budge, held an earnings call that day. Skonnard highlighted for investors the "***strong focus and commitment***" of the Company's sales and customer success teams, who "***continue to execute***," resulting in another quarter of high billings growth.

274. Budge told investors that the Company's past investment in its sales force was resulting in "***economies of scale***," meaning that the sales representatives would be able to maintain or improve their performance and efficiency levels as billings grew. In response to an analyst's request for him to comment on "where you are in the ramping of the productivity of

sales reps? And where are you in terms of your hiring plans?" Budge responded: "***I'd say we feel really good*. . . . *[W]e're seeing some of the economies of scale that we've talked about in past conferences and earnings calls***."

275. Budge and Skonnard's positive statements about the successful ramping and productivity of Pluralsight's sales force had a strong impact on analysts. J.P. Morgan, for instance, reported that "***[s]ales productivity has hit an inflection point***" and that "***[t]he company's investments in its channels aimed at enterprise sales over the last year are now ramping up and would continue to drive this growth as the sales force matures***."

**5. At a January 16, 2019 Conference, Budge Told Investors that the Sales Force Was "Killing It" and the Sales Infrastructure was "At Scale"**

276. On January 16, 2019, at an analyst and investor meeting at the Needham & Company, LLC Growth Conference, Budge highlighted the capacity, strength, and efficiency of the Company's sales representatives and infrastructure. During the conference, according to a transcript of the session, Budge represented that the sales representatives were "***killing it***." Budge emphasized the dramatic growth in the Company's sales force, particularly in the high-billings-generating B2B enterprise segment, to what he claimed were 250 quota-bearing sales representatives, and spoke of the Company's growth model, which he said was demonstrating "***efficiencies***." These comments underscored the fact that the Company closely monitored its sales representatives' ramping according to their plan. Budge also claimed that the Company's past investments had heavily invested in and built out the "***great infrastructure around them***," which the Company "***didn't have to keep growing***," and that as a result, the Company had "***improved our retention massively and we're now at scale***."

### 6. Just Prior to the SPO, in February 2019, Pluralsight and Budge Continued to Emphasize the Sales Force's Growth, Productivity, Efficiency, and Effectiveness

277. On February 13, 2019, Pluralsight announced that in the fourth quarter of 2018, it had grown total billings 42% and B2B billings 51%. It was the Company's "seventh consecutive quarter of greater than 50% growth in B2B billings," Skonnard said.

278. On the earnings call with analysts and investors, in response to a question about "hiring trends for the sales force," Budge said that the Company was investing in and had a plan for the growth of its sales force through 2019 and that the Company could expect "***more reps to come, more on quota on the street and more goodness from them***." Skonnard said that "our teams continued to execute with strong focus and commitment to customer success."

279. On February 21, 2019, Pluralsight filed with the SEC its Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by the Signer Defendants. [21] In the 10-K report, Pluralsight told investors it expected billings from business customers, currently 85% of the Company's billings, to continue to grow, and that the Company closely monitored these billings—which were generated by the quota-bearing sales representatives. To that end, the Company told investors, it had devoted ample resources to drive business customer billings growth. The report stated: "***We have a large direct sales force to focus on business***

[21] On June 17, 2019, the Company filed with the SEC a Form 8-K announcing that its board of directors (of which Skonnard was the chair) had determined that the Company's 2018 Form 10-K had materially understated the Company's net losses, which was related to the incorrect timing of recognition of certain expenses beginning in the second quarter of 2018. The Form 8-K was signed by Budge. On June 27, 2019, the Company filed an amended Form 10-K for the fiscal year ended December 31, 2018, which was signed by Skonnard and Budged. In the report, the Company announced, "we identified a material weakness in our internal control over financial reporting, and as such, our disclosure controls and procedures were determined to be ineffective for the quarters ended June 30, 2018, September 30, 2018 and March 31, 2019 and for the year ended December 31, 2018."

***sales***. . . . We have also been able to drive ***substantial increases in the productivity and effectiveness*** of our sales personnel over time as they gain more experience selling subscriptions to our platform."

280. Unapprised of the looming risk to billings growth posed by Pluralsight's failure to follow its annual sales ramp capacity plan and its deficient sales infrastructure, analysts reacted positively to the report, and its share price rose. On February 27, 2019, *Seeking Alpha* published an article titled "*Pluralsight: The Sight Of All Of Those Beat And Raise Quarters*." The article reported that "***[t]he picture being painted remains one of hyper-growth***."

### B. At the Time of the SPO, Undisclosed Adverse Facts Showed that Pluralsight Was Months Behind On Its Plan For Hiring and Ramping Sales Representatives

281. Unbeknownst to investors, as Pluralsight began 2019 (and a new fiscal year), its sales force lacked the capacity to sustain its (and investors') high-growth expectations of 40-50% billings growth through June 2019. Sustaining that level of growth would have required the Company to hire, place, and train enough properly ramped sales representatives at the beginning of 2019 to fuel its approximately six-month-long deal pipeline through the second quarter of 2019, which the Company, Budge, and Skonnard later disclosed, the Company had not done.

282. Instead of being on track with its sales representative ramping plan, from the beginning of 2019, Pluralsight was months behind by dozens of quota-bearing sales representatives—a significant number for a sales force of up to 250 people. As a result, the Company fell off its annual sales ramp capacity plan, meaning that not enough adequately ramped sales representatives were in place to deliver billings growth of over 40-50% in the next

several months, which was the growth rate that Pluralsight, Budge, and Skonnard repeatedly and consistently touted to investors.

283. From the beginning of 2019, the Company's sales infrastructure—its program to support the hiring, ramping, and continued success of its sales representatives—was also deficient. Entering the year, according to subsequent statements by Budge, the Company's sales leaders were not properly focused on hiring high-quality sales representatives. As the Company later disclosed, the failures in the sales infrastructure had contributed to the sales execution failures from the beginning of 2019, resulting in the Company falling off its expected long-term trajectory of 40-50% billings growth.

