Keith M. Woodwell (#7353)
Joseph D. Watkins (#16979)
CLYDE, SNOW & SESSIONS, P.C.
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 322-2516
Facsimile: (801) 521-6280
kmw@clydesnow.com
jdw@clydesnow.com

Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

*Additional Counsel on Signature Page*

*Attorneys for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers'
Pension and Retirement Fund of Chicago and the Proposed Class*

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PLURALSIGHT, INC.; AARON SKONNARD; JAMES BUDGE; GARY CRITTENDEN; SCOTT DORSEY; ARNE DUNCAN; RYAN HINKLE; LEAH JOHNSON; TIMOTHY MAUDLIN; FREDERICK ONION; BRAD RENCHER; BONITA STEWART; KARENANN TERRELL; MORGAN STANLEY & CO., LLC; and J.P. MORGAN SECURITIES, LLC,<br><br>Defendants. | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS<br><br><br><br>Case No. 1:19-cv-00128-JNP<br>District Judge Jill N. Parrish |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS .................................................................................. 5

III.    ARGUMENT...................................................................................................... 8
        A.      The CAC is Properly Pled.......................................................................... 8
        B.      Plaintiffs Adequately Allege Exchange Act Claims. ........................................ 10
                1.      Defendants Made Materially False and Misleading Statements............... 11
                        a.      Defendants Misrepresented Present and Historical Facts............ 12
                        b.      The Statements Were Not Unactionable Optimism or
                                Opinions. ....................................................................... 15
                        c.      The PSLRA Safe Harbor Provides No Shelter. ......................... 19
                        d.      Defendants' Risk Factors Were Misleading and Useless. ........... 20
                        e.      Defendants Violated Their Legal Duties to Disclose Certain
                                Information Under Items 303 and 105 of Regulation S-K. .......... 22
                2.      The CAC Adequately Pleads Scienter. .................................................. 24
        C.      Plaintiff INPRS Alleges Actionable Securities Act Claims. ............................... 32

IV.     CONCLUSION.................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ......................................................................................25

*Arena Land & Inv. Co., Inc. v. Petty*,
69 F.3d 547 (10th Cir. 1995) .............................................................................................9

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ...................................................................................20

*Bos. Ret. Sys. V. Uber Techs., Inc.*,
No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020).................................21

*Bus. Loan Express, LLC v. Faith Ventures, Inc.*,
No. 07-cv-1433-W, 2008 WL 11338444 (W.D. Okla. July 30, 2008)
(unpublished) ....................................................................................................................9

*In re CPI Grp. Inc. Sec. Litig.*,
No. 16-cv-4531-LAK, 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)
(unpublished) ..................................................................................................................23

*DiTucci v. Ashby*,
No. 2:19-cv-277-TC-PMW, 2020 WL 1249627 (D. Utah Mar. 16, 2020)
(unpublished) ............................................................................................................11, 24

*Employees' Ret. Syst. of Govt. of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).............................................................................................30

*In re Facebook, Inc. Sec. Litig.*,
405 F. Supp. 3d 809 (N.D. Cal. 2019) .............................................................................29

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ...........................................................................................28

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)..........................................................................19, 31

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................................29, 32

*Golden v. Mentor Capital, Inc.*,
No. 15-cv-0176-JNP, 2016 WL 10100280 (D. Utah Apr. 19, 2016)
(unpublished) (Parrish, J.)...............................................................................................29

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ..........................................................................................17

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)....................................................................................................32, 33

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000), *abrogated on other grounds by California
Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 198 L. Ed. 2d
584 (2017) ...................................................................................................................11, 14

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ................................................................................ *passim*

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..........................................................................................22

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)...............................................................................20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................................................................................................13, 28

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) ........................................................................................14

*Meyer v. Jinkosolar Holdings, Co.*,
761 F.3d 245 (2d Cir. 2014)......................................................................................20, 22

*In re Mylan N.V. Sec. Litig.*,
No. 16-cv-7926-JPO, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)...............................24

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) ............................................................................... *passim*

*In re Nature's Sunshine Prod. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007).......................................................................30, 31

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................................................18, 26

*Operating Local 646 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)..................................................................................................14

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
    838 F. Supp. 2d 1148 (D. Colo. 2012).............................................................................10, 32

*In re Quality Sys. Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..............................................................................15, 16, 19, 27

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................................20

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) ..........................................................................................10, 33

*S.E.C. v. Curshen*,
    372 F. App'x 872 (10th Cir. 2010) (unpublished)........................................................11, 12, 14

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ........................................................20

*Slater v. A.G. Edwards & Sons, Inc.*,
    719 F.3d 1190 (10th Cir. 2013) ..........................................................................................22

*Spiegel v. Tenfold*,
    192 F. Supp. 2d 1261 (D. Utah 2002)..................................................................................20

*Stratte-McClure v. Morgan Stanley*
    776 F.3d 94, 102 (2d Cir. 2015)..........................................................................................22

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..................................................................................................19

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)..............................................................................................10, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................3, 24, 25, 27

*United Food & Commerical Workers Union v. Chesapeake Energy Corp.*,
    No. 09-cv-1114, 2010 WL 3527596 (W.D. Okla. Sept. 2, 2010) (unpublished)...............21, 33

iv

*Williams v. Globus Med., Inc.*,
    69 F.3d 235 (3d Cir. 2017)......................................................................................21

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003).........................................................18, 22

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019).................................................19, 23, 27, 28

**STATUTES**

Securities Exchange Act ..................................................................................... *passim*

Securities Act .................................................................................................... *passim*

**OTHER AUTHORITIES**

17 C.F.R. § 229.105 .................................................................................................23

17 C.F.R. §229.303(a)(3)(ii).....................................................................................22

17 C.F.R. § 240.10b-5(b)..........................................................................................11

Plaintiffs respectfully submit this memorandum of law in opposition to the Exchange Act Defendants and Securities Act Defendants' Motions to Dismiss (the "MTD" or "Motions") Lead Plaintiffs' Corrected Amended Complaint (the "CAC") (Dkt. 111, 114).[1]

## I.    INTRODUCTION

Defendants argue that Plaintiffs' action is meritless because Pluralsight's stock price collapse, of nearly 40% in a single day, merely reflected investor "disappointment" with "one business metric," billings growth, for which Pluralsight did not provide projections. And, they say, "disappointment" does not give rise to claims under the Exchange Act or the Securities Act. This argument, however, rests on a faulty premise and ignores Plaintiffs' actual allegations. In fact, the massive stock price drop-off was fueled by Defendants' admission the previous day as to the *cause* of the billings growth decline. Specifically, Pluralsight and its two most senior officers, Defendants Skonnard (its CEO) and Budge (its CFO), disclosed that since the beginning of January 2019, they had known that the Company had too few seasoned (or "ramped") sales representatives to achieve its traditional level of billings growth, and that its sales infrastructure required an overhaul.

The significance of this admission was not lost on investors and securities analysts. It meant that Pluralsight, Skonnard and Budge's months of unequivocally positive statements about *the sales force*, including its current size, infrastructure, and output, were false and misleading.[2] This admission triggered such a dramatic decline in stock price because Pluralsight, Skonnard, and

---

[1] In this memorandum of law, Plaintiffs use the definitions of the parties in the CAC. Capitalized terms used and not defined in this brief have the same meanings as defined in the CAC. Unless otherwise noted, all emphasis is added, and all internal quotations and citations are omitted.

[2] To facilitate the Court's review, Plaintiffs annex as Exhibits A-C charts that identify the actionable statements for the Exchange Act and Securities Act claims, as well as the statements that Plaintiffs did not allege were actionable but that Defendants set up as straw men.

Budge themselves had repeatedly told investors that expanding sales force capacity, as investors were falsely led to believe was occurring, was essential to sustaining billings growth. Faced with these clearly actionable misstatements and omissions, Defendants unsuccessfully attempt to recast Plaintiffs' allegations and advance arguments for dismissal, all of which fail.

