Gregory L. Watts (*pro hac vice*)
gwatts@wsgr.com
Stephanie L. Jensen (*pro hac vice*)
sjensen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104
Telephone: (206) 883-2500

Ignacio E. Salceda (*pro hac vice*)
isalceda@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA  94304
Telephone: (650) 493-9300

Jason W. Hardin (# 8793)
jhardin@fabianvancott.com
Sarah C. Vaughn (# 14615)
svaughn@fabianvancott.com
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City,  UT 84111
Telephone: (801) 531-8900

*Attorneys for Pluralsight, Inc., Aaron Skonnard, James Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>PLURALSIGHT, INC.; AARON SKONNARD; JAMES BUDGE; GARY CRITTENDEN; SCOTT DORSEY; ARNE DUNCAN; RYAN HINKLE; LEAH JOHNSON; TIMOTHY MAUDLIN; FREDERICK ONION; BRAD RENCHER; BONITA STEWART; KARENANN TERRELL; MORGAN STANLEY & CO., LLC; and J.P. MORGAN SECURITIES, LLC,<br><br>Defendants. | Case No. 1:19-CV-00128-JNP-DBP<br><br>**THE PLURALSIGHT DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CORRECTED AMENDED COMPLAINT**<br><br><br>Honorable Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

I.     THE CAC FAILS TO SATISFY RULE 8 .................................................................1

II.    THE CAC FAILS TO STATE AN EXCHANGE ACT CLAIM .......................................2

      A.    Plaintiffs Fail to Plead a Material Misrepresentation or Omission..........................2

      B.    Plaintiffs Fail to Plead a Strong Inference of Scienter..............................................6

III.    THE CAC FAILS TO STATE A SECURITIES ACT CLAIM .......................................10

      A.    The CAC's Securities Act Claim Sounds in Fraud.................................................10

      B.    Plaintiffs Fail to Plead a Material Misrepresentation or Omission........................11

      C.    Plaintiffs Lack Section 12(a)(2) Standing as to Pluralsight..................................15

CONCLUSION.....................................................................................................................15

**TABLE OF AUTHORITIES**

<u>**Page(s)**</u>

**CASES**

*Arena Land & Inv. Co. v. Petty*,
   69 F.3d 547 (10th Cir. 1995) (unpublished) ........................................................................2

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) (unpublished) .................................................5

*City of Phila. v. Fleming*,
   264 F.3d 1245 (10th Cir. 2001) ...........................................................................................7

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................................8

*Emps.' Ret. Syst. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...................................................................................................9

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................9

*Hampton v. root9B Techs., Inc.*,
   897 F.3d 1291 (10th Cir. 2018) ...........................................................................................12

*In re Level 3 Commc'ns Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) ................................................................................ *passim*

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003)...............................................................................5

*Karacand v. Edwards*,
   53 F. Supp. 2d 1236 (D. Utah 1999)......................................................................................6

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .................................................................................................5

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) .............................................................................................12

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...................................................................................................5

*MVT Servs., LLC v. Cardenal Express, S.A. de C.V.*,
   2015 WL 13050027 (D.N.M. June 29, 2015)......................................................................10

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...................................................................................................8

*Pinter v. Dahl*,
      486 U.S. 622 (1988)................................................................................................15

*Rubke v. Capitol Bancorp Ltd.*,
      551 F.3d 1156 (9th Cir. 2009) ........................................................................10, 11

*Slater v. A.G. Edwards & Sons, Inc.*,
      719 F.3d 1190 (10th Cir. 2013) .................................................................................6

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
      33 F. Supp. 3d 401 (S.D.N.Y. 2014)........................................................................11

*Spiegel v. Tenfold*,
      192 F. Supp. 2d 1261 (D. Utah 2002)......................................................................15

*TDC Lending LLC v. Private Capital Grp., Inc.*,
      340 F. Supp. 3d 1218 (D. Utah 2018).........................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
      551 U.S. 308 (2007)....................................................................................... 1, 6, 7

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*,
      2010 WL 3527596 (W.D. Okla. Sept. 2, 2010) (unpublished).....................................5, 15