### C. The SPO Offering Documents Contained Material Misstatements and Omitted Material Facts

284. On March 4, 2019, pursuant to the Securities Act of 1933, Pluralsight filed with the SEC a registration statement and a preliminary prospectus on Form S-1, which was signed or authorized to be signed by the Signer Defendants. Therein, the Company announced a secondary public offering (the "SPO") of 15,592,234 shares[22] of Class A common stock by company insiders, including by Signer Defendants Skonnard, Budge, Dorsey, Duncan, Onion, and Rencher, for gross proceeds of over $450 million. The co-lead underwriters of the SPO were Morgan Stanley and J.P. Morgan.

285. On March 7, 2019, pursuant to Rule 433, the Company filed a free writing prospectus (dated March 6) relating to its preliminary prospectus, announcing that the shares offered in the SPO would be priced at $29.25. The prospectus announced a trade date of March

[22] Excluding additional shares that the Company granted underwriters the option to purchase from the selling stockholders, the total amount of securities to be registered was 13,558,464.

7, 2019, and a settlement date, upon which the underwriters would deliver the shares to purchasers, of March 11, 2019. The free writing prospectus reiterated that the "selling stockholders will receive all the net proceeds from the offering of Class A Common Stock and the Issuer will not receive any proceeds from the sale of the shares in the offering of Class A Common Stock." On March 6, 2019, the SEC declared the registration statement effective (the "Registration Statement").

286. On March 7, 2019, pursuant to Rule 424(b)(4), the Company filed a final prospectus with the SEC (the "Prospectus") (together with the Registration Statement, referred to herein as the "Offering Documents"). The Offering Documents listed the amounts of shares being sold by the selling stockholders in the SPO:

| | Shares Beneficially Owned Before this Offering | | | | | | | | Shares Beneficially Owned After this Offering (assuming option to purchase additional shares is not exercised) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A | | Class B† | | Class C† | | | | Class A | | Class B† | | Class C† | | |
| Name of Beneficial Owners | Shares | % | Shares | % | Shares | % | % of Total Voting Power Before the Offering# | Number of Class A Shares Being Sold by Selling Stockholders in this Offering | Shares | % | Shares | % | Shares | % | % of Total Voting Power After the Offering (assuming option to purchase additional shares is not exercised)#‡ |
| **Named Executive Officers and Directors:** | | | | | | | | | | | | | | | |
| Aaron Skonnard(1) | 841,883 | 1.3% | — | — | 14,642,929 | 100.0% | 54.7% | 480,618 | 841,883 | 1.1% | — | — | 14,162,311 | 100.0% | 53.8% |
| James Budge(2) | 205,726 | * | 1,094,358 | 1.9% | — | — | * | 177,854 | 191,332 | * | 930,898 | 2.0% | — | — | * |
| Joe DiBartolomeo(3) | 90,113 | * | 523,696 | * | — | — | * | 60,000 | 90,113 | * | 463,696 | 1.0% | — | — | * |
| Gary Crittenden(4) | 20,180 | * | 179,758 | * | — | — | * | — | 20,180 | * | 179,758 | * | — | — | * |
| Scott Dorsey(5) | 27,278 | * | 269,204 | * | — | — | * | 47,492 | 27,278 | * | 221,712 | * | — | — | * |
| Arne Duncan(6) | 38,295 | * | 363,008 | * | — | — | * | 30,000 | 38,295 | * | 333,008 | * | — | — | * |
| Ryan Hinkle(7) | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Leah Johnson(8) | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Timothy Maudlin(9) | 20,180 | * | 303,588 | * | — | — | * | — | 20,180 | * | 303,588 | * | — | — | * |
| Frederick Onion(10) | 2,612,400 | 3.9% | 9,961,071 | 17.7% | — | — | 4.7% | 1,000,000 | 1,612,400 | 2.1% | 9,961,071 | 21.0% | — | — | 4.4% |
| Bradley Rencher(11) | 20,180 | * | 300,670 | * | — | — | * | 42,500 | 20,180 | * | 258,170 | * | — | — | * |
| Bonita Stewart(12) | 5,000 | * | — | — | — | — | * | — | 5,000 | * | — | — | — | — | * |
| Karenann Terrell(13) | 32,982 | * | 103,459 | * | — | — | * | — | 32,982 | * | 103,459 | * | — | — | * |
| **All executive officers and directors as a group (14 persons)(14)** | **3,978,712** | **5.9%** | **13,452,012** | **23.9%** | **14,642,929** | **100.0%** | **60.9%** | **1,908,464** | **2,964,318** | **3.9%** | **13,038,560** | **27.5%** | **14,162,311** | **100.0%** | **59.5%** |

287. The Offering Documents made clear that billings from business customers—which were generated by the sales force—had risen to 85% of the Company's billings in 2018 and that billings from business customers had grown at over 50% year-over-year in 2017 and

2018. Pluralsight's ability to continue to grow its billings to business customers, its core customer base, was therefore key to investors, and the Offering Documents assured investors that the Company's sales force was up to that task.

288. The Offering Documents omitted material facts necessary to make the statements contained therein not misleading, contained untrue statements of material fact, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents. As Pluralsight, Budge, and Skonnard later disclosed, as detailed *infra* in Section V.D, the Offering Documents failed to disclose major deficiencies in the sales force's capacity and infrastructure, and the associated risks for the Company's billings and revenue.

**1. The Offering Documents' Statements about an Expanded Sales Force Having Increased Effectiveness and Productivity Were Materially False and Misleading, and Contained Material Omissions**

289. The Offering Documents, falsely and misleadingly represented: "***We have significantly expanded our direct sales force to focus on business sales***." Similarly, the Offering Documents falsely and misleadingly stated, in a section titled "***Growth Strategy***":

> ***We have a large direct sales force to focus on business sales*** and have aligned our sales team's compensation structure to fit this objective. ***We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform.*** We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship. As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase. We will continue to expand our platform capabilities to deliver additional value to our customers. Our sales force educates business customers on the strengths of our platform to help customers make informed

decisions and create a customized and unified end-to-end learning experience for their businesses.