First, Defendants argue the CAC violates Rules 8 and 9(b) because it is too long and repetitive. This argument is baseless. The length and detail in the CAC reflect Plaintiffs' care in first setting forth the predicate chronologies necessitated by the differences between the Exchange Act and Securities Act claims, and then identifying each actionable misstatement and explaining why it was false and misleading. *See* CAC Sections IV, V. The need for this structure is evidenced by Defendants' effort to obfuscate which actionable statements were alleged to be misleading and by their contention that the Securities Act claims sound in fraud (when they do not).[3]

Defendants next argue that none of the alleged material misstatements and omissions are actionable under Section 10(b) (and later, that the control person and insider trading claims under Sections 20(a) and 20A therefore fail for lack of a primary violation) because they were true historical facts, "forward looking" statements protected by the PSLRA safe harbor, or statements of unactionable optimism or opinion. These arguments are futile, because again, they rest on the fallacy that this case is about billings growth projections, when in fact it is about demonstrably false statements, misleading half-truths, deceptive risk disclosures, and omissions *regarding the*

---

[3] For example, Defendants devote a section of their brief to why "Statements Outside the Class Period or Not Made by Defendants are Unactionable." MTD at 15. Plaintiffs do not allege that any statements made outside the Class Period or by analysts *are* actionable. *See* CAC Section IV.C. Rather, these allegations provide context for Defendants' misstatements (*see* ¶¶ 171-223; Ex. A), demonstrate falsity and materiality, and bolster an inference of scienter. Defendants also argue that their numerical billings results were accurate, which the CAC does not dispute. *See id.*; Ex. C.

2

*sales force*. Moreover, on their face, none of these misstatements were forward-looking, vague, or incapable of objective verification.

Defendants then argue that the Exchange Act claims must be dismissed because the CAC's allegations do not support an inference of scienter. To the contrary, the allegations, when analyzed holistically, as *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007) requires, establish a strong inference of scienter. Pluralsight, Budge, and Skonnard claim that they did not know of the sales problems at the time (and that Plaintiffs only allege fraud by hindsight). But this argument is belied by their own statements, including that since the beginning of 2019, they had "suffered" from months of sales execution challenges and struggled to get "caught up." ¶¶ 119-28. Securities analysts also recognized their statements as admissions, reporting that "the hiring issue was known earlier" and "[m]anagement pointed out that it saw it was behind on sales hiring coming into the year," which led to an analyst "calling [Budge] out for not sharing this information as soon as it happened." ¶¶ 131, 134. And Skonnard and Budge's own prior detailed descriptions of how they personally tracked internal sales force data further supports a plausible inference of scienter. *See, e.g.*, ¶¶ 71, 74, 76-77, 79-80.

Unable to plausibly deny that they have already admitted that they knew, during the Class Period, that the sales force was under-capacity, Pluralsight, Budge, and Skonnard say they withheld that information from investors in the hope that new deals and billings growth would materialize at the last minute. ¶¶ 120-28, 131, 136; MTD at 22. But hope is not a valid excuse for misleading investors. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008). And this excuse contradicts their own argument that they did not know of the problems.

Scienter for the Exchange Act claims is bolstered by allegations demonstrating that the misstatements and omissions were well-timed to maximize the personal profits of Pluralsight's insiders. Defendants' false and misleading sales force statements and omissions fueled a meteoric 58% rise in Pluralsight's stock price in the first two months of 2019. On March 7, 2019, Pluralsight completed a $450 million secondary public offering ("SPO") of its insiders' shares. The SPO, underwritten by Defendants Morgan Stanley and JP Morgan Securities, sold these insider shares to the public at $29.25 per share—a 95% increase over Pluralsight's IPO less than a year earlier.[4] Through the SPO and additional open market sales, Pluralsight's two most senior officers, Skonnard and Budge, reaped $22.2 million and $15.1 million, respectively—amounts that tower over their subsequent sales and their annual compensation. The fact that Skonnard and Budge did not receive a salary in 2019 supports a finding, contrary to Defendants' argument, that they *did* have a motive to capitalize on their stock sales. Moreover, their 10b5-1 insider trading plans are not an absolute shield from liability. The CAC's allegations (which must be construed in Plaintiffs' favor) demonstrate that the structure of those plans, which Skonnard and Budge adopted shortly before the start of the Class Period, incentivized them to boost the stock price during the first half of 2019, through the SPO (which was not subject to a trading plan) and their other planned sales. With such a massive personal windfall on the line, there is a cogent and compelling inference that Skonnard and Budge withheld the adverse sales force information for fear it would adversely

---

[4] In connection with the SPO, Plaintiffs assert Section 11 claims against the issuer Pluralsight, the Signer Defendants (¶¶ 47-57), and the Underwriter Defendants (¶¶ 58-61), and Section 12(a)(2) claims against Pluralsight and the Underwriter Defendants.

4

impact their stock sales. These robust allegations, taken together, amply support an inference that the Exchange Act Defendants acted with scienter.

Finally, the Securities Act Defendants argue that the claims under Sections 11 and 12(a)(2) of the Securities Act should be dismissed because the SPO's Offering Documents contain no actionable misstatements, for the same reasons they assert as to the Exchange Act claims. But all that Plaintiff needs to allege is a single material misstatement or omission, which, as discussed herein, is a bar they easily clear. Nor can Pluralsight escape liability under Section 12(a)(2) for its role in filing the Registration Statement and prospectuses with the SEC that solicited investors.

For these reasons and those that follow, Defendants' Motions should be denied.

## II.    STATEMENT OF FACTS[5]

Pluralsight offers an online technology skills training platform. ¶ 62. In May 2018, its IPO achieved a nearly $2 billion market capitalization. ¶¶ 63-64. Through the Class Period, Pluralsight was not profitable, so Defendants' strategy to attract investors was to tout Pluralsight's billings growth—a key measure of revenue that Defendants made clear was achieved through their expansion of the Company's sales force.[6] Because the sales force was critical to Pluralsight's billings and revenue, Defendants maintained an "annual sales ramp capacity plan" to monitor the pace of sales representatives' hiring, ramping, and productivity, and paid close attention to their progress. ¶¶ 70-71, 76, 114-15, 120-28, 136. Pluralsight, Budge and Skonnard also explained to the market that they tracked billings growth by closely monitoring both the sales representatives'

---

[5] Citations in this Section are to the Exchange Act claims; factual allegations and actionable misstatements for the Securities Act claims, which are premised on negligence, are contained in ¶¶ 254-342; *see also* Ex. B.

[6] ¶¶ 64-75, 78-81, 85, 89-91, 105, 114-18, 125, 173, 177, 181, 194-95, 199, 204-05, 208-09.

ramp to full quota capacity (which took at least six months from their dates of hire) and the progression of deals through the sales pipeline from initiation to generation of billings (which typically took five to six months). ¶¶ 69-71, 76-77, 124.

As Defendants entered 2019 (and the Class Period), they faced two problems. The first, which was publicly known, was that as of December 24, 2018, Pluralsight's share price was "touching bottom" near the price of its IPO.[7] ¶¶ 14, 97-98. The second, which was concealed from investors, was that the Company was missing "dozens" of ramped or quota-bearing sales representatives as well as the fully functional sales infrastructure needed to support them. ¶¶ 70-71, 77, 123-25, 128, 136. Pluralsight's "annual sales ramp capacity plan" required that many more sales representatives be brought "on board" by the beginning of 2019 to properly "ramp and become fully productive" by the second quarter of 2019 ("Q2 2019"). ¶¶ 120-25. That did not happen. *Id.* The significant "gap" between the number of sales representatives needed under Defendants' plan and the actual number of sales representatives on board translated into missing deals in June 2019. ¶¶ 76, 122-24, 136.

Facing the confluence of a struggling share price and their possession of adverse information about the sales force, Defendants chose not only to withhold that information but also to make unequivocally positive statements about the sales force[8], including:

- On ***January 16, 2019***, Budge told investors that Pluralsight had "250" quota-bearing sales representatives, highlighting the "efficiencies in the model" demonstrated by the Company's progress in its hiring and building its "great" sales infrastructure, and described the sales force as "killing it" and operating "at scale." ¶¶ 82-83, 173.

---

[7] Pluralsight's fiscal year runs on a calendar year. The start of the first quarter of 2019 was January 1, 2019; the start of the second quarter of 2019 was April 1, 2019. ¶¶ 89 n.9, 109.

[8] Defendants also misleadingly portrayed risks related to the sales force. *See* ¶¶ 184, 185, 187, 189, 191, 198, 202 (false and misleading risk statements).

- On *February 13, 2019*, when asked on a call with securities analysts about "hiring trends for the sales force, where did we end in the fourth quarter [of 2018] and any thoughts on how we should think about that in 2019," Budge described the hiring and ramping plan as in good shape such that Pluralsight was "roll[ing] through 2019" with "more reps . . . on quota . . . and more goodness from them." ¶¶ 87, 177.

- On *February 21, 2019*, in its 2018 Form 10-K, signed by Skonnard and Budge, Pluralsight trumpeted its "large direct sales force" and "substantial increases in the productivity and effectiveness of our sales personnel." ¶¶ 89-91, 121, 181.