*Williams v. Globus Med., Inc.*,
      869 F.3d 235 (3d Cir. 2017)........................................................................................5

## RULES

Fed. R. Civ. P. 8.............................................................................................................2

Fed. R. Civ. P. 9(b) ...............................................................................................10, 12

**INDEX OF EXHIBITS**

| Exhibit | Exhibit Description |
|---|---|
| 12 | Chart consolidating information from the four previously-submitted chart into a single exhibit. This exhibit was created by Defendants to facilitate the Court's review of the Corrected Amended Complaint and allegations therein. |
| 13 | Pluralsight's January 14, 2020 Presentation at Needham & Company, LLC's Conference Transcript. |

## INTRODUCTION

The Opposition is notable not for what it argues, but for what it concedes and where it retreats. Plaintiffs abandon eight of the thirty purported misstatements (Statements 5-7, 9, 10, 16, 24, 26) and retreat by recasting their remaining allegations as solely focused on the growth and productivity of Pluralsight's sales force. By Plaintiffs' own characterization, sales capacity and productivity are only material to the extent they impact billings growth, which Plaintiffs concede was accurately reported during the class period (Opp. at 2 n.3). Throughout the class period, Defendants' statements about the sales force were not false or misleading, but rather were unactionable accurate statements of historical fact, forward-looking statements, and/or expressions of corporate optimism or opinions. Plaintiffs' failure to plead falsity requires dismissal of their claims under both the Securities Act and Exchange Act.

Plaintiffs' Exchange Act claims must also be dismissed for failure to plead a "cogent" and "compelling" inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Unable to point to specific contemporaneous information that contradicted Defendants' statements, Plaintiffs rely on purported "admissions" that were made with the benefit of hindsight and admit nothing, and stock sales that are not suspicious in amount or timing. Defendants' proffered nonculpable inference is far more plausible.

## ARGUMENT

### I.    THE CAC FAILS TO SATISFY RULE 8

Plaintiffs claim Defendants mistakenly (or even purposely) address statements in their motion that Plaintiffs did not challenge. Opp. at 1 n.2, 19 n.19; Woodwell Decl. Ex. C. Any fair reading of the CAC, however, reveals that Plaintiffs did allege these statements were false or

misleading. ¶¶ 85, 89, 105, 112. Regardless, Plaintiffs now concede they are not. This ambiguity over which statements are challenged, and the fact that it takes *five charts* to distill the CAC's allegations, highlights that the CAC is a confusing and prolix puzzle pleading that fails to satisfy Rule 8. Opp. at 1 n.2; Jensen Ex. 1; Woodwell Exs. A-C; Jensen Supp. Ex. 12 (consolidating information from four charts into a single exhibit). Plaintiffs' attempt to blame Defendants for trying to "sow confusion" (Opp. at 19 n.19) shows their misunderstanding of their pleading burden: it is not the job of the Court or Defendants to "sift through a lengthy, conclusory and poorly written complaint to piece together the cause of action." *Arena Land & Inv. Co. v. Petty*, 69 F.3d 547, at *1 (10th Cir. 1995) (unpublished); MTD at 9 (citing authority).

## II.    THE CAC FAILS TO STATE AN EXCHANGE ACT CLAIM

### A.    Plaintiffs Fail to Plead a Material Misrepresentation or Omission

Plaintiffs concede that eight of the CAC's twenty-six statements challenged under the Exchange Act were not false or misleading. Opp. at 1 n.2, 2 n.3, 13 n.13, 15 n.15, 19 n.19. All that remain are eighteen statements that purportedly concern the growth and productivity of the Company's sales force (Statements 1-4, 8, 11-15, 17-19, 25, 27-30).