290. The statements in Paragraph 289 that "***[w]e have significantly expanded our direct sales force to focus on business sales***," "***[w]e have a large direct sales force***," and that Pluralsight had "***been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time***," were materially false and misleading because the statements created an inaccurate picture that the then-existing capacity, size, productivity, and effectiveness of the Company's sales force were adequate to continue to drive high billings growth. In fact, at the time these statements were made, the Company was then experiencing significant hiring, productivity and effectiveness problems with its sales force and infrastructure that were threatening its billings growth. Specifically, from the beginning of 2019, the Company was off its "annual sales ramp capacity plan" by "dozens" of sales representatives, its sales infrastructure was deficient, and the Company had therefore deviated from its "long-term growth trajectory" of a "long and sustainable business model" of "greater than 40% and near 50% on B2B."

291. Furthermore, the false statements regarding the current condition of the sales force in the context of the Company's "***growth strategy***" were misleading because the growth strategy the Securities Act Defendants presented to investors was quarterly billings growth of 40-50%, and so by speaking on this topic, the Securities Act Defendants incurred a duty to speak accurately and completely about impact of the undisclosed adverse facts on this strategy. Instead, they omitted these material facts—such as that the Company's strategy for achieving consistent quarterly billings growth in 2019 was significantly off track because as Pluralsight, Budge and Skonnard later admitted, from the beginning of January 2019, there was an insufficient number of adequately ramped sales representatives (and attendant adequate sales infrastructure) capable

of meeting the Company's targeted quotas, which were necessary for the Company to continue to achieve its historic, consistent level of billing growth through 2019.

292. Finally, having chosen to speak about the size, productivity, and effectiveness of the sales force, the Securities Act Defendants incurred a duty not to omit material adverse facts, such as that the size, productivity, and effectiveness of the sales force were in fact insufficient to sustain the Company's 2019 billings growth.

#### 2. The Offering Documents' "Risk Factors" Supposed Warnings of ***Possible*** Adverse Conditions Contained Material Omissions and Misstatements of Fact

293. The Offering Documents also contained certain "Risk Factors" that purported to address the Company's ability to hire and retain sales and marketing employees. The foregoing "Risk Factors" were materially false and misleading because (i) they presented the risks as hypothetical when in fact the risks had already materialized and posed a direct threat to Pluralsight's business model, and (ii) they omitted material information that would have allowed investors to properly evaluate the risks.

294. The Offering Documents contained a "Risk Factor" that stated: "As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and ***there is no guarantee*** that our investments will succeed and contribute to additional customer acquisition and revenue growth."

295. The Securities Act Defendants' statement in Paragraph 294 that there was "***no guarantee***" that the Company's investments in its sales force would succeed and lead to new customers and revenue created an impression of a general, hypothetical risk, which was false and misleading because specific facts available to them indicated that the risk had already

materialized. These material omitted facts were that the Company was then suffering from sales execution failures, namely, a failure to hire, train, and place enough sales representatives by the end of 2018 to increase sales at a level commensurate with past quarters, and that the Company had already fallen off its "***long-term growth trajectory***" and was then struggling to catch up to its planned level of 2019 billings growth.

296. The Offering Documents also contained a "Risk Factor" captioned "Failure to effectively expand our sales and marketing capabilities ***could*** harm our ability to increase our customer base and achieve broader market acceptance of our platform" that stated:

> ***If*** *we are unable to hire, develop, and retain talented sales or marketing personnel,* ***if*** *our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time,* ***or if*** *our sales and marketing programs are not effective,* our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

297. The Securities Act Defendants' statements in Paragraph 296 that the Company might not be able to "hire, develop, and retain talented sales or marketing personnel"; that its new personnel might be "unable to achieve desired productivity levels in a reasonable period of time"; and that its sales program might not be effective, were false and misleading because they were contradicted by facts available to the Securities Act Defendants at the time. The risks were not hypothetical; Pluralsight had already failed "to effectively expand" its "sales and marketing capabilities." The Company was already ***months behind*** hiring, developing, and training sales personnel; they were already significantly off track with ramping their sales representatives to desired productivity levels; and their sales program, behind the scenes, demonstrably lacked sufficient infrastructure (contrary to its representatives' public statements about how well they had already built it out to support the sales team). Pluralsight, Budge and Skonnard already were

aware that going into 2019, their sales leaders were not adequately focused on "hiring high-quality sales representatives." By failing to disclose the mounting threat posed by these risks, the Securities Act Defendants created a misleading impression of the Company's sales program and its ongoing production levels for investors.

298. The Offering Documents also contained a "Risk Factor" captioned: "***If*** *we fail* to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed" that stated in part: "As we expand our business, our continued success will also depend, in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base."

299. The statement in Paragraph 298 that its business could be harmed ***if*** the Company failed to recruit or retain qualified sales, marketing, and operation personnel was false and misleading because the Company was ***already*** failing to recruit and retain the sales representatives and enablement employees that they needed to maintain the "***long and sustainable business model***" that Pluralsight had built to sustain a consistent level of billings growth of 40-50%. As Budge later disclosed, "going into 2019," the sales leaders were not properly focused on "***the process of hiring high-quality sales reps***" and the Company was experiencing a "***capacity gap***" of "***dozens***" of sales representatives. By failing to disclose these facts to investors when they spoke of this recruitment and retention risk, the Securities Act Defendants misled investors about the existing strength of the Company's sales force and infrastructure.