- From *March 4-7, 2019*, the SPO Offering Documents stated that the sales force had "significantly expanded" and reiterated that "productivity and effectiveness" had "substantially" increased. ¶¶ 106-07, 194-95, 289. Skonnard, Budge, the Company's Chief Marketing Officer (Joseph DiBartolomeo), and several of the Signer Defendants, reaped massive proceeds in the sale, which generated $456 million for Company insiders. ¶¶ 49, 50, 54, 55, 108, 194-95.

- On *May 1, 2019*, Budge stated "we like where we are with our sales reps," touting that the Company had "massively expanded" its sales force and that sales force expansion was "on pace" with a "clear path" to continued "growth of greater than 40% and near 50% on B2B [billings]." ¶¶ 114-15, 205, 208-09.

These positive statements were absorbed by the market, underscoring their materiality. Securities analyst reports described how "the picture being painted" by Pluralsight was that its hiring, "significantly expanded sales capacity," and "increased productivity of the expanded sales force" was materializing in strong billings growth (or, as one report put it, "hyper-growth"). ¶¶ 75, 81, 88, 97, 109, 117-18. With Defendants' one-sided positive depiction of the sales force, Pluralsight's share price shot up accordingly, appreciating *nearly 60%* from December 2018 to February 2019. ¶ 98. Defendants wasted no time in consummating a $450 million SPO of their own (and other insiders') stock and making additional insider sales at dramatically inflated prices, earning Skonnard and Budge over $22 million and $15 million, respectively, during the Class Period. ¶¶ 98-102, 143, 151.

The rosy portrayal of Pluralsight's sales force ended abruptly on July 31, 2019, when Pluralsight, Skonnard and Budge blindsided investors by admitting that since the beginning of 2019, the Company had "suffered" from "sales execution challenges" and had struggled to get "caught up" behind the scenes to its "annual sales ramp capacity plan" and "expected long-term growth trajectory." ¶¶ 119-28. Budge and Pluralsight were forced to acknowledge that the sales problem "expressed itself" with a collapse in the "billings growth rate" that would have "a negative impact on our revenue in future periods." ¶¶ 120, 124. Investors and analysts, who had regularly asked specific questions about that very topic during the Class Period, realized that they had been misled, with one analyst asking: "[W]hy didn't we hear this on last quarter's call?" ¶ 126. Budge provided a rambling non-answer about how "we were still hitting our [billing] numbers"—a separate metric from the capacity of the sales force. *See id.* Analysts saw through this feeble excuse: "[m]anagement pointed out that it saw it was behind on sales hiring coming into the year, but we are just now hearing about it since they were able to deliver on 1Q19 [billings] numbers and hoped that quarter's execution would continue." ¶ 131; *see also* ¶¶ 132-35. On August 1, 2019, Pluralsight's share price plummeted, dropping a massive 39.52% in a single day, from $30.69 to $18.56, and entirely erasing the stock's year-to-date gains, as the market and investors reacted to "management's lack of transparency." ¶¶ 129, 134-35.

## III.  ARGUMENT

### A.  The CAC is Properly Pled.

Faced with a detailed and well-pled complaint, Defendants argue that the CAC does not comply with Rule 8 given its structure and supposedly "garrulous" style. They also contend that

8

INPRS' Securities Act claims sound in fraud, making them subject to Rule 9(b)'s particularity requirement. *See* MTD at 8-9. *Not so.*

*First*, the CAC scrupulously attends to the different pleading requirements for the Exchange Act and Securities Act claims. As to the former, it complies with the PSLRA's requirement that it "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and provides particular facts giving rise to a strong inference that defendants acted with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(1); CAC Sections IV.B-D. For the Securities Act claims (which involve additional defendants and different elements), the CAC likewise sets forth the relevant chronology of events and then identifies each specific material misstatement and omission in the SPO Offering Documents and explains why each statement or omission is materially false and misleading. CAC Sections V.B-F. Plaintiffs therefore put all Defendants on notice of the two sets of legal claims, which is all they must to do proceed.[9] *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003).

*Second*, contrary to Defendants' contention (MTD at 8), INPRS' Securities Act claims do not automatically "sound in fraud" and become governed by Rule 9(b) just because they share underlying facts with Exchange Act claims. Such a result "would effectively preclude plaintiffs

---

[9] This case is distinguishable from *Smallen v. W. Union Co.*, 950 F.3d 1297 (10th Cir. 2020), (*see* MTD at 9), where the criticized complaint asserted only Exchange Act claims, with one set of defendants and applicable elements. The CAC suffers from none of the defects identified in *Arena Land & Inv. Co., Inc. v. Petty*, 69 F.3d 547 (10th Cir. 1995) (unpublished) (complaint contained "confusing grammatical and structural problems" and unsupported legal conclusions). And *Bus. Loan Express, LLC v. Faith Ventures, Inc.*, No. 07-cv-1433-W, 2008 WL 11338444 (W.D. Okla. July 30, 2008) (unpublished) did not address securities fraud claims.

9

from filing suit" under both statutes, and "[t]here is no suggestion that Congress intended such an incongruous approach." *In re Suprema Specialties, Inc. Sec. Litig.* ("*Suprema*"), 438 F.3d 256, 273 (3d Cir. 2006). Rule 9(b) is inapplicable where, as here, the CAC "carefully segregated its allegations of negligence" under Section 11 and 12(a)(2) from the fraud-based Section 10(b) claims, such that there is "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud." *Id.*; *see also Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (finding Section 11 claim did not sound in fraud when plaintiff alleged defendants had failed to exercise reasonable care and make a reasonable investigation); Section III.C, *supra*. Thus, the CAC complies with these pleading rules.

### B.    Plaintiffs Adequately Allege Exchange Act Claims.

The Exchange Act Defendants (in this Section (III.B), the "Defendants") challenge only two of the five elements of Plaintiffs' 10(b) claim pursuant to the Exchange Act[10]: (i) that Defendants made a false or misleading statement and (ii) that Defendants "acted with scienter, that is, with intent to defraud or recklessness." *Adams*, 340 F.3d at 1095; MTD at 9-10. In analyzing Defendants' Motions, this Court must consider the CAC "as a whole," accepting its factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor. *Adams*, 340 F.3d at 1105. To survive a Rule 12(b)(6) motion to dismiss for failure to state a Section 10(b) claim, "all that is required is the pleading of sufficient facts to raise a reasonable expectation that discovery will reveal evidence of wrongdoing." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1155 (D. Colo. 2012). The CAC adequately alleges both contested elements.

---

[10] Defendants thereby concede that the other three elements (that the statement complained of was made in connection with the purchase or sale of securities; that Plaintiffs relied on the misleading statements; and that Plaintiffs suffered damages) are adequately pled at this stage.

10

### 1.      Defendants Made Materially False and Misleading Statements.

It is unlawful under Section 10(b) to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5(b). "A statement or omission is material if it is reasonably calculated to influence the decisions of an investor—institutional or otherwise—in its trading in securities." *DiTucci v. Ashby,* No. 2:19-cv-277-TC-PMW, 2020 WL 1249627, at *3 (D. Utah Mar. 16, 2020) (unpublished) (quoting *S.E.C. v. Gann*, 565 F.3d 932, 937 (5th Cir. 2009)). A statement is "false if a reasonable person would have understood it to be inconsistent with facts on the ground." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015). Technically true statements that are "so incomplete as to be misleading (e.g., half-truths or distortions)" are also actionable. *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000), *abrogated on other grounds by California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 198 L. Ed. 2d 584 (2017). And upon choosing to speak on a topic, a defendant "must speak fully and truthfully, and provide complete and non-misleading information." *S.E.C v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) (unpublished) (citing *In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002)).

The CAC plausibly alleges material misrepresentations because it identifies each instance where Defendants spoke falsely and misleadingly about the size, strength, and effectiveness of the sales force, while omitting then-existing adverse facts about those topics.[11] *See* Ex. A. Defendants argue that there are no actionable omissions because they "consistently disclosed" details about their sales team, including sales headcount and turnover, and "repeatedly warned" investors that

---

[11] ¶¶ 172-73, 177, 181, 185, 187, 189, 191, 194-95, 198-99, 202, 204-05, 208-09.

billings would suffer if they experienced delays in hiring and ramping sales representatives. *See* MTD at 15-16. But this does not absolve Defendants; *it implicates them*. When Defendants spoke (often in response to analysts' targeted questions) about those topics, Defendants incurred a duty to "speak fully and truthfully." *Curshen*, 372 F. App'x at 880; *see also In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d. Cir. 2016). Instead, they omitted critical adverse facts: that from the beginning of 2019, Defendants' sales ramp capacity plan (including their headcount) was "a few months" and "dozens" of sales representatives behind and therefore lacked the necessary "capacity" to generate billings, and that their sales infrastructure was deficient. ¶¶ 120-28, 136.