*Approximations of Sales Headcount Were Not False or Misleading.* Mr. Budge orally stated on January 16, 2019 and February 13, 2019 that the Company had "*about* 250" quota-bearing representatives (Statement 1) and "*around* 240" (Statement 8), respectively. Plaintiffs argue these approximations were false when made because Mr. Budge orally stated a year later in January 2020 that the Company "came out of 2018 going into 2019 with *about* 200 quota-bearing sales reps. And we're now going into 2020…with *about*—we have *about* 320 reps right now[.]" ¶ 136 (emphasis added); Opp. at 13. Mr. Budge's approximation in January 2020 does not render

2

his prior statements false when made. First, Statements 1, 8 and the so-called January 2020 admission did not purport to provide a precise number of sales representatives, but rather a ***rough estimate***. This is supported by Mr. Budge's use of the terms "about" and "around" before these numbers. It also is supported by the fact that mere moments after saying the Company had "about 320 reps" as of January 2020, Mr. Budge said the Company had a sales team "of 300-plus." Jensen Supp. Ex. 13 at 5-6. Second, Mr. Budge's temporally vague statement that Pluralsight "came out of 2018 going into 2019 with ***about*** 200 quota-bearing sales reps" does not mean that it did ***not have*** "***about*** 250" sales representatives as of January 16, 2019. Third, a common-sense review of the statements shows the "about 250" figure was accurate when made—Pluralsight had about 250 sales representatives as of January 2019 (¶ 173), it experienced some attrition and thus had about 240 representatives as of mid-February 2019 (¶ 87), and it returned to about 250 representatives by the end of July 2019 (¶ 123).

 ***Statements About Sales Force Efficiencies/Productivity Were Not False or Misleading.*** Defendants stated from January 16 through May 1, 2019, when Pluralsight reported 1Q19 results, that Pluralsight was experiencing increased sales force "efficiencies," *i.e.*, that the Company's sales force was becoming more productive as it scaled up (Statements 2-4, 11, 18, 29). Plaintiffs fail to allege a single, particularized fact indicating that the sales force was not becoming more efficient. Indeed, assuming Plaintiffs are correct that Pluralsight had fewer sales representatives than it had hoped for during 1Q19, Plaintiffs' own allegations concede that ***the Company nonetheless achieved all of its key business metrics for the quarter*** (metrics Plaintiffs admit were not false or misleading) with ***total billings growth of 41%, B2B billings growth of 48%, and revenue and EPS that exceeded its projections***. MTD at 4-5, 22; ¶ 112.

3

***Expressions of Vague Optimism and Puffery Were Not False or Misleading.*** Rather than rebut the fact that Statements 4, 8, 28, and 30 are or contain unactionable puffery, MTD at 13, 13 n.6, Plaintiffs recount the basic proposition that statements are material if a reasonable investor could find them important. Opp. at 15 (citing *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012)). This misses the point. *Level 3* makes clear that vague, optimistic statements that are not capable of objective verification are unactionable as a matter of law. 667 F.3d at 1339. Indeed, there is no way to objectively determine the meaning of statements such as "They're killing it" (Statement 4), "more goodness" (Statement 8), "good rigor" (Statement 28), and "strong focus and commitment to customer success" (Statement 30). These are similar to the statement "this year is really focused on integration and getting synergies from all those acquisitions," which *Level 3* held as the type of vague "management-speak upon which no reasonable investor would base a trading decision." *Id*. at 1340.

***Opinions Were Not False or Misleading.*** Plaintiffs' denial that any of the challenged statements were opinions, Opp. at 15, is similarly unavailing. Plaintiffs fail to explain how statements like "it seems to be working" (Statement 4), we have "a large direct sales force to focus on business sales" (Statements 11, 18), "we like where we are" (Statement 27), we "love our growth there" (*id*.), and "we like the direction we are going" (Statement 28) are anything other than unverifiable opinions. MTD at 13-14. And Statements 17 and 27 disclosing that Pluralsight had "significantly expanded" its "direct sales force to focus on business sales" were demonstrably true. MTD at 11. At the time those statements were made, Pluralsight had grown its sales force from "roughly 0 enterprise-class reps" in 2017 to "about 120" and from "about 80 quota-bearing reps" in 2017 to "about 250." ¶ 173.