300. Further, the Offering Documents contained a "Risk Factor" captioned: "***If*** *we fail* to effectively manage our growth, our business and results of operations could be harmed" that

stated in part: "We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . ***If*** *we do not achieve the benefits anticipated from these investments*, ***or if*** *the achievement of these benefits is delayed*, our results of operations may be adversely affected."

301. The Securities Act Defendants' statements in Paragraph 300 that Pluralsight's results of operations ***might be*** adversely affected if they failed to effectively manage their growth were false and misleading because, ***in reality***, its results of operations were ***already*** being adversely affected by its failure to effectively manage its growth. The risk was not hypothetical; it was substantially transpiring. From the beginning of 2019, Pluralsight, Budge and Skonnard had misled investors about their sales headcount, the quality of their sales program's infrastructure, and the Company's progress on its "***long-term growth trajectory***" toward achieving "***a long and sustainable business model***" of "***greater than 40% and near 50% on B2B***". In fact, the Company had already fallen off that trajectory because its new sales representatives were not properly being ramped. The Securities Act Defendants' omission of this information and their failure to disclose that their achievement of the benefits of their investment in their sales force would be substantially delayed created a materially misleading impression for investors about the likelihood of the risk to the Company's results of operations.

302. Thus, the Offering Documents were negligently prepared and contained untrue statements of material fact as well as omissions of facts necessary to render the statements made not misleading.

**D. On July 31, 2019, the Truth Emerged**

**1. The Second Quarter Results Revealed a 21% Drop in B2B Billings Growth in Just Three Months**

303. On July 31, 2019, after the close of the markets, the Company announced its financial results for the second quarter of 2019, which ended on June 30, 2019. According to the Form 10-Q that Pluralsight filed with the SEC that day, which Skonnard and Budge signed, as a result of "sales execution challenges," the Company had dismal total billings growth of 23% year-over-year, and B2B billings growth of 27% year-over-year. These results were an abrupt and dramatic departure from the Company's performance in previous quarters, as demonstrated by the following charts:

| | Q2 2018 | Q3 2018 | Q4 2018 | FE 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| B2B Billings | 52% | 53% | 51% | 52% | 48% | 27% |
| Total Billings | 42% | 44% | 42% | 43% | 41% | 23% |
| Revenue | 38% | 42% | 42% | 42% | 40% | 42% |



304. The Form 10-Q revealed for the first time that the Company had been "slower in hiring additional sales representatives ***than planned for 2019***" and that "***[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods***."

305. Given the magnitude of the billings growth collapse, and the fact that Pluralsight, Budge and Skonnard were aware that there were not enough sales representatives as of the beginning of 2019 to continue to generate a high level of billings growth, the Securities Act Defendants negligently failed to disclose facts in the Offering Documents that were readily apparent to them or that they would have uncovered had they conducted a cursory investigation.

**2. Budge and Skonnard Disclosed that the Sales Force Deficiencies Existed Since the Beginning of 2019**

306. Skonnard and Budge spoke on the earnings call that day. A *Seeking Alpha* analyst later commented that "we have not sat in at a worse one." Skonnard and Budge disclosed that they had had access to information that showed that the sales force lacked capacity and was not properly ramped ***since at least the beginning of 2019*** (meaning, two months before the SPO, when they had told investors that they had "significantly expanded" their sales force to drive "substantial increases" in "productivity" and "effectiveness"), and that this deficiency early in the year had translated into the billings collapse six months later. The analysts on the call openly struggled to understand how the Company could have had "sales execution challenges" when all they had heard from the Company and its officers to that date was how well the sales team was executing.

307. Skonnard acknowledged the fact—which the Securities Act Defendants omitted from the Offering Documents—that there "***was not enough capacity in the system to sustain our***

***high-growth expectations as we entered the year***." Because the Company's deal cycle lasted approximately five to six months, to sustain those high-growth expectations through June 2019, the Company would have needed to hire and place enough sales representatives to fuel its deal pipeline as of in or around January 2019—in time for the deals in the pipeline to be ready to close in the spring of 2019.

308. Budge disclosed that the quota-bearing sales representatives that the Company had needed and had planned to have ramped in time to close deals in the second quarter "***didn't come into the year early enough in the year***" and that billings had suffered dramatically as a result: "We're about 250 quota-bearing reps right now. And that's about the number of bodies ***we wanted to have at this time in the year***, ***but they didn't come into the year early enough in the year***. ***So the ramp time to get them trained up and ready to go, be effective with salaries, we're a few months behind there, that's been the big impact.***"

309. Along the same lines, Budge informed investors that Pluralsight's sales force had lacked "***ramped capacity***" since the "***end of last year***," which had prevented the Company, "***beginning into this year***," from generating the deal pipeline activity necessary to sustain its customary and expected high level of billings growth in the second quarter of 2019:

> The productivity we're seeing on the tenured reps is the same where it historically has been. ***Simply put, there was dozen -- there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.*** The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, ***but we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter.*** Good news is we feel, with where we are,

> ***we're caught up to some extent.*** For the most part still, we're up by a few heads, but not a material amount like we were through Q2. So we feel like we're in a great spot going into the second half.

310. Despite having never told investors that the Company was off track with its sales force ramping in the first place, Skonnard now told investors that "***we've nearly caught up with our annual sales ramp capacity plan***, which will strengthen the balance of the year and into 2020." Budge echoed him, telling investors that the Company had "nearly caught up on our ***sales capacity gaps***."

311. Given these disclosures that they had been privy to the sales capacity failures, and the concurrent threat to billings, for ***several months***, an analyst asked a logical question: "**[*W*]*hy didn't we hear this on last quarter's call***?" Budge acknowledged that they had not told analysts about the capacity problem because they had unreasonably hoped that they could paper over the capacity gap without having to disclose the true facts during the Class Period: "***Well, we were still hitting our numbers, and we felt like we had things broke, right***. We were still realizing what we needed with on our – what we need on our retention rates with our expand opportunities, and we were seeing kind of an accelerated productivity out of reps ***that was not sustainable in the second quarter***. ***We just needed more bodies to soak that up***."