Defendants also went beyond omitting key facts: they affirmatively conveyed a positive, false and misleading message about the then-present capacity of the sales force as expanding, ramping, and producing billings according to Defendants' plan. As Defendants themselves explained to investors, information about the sales force was highly relevant to Pluralsight's financial performance, so this false narrative and the omitted facts were clearly material. *See, e.g.*, ¶¶ 64-71, 184-85, 187, 189, 191. These are therefore actionable misstatements and omissions.[12] *See Nakkhumpun*, 782 F.3d at 1152-53. Confronted with this truth, Defendants raise straw man arguments and seek dismissal of Plaintiffs' claims as a matter of law on several grounds, all of which fail.

    a.       **Defendants Misrepresented Present and Historical Facts.**

---

[12] Defendants also argue (repeatedly) that they had no duty to disclose that they had problems with their sales capacity because they never promised to continue to grow billings above 40% forever. *See, e.g.*, MTD 15-16, 22. This misses the point and ignores Plaintiffs' well-pled allegations. Defendants chose to speak about the sales force itself, including hiring, its ramping to productivity, and current execution of billings growth, and in doing so incurred a duty not to mislead investors about those issues. *See Nakkhumpun*, 782 F.3d at 1152-53; CAC Section IV.C.

Defendants first argue that their statements were facially accurate and are therefore unactionable. *See* MTD at 11-12, 15-16. But Plaintiffs do not even allege that most of the statements Defendants cite are false.[13] As to the rest, Defendants ignore facts that show that their statements were literally false, misleading half-truths, and/or omissions of material information.

**Number of Sales Representatives (¶¶ 173, 177, 205)**. On January 16, 2019, Budge falsely told investors that Pluralsight had 250 quota-bearing sales representatives when in truth it had 200. ¶¶ 124, 136, 172-74. Defendants now contend (and thereby create an issue of fact that cannot be decided at this stage) that the 250-person headcount was correct, ignoring that Budge already admitted that it was not. *See* MTD at 11, 15, 16 n.8; ¶ 136. A 25% inflation of the sales headcount is material, particularly given Defendants' admission that missing "dozens" of planned-for sales representatives coming into 2019 "expressed itself" in the billings growth collapse that occurred in the second quarter; the link that Defendants themselves repeatedly made between the expansion of Pluralsight's sales force and billings growth; and how often analysts asked about sales hiring. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); ¶¶ 67-81, 87, 114-15, 124.

Budge's subsequent statements about headcount are also actionable. Upon speaking about the present headcount in response to a question about "hiring trends" (¶ 177 (February 13, 2019)) and offering specific numbers about the Company's "plan to grow" in response to a question about

---

[13] Plaintiffs do not allege that Defs.' Statement Nos. 5, 6, 24, or 26 were actionable. Plaintiffs do not allege that Defendants falsely stated billings or revenue growth in Paragraph 173 (Defs.' Statement No. 3). Plaintiffs do not allege that Defendants falsely stated the historical percentage of B2B customers, Pluralsight's dollar-based net retention rate, or customers' annual spend. *Compare* MTD at 11 (describing categories (c), (d), and (e)) *with* CAC Section IV.C. The rest of Defendants' argument on this point pertains to ¶¶ 173, 177, 194, 199, and 205 (corresponding to Defs.' Statement Nos. 1, 3, 8, 17, 27, and 29); *see* Plaintiffs' Ex. A; MTD at 11.

"hiring to your targeted sales headcount by the end of the year," (¶¶ 204-05 (May 1, 2019)), Budge incurred a duty to "speak fully and truthfully." *Curshen*, 372 F. App'x at 880. Instead, he omitted that since the end of 2018, the Company had been off its annual sales ramp capacity plan by "a few months" and "dozens" of sales representatives, facts whose materiality is evidenced by analysts' pointed questions and the admitted importance of the sales ramp capacity plan to sustaining billings growth. *See, e.g.*, ¶¶ 69-71, 123-24, 177-78, 205-06.

**Sales Force Expansion (¶ 194).** Defendants' statement in the March 2019 SPO Offering Documents that "[w]e have *significantly expanded* our direct sales force to focus on business sales" (¶ 194) is an actionable half-truth and omission. While the sales force had expanded over the years, the true and complete story at that time was that Pluralsight was *then* addressing *significant delays in hiring and on-boarding* dozens of salespeople to catch up to its planned headcount and capacity. ¶¶ 123-25, 195(a). *See Joseph*, 223 F.3d at 1162; *Operating Loc. 646 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Pluralsight's playing catch-up for a deficient, under-staffed sales force was not a vague "contingenc[y]" that Defendants did not have a duty to disclose; it was a set of present facts that directly contradicted Defendants' public statement. *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). This omitted information would have mattered to investors deciding whether to purchase Pluralsight shares in the SPO because they would have understood, due to what Defendants had told them about the sales force and billings, that months of delay in expanding the sales force might well affect Pluralsight's "key business metric" of billings growth (which it in fact did). ¶¶ 68, 76-77,

14

81, 83, 124 (Budge admitting that a lack of "ramped capacity" in "the first and second quarter . . . expressed itself with the outcome you saw in the second quarter).["14]

> **b.        The Statements Were Not Unactionable Optimism or Opinions.**

Defendants paint several of their statements (contained in ¶¶ 173, 177, 181, 194-95, 199, 205, and 209) as unactionable corporate optimism or opinions. *See* MTD at 13-14[15]. But statements are *not* immaterial puffery if "a reasonable investor could find them important." *See In re Level 3 Commc'ns, Inc. Sec. Litig.* ("*Level 3*"), 667 F.3d 1331, 1340 (10th Cir. 2012). And, on their face and taken in proper context, none of these challenged statements were opinions. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (defining statements of opinion as subjective beliefs, views, or sentiments that are not determinate or

---

[14] Defendants also argue that Pluralsight and Skonnard's May 1, 2019 statement (¶ 199, No. 29) about Q1 2019 billings growth is unactionable because it did not imply future billings growth. *See* MTD at 11. But Plaintiffs do not challenge the statement with respect to *future* billings growth. Rather, Plaintiffs' challenge concerns the misleading impression Skonnard created about the sales force's present capacity to generate growth when he repeatedly used the present tense ("billings growth *continue[s]* to be strong . . . over 40%," "*[w]e continue* to demonstrate the efficiency in our model" and "our teams *continue* to execute with strong focus . . . .") which clearly refers to circumstances on May 1, 2019, when the statements were made. *See id.* Viewed in context, Skonnard was describing conditions in the very quarter when the under-capacity of sales representatives resulted in the dramatic 40% decline in billing growth without disclosing that adverse information. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statement that "[o]ur pipeline *continues* to build to record levels" was materially false and misleading statement of present fact; *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 705 (7th Cir. 2008) (statement that sales were "*still going strong*" was a materially false and misleading statement of present fact).

[15] Again, Defendants mischaracterize Plaintiffs' claims to distract from their core. Plaintiffs do not allege that the statements identified as Item Nos. 7 (¶ 86) or 10 (¶ 90) were false or misleading; these are from the "Factual Allegations" section of the CAC. Plaintiffs do not challenge the statements identified as Item Nos. 12 (¶ 185) or 17 (¶ 194) on the ground that Defendants falsely stated that Pluralsight was expanding sales efforts to B2B customers. *See* ¶¶ 186, 196. Plaintiffs do not challenge the statement identified as Item No. 30 (excerpt of ¶ 199) as falsely stating the Company's dollar-based retention rate. *See* ¶ 200.

verifiable). Finally, even if they were opinions, they were false and misleading and are therefore actionable. *See Hampton v. root9B Tech., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018).

**Materiality.** The actionable sales force statements challenged by Defendants were not subjective or "broad claims" about overall success that would have been inconsequential to investors. *See Level 3*, 667 F.3d at 1340. They were fact-based statements about the sales force, a topic on which analysts repeatedly pressed Defendants for updates. *See* ¶¶ 72, 79, 87, 114-15, 177, 204, 208. These statements were woven into concrete assertions and omissions of verifiable facts regarding critical aspects of Pluralsight's business (its sales force's size, ramping, and productivity), which means investors would have viewed them as conveying facts, not puffery or subjective opinions. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017).