***Risk Factors.*** Plaintiffs challenge Pluralsight's risk factors (Statements 12-15, 19-23, 25). If these risk factors were "[u]seless" as Plaintiffs claim, Opp. at 20, the result would be that the Safe Harbor would not immunize the forward-looking statements, ***not*** that the risk factors are ***transmogrified into independently false statements themselves***. MTD at 14; *infra* at 14.[1] Plaintiffs' authority proves this outcome. *See Lormand v. US Unwired, Inc*., 565 F.3d 228, 247 (5th Cir. 2009) (warnings "failed to correct the false impression" created by other statements); *Bos. Ret. Sys. v. Uber Techs., Inc*., 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (unpublished) ("what was disclosed…was not enough to render what was *not* disclosed, not misleading."); *In re Williams Sec. Litig*., 339 F. Supp. 2d 1206, 1227 (N.D. Okla. 2003) (risk factors failed where company prepared for bankruptcy despite saying it was thriving).[2]

***Alleged Omissions.*** Plaintiffs claim that because Defendants disclosed the Company's number of historical and projected sales representatives in January, February, and May 2019, they

---

[1] Plaintiffs concede they do not challenge the forward-looking portions of Statements 2, 8, 11, 12, 18, 27, and 28. Opp. at 19, 19 n.19 ("this is not a case about false or misleading projections").

[2] The Third Circuit's opinion in *Williams v. Globus Med., Inc*., 869 F.3d 235, 242 (3d Cir. 2017), supports dismissal here. In *Globus*, the court affirmed dismissal and held that the risk factor in question was not misleading because (a) it warned of losing sales distributors, a risk that only mattered if it caused "adverse effects on sales," and (b) sales were not adversely affected "at the time the risk disclosures were made." *Id*. Here, Defendants show (a) the risks of ineffective sales force investments, growth, and productivity only matter if they adversely impact billings growth, and (b) billings growth was not adversely effected until the end of 2Q19 when Defendants disclosed it. Plaintiffs' other cited authority, Opp. at 20-21, misses the mark. Plaintiffs misquote *United Food & Commercial Workers Union v. Chesapeake Energy Corp*., 2010 WL 3527596, at *5 (W.D. Okla. Sept. 2, 2010) (unpublished) by quoting the court's ***recitation*** of the plaintiff's allegations, not the court's holdings or findings. The defendant in *Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 251-52 (2d Cir. 2014) had a duty to disclose "ongoing and serious pollution violations" that threatened the "entire venture" because the defendant made affirmative statements of compliance with regulations knowing that it was not.

incurred a duty to disclose all minutiae related to the sales force (including the status of training, onboarding, or territory assignment) every time they spoke. Opp. at 11-12. The securities laws do not require such disclosures. MTD at 15-16; *see also Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243-44 (D. Utah 1999) (Kimball, J.).

*Items 105 and 303.* Instead of pleading facts showing an alleged sales capacity gap was a "known trend" in 1Q19 and 2Q19, Plaintiffs point to Mr. Budge's hindsight analysis of 1Q19 in July 2019, after the end of 2Q19. Opp. at 22-23. Mr. Budge's retrospective July realization does not mean he knew of a sales capacity gap in 1Q19 or midway through 2Q19, or knew it was a trend. MTD at 23-24. Disclosures are required only for information "presently known to management," not information they *subsequently* learn. *See Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). And contrary to Plaintiffs' claim (Opp. at 23 n.25), determination of what constitutes a "trend" can be decided on a motion to dismiss. MTD at 23 n.11 (citing Item 303 opinions dismissing or affirming dismissals).

### B.   Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs suggest that, when "[d]rawing all reasonable inferences" in their favor, they have adequately pled a strong inference of scienter. Opp. at 25 n.26. That is not the standard. *Tellabs* held that, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." 551 U.S. at 323-24; *see also Level 3*, 667 F.3d at 1345. The CAC can avoid dismissal only if, after this holistic analysis of *all inferences*, the inference of scienter is *at least as compelling* as any opposing inference. Here, the only allegations of scienter Plaintiffs put forward are (1) so-called "admissions" made with the

benefit of hindsight that admit nothing, (2) "access" to unspecified data that Plaintiffs fail to show raised any red flags, and (3) stock sales that were not suspicious in size or timing. Viewed holistically, these allegations fall short of pleading a strong inference of scienter.