312. Skonnard and Budge reiterated that they had monitored the sales force's retention rate and growth over the first six months and were resolute that the billings collapse had been due to sales capacity problems, not an unexpected loss of sales representatives, as Skonnard said: "We actually -- ***we have benchmarks that we look out regularly for what happens in the software industry***, where we have historically been much better than those benchmarks and that continued through the first 6 months."

313. Thus, these facts were readily apparent to the Securities Act Defendants prior to the SPO or would have been had they conducted a diligent investigation, and the Securities Act Defendants' failure to disclose the omitted facts was negligent.

### 3. Budge and Skonnard Disclosed that the Company's Investments in Sales Infrastructure Were Inadequate to Support the Company's Long-Term Growth Trajectory

314. Pluralsight, Skonnard and Budge's repeated assurances about how well they had invested in and built out their sales infrastructure to "scale" also turned out to have been empty. Skonnard informed analysts that "the type of fast growth we've enjoyed requires us to provide prescriptive and effective sales enablement, and ***we didn't invest enough in that area of our business***." After having told investors for the last several months how efficiently their sales model was executing, Skonnard now announced that the Company would be "adding key people and investing in sales operations, customer success and sales enablement to support our newly hired sales teams." Skonnard also announced that DiBartolomeo was leaving the Company after three years as CRO to help the sales force become more "***effective***." Skonnard stated that he was "confident these are the right changes for the business and that they'll get us quickly ***back to our expected long-term growth trajectory***."

315. The Securities Act Defendants negligently failed to disclose in the Offering Documents that the Company had fallen off its long-term growth trajectory by not investing enough in Pluralsight's sales infrastructure and that it was months behind on its sales ramp capacity plan, because these facts were readily apparent to the Securities Act Defendants or would have been had they done basic diligence.

### 4. Pluralsight, Budge and Skonnard's Disclosures Demonstrated That the Securities Act Defendants Negligently Omitted Key Information About the Sales Force From the Offering Documents

316. These revelations, coming less than five months after the SPO, reveal that the Securities Act Defendants could easily have disclosed in the Offering Documents, especially with an adequate investigation, that (i) the Company was experiencing sales execution failures, including being dozens of sales representatives behind in its sales representative ramp capacity plan from the beginning of 2019, and having a deficient sales infrastructure; and (ii) that there was a substantial risk that the company would not achieve its consistent, precedented rate of billings growth, thus negatively impacting its future revenue.

317. Budge made subsequent disclosures that shed additional light on facts that existed prior to the SPO. On January 14, 2020, Budge returned to the Needham Growth Conference to speak to investors on behalf of the Company. Analyst Scott Randolph Berg asked him about the failures in 2019. Budge responded by expounding on what Pluralsight, Skonnard and he had known at the start of the Class Period about the state of Pluralsight's sales force:

> ***I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned -- than we had hoped for.*** And the reason for that is we didn't -- while we planned for, we didn't execute to those reps. We didn't decide where they should go early enough in 2018 leading into 2019. We were experimenting with a hunter-farmer model in 2019. ***We didn't do a good enough job planning early and enough and executing early and enough in deciding who would fit into what slot as we rolled through 2019. And as a result, we had some capacity challenges in our sales force. We just didn't have enough reps.***
>
> So we've put the gas pedal down hard in the second half in the last kind of 3 quarters in 2019. ***We came out of 2018 going into 2019 with about 200 quota-bearing sales reps***. And we're now going into 2020, a year later, with about -- we have about 320 reps right

> now, which is pretty close to what the target was for us going -- exiting 2019.
>
> So I think with the new leadership, and frankly, I give all the credit to the new sales leadership that we have. They've done a remarkable job. You can have a really great recruiting engine. You can have a great planning engine. ***But unless the sales leaders engage in the process of hiring high-quality sales reps, it's not going to go anywhere. And we feel much better focused from our sales leaders going into 2020 than we had going into 2019.***

318. These statements underscored that the likely impact of the Company's sales force problems either was readily apparent to the Securities Act Defendants or could easily have been discovered, and thus should have been included in the Offering Documents. By not including this information in the Offering Documents, the Securities Act Defendants acted negligently.

**E. The False and Misleading Statements and Omissions Were Material**

319. As described above, the Offering Documents failed to disclose that from the beginning of 2019, the Company had been dozens of sales representatives behind in its annual sales ramp capacity plan and therefore had fallen off its long-term growth trajectory of achieving 40-50% billings growth each quarter. The Offering Documents further failed to disclose that the Company's sales infrastructure was insufficient to properly hire and ramp its sales representatives in a timely manner. Finally, the Offering Documents failed to accurately describe the risks posed by the then-existing sales force capacity problems to the Company's billings and revenue—risks that had materialized by the time of the SPO and ultimately negatively affected the Company's finances. These false statements and omissions were material to investors because they pertained to core aspects of Pluralsight's business as well as its prospects for success. The materiality of these statements is demonstrated by: (i) the dramatic impact of the undisclosed capacity problems with the sales force on billings growth in the second quarter of

2019; (ii) disclosures by Pluralsight, Budge, and Skonnard conceding that these problems, which existed at the time of the SPO, were directly responsible for the collapse in billings growth; (iii) analysts' shocked reactions to the July 31, 2019 disclosures of adverse facts about the sales force that had existed for several months; and (iv) the complete collapse of Pluralsight's stock price in reaction to the omitted facts.

### 1. The Impact of the Omitted Facts About the Sales Force on the Second Quarter 2019 Results Demonstrate the Materiality of the Omitted Facts in the Offering Documents

320. The omitted facts had substantial implications for core aspects of Pluralsight's business. Pluralsight has repeatedly asserted that billings, which are driven by its sales force, are its "key business metric" and a "key factor affecting [its] long-term performance." Accordingly, decisions, trends, and risks affecting the Company's sales force are of great importance to investors.