For example, Budge made his January 16, 2019 positive comments about the sales force while discussing headcount figures and how the Company's hiring plan and heavy investment were demonstrating "efficiencies" by growing "our B2B billings number faster than our sales and marketing line." ¶ 173. He prefaced his February 13, 2019 comments (offered in response to a question about hiring trends in 2019) with a sales headcount, and then described that headcount growing "as we roll through 2019." ¶ 177. Budge's May 1, 2019 answers (¶¶ 205, 209) to analysts' questions about "how are you doing in terms of the hiring to your targeted sales headcount" and "[w]hat is the limiting factor on the pace of sales headcount growth" (¶¶ 204, 208) were also phrased as conveying definite facts, not subjective, immaterial opinions or beliefs. These statements are a far cry from a soft statement like "Level 3 is a logical consolidator with proven integration experience" and are akin to a statement that characterizes a specific aspect of a

16

company's business as mostly "complete, ahead of plan, and under budget," which the Tenth Circuit has found actionable. *See Level 3*, 667 F.3d at 1340.

Defendants' statements about Pluralsight's "significantly expanded," "large" sales force and its "productivity and effectiveness" [16] and continuing successful billings growth were also concrete. ¶¶ 181, 194, 195, 199. They were framed as statements of present and historical fact capable of verification, not optimism or opinion. *See id*. Pluralsight had a set "annual sales ramp capacity plan" and a deal pipeline that ostensibly supported these statements (but in truth did not). ¶¶ 182, 196, 200. And Defendants used the challenged statements in the SPO Offering Documents to solicit investors to purchase Pluralsight shares, so it is reasonable to infer that investors relied on those statements (and that Defendants expected they would). *See Omnicare*, 575 U.S. at 188 (2015) ("[T]he reasonable investor expects [that a registration statement] has been carefully wordsmithed to comply with the law."); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (statement in annual report that sales were " 'very strong' . . .is plausibly understood as a description of historical fact rather than unbridled corporate optimism"). As further evidence of materiality, analysts absorbed and repeated Defendants' comments to justify Pluralsight's investment value. ¶¶ 75, 81, 88, 97, 111, 117-18. And when the truth came out revealing their falsity, the stock price plummeted. ¶¶ 119, 129.

---

[16] With regard to "productivity and effectiveness," on July 31, 2019, Budge told investors that the *tenured* sales representatives' productivity was at their "historical" level through the first half of the year but admitted that *during that same time*, the *new* sales representatives did not have the ramped capacity needed to grow billings beyond that level (and did not even come on board until at least April 2019). ¶ 124. In the March 4-7, 2019 Offering Documents, when Defendants touted the "productivity" of the "significantly expanded" sales force (which were quantifiable metrics), and they omitted that "dozens" of sales representatives were missing and therefore not producing according to plan, which rendered their statements misleading. ¶¶ 181, 195.

**Falsity.** Defendants ask this Court to disregard Plaintiffs' allegations of why the above-described statements were false and misleading (*see* ¶¶ 174, 178, 182, 196, 200, 206, 210) because Plaintiffs have supposedly not proffered "facts on the ground" as support. MTD at 14. That is untrue. Pluralsight's CEO (Skonnard) and CFO (Budge) already admitted the existence of material, undisclosed, adverse facts. ¶¶ 120-28, 136. And Plaintiffs have demonstrated that Pluralsight, Skonnard and Budge maintained and reviewed internal reports—including the "annual sales ramp capacity plan," sales quotas, billing targets, and deal pipeline—that existed at the time the statements were made and contained information that contradicted Defendants' public statements. *See, e.g.*, ¶¶ 76-77, 120-28, 136. For example, when Budge described the sales ramp capacity plan as proceeding as "planned for" and "on pace," with "normal" turnover, and continuing "on the really outstanding progression . . . where we've massively expanded our sales force" (¶¶ 205, 209), the facts on the ground showed that Company was "slower in hiring additional sales representatives than planned for 2019"; its "ramped capacity" was "a few months behind" schedule; and Defendants were struggling to get "caught up." [17] ¶¶ 120-126. Defendants' statements about the capacity of Pluralsight's sales force to hire and ramp and produce billings (¶¶ 173, 177, 181, 194-95, 199, 205, 209) "affirmatively created an impression of a state of affairs

---

[17] Other courts have held statements similar to Defendants' to be actionable and not opinions or puffery. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" when the contrary was true were actionable); *Scheller v. Nutanix, Inc.*, No. 19-cv-01651-WHO, 2020 WL 5500422, at *8 (N.D. Cal. Sept. 11, 2020) (unpublished) (statements that hiring success had positioned defendants to " 'deliver on [their] future growth plans,' and had 'ramped rep sales productivity'" were misleading in light of allegations to the contrary); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1226 (N.D. Okla. 2003) (statement that "we believe we are on a clear path to profitability" was false and misleading when defendants were then experiencing a market downturn and investors were concerned about the company's finances).

that differed in a material way from the one that actually existed." *See In re Quality Sys.*, 865 F.3d at 1144.[18] This is enough to find that the complaint, "when considered as a whole, is not based on conclusory assertions." *Adams*, 340 F.3d at 1105.

### c.      The PSLRA Safe Harbor Provides No Shelter.

In a further effort to avoid liability, Defendants carve phrases out of alleged misrepresentations (¶¶ 173, 177, 181, 185, 195, 205, 209) to portray the statements as forward-looking and protected by the PSLRA's safe harbor. *See* MTD at 12. But this is not a case about false or misleading projections.[19] The gravamen of Plaintiffs' allegations is that Defendants made materially false and misleading statements and omissions of then-present and past facts about Pluralsight's sales force, and these are not protected by the safe harbor. *In re Quality Sys., Inc.*, 865 F.3d at 1141–42; *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 870 (D. Kan. 2019).

For example, contrary to Defendants' argument (another straw man), Plaintiffs do not allege that the Company did not plan to grow its sales force through 2019 (*see* MTD at 12), but

---

[18] Even if Defendants' challenged statements are interpreted to constitute subjective opinion—which they were not—the factual allegations in the CAC support the inference that Defendants did not genuinely hold those opinions, they were predicated on untrue statements of fact, and the opinions omitted information necessary to make the statements not misleading. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017).

[19] Yet again, Defendants have tried to sow confusion about what Plaintiffs allege was false or misleading. Plaintiffs do not allege that Defs.' Statement No. 10 (¶ 90) was false or misleading. Plaintiffs do not allege that the other standalone statements identified by Defendants as being forward-looking (Nos. 2, 8, 11, 12, 18, 27, and 28) were actionable for the reasons listed by Defendants in points (a) through (f) at page 12 of their Motion. *See* ¶¶ 174, 178, 182, 186, 206, 210. "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005).

that (among other things) in offering specific details about the status of the annual sales ramp capacity plan, Budge omitted material information about how far behind the Company currently was and created a materially misleading positive impression as to the capacity of the sales force. ¶¶ 173, 174, 177, 178, 205, 206. Likewise, Plaintiffs do not allege that the statement "we think that will grow a long and sustainable business model for us" was actionable on its own (¶¶ 209, 210), but rather that when Budge described the current "pace" of sales headcount and capacity growth as adequate to "continue to drive growth of greater than 40% and near 50% on B2B" as part of the "business model," that description was not truthful or complete. ¶ 210(c). And even if these statements could be read as forward-looking, as explained below, they were not accompanied by meaningful cautionary statements because the supposed warnings were themselves misleading.

### d.    Defendants' Risk Factors Were Misleading and Useless.

Under Defendants' logic, a company can deceive investors about facts on the ground so long as it warns investors that those facts *may* materialize in the future. *See* MTD at 14. That is not the law, and for good reason.[20] "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has already transpired." *Rombach*, 355 F.3d at 173; *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27

---

[20] Defendants' proffered case law does not support their position. *Spiegel v. Tenfold*, 192 F. Supp. 2d 1261, 1268 (D. Utah 2002), is inapposite because it involved alleged false projections, as opposed to here where risk factors were alleged to be misleading for the failure to disclose present and historical facts. *See* Section III.B.1(c), *supra*. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014) is inapt because the Second Circuit has held that risk disclosures that paint a misleading picture of the probability of the risk are actionable. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also Meyer v. Jinkosolar Holdings, Co.*, 761 F.3d 245, 251 (2d Cir. 2014). Finally, the Sixth Circuit's ruling in *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) is unhelpful to Defendants because the court found that plaintiffs had not sufficiently alleged that a risk had in fact materialized, whereas Plaintiffs have clearly done so here.

(2011) (holding that risk factor listed in Form 10-Q that gave "no indication that the risk may already have come to fruition," when it in fact had, was false and misleading).