**Hindsight Evaluations Are Not Admissions.** Plaintiffs' entire case hinges on alleged "admissions" by the Individual Defendants in July 2019 and January 2020. But these hindsight disclosures "do not suggest that defendants knew or recklessly disregarded information contrary to their public statements." *Level 3*, 667 F.3d at 1347. When Mr. Budge said "we were still hitting our numbers," he was not saying he knew of a sales capacity gap in 1Q19 or 2Q19 and withheld it; he was explaining that sales productivity prevented him from realizing it until the end of 2Q19. Ex. 7 at 12. Indeed, an analyst recognized that questioning management about this issue in July 2019 was playing "Monday morning quarterback." *Id*. Defendants' statements that it "took too long" to make decisions and "[w]e were still realizing what we needed[,]" for example, reflect the hindsight nature of these statements. *Id*. at 12. While this disclosure, as with the disclosure in *Level 3*, "addresse[d] the issues [the company] experienced during the class period, it does not constitute an admission that defendants spoke fraudulently during that time." 667 F.3d at 1347. The Tenth Circuit was quite clear that such hindsight review "contributes nothing to an inference of scienter." *Id.* (citing *City of Phila. v. Fleming,* 264 F.3d 1245, 1260 (10th Cir. 2001)); MTD at 19.

**Plaintiffs Do Not Point to Any Red Flags.** Plaintiffs cite purported access to an annual sales ramp capacity plan, representative recruitment and retention benchmarks, deal pipeline, billings targets, and expenditures on sales investments. Opp. at 26. But Plaintiffs fail to allege any information contained in these materials and known to Defendants that contradicted their statements or otherwise constituted "red flags" of a sales capacity gap that would negatively impact

billings. *See TDC Lending LLC v. Private Capital Grp., Inc*., 340 F. Supp. 3d 1218, 1228 (D. Utah 2018) (Shelby, J.). Plaintiffs' own cited cases reinforce this. The Second Circuit held when "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). To protect against speculation, Plaintiffs must allege "specific instances through which information was given to defendant." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Where, as here, Plaintiffs allege no specific facts about what Defendants knew, "'[s]uch omissions and ambiguities count against inferring scienter.'" *Level 3*, 667 F.3d at 1345 (citation omitted).

***Defendants' Stock-Based Compensation and Stock Sales Do Not Support Scienter.*** In *Level 3*, the Tenth Circuit found "incentive-based compensation...is common among executives at publicly traded companies and does not ordinarily indicate scienter." *Id*. at 1346. This cuts directly against Plaintiffs' claim that Mr. Skonnard's and Mr. Budge's compensation was "heavily weighted in favor of stock awards" and is "proof of their motive." Opp. at 31; MTD at 20.

In *Level 3,* even though the defendants had not traded ***any*** shares in the prior two years, the court found their retention of a substantial percentage of their holdings and the fact that the sales were made pursuant to automatic transactions set up prior to the class period to pay withholding taxes that became due "rebut[ted] any inference of scienter [it] might otherwise draw regarding these sales." 667 F.3d at 1346-47. Any inference of scienter based on stock sales here is likewise negated by the fact that (1) Skonnard and Budge both retained substantial percentages of their Pluralsight holdings (more than 95% and 88% of their total salable holdings, respectively), MTD

at 21-22, and (2) the majority of the their sales were made automatically, either to satisfy tax liabilities or pursuant to 10b5-1 trading plans, MTD at 19-20.

By their very nature, 10b5-1 plans are pre-arranged, non-discretionary sales of stock. *See* 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)-(B). Such plans undermine an inference that plan-triggered stock sales support a strong inference of scienter.[3] MTD at 20. Plaintiffs cite out-of-circuit cases where the court found scienter despite a 10b5-1 plan because it was adopted ***during the class period and after the fraud allegedly started***. *See Emps.' Ret. Syst. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010). Here, the 10b5-1 plans were adopted by the end of 2018, before the class period and before the January 2019 date Plaintiffs allege Defendants knew of the so-called sales capacity gap. ¶ 14.