321. Pluralsight, Budge and Skonnard specifically attributed the billings collapse in the second quarter of 2019 to sales execution failures. The drop-off in billings that resulted from those failures was dramatic and quantifiable: after eight consecutive quarters of at least 48% B2B billings growth and over 50% in all but one quarter, Pluralsight posted a dismal 27% B2B billings growth rate in the second quarter of 2019. In its 2019 Q2 Form 10-Q, which Skonnard and Budge signed, the Company announced, "[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods." The impact of the omitted facts on the Company's financial results are demonstrated below:

| 322. | **Q2 2018** | **Q3 2018** | **Q4 2018** | **FE 2018** | **Q1 2019** | **Q2 2019** |
|---|---|---|---|---|---|---|

| 322. | Q2 2018 | Q3 2018 | Q4 2018 | FE 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| B2B Billings | 52% | 53% | 51% | 52% | 48% | 27% |
| Total Billings | 42% | 44% | 42% | 43% | 41% | 23% |
| Revenue | 38% | 42% | 42% | 42% | 40% | 42% |




**2. Pluralsight's and its Officers' July 31, 2019 Disclosures Demonstrate the Materiality of the Omitted Facts in the Offering Documents**

323. Pluralsight, Budge, and Skonnard's post-SPO statements also underscored that the omitted facts would have been important to investors. They conceded that the substantial decline in billings correlated to a significant capacity gap in Pluralsight's sales force that existed as of the beginning of 2019. Budge quantified the number of sales representatives that the Company "needed to bring on board at the end of [2018], beginning into [2019], so they would ramp and become fully productive in the second quarter" as being in the "dozens."

324. Skonnard publicly disclosed that, prior to the SPO, the Company was aware that it lacked the "capacity in our system to sustain our high-growth expectations." Budge

acknowledged that the number of sales representatives that the Company planned to have hired "didn't come into the year early enough in the year," which caused a "big impact" on billings in the second quarter of 2019. He also disclosed that "we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter."

### 3. The Stock Price Reaction to the July 31, 2019 Sales Force Disclosures Demonstrates the Materiality of the Omitted Facts in the Offering Documents

325. The market's strong, negative reaction to the revelation of the omitted facts further demonstrates materiality. Pluralsight's share price declined nearly 40% the day after the disclosure, as demonstrated in the following chart, which shows Pluralsight's closing stock price during the relevant period:




326. The drop, from $30.69 on July 31, 2019, to $18.56 on August 1, on unusually high trading volume of 22 million shares, entirely erased the stock's year-to-date gains.

### 4. The Reaction of Analysts to the July 31, 2019 Sales Force Disclosures Demonstrates the Materiality of the Omitted Facts in the Offering Documents

327. Analysts expressed shock following the Company's July 31, 2019 disclosures. On August 1, 2019, SunTrust issued a report titled: "*Where Did That Come From*?" J.P. Morgan similarly noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "***hiring issue was known earlier***" and that ***"[m]anagement pointed out that it saw it was behind on sales hiring coming into the year***, but we are now just hearing about it since they were able to deliver on 1Q19 numbers ***and hoped that quarter's execution would continue***."

328. A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that the Company had "been an investor darling for much of its lifetime as a public company" but that its "bullish case broke down" in the second quarter. Alexander observed that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million implies a sharp revenue deceleration to just 30% y/y growth."

329. On August 5, 2019, another *Seeking Alpha* article titled "*Pluralsight: Investors Learn A Lesson*" further analyzed the earnings announcement: "While the company maintained the full year guidance, it is very clear that the situation is far from rosy. ***Not only are risks related to the full year guidance up in a major way, realistic losses still coming in rapidly above the $100 million mark***, mostly because of a run rate of $85 million in stock-based compensation.

330. On September 4, 2019, *Seeking Alpha* published an article titled "*Pluralsight: Good Problems To Have, But Needs To Address A Major Concern*," that noted that "[i]t was revealed during Q2 earnings call that Q2's sales issue ***was actually an extension from Q1***" and that "***[w]ith the issue getting bigger and affecting its billings growth in Q2, there was nowhere to hide***."

**F. Pluralsight Violated Items 303 and 105 of Regulation S-K**

331. Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires companies, in their Registration Statements, to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

332. Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3. The SEC's interpretive release regarding Item 303 further clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

333. As described above, Pluralsight, Budge and Skonnard publicly disclosed that, prior to the SPO, they were aware of the capacity gap in the sales force and that the Company had fallen significantly behind on its sales representative ramp plan. Without those sales representatives achieving their scheduled levels of productivity from the beginning of the year, the Company's continued billings growth was significantly jeopardized.

334. Skonnard disclosed that the Company had not had "enough capacity in the system to sustain our high-growth expectations ***as we entered the year***."

335. Budge disclosed that the quota-bearing sales representatives that the Company had needed and had planned to have ramped in time to close deals in the second quarter "***didn't come into the year early enough in the year***" and that billings had suffered dramatically as a result: "We're about 250 quota-bearing reps right now. And that's about the number of bodies ***we wanted to have at this time in the year***, ***but they didn't come into the year early enough in the year***. ***So the ramp time to get them trained up and ready to go, be effective with salaries, we're a few months behind there, that's been the big impact.***"

336. Budge also informed investors that the Company's sales force had lacked "***ramped capacity***" since the "***end of last year***," which had prevented the Company, "***beginning into this year***," from generating the deal pipeline activity necessary to sustain its customary and expected high level of billings growth in the second quarter of 2019:

> The productivity we're seeing on the tenured reps is the same where it historically has been. Simply put, there was dozen -- there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter. The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move

> into the fourth quarter, but we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter. Good news is we feel, with where we are, we're caught up to some extent. For the most part still, we're up by a few heads, but not a material amount like we were through Q2. So we feel like we're in a great spot going into the second half.