The CAC makes clear that Defendants' risk statements (¶¶ 185, 187, 189, 191, 198, 202) were misleading for a simple reason: when Defendants filed their Forms 10-K, 10-Q and Offering Documents containing their purported risk factors, they knew or recklessly disregarded "facts which were material to an investor's assessment of the risks associated with the potential purchase of [Pluralsight] stock" and "Defendants failed to fully disclose those facts." *United Food & Com. Workers Union v. Chesapeake Energy Corp.*, No. 09-cv-1114-D, 2010 WL 3527596, at *5 (W.D. Okla. Sept. 2, 2010) (unpublished); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). Such facts included that since the beginning of 2019, the Company was suffering from sales execution failures; that Defendants were experiencing significant delays in hiring and ramping sales personnel to adequate productivity levels; and that they were furtively working to get caught up with their sales plan, all of which posed a risk to and in fact did impact billings and revenue growth. ¶¶ 119-28, 136. Defendants presented these scenarios as hypothetical. ¶¶ 185, 187, 89, 191, 198, 202. At the same time, Defendants affirmatively created an impression of a healthy, growing sales force with the capacity and infrastructure support to meet its task of growing billings.[21] That impression differed in a material way from the truth, and therefore, the risk factors' supposed warnings were "not enough to render what was not disclosed, not misleading." *Bos. Ret.*

---

[21] ¶¶ 173, 177, 181, 194-95, 199, 205, 209; *see also* ¶¶ 88, 97, 109, 111, 117-18 (securities analyst reports repeating Defendants' positive refrain).

21

*Sys. V. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (unpublished).[22]

> e.    **Defendants Violated Their Legal Duties to Disclose Certain Information Under Items 303 and 105 of Regulation S-K.**

**Item 303 (¶¶ 212-220).** Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in a Company's 10-K or 10-Q reports or registration statements.[23] 17 C.F.R. § 229.303(a)(3)(ii); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015). The duty to disclose arises where the trend or uncertainty is "presently known to management" and "reasonably likely to have material effects on the registrant's financial condition or results of operations." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). In *Slater*, the Tenth Circuit held that the plaintiffs had not properly alleged that the company knew that the relevant uncertainty, which hinged on the occurrence of collapses in the prime and subprime mortgage markets, was likely to materialize. *Id.* at 1204-05. Defendants argue that *Slater* applies here because Defendants did not know about the "supposed capacity gap." MTD at 23.

---

[22] There is ample support for this theory of liability. *See, e.g.*, *Meyer*, 761 F.3d at 252 (omissions from risk factors were material where a reasonable investor could conclude that omitted facts "would constitute a substantial threat to earnings"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) ("The defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized."); *In re Williams Sec. Litig.*, 339 F. Supp. 2d at 1232 (statements "either made in light of adverse information known to [defendants] or specifically designed to downplay those risks" were actionable).

[23] The CAC inadvertently identifies Pluralsight's 2018 Form 10-K report as a Form 10-Q at Paragraphs 215 and 216. Elsewhere, the report is correctly identified as a Form 10-K. ¶¶ 214, 219.

Defendants, however, cannot erase history. "Capacity gap" was how Budge himself described the sales problems that Defendants concealed from investors for the first seven months of 2019. ¶¶ 124-25, 136.[24] And unlike in *Slater*, the adverse trend and uncertainties alleged here (the sales problems) was not dependent on catastrophic market-wide events; they were specific to Pluralsight's business and were reasonably likely to have a material financial impact (and in fact did). ¶¶ 120, 122-25, 128. These facts and others alleged in the CAC, taken together, demonstrate that Defendants knew of a trend[25] or uncertainty that posed a material risk to Pluralsight's billings and revenue and that they failed to disclose it. *See Yellowdog Partners*, 426 F. Supp. 3d at 872.

**Item 105 (¶¶ 213, 217, 219, 221-23).** Item 105 imposes a duty to disclose "the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Defendants claim that their disclosure of hypothetical sales problems and a warning that it might be difficult "to determine in a timely manner if we are efficiently allocating our resources in these areas" was enough. MTD 24. But what Defendants failed to disclose in the

---

[24] The fact that Pluralsight announced strong billings growth for the first quarter of 2019 is irrelevant here (*see* MTD 23), because the pipeline activity that drove that result was generated approximately three months before the start of the Class Period and the sales problems. ¶¶ 76-77. Defendants had a reasonable approximation of what second quarter billings growth would look from at least the beginning of 2019, because they monitored the pipeline as deals progressed through it and followed the ramping of the sales force. ¶ 76.

[25] Defendants also argue that two months is too short to be a trend. MTD at 23. *First*, this ignores the fact that Budge was specifically asked about "**hiring trends** for the sales force" less than a month before the SPO and he provided a specific headcount and described the sales force's growth "through 2019" in positive terms. ¶ 177. Budge made a conscious choice to only describe those trends in positive terms while omitting material information. ¶ 178. *Second*, there is no bright line rule for what constitutes a "trend" under the federal securities laws, and this question of fact is not resolvable at the motion to dismiss stage. *In re CPI Grp. Inc. Sec. Litig.*, No. 16-cv-4531-LAK, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017) (unpublished). *Third*, Plaintiffs allege that Defendants also omitted material *uncertainties* caused by the sales capacity gap. ¶¶ 213-220.

23

Offering Documents were the real risks they were combatting in real time. ¶ 222. Defendants knew that they were having significant sales hiring and ramping problems from the beginning of 2019. ¶¶ 120-28, 136. They admitted to investors that they spent the first quarter trying to get "caught up," which shows that they knew, during the first quarter, that they were not efficiently allocating their resources in these areas and had to correct course. ¶¶ 124-25. Defendants' failure to provide investors with this material information in the Offering Documents so that investors could properly evaluate the risks at play is actionable. *See, e.g., In re Mylan N.V. Sec. Litig.,* No. 16-cv-7926-JPO, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (unpublished) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

### 2. The CAC Adequately Pleads Scienter.

An affirmative misrepresentation violates Rule 10b-5 if Defendants acted with a "mental state embracing intent to deceive, manipulate, or defraud," or recklessness. *Adams*, 340 F.3d at 1105; *see also Nakkhumpun*, 782 F.3d at 1149 ("Scienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors."). An omission is actionable if Defendants knew or recklessly disregarded a potentially material fact and knew or recklessly disregarded that the failure to reveal the potentially material fact would likely mislead investors. *DiTucci*, 2020 WL 1249627, at *5. A determination of scienter rests on the entire complaint, not on isolated allegations. *Tellabs*, 551 U.S. at 322-24. A reasonable inference of scienter must be cogent and as compelling as any opposing inference, but it "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences."

24

*Id.* at 324; *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A] tie on scienter goes to the plaintiff."). Here, the cogent and compelling inference of scienter is well-pled.

**Admissions and Access to Facts About Key Metrics.** Skonnard and Budge openly and repeatedly admitted that, since January 2019, they knew that Pluralsight "suffered from" significant sales capacity and execution problems.[26] ¶¶ 120-28, 136, 139-40. Despite Defendants' efforts to create a new rule (*see* MTD at 16-17), there is no requirement at the pleading, pre-discovery stage to proffer the contents of internal reports or witnesses to support a plausible inference of scienter, particularly where admissions made by such senior officers and the existence of provable facts demonstrate that this action has merit.

Scienter is further bolstered by Defendants' supposedly competing inference that their personal optimism about achieving future billings growth meant that they did not need to disclose the sales force capacity problems to investors. *See* MTD at 18, 22.[27] Hope is not a defense to well-pled scienter allegations, *see Tellabs II*, 513 F.3d at 710, and here, it has nothing to do with the

---

[26] Investment analysts construed Defendants' statements as admissions in real time. ¶¶ 131 ("hiring issue was known earlier" and "management pointed out that it saw it was behind on sales hiring coming into the year"); ¶ 134 ("it was revealed . . . that Q2's sales issue was actually an extension from Q1"). Drawing all reasonable inferences in Plaintiffs' favor, this supports an inference of scienter. *See Tellabs*, 551 U.S. at 322.

[27] Defendants persist in their quixotic effort to persuade the Court that Pluralsight's Q1 2019 billings growth and its "optimism" about Q2 2019 growth are dispositive of the case, but they are not. *See* MTD at 18, 22. Pluralsight's billings growth in Q1 2019 was achieved with the sales representatives that it had in place before 2019 began, according to Defendants' plan. ¶¶ 76, 120-25. And the alleged false and misleading statements in this case are not about optimistic projections of Q2 billings growth (which Defendants did not utter), but about the sales force itself and the current status of billings growth when Defendants spoke on those topics. This distinguishes this case from *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016), where forecasts were the statements at issue.

25

subject of Defendants' alleged misstatements (the sales force). "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs II*, 513 F.3d at 710; *see also Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1130 (D. Colo. 2017) ("[I]t is more than logical for plaintiffs to assert that [defendants] acted in the hope that positive results would overtake negative ones because, based upon the [defendants'] own contentions, that is precisely what they did.").