***Nonculpable Inferences.*** Plaintiffs fail to show a cogent and compelling inference of scienter. In *Level 3*, even where plaintiffs alleged specific internal reports, the Court found that the failure to show a conflict between the information in the reports and defendants' statements required one to impermissibly "stack inference upon inference to even conclude that the statements were false—much less that defendants knew or were reckless in not knowing." 667 F.3d at 1345. Plaintiffs here have not even alleged a single specific report (no date, no author), let alone any information therein that contradicted Defendants' statements.

---

[3] Plaintiffs' claim that Defendants' 10b5-1 plans cannot be considered because they did not rely on them in preparing their CAC is both legally unsupported and contradicted by the CAC's reference to the 10b5-1 plans. ¶ 14; Opp. at 29 n.31. The Form 4s filed by Defendants denoting the 10b5-1 sales were publicly available and cited by Plaintiffs in their CAC. *See, e.g.*, ¶¶ 14 ("By the end of 2018, all three individuals had created 10b5-1 trading plans"), 143, 151.

The far more plausible inference is that in 2Q19, Defendants discovered that Pluralsight had a billings growth rate that was lower than anticipated—although strong enough to achieve 23% and 27% year-over-year growth for billings and B2B billings, respectively. ¶ 119. Defendants conducted a post-hoc analysis of this deceleration and, ***with the benefit of hindsight***, realized they should have brought more sales representatives on earlier and deployed them differently. The fact that they did not see this issue sooner is because the increased productivity of certain representatives in 1Q19 masked a slowdown. ¶ 119; MTD at 18, 22-23.

## III.     THE CAC FAILS TO STATE A SECURITIES ACT CLAIM

### A.     The CAC's Securities Act Claim Sounds in Fraud

Plaintiff INPRS claims it "carefully segregated" its Exchange Act and Securities Act claims to avoid the burden of Rule 9(b), ***while simultaneously admitting*** it made an "inadvertent[]" error by alleging that Securities Act defendants Skonnard and Budge "***knew*** that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public[.]" Opp. at 10, 33; ¶¶ 41, 47 (emphasis added). Try as it must, INPRS cannot amend its CAC through its Opposition. *See MVT Servs., LLC v. Cardenal Express, S.A. de C.V.*, 2015 WL 13050027, at *2 (D.N.M. June 29, 2015). This supposed inadvertence proves Plaintiffs duplicated their fraud-based claims and then tried (unsuccessfully) to sanitize them.

Despite INPRS' assertion to the contrary, where, as here, "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, [the Court] can assume that it sounds in fraud." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). Regardless, claims certainly sound in fraud where, as here, the same underlying ***misconduct*** is the nucleus for both the Securities Act

10

and Exchange Act claims. MTD at 25. For example, Plaintiffs allege stock sales by Skonnard and Budge in the SPO—the offering that prompted the allegedly misleading Offering Documents that forms the basis for INPRS' Section 11 claim—can be used to infer fraudulent conduct and insider trading. ¶¶ 141-156. It is irreconcilable to allege these same Offering Documents were *negligently* prepared *and at the same time argue* that Messrs. Skonnard and Budge *deliberately* sold "massive" amounts of their own stock in the SPO, *knowing* the registration statement was misleading. ¶ 130; *see Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 440 (S.D.N.Y. 2014). Indeed, the Opposition cherry-picks a handful of paragraphs in the Securities Act section that include the word "negligence" (Opp. 33 n.37), but are in general thinly-veiled references to their Exchange Act fraud narrative (¶¶ 305, 313, 315 (arguing the fraudulent implications of Defendants' statements made *before and after the Offering Documents* were "readily apparent" to Defendants)). Courts perform a "close examination of the language and structure of the complaint" to determine whether a unified course of fraudulent conduct is alleged. *Rubke*, 551 F.3d at 1161. Here, even an elementary level of scrutiny reveals as much. ¶¶ 41, 47, 305, 313, 315; MTD at 25. Accordingly, Rule 9(b) applies.