337. On January 14, 2020, Budge told investors: "I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned -- than we had hoped for. And the reason for that is we didn't -- while we planned for, we didn't execute to those reps. We didn't decide where they should go early enough in 2018 leading into 2019."

338. The Securities Act Defendants therefore had information that demonstrated that because the Company was significantly behind on its sales ramp plan, it was reasonably likely that Pluralsight would be unable to keep up the sustained high billings growth rate of 40-50% that it had told investors it was capable of consistently delivering and that future revenue would likewise be negatively impacted.

339. At the time when Pluralsight filed its Offering Documents, these trends and circumstances were either readily apparent to the Securities Act Defendants, or they could easily have discovered them with a reasonable investigation, but negligently failed to disclose them in the Offering Documents.

340. As a result, the Securities Act Defendants caused Pluralsight to violate Item 303 of Regulation S-K by negligently failing to disclose this known trend and uncertainty to the marketplace.

341. Similarly, Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Item 105 required Pluralsight to "[e]xplain how the risk affects the registrant or the securities being offered" and to "adequately describe[] the risk." *Id.*

342. The Offering Documents made no mention of the substantial risks posed by the sales capacity gap to Pluralsight's billings growth, much less provided an adequate description of those risks, despite the fact that, as discussed above, the Company and its officers were well aware of the risks.

343. At the time when Pluralsight filed its Offering Documents, these risks were either readily apparent to the Securities Act Defendants, or they could easily have discovered them with a reasonable investigation, but negligently failed to disclose and adequately describe them in the Offering Documents, causing Pluralsight to violate Item 105 of Regulation S-K.

**COUNT IV**
**For Violations of Section 11 of the Securities Act**
**Against Pluralsight, the Signer Defendants, and the Underwriter Defendants**
**(The Securities Act Defendants)**

344. This claim is brought by Lead Plaintiff INPRS under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the Class A common stock of Pluralsight in connection with the SPO.

345. Lead Plaintiff INPRS repeats, incorporates, and realleges every allegation in Sections I (¶¶ 2-12), II, III.A, III.C and V as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud Lead Plaintiff INPRS or members of the Class. For the purposes of this

Section 11 claim, Lead Plaintiff INPRS does not allege that any Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is predicated upon the Securities Act Defendants' liability for negligently making false and materially misleading statements in the Offering Documents.

346. The Offering Documents were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated in it.

347. Pluralsight is the registrant for the shares issued and distributed to the Class members in the SPO. As the issuer of the shares, Pluralsight is strictly liable to Lead Plaintiff INPRS and the Class for the Offering Documents' material misstatements and omissions.

348. The Signer Defendants are responsible for the contents of the Offering Documents based on their status as officers and/or directors of the Company and because they signed or authorized the signing of the Offering Documents.

349. The Underwriter Defendants are responsible for the contents of the Offering Documents based on their status as underwriters.

350. Each of the Signer and Underwriter Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering documents. Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Offering Documents inaccurate.

351. The Signer and Underwriter Defendants failed to make a reasonable and diligent investigation, and thus lacked reasonable grounds for the belief that the statements contained in

the Offering Documents were true and without omissions of any material facts and were not misleading.

352. By virtue of the Signer and Underwriter Defendants' failure to make a reasonable and diligent investigation, the Offering Documents were false and misleading, contained untrue statements of material fact, omitted other facts needed to render the statements made not misleading, and omitted material facts required to be stated therein. As such, the Signer and Underwriter Defendants are strictly liable to Lead Plaintiff INPRS and the Class.

353. Lead Plaintiff INPRS and the Class purchased shares of Pluralsight Class A common stock pursuant to and/or traceable to the Offering Documents filed in connection with the SPO. There has been no subsequent offering.

354. Lead Plaintiff INPRS and the Class have sustained damages. The value of Pluralsight Class A common stock has declined substantially since the disclosure of the truth about the Company's sales force after July 31, 2019, and after the issuance and dissemination of the materially misleading Offering Documents.

355. At the time of their acquisition of Pluralsight Class A common stock in the SPO, Lead Plaintiff INPRS and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count.

356. Less than one year elapsed from the time that Lead Plaintiff INPRS discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that Lead Plaintiff INPRS filed this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff INPRS filed this action.

357. By reason of the misconduct alleged herein, Pluralsight, and the Signer and Underwriter Defendants, are liable to Lead Plaintiff INPRS and the Class for damages suffered under Section 11 of the Securities Act.

**COUNT V**
**For Violations of Section 12(a)(2) of the Securities Act against Pluralsight and the Underwriter Defendants**

358. Lead Plaintiff INPRS repeats, incorporates, and realleges every allegation in Sections I (¶¶ 2-12), II, III.A, III.C.1 and 3, and V above, as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of Pluralsight and the Underwriter Defendants to defraud Lead Plaintiff INPRS or members of the Class.

359. This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2). By means of the defective Prospectus and as otherwise detailed in this complaint, Pluralsight and the Underwriter Defendants promoted and sold, for the benefit of themselves and their associates, Pluralsight Class A common stock to Lead Plaintiff INPRS and other members of the Class.

360. The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Pluralsight and the Underwriter Defendants owed Lead Plaintiff INPRS and other members of the Class who acquired Pluralsight Class A common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained in the Prospectus not misleading. Pluralsight and the Underwriter

Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as alleged above. Had they done so, they would have known of the untrue statements of material fact and omissions alleged herein. Lead Plaintiff INPRS and other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the material untruths and omissions contained in the Prospectus at the time they purchased or acquired Pluralsight Class A common stock.