This excuse for why they did not tell investors about the sales force problem ("we were still hitting our [billings] numbers" (MTD at 18, 22; *see also* ¶ 126)) underscores that Defendants made a conscious choice to keep the sales capacity problems from investors and that this not a case of fraud-by-hindsight. ¶¶ 126, 169-70. Unlike the statements in *Level 3* (*see* MTD at 19), Defendants' excuse *does* "suggest that [they] knew or recklessly disregarded information contrary to their public statements." 667 F.3d at 1347. And unlike in cases where there were no allegations that "defendants ever viewed specific data contradicting their representations" (MTD at 17-18), in their public statements, Skonnard (the CEO) and Budge (the CFO) went far beyond generalities and identified specific data that they had access to and reviewed, including: the annual sales ramp capacity plan (¶¶ 77, 83, 87, 114-15, 120-21, 124-25, 136); representative recruitment and retention benchmarks (¶ 33, 74, 114, 127); the deal pipeline (¶ 76); billings targets (¶¶ 76, 115); and expenditures on sales investments (¶ 72, 79, 84). These allegations weigh in favor of scienter. *See Novak*, 216 F.3d at 311 (scienter alleged when defendants "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor").

26

The frequency with which analysts asked about the sales force and where Defendants spoke extensively on that subject, but misled and omitted material facts, also creates a strong inference of scienter. Investment analysts asked about the sales force *itself*, including "hiring trends" (¶ 177); "hiring to your targeted sales headcount" (¶ 204); "the limiting factor on the pace of sales headcount growth" (¶ 208); and "sales management's capacity" (*id.*). In speaking to investors and analysts, in Pluralsight's SEC filings (which Budge and Skonnard signed), and in soliciting investors' purchase of Pluralsight shares to enrich Budge and Skonnard, Defendants spoke about the sales force *itself* (including its size, its ramping to productivity, and the benefits of its investments).[28] Defendants therefore understood that "failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1298 (N.D. Okla. 2010); *see also In re Quality Sys.*, 865 F.3d at 1145-46 (finding scienter where defendants "repeatedly described the state of [company's] pipeline to analysts and investors"); *Tellabs II*, 513 F.3d at 709 ("exceedingly unlikely" that defendants innocently misled investors about core business). These facts raise a cogent and compelling inference of scienter. *See Adams*, 340 F.3d at 1105-06; *Yellowdog*, 426 F. Supp. 3d at 874-75.

**Insider Trading as a Motive.** Budge and Skonnard's insider sales provide an additional basis for a strong inference of scienter. Motive is not necessary to adequately plead scienter, but "personal financial gain" may bolster such an inference. *Tellabs*, 551 U.S. at 325. A court examines whether the trades were "normal and routine"; whether profits were substantial compared to

---

[28] ¶¶ 33-34, 37-38, 173, 177, 181, 185, 187, 189, 191, 194, 198, 199, 202, 204-05, 208-09.

compensation; and whether, "in light of the insider's total stock holdings, the sales are unusual or suspicious." *In re Qwest Commc'ns Int'l Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1195 (D. Colo. 2004). The CAC addresses of these criterion in detail. *See* ¶¶ 141-62. As alleged in the CAC and explained below, contemporaneous with their alleged misstatements, Budge and Skonnard[29] consummated the SPO and executed additional sales of their personal shares, for a total of $15.1 million and $22 million, respectively, at inflated prices. ¶¶ 125-26, 141-43, 151.[30] The cogent and compelling inference arising from Budge and Skonnard's suspicious trading is that they intentionally concealed the sales force problems because disclosure might adversely impact Pluralsight's share price. *Matrixx*, 563 U.S. at 49 (strong inference that Defendants elected not to disclose problems "not because [Defendants] believed they were meaningless but because [Defendants] understood their likely effect on the market.").

**Unusually High Proceeds and Suspiciously Timed Trades.** Skonnard and Budge's Class Period sales were not normal or routine because they far exceeded their sales after the Class Period ($22.18 million during the Class Period vs. $4.5 million post for Skonnard and $15.1 million vs. $335,204 for Budge). Defendants argue that no inference of scienter can be derived from the portion of the sales made pursuant to 10b5-1 plans, but there is an equally plausible inference here

---

[29] The CAC's allegations regarding former Chief Revenue Officer Joseph DiBartolomeo's trading activity provides additional, relevant context for Budge and Skonnard's trading and demonstrate that another senior officer dumped shares at peak prices in the same concentrated period. ¶¶ 157-162. DiBartolomeo did not speak publicly during the Class Period or sign SEC filings.

[30] Skonnard's and Budge's $13.6 million and $5 million stock sales in the SPO alone (which raised more money for Pluralsight insiders than the Company's IPO just ten months earlier, at a share price 95% higher than the IPO) raise an inference of scienter. *See Yellowdog Partners*, 426 F. Supp. 3d at 875-76 (motive to benefit a specific transaction can raise an inference of scienter); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (positive statements permitted a successful offering and supported scienter). ¶¶ 63, 104, 108, 143, 151.

that it can. A 10b5-1 trading plan[31] is a statutorily recognized affirmative defense to a charge of trading on the basis of material nonpublic information, not to allegations of making false and misleading statements. *See* 17 C.F.R. § 240.10b5-1. Scienter is a fact-specific inquiry, and while some courts have held that the existence of a 10b5-1 plan adopted before the start of a fraudulent scheme does not support an inference of scienter (*see* MTD at 20), that is not a bright line rule (and here, Defendants adopted their plans close to when Defendants say the sales problems began). If a trading plan could absolve individuals of liability for misleading investors in all cases, officers could make false and misleading statements and withhold negative information in advance of their scheduled trades and watch the profits roll in. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (explaining how "a clever insider" might "seek to disguise their conduct with a 10b5-1 plan"). Defendants do not deserve such immunity here, where the facts suggest that Defendants designed their trading plans to capitalize on inflated share prices with massive sales in a short period and near earnings announcements.[32]

---

[31] Such a plan "permits company insiders to adopt written, pre-arranged trading plans under which specific amounts of stock are sold according to pre-established criteria, thus *theoretically* liminating [sic] an individual's discretion over trading." *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 828 n.4 (N.D. Cal. 2019). Conspicuously absent from Defendants' description of this rule (for which they cite *In re Facebook*) is one word: "*theoretically*." *See* MTD at 19. Defendants have not published their 10b5-1 plans and Plaintiffs did not rely on them in preparing the CAC, so Defendants cannot claim that they had no discretion over their trades or argue anything else about what the plans provided.

[32] Budge and Skonnard argue that their sales to cover tax liabilities were automatic transactions by Pluralsight, but it is not clear from the Forms 4 who executed the sales or what agreement existed between Budge and Skonnard and Pluralsight. *See* MTD at 20, Defs.' Exs. 9, 10. At this stage, the Court must "disregard all of Defendants' facts that contradict those presented by Plaintiffs in their complaint," and all well-pleaded facts must be viewed in the light most favorable to Plaintiffs. *Golden v. Mentor Cap., Inc.*, No. 15-cv-0176-JNP-BCW, 2016 WL 10100280, at \*3 (D. Utah Apr. 19, 2016) (unpublished) (Parrish, J.). Even if Pluralsight executed the trades autonomously, paying

- On February 19 and 20, 2019, days after misleading investors about "hiring trends" for the sales force (¶ 177), Budge executed his *only trades* pursuant to his 10b5-1 plan, for nearly $10 million. ¶ 152. Two weeks later—after Defendants told investors that that Pluralsight's sales force had been "significantly expanded" and was seeing increased "productivity and effectiveness" from its sales representatives as they ramped, with only hypothetical risks on the horizon—he tacked on $5 million in the SPO.[33] These sales dwarfed Budge's other sales.[34] ¶ 151.

- Besides the $13 million that Skonnard earned in the March 2019 SPO as a result of Defendants' positive statements about the sales force (¶¶ 97, 103-08, 143), he sold nearly $5 million in shares during the second quarter near the stock's highest share price of the Class Period, and $2.58 million in shares *just five days* before the disastrous July 31, 2019 earnings call. ¶¶ 144-45.

These facts raise a strong inference that Budge and Skonnard's trading plans incentivized them to make positive statements to boost Pluralsight's share price and withhold negative information in advance of their scheduled sales and/or near earnings announcements, and to execute the SPO in the first quarter of 2019 before the effect of their insufficient ramped capacity had expressed itself in billings. *See Empls.' Ret. Syst. of Govt. of V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (finding scienter where defendants "knew the dates of their scheduled sales were imminent when they made the allegedly misleading statements to investors").