### B.    Plaintiffs Fail to Plead a Material Misrepresentation or Omission

Even if Rule 9(b) does not apply, INPRS fails to plead a material misrepresentation or omission. INPRS concedes that Statement 16 was not false or misleading. Woodwell Ex. C. Plaintiff is left challenging only seven statements in the Offering Documents: Statement 17 regarding Pluralsight's expanded sales force, Statement 18 regarding its growth strategy and sales productivity, and Statements 19-23 regarding risk factors.

***Statement 17.*** INPRS concedes that Pluralsight's statement "[w]e have significantly expanded our direct sales force to focus on business sales" was an accurate statement of historical fact when made in early March 2019. Opp. at 14, 15 n.15. Indeed, Pluralsight's sales force ***tripled*** from 80 representatives in 2017 (¶ 114), to 240 as of mid-February 2019 (¶ 87).[4] Instead, INPRS contends this statement about historical growth is misleading because the Offering Documents did not further disclose that Pluralsight "was then addressing significant delays in hiring and on-boarding dozens of salespeople." Opp. at 14. Yet this purported omission does not contradict the disclosure, and a defendant that discusses historical growth does not incur a duty to disclose factors that might impact *future* growth. *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) ("It is well-established that the accurate reporting of historical successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future."). Indeed, as Defendants warned, there was "no guarantee" that the strategy would be seamlessly implemented or successful. MTD at 6, 16, 26; Statements 19-23. INPRS argues that this omitted information would have been material to investors, yet materiality is a separate element that a plaintiff must establish and cannot itself render an alleged omission actionable. *See McDonald*, 287 F.3d at 997 ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."). While INPRS claims the facts in early March 2019 contradicted the statement, the only logical reading of the phrase "[w]e have significantly expanded our direct sales force to focus on business sales"

---

[4] "[S]ignificantly expanded" is a statement of opinion that is not false or misleading unless it inaccurately represents the speaker's beliefs about then-present facts. MTD at 13-14 (citing *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018)). There is no allegation Defendants did not believe this statement, and ample support that they justifiably believed it.

12

is that the Company was talking about its historical growth over time, not whether it was on track with an internal goal for 1Q19, a quarter not yet completed. This is supported by the statement's location in the Prospectus Summary under the heading "Growth Strategy," showing the statement described the Company's strategy, a strategy that had been in place since at least 2016. Ex. 2 at 9.

*Statement 18.* The first part of Statement 18 ("we have a large direct sales force to focus on business sales[,]" ¶¶ 195, 289) is unactionable for the same reasons as Statement 17. Similarly, the second part of Statement 18 ("we have been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time") is demonstrably true. As with Statement 17, a fair reading shows it was not about 1Q19, but about the Company's increases in productivity and effectiveness *"over time."* Again, this is supported by the statement's location under the heading "Growth Strategy" in the Offering Documents, showing it described a growth strategy that had been in place since 2016 and which the Company was continuing to pursue, without any guarantees of success. Ex. 2 at 9. INPRS responds that these statements were misleading because "they omitted that 'dozens' of sales representatives were missing and therefore not producing according to plan" (Opp. at 17 n.16), yet this ignores the point—INPRS asserts no allegation contradicting that Pluralsight had a large direct sales force or that the overall sales team, even with missing representatives, had become more productive and efficient over time.

Assuming, as INPRS alleges, the second part of Statement 18 was about 1Q19 or, although addressing the strategy over many years, would have been misleading if sales productivity and effectiveness were down in 1Q19, the statement still is demonstrably true based upon facts INPRS concedes. This statement was made in early March, roughly a month before the end of 1Q19, in which Pluralsight (a) achieved total billings growth of 41% to $77.9 million and B2B billings

growth of 48% to $67.2 million (¶ 112), and (b) exceeded its quarterly revenue and earnings projections. *See supra* at 3; MTD at 6. If the Company's sales force was smaller at the end of 1Q19 than planned, as INPRS alleges, it necessarily was more productive and effective—achieving the same billings growth with fewer-than-anticipated sales representatives. And it was reasonable for Defendants to expect that this heightened productivity would continue as these representatives continued to season in their roles.