361. By reason of the conduct alleged in this Count, Pluralsight and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of this violation, Lead Plaintiff INPRS and the other members of the Class who purchased Pluralsight Class A common stock in the SPO pursuant to the Prospectus sustained substantial damages in connection with those acquisitions. Accordingly, Lead Plaintiff INPRS and the other members of the Class who hold the Class A common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to Pluralsight. Class members who have sold their Pluralsight Class A common stock acquired by them in the SPO are entitled to rescissory damages.

362. Less than one year elapsed from the time that Lead Plaintiff INPRS discovered, or reasonably could have discovered, the facts upon which this count is based to the time that Lead Plaintiff INPRS filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were acquired by members of the Class and the time Lead Plaintiff INPRS filed this action.

**COUNT VI**
**For Violations of Section 15 of the Securities Act Against the Signer Defendants**

363. Lead Plaintiff INPRS repeats, incorporates, and realleges every allegation in Sections I (¶¶ 2-12), II, III.A, III.C.1 and 2, and V above, as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Signer Defendants to defraud Lead Plaintiff INPRS or members of the Class.

364. This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Signer Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is expressly disclaimed.

365. Signer Defendants Budge and Skonnard were control persons of Pluralsight by virtue of their positions as senior executive officers of Pluralsight at the time of the SPO. The additional Signer Defendants were control persons of Pluralsight by virtue of, among other things, their positions as directors of the Company. The Signer Defendants were in positions to control, and did control, the false and misleading statements and omissions contained in the Offering Documents.

366. The Signer Defendants at all relevant times participated in the operation and/or management of Pluralsight, and conducted and participated, directly and indirectly, in the conduct of Pluralsight's business affairs. The Signer Defendants were under a duty to disseminate truthful and accurate information with respect to Pluralsight's sales force and financial condition. Because of their positions of control and authority as officers and directors of Pluralsight, the Signer Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue and/or misleading statements.

367. The Signer Defendants' control, ownership, and positions made them privy to and provided them with knowledge of the material facts concealed from Lead Plaintiff INPRS and members of the Class.

368. None of the Signer Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

369. Less than one year elapsed from the time that Lead Plaintiff INPRS discovered, or reasonably could have discovered, the facts upon which this count is based to the time that Lead Plaintiff INPRS filed this action. Less than three years has elapsed between the time that the securities upon which this count is brought were acquired by members of the Class and the time Lead Plaintiff INPRS filed this action.

370. By reason of the conduct alleged in this Count, for which Pluralsight is primarily liable, as set forth above, the Signer Defendants are jointly and severally liable with and to the same extent as Pluralsight pursuant to Section 15 of the Securities Act. As a direct and proximate result of the conduct of the Signer Defendants, Lead Plaintiff INPRS and the other members of the Class suffered damages in connection with their purchase or acquisition of shares pursuant to the Offering Documents.

## VI. CLASS ACTION ALLEGATIONS

371. Lead Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of (i) all persons who purchased the Class A common stock of Pluralsight during the Class Period (January 16, 2019, through July 31, 2019, inclusive) and

were damaged thereby, and (ii) all persons who purchased Pluralsight Class A common stock issued pursuant or traceable to the Offering Documents and were damaged thereby (the "Class"). Excluded from the Class are (i) all defendants; (ii) members of the immediate families of the Exchange Act and Securities Act defendants; (iii) any of the selling stockholders listed in the Offering Documents; (iv) members of the immediate families of any of the selling stockholders listed in the Offering Documents; (v) the subsidiaries and affiliates of any defendants or the selling stockholders listed in the Offering Documents; (vi) any person or entity who is a partner, executive officer, director or controlling person of any defendants or selling stockholders listed in the Offering Documents (including any of their subsidiaries or affiliates); (vii) any entity in which any defendant has a controlling interest; and (viii) the legal representatives, heirs, successors and assigns of any such excluded party.

372. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. According to Pluralsight's Q2 2019 Form 10-Q, as of June 30, 2019, the Company had approximately 101,096,472 shares issued and outstanding owned by many thousands of investors. The precise number of Class members is unknown to Lead Plaintiffs at this time, but it is believed to be in the thousands. Members of the Class may be identified by records maintained by Pluralsight or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

373. Common questions of law and fact exist as to all members of the Class, predominate over questions that may affect individual Class members and include:

a. Whether Pluralsight and the Officer Defendants violated the Exchange Act as alleged herein;

b. whether Pluralsight and the Officer Defendants omitted and misrepresented material facts in the SEC filings, press releases, and other public statements disseminated to the investing public during the Class Period;

c. whether Pluralsight and the Officer Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

d. whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972);

e. whether and to what extent the market price of Pluralsight Class A common stock was artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

f. whether the Securities Act Defendants violated the Securities Act as alleged herein;

g. whether the Offering Documents issued by the Securities Act Defendants to the investing public omitted and/or misrepresented material facts about the Company and its business;

h. whether, with respect to Lead Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, defendants named in those claims are controlling persons of the Company;

i. the extent of damages sustained by Class members and the appropriate measure of damages.

374. Lead Plaintiffs' claims are typical of those of the Class because all members of the Class arise from and were caused by and have sustained damages as a result of Pluralsight and the Officer Defendants' wrongful conduct in violation of the Exchange Act, and/or as a result of the Securities Act Defendants' wrongful conduct in violation of the Securities Act, as complained of herein.

375. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Lead Plaintiffs have no interests that conflict or are antagonistic with those of the Class.

376. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest;

C. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 3, 2020

By /s/ Keith M. Woodwell
**CLYDE SNOW & SESSIONS, P.C.**

Keith M. Woodwell
Joseph D. Watkins

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (admitted *pro hac vice*)

Steven J. Toll (admitted *pro hac vice*)
Megan Kinsella Kistler (admitted *pro hac vice*)

Joel P. Laitman (*pro hac vice* forthcoming)
jlaitman@cohenmilstein.com
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

*Counsel for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago and the Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2020, I electronically filed the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system which sent notification of such filing to all parties of record.

/s/ Michelle Carter