**Stock Sales Far Exceeded Compensation.** Scienter may also be inferred where "profits reaped were substantial in relation to compensation levels." *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007). Skonnard and Budge's stock sale proceeds

---

Budge and Skonnard's tax liabilities still provided a financial benefit to them, and the higher the price of the shares, the fewer shares Budge and Skonnard would have to sell to settle their bills.

[33] ¶¶ 153, 181, 185, 187, 189, 191, 194-95, 198.

[34] It is suspicious that Budge's supposed trading plan apparently called for him to sell nearly $10 million in hundreds of thousands of shares at prices of $29-$30 in February 2019, but only 1,823 shares on May 22, 2019, when the share price was higher. This raises an inference that Budge exercised discretion over his trading plan or that it was irregularly structured to encourage high volume trading in a short amount of time.

during the Class Period were 342% and 533.6% of their total respective compensation packages in 2019 (¶¶ 146, 154), which bolsters a finding of scienter. *Id.* at 1309-11. As Defendants point out, Skonnard and Budge did not receive base salaries in 2018 or 2019, meaning that their compensation was heavily weighted in favor of stock awards (MTD at 20), which is more proof of their motive. ¶¶ 35-36, 39-40. It is plausible that the lack of a salary motivated Skonnard and Budge to make false and misleading statements to boost the share price in advance of the SPO and their scheduled sales. *See Fresno Cty. Empls.' Ret. Ass'n*, 268 F. Supp. 3d at 555 (plausible that defendant "unloaded his shares at the first opportunity while the stock price was artificially elevated").

**Amounts of Holdings Sold**. "A strong inference of scienter may be shown from insider trades at times and in quantities that were suspicious in light of the insider's total stock holdings." *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d at 1301. Budge sold 39.9% of his total holdings during the Class Period, and only approximately 2.4% of his holdings after, which raises questions about just how standard his trading plan was.[35] ¶ 156. Skonnard's percentage of shares sold during the Class Period was lower, at 4.8%. ¶¶ 148-49. But it does not defy logic that Skonnard "would commit fraud to sell 5% of his holdings only to suffer" losses at the end of the Class Period. *See* MTD at 21. It is plausible that Skonnard held onto the rest of his stock and took

---

[35] Plaintiffs did not "ignore" that Budge had additional shares vest during the Class Period. *See* MD at 21. The CAC specifically identified January 31, 2019 as the date upon which this calculation was based because the vast majority of his sales occurred before additional shares vested. ¶ 156. Using Defendants' preferred denominator, Budge sold 34.4% of his total shares, which is still high. There is no rule for what percentage is substantial in this situation (otherwise, the law would create a perverse incentive to sell just below that percentage). This criterion is one more piece of information that, along with the rest, supports an inference of scienter.

the loss because he did not want to relinquish control of the business he founded and because he had already collected tens of millions of dollars in just a few months. ¶ 149. "Where a defendant may have believed that he could eventually sell his shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts, courts refuse to hold that defendants' stock purchases were inconsistent with fraud." *Freudenberg*, 712 F. Supp. 2d at 201.

Accordingly, viewing the CAC holistically, the inference that Budge and Skonnard knew that the undisclosed information about the sales force would be important to and viewed negatively by investors, but decided to keep it from them anyway, is equally as compelling if not stronger than Defendants' excuse that they were "simply 'overly optimistic'" about billings growth. And because the CAC adequately alleges Budge and Skonnard's scienter, "those allegations are also sufficient to allege scienter to defraud on behalf of [Pluralsight] itself." *Adams*, 340 F.3d at 1106.

**C.      Plaintiff INPRS Alleges Actionable Securities Act Claims.**

Section 11 "places a relatively minimal burden on a plaintiff" who "need only show a material misstatement or omission to establish [a] prima facie case," and "liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 371-82 (1983). "Section 12(a)(2) of the Securities Act provides essentially the same cause of action as § 11, but applies it to persons who use material misstatements or omissions in a prospectus . . . in an offer or sale of a security."[36] *In re Oppenheimer Rochester Funds*, 838 F. Supp. 2d at 1156-57.

---

[36] Liability under § 12(a)(2) extends to those who "successfully solicit the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). Defendants contend that Pluralsight was not a solicitor

To evade the negligence standard under Rule 8, the Securities Act Defendants (in this Section, III.C., "Defendants") argue that Rule 9(b) applies because these particular Securities Act claims "sound in fraud." Defendants are wrong. *See* Section III.A, *supra*. A Securities Act claim that alleges, as INPRS does here, that the Underwriter and Signer Defendants failed to make a reasonable investigation of the statements contained in the Registration Statement and Prospectus and that with reasonable care they would have known that the statements contained therein were materially untrue and incomplete does not sound in fraud.[37] *Schwartz*, 124 F.3d at 1251-52.[38] Defendants argue that a sole allegation, which was inadvertently incorporated into the Securities Action claims, that Budge and Skonnard knew that adverse facts had been concealed from the public, proves that the Securities claims sound in fraud. *See* MTD at 25; ¶¶ 41, 47. As a whole, however, the claims are clearly based on allegations of negligence. *See In re Suprema*, 438 F.3d at 273; *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008). And even if Rule 9(b) were to apply, INPRS has easily met that standard.

---

under this rule. *See* MTD 26. "Solicitation' for purposes of § 12(a)(2) potential liability includes . . . substantial involvement in the offering process." *United Food & Commercial Workers Union v. Chesapeake Energy Co.*, 2010 WL 3527596, at *7 (W.D. Okla. 2010) (citing *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988)). Pluralsight did much more than "promote" the SPO; it filed all the necessary registration statement and prospectuses with the SEC to solicit investors. ¶¶ 284-86, 358. This claim against Pluralsight should not be dismissed as a matter of law at this stage. *See Pinter*, 486 U.S. at 644 ("A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase."); *see also id.* at 655.

[37] ¶¶ 61, 302, 305, 313, 315, 318, 338-39, 342, 344, 349-51, 359, 367. Section 11 imposes strict liability against the issuer of securities (Pluralsight) where a registration statement contains material misstatements or omits material facts. *Herman*, 459 U.S. at 381.

[38] Defendants' cited case from this District on this point did not involve Exchange Act or Securities Act claims. *See Security Sys., Inc. v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186 (D. Utah 2019); MTD 25. *Schwartz* controls here.

Defendants also trot out the same misguided arguments regarding the alleged misleading statements that they do for the Exchange Act claims. They attack the falsity of Paragraph 287 (which describes increased billings) when the CAC does not allege that is a false statement; argue that the statements in Paragraph 289 (claiming Pluralsight's "large sales force" has shown "substantial increases" in "productivity and effectiveness") are forward-looking and mere puffery or unactionable opinions when they are clearly assertions of present and historical fact that created an inaccurate picture of the adequacy of Pluralsight's sales force and its growth strategy (¶¶ 290-92); and fail to rebut the inference that the risk factors described in Paragraphs 294, 296, 298, and 300 were materially false and misleading because they created an impression that the risks were merely hypothetical when, in fact, Defendants were then suffering from and struggling to address the problems described therein. ¶¶ 295, 297, 299, 301. Defendants' violations of Items 303 and 105 of Regulation S-K are actionable for the same reasons. ¶¶ 330-342. And Defendants' attack on omissions fails because the statements challenged under the Securities Act claims were not about future billings growth, but the sales force. These omissions were material to investors because of their obvious connection to billings growth. *See, e.g.*, ¶¶ 291-92.[39]

## IV.  CONCLUSION

Defendants' motions to dismiss should be denied in their entirety.[40]

---

[39] Defendants' only argument for dismissal of Plaintiffs' claims under § 20(a) and 20A of the Exchange Act and INPRS' claims under § 15 of the Securities Act is that the CAC fails to allege underlying violations of § 10(b) of the Exchange Act and §§ 11 and 12(a)(2) of the Securities Act on the grounds. But as Plaintiffs have demonstrated, Defendants' arguments are meritless. The CAC adequately alleges the underlying claims; accordingly, the control-person and statutory insider trading claims should be sustained.

[40] If the Court dismisses any claims, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. 15.

Dated: October 16, 2020

By /s/ Keith M. Woodwell
**CLYDE SNOW & SESSIONS, P.C.**
Keith M. Woodwell
Joseph D. Watkins

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (admitted *pro hac vice*)

Steven J. Toll (admitted *pro hac vice*)
Megan Kinsella Kistler (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
mkistler@cohenmilstein.com

Joel P. Laitman (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
jlaitman@cohenmilstein.com

*Counsel for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago and the Proposed Class*

35

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2020, I electronically filed the foregoing Plaintiffs'

Memorandum in Opposition to Defendants' Motion to Dismiss with the Clerk of Court using the

CM/ECF system which sent notification of such filing to all parties of record.

/s/ Lyndee Aardema

36