*Statements 19-23.* INPRS claims the Offering Documents' risk factors were misleading because what was posed as risks had already materialized. Opp. at 34. But Plaintiff fails to allege any facts indicating that these risks had materialized by March 7, 2019, nearly a month before the end of 1Q19 in which Pluralsight exceeded expectations for total billings, B2B billings, revenue, and EPS. *See supra* at 5; MTD at 5-7, 14. INPRS also cannot credibly explain how a warning about risks to the Company's business strategy—and express disclaimers that its sales force investments might not "succeed and contribute to additional customer acquisition and revenue growth" (¶ 294)—somehow served as a guarantee that those conditions did not exist at the time. Statement 20; MTD at 14 (citing authority). INPRS seems to claim these risk factors promised Pluralsight's hiring trends would expand linearly and without temporary setbacks. But Plaintiff points to no such promise, because Defendants never made it.

*Items 105 and 303.* Alleged Items 303 and 105 violations fail to plead a claim under the Securities Act for the same reason they fail to plead a claim under the Exchange Act. MTD at 23-24. It is impossible for there to have been a "known trend" in early March 2019 when the Company achieved every metric a month later when 1Q19 ended. *See supra* at 6. And Defendants clearly complied with Item 105 by disclosing the Company's most significant risks. MTD at 24.

### C.       Plaintiffs Lack Section 12(a)(2) Standing as to Pluralsight

Plaintiff INPRS does not assert a Section 12(a)(2) claim against the Individual Defendants; it only asserts it against Pluralsight and the Underwriter Defendants. ¶¶ 357-361. Defendants have shown, and INPRS concedes, that Pluralsight was not a "seller" in the SPO. MTD at 26-27; Opp. at 32 n.36. Pluralsight was not among the selling stockholders and did not sell a single share of stock in the SPO. ¶¶ 284, 286 (identifying "company insiders" as the selling stockholders); Ex. 2 at 150-154 (same). Instead, INPRS alleges Pluralsight was a "solicitor" because it filed the Offering Documents with the SEC and "promoted" the SPO "for the benefit of [itself] and [its] associates[.]" ¶ 358; *see also* Opp. at 32 n.36 (Pluralsight was "motivated at least in part by a desire to serve [its] own financial interests"). But the mere filing of a prospectus, without more, did not sufficiently plead the required "direct and active participation" in *Spiegel v. Tenfold*, 192 F. Supp. 2d 1261, 1269 (D. Utah 2002) (dismissing complaint).[5] And INPRS does not plead what "benefit" or "financial interest" motivated Pluralsight. In fact, INPRS admits that Pluralsight did "not receive any proceeds from the sale of the shares" in the SPO. ¶ 285; Ex. 2 at cover (Pluralsight "will not receive any proceeds from the sale of shares by the selling stockholders").[6]

### CONCLUSION

For the foregoing reasons, the Court should dismiss the CAC with prejudice.

RESPECTFULLY SUBMITTED this 17th day of November, 2020.

---

[5] *Pinter v. Dahl*, 486 U.S. 622 (1988), did not involve a firm commitment underwriting or allegations that the issuer was a solicitor. Unlike here, the complaint in *Chesapeake Energy Corp.*, 2010 WL 3527596, at *7, included detailed "factual allegations" showing the issuer was "involved in all stages of the offering."

[6] Absent predicate violations under the Exchange Act and Securities Act, the CAC's control person liability claims and Section 20A insider trading claims also fail. MTD at 27 n.13.

15

**FABIAN VANCOTT**

*/s/ Jason W. Hardin*
Jason W. Hardin (# 8793)
Sarah C. Vaughn (# 14615)

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Gregory L. Watts*
Gregory L. Watts (*pro hac vice*)
Ignacio E. Salceda (*pro hac vice*)
Stephanie L. Jensen (*pro hac vice*)

*Attorneys for Pluralsight, Inc., Aaron Skonnard, James Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell*