FILED
2021 MAR 31 PM 2:17
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>PLURALSIGHT, INC., *et al.*,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING THE PLURALSIGHT DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 1:19-cv-00128-JNP-DBP<br><br>District Judge Jill N. Parrish |

Before the court is a Motion to Dismiss Corrected Amended Complaint ("CAC") filed by Defendants Pluralsight, Inc. ("Pluralsight"), Aaron Skonnard ("Skonnard"), James Budge ("Budge"), Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell (collectively, the "Pluralsight Defendants"). ECF No. 111. Defendants Morgan Stanley & Co., LLC and J.P. Morgan Securities, LLC (collectively, the "Underwriter Defendants") joined the Pluralsight Defendants' Motion to Dismiss and Reply in Support of Motion to Dismiss. ECF Nos. 114, 124. The court entertained oral argument on the Motion to Dismiss on March 22, 2021. Having reviewed the memoranda and considered the oral argument, the court grants the Pluralsight Defendants' Motion to Dismiss.

## BACKGROUND

Pluralsight is a software company that offers a cloud-based technology skills platform and sells subscriptions to its platform to businesses and individuals. Pluralsight customers have access

to a library of online technology skills courses, skill and role assessments, learning paths to help users master particular subjects, and analytic tools to help business customers track and respond to the technology skills of their employees.

The class period in this case is from January 16, 2019 through July 31, 2019 ("Class Period"). Pluralsight became a public company in May 2018. Each year from 2017 through 2019, Pluralsight reported net losses of $96.53 million, $128.58 million, and $163.57 million, respectively. Despite these net losses, Pluralsight attracted investors by touting its "billings" growth. "Billings" were comprised of revenue recognized ratably for the period that subscription services were provided, plus new subscriptions and subscription renewals in future quarterly periods. Although Pluralsight's profits did not grow from 2017 through 2019, its "billings" grew by approximately 40–50% year-over-year. Pluralsight told investors during the Class Period that this level of growth was built into its long-term business model. Pluralsight also told investors that its billings growth was dependent upon the capacity—including headcount, experience, efficiency, and productivity—of its sales force. Pluralsight's sales force was responsible for its sales to business customers, which in turn represented at least 85% of the company's billings.

Prior to the Class Period, in August 2018, Skonnard (Pluralsight's Chief Executive Officer and Chairman) and Budge (Pluralsight's Chief Financial Officer) made positive statements to investors about the growth in Pluralsight's number of sales representatives and the sales force's increasing productivity and effectiveness. Pluralsight also told investors that sales representatives required six months from hiring to become fully productive, or "seasoned," in terms of meeting sales quotas. Pluralsight tracked its number of sales representatives and when each sales representative began work. Because the productivity and effectiveness of the sales force had a

2

substantial effect on Pluralsight's billings, and because billings were how Pluralsight attracted investors, the sales force's effectiveness was relevant to investors.

During the Class Period, Pluralsight did not disclose to investors that, by the end of 2018, Pluralsight was behind in its sales representative ramping capacity plan. Pluralsight did, however, make numerous positive statements about its sales force and infrastructure during the Class Period at a conference, on a conference call with securities analysts and investors, on its Form 10-K, on its Secondary Public Offering ("SPO") Documents, and on an earnings call with securities analysts and investors. Also during the Class Period, Defendants Skonnard and Budge sold significant quantities of their Pluralsight stock at peak prices and in a concentrated period pursuant to 10b5-1 trading plans that they had created at the end of 2018. The stock quantities that Skonnard and Budge sold were substantially greater than the amount of stock that they sold either before or after the Class Period and represented a significant percentage of each of their respective total holdings. Skonnard and Budge sold additional shares through Pluralsight's SPO in March 2019. Skonnard sold more of his shares on July 26, 2019.

On July 31, 2019, during Pluralsight's second quarter 2019 earnings call, Pluralsight, Skonnard, and Budge disclosed to securities analysts and investors that Pluralsight had been behind in its capacity of seasoned sales representatives in the first and second quarters of 2019, which manifested in a 43.8% collapse in B2B[1] billings growth from business customers in three months. On the call, Budge stated that Pluralsight had to bring on dozens of sales representatives at the end of 2018 so that they could become seasoned in the second quarter, but that Pluralsight was months behind. Skonnard confirmed the same and said that Pluralsight had fallen off its annual

---

[1] "B2B" refers to Pluralsight's billings from business customers. ECF Nos. 94 ¶ 65, 111 at 8.

sales ramp capacity plan. Following these statements, Pluralsight's shares dropped 39.52% in one day. This amounted to a one-day market capitalization loss of $1.23 billion.

Court-appointed Co-Lead Plaintiff the Indiana Public Retirement System ("INPRS") is a $34.2 billion pension fund that purchased shares of Pluralsight Class A common stock during the Class Period, including 65,200 shares of Pluralsight Class A common stock in the SPO and directly from lead underwriter Morgan Stanley & Co., LLC. Co-Lead Plaintiff the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF")[2] is a $10.4 billion defined benefit public employee retirement system that also purchased Pluralsight Class A common stock during the Class Period, including 7,900 shares of Pluralsight Class A common stock the same day as the SPO from an SPO underwriter. Plaintiffs allege that they purchased or otherwise acquired this stock at artificially inflated prices because of material misstatements and omissions made by the Exchange Act Defendants[3] and Securities Act Defendants.[4] Based upon the foregoing, Plaintiffs bring this proposed securities fraud class action "on behalf of all persons other than Defendants and their affiliates who purchased Pluralsight Class A common stock [during the Class Period] and were damaged thereby." ECF No. 94 ¶ 1.

---

[2] Co-Lead Plaintiffs INPRS and CTPF will be referred to collectively as "Plaintiffs."

[3] Based upon Plaintiffs' CAC, the Exchange Act Defendants are Pluralsight, Skonnard, and Budge. Plaintiffs also name Joe DiBartolomeo ("DiBartolomeo") as a "relevant executive officer" in their CAC, but he is not a defendant in this case.

[4] Based upon Plaintiffs' CAC, the Securities Act Defendants are Pluralsight, the "Signer Defendants" (Skonnard, Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell), and the "Underwriter Defendants" (Morgan Stanley & Co., LLC and J.P. Morgan Securities, LLC).

Plaintiffs sue for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Their Exchange Act claims are as follows: violations of Section 10(b) and Securities and Exchange Commission ("SEC") Rule 10b-5 against Pluralsight, Skonnard, and Budge; Section 20(a) against Skonnard and Budge; and Section 20A against Skonnard and Budge. Plaintiffs' Security Act claims are as follows: violations of Section 11 against Pluralsight, the Signer Defendants,[5] and the Underwriter Defendants;[6] Section 12(a)(2) against Pluralsight and the Underwriter Defendants; and Section 15 against the Signer Defendants. Plaintiffs also allege violations of Items 303 and 105 of Regulation S-K as part of their Exchange Act and Securities Act claims.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

---

[5] As previously noted, the Signer Defendants are Skonnard, Budge, Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell.

[6] As previously noted, the Underwriter Defendants are Morgan Stanley & Co. LLC and J.P. Morgan Securities LLC.

556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusions and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## DISCUSSION

The Pluralsight Defendants[7] move to dismiss Plaintiffs' CAC on three primary grounds. First, they argue that the CAC fails to satisfy the pleading requirements of Federal Rules of Civil Procedure 8 and 9(b). Second, they argue that the CAC fails to state an Exchange Act claim under Section 10(b), and therefore also fails to state claims under Sections 20(a) and 20A, and that Plaintiffs fail to plead violations of Items 303 and 105 of Regulation S-K as part of these claims. Third, they argue that the CAC fails to state a Securities Act claim under Sections 11 and 12(a)(2), and therefore also fails to state a claim under Section 15, and that Plaintiffs fail to plead violations of Items 303 and 105 as part of these claims. The Pluralsight Defendants also argue that Plaintiffs lack standing under Section 12(a)(2) to state a claim against Pluralsight. The court considers each argument in turn.

## I.    Pleading Standard

The Pluralsight Defendants begin their Motion to Dismiss with an argument on the pleading standard applicable to the CAC. The Pluralsight Defendants first argue that the CAC fails under Rule 8 because of its length—148 pages and 375 paragraphs—and redundancies between its Exchange Act and Securities Act allegations. The Pluralsight Defendants also appear to argue

---

[7] The Underwriter Defendants have joined the Pluralsight Defendants' Motion to Dismiss CAC, incorporating all arguments and authorities set forth therein and requesting that all of the claims and causes of action in the CAC against them be dismissed with prejudice. ECF No. 114. The Underwriter Defendants have also joined the Pluralsight Defendants' Reply in Support of Motion to Dismiss CAC. ECF No. 124.

that Plaintiffs' Exchange Act and Securities Act claims are subject to Rule 9(b)'s heightened pleading requirements because they both sound in fraud, as the Securities Act claims repeat many of the allegations made under the fraud-based Exchange Act claims and do not omit all references to the Pluralsight Defendants' alleged knowledge.

Plaintiffs respond that their Exchange Act claims comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, and both their Exchange Act and Securities Act claims are sufficiently pleaded and put the Pluralsight Defendants on notice of the claims asserted against them. Plaintiffs further argue that their Securities Act claims do not necessarily sound in fraud simply because they contain underlying factual similarities with their Exchange Act claims. While Plaintiffs concede that their Securities Act claims "inadvertently incorporated" an allegation that "Budge and Skonnard knew that adverse facts had been concealed from the public," they maintain that "the claims are clearly based on allegations of negligence" (ECF No. 119 at 39) and thus are only subject to Rule 8's pleading requirements rather than those of Rule 9(b). Further, Plaintiffs argue that their CAC clearly separates—both physically and conceptually—their fraud-based Section 10(b) claim from their negligence- and strict liability-based Section 11 and 12(a)(2) claims.

The court will evaluate the sufficiency of Plaintiffs' pleadings with respect to each claim in their CAC below. However, at this juncture, the court will determine the appropriate pleading standard for Plaintiffs' Exchange Act and Securities Act claims.[8]

---

[8] The court also notes at this stage that the Pluralsight Defendants' thorough brief in support of their Motion to Dismiss supports that they have been put on notice of the claims that Plaintiffs have made against them, which is a central "goal[] embodied within Rule 8(a), Rule 9(b), and the [PSLRA]." *In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 310 (S.D.N.Y. 2013) ("Indeed, Defendants' briefs in support of their motions to dismiss, which forcefully and directly

A. Pleading Standards Relevant to Exchange Act and Securities Act Claims

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 9(b) imposes a heightened pleading requirement for claims sounding in fraud: a plaintiff must "state with particularity the circumstances constituting fraud," and "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Securities fraud claims under the Exchange Act must also satisfy the PSLRA's heightened pleading requirement "with regards to . . . whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018) (citing 15 U.S.C. § 78u-4(b)(1)–(2)).[9]

The parties do not appear to dispute that Plaintiffs' securities fraud claims under the Exchange Act are subject to Rule 9(b) and the PSLRA's heightened pleading requirements. Because Plaintiffs' claims under the Exchange Act are grounded in securities fraud, the court finds that Rule 9(b) and the PSLRA's heightened pleading requirements apply to those claims. Thus, the only remaining issue is the pleading standard applicable to Plaintiffs' Securities Act claims.

---

attack Plaintiffs' allegations of wrongdoing, are themselves proof that Defendants have notice of the claims against them.").

[9] With respect to misleading statements or omissions, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). With respect to scienter, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

B.  Pleading Standard Applicable to Plaintiffs' Securities Act Claims

Plaintiffs' Securities Act claims are alleged under Sections 11, 12(a)(2), and 15. Although these causes of action do not require proof of fraud, *see* 15 U.S.C. §§ 77k, 77*l*(a)(2) 77*o*(a), and are not subject to the PSLRA's heightened pleading requirements, *see id.* § 78u-4(b)(1)–(2), other circuits have found that such claims can still be subject to the heightened pleading standards of Rule 9(b) if they "sound[] in fraud." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted); *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (collecting cases); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). *Contra In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) ("[T]he particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11.").

The Tenth Circuit has not ruled on the applicability of Rule 9(b)'s heightened pleading standards to Securities Act claims that do not require proof of fraud but are still premised on fraud, having only contemplated the issue without deciding it. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("[a]ssuming without deciding" that the court adopted the Third Circuit's analysis that "Rule 9(b) scrutiny" is triggered in Securities Act claims sounding in fraud and finding that the heightened pleading requirements of Rule 9(b) did not apply to a Securities Act claim "not premised on fraud"), *superseded on other grounds by* 15 U.S.C. § 78u-4. Although Sections 11, 12(a)(2), and 15 of the Securities Act do not require proof of fraud, this court adopts the analysis of the circuits previously cited and applies the Rule 9(b) heightened pleading standard to Securities Act claims that "sound in fraud," as determined by a close examination of the CAC. *See Shapiro*, 964 F.2d at 288 ("We see no valid reason to create a special exception to Rule 9(b)

9

for [§ 11 and § 12(2) claims grounded in fraud]. Accordingly, we hold that when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies.").

"To ascertain whether a complaint 'sounds in fraud,' [the court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" *Rubke*, 551 F.3d at 1161 (citation omitted). If a complaint "employs the exact same factual allegations to allege violations of [the Securities Act] as it uses to allege fraudulent conduct under . . . the Exchange Act, [the court] can assume that it sounds in fraud." *See id.* (citation omitted). "However, a complaint that neither specifically alleges fraud 'nor alleges facts that would necessarily constitute fraud' does not sound in fraud and is not governed by Rule 9(b)." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 917 (N.D. Cal. 2015) (citations omitted).

After careful review of Plaintiffs' Securities Act claims in their CAC, the court finds that they are not grounded in fraud and are thus governed by Rule 8's pleading requirements. Although there is much factual overlap between Plaintiffs' Exchange Act and Securities Act claims, Plaintiffs have formulated their Securities Act claims to sound in negligence and strict liability rather than in fraud. Plaintiffs employ several tools to differentiate their Securities Act claims from their Exchange Act claims and articulate the foundations on which each set of claims rests—the former on negligence and strict liability and the latter on fraud. *Cf. In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) (labeling mere disclaimers that a Securities Act claim did not sound in fraud as "nominal efforts" that were "unconvincing where the gravamen of the complaint [was] plainly fraud and no effort [was] made to show any other basis of the claims levied").

First, Plaintiffs clearly segregate their Exchange Act claims from their Securities Act claims. Although this provides for an admittedly lengthy complaint, the length of the CAC alone

is not a sufficient basis on which to find that the CAC fails under either Rule 8 or Rule 9(b), as the Pluralsight Defendants suggest that it should. *See* ECF No. 111 at 15–16. There is significant overlap between the allegations of Plaintiffs' Exchange Act and Securities Act claims. But this appears to be a product both of setting out two different sets of claims—one set grounded in fraud, and the other in negligence and strict liability—and seeking to thoroughly state those claims. The CAC is, on the whole, well-organized. The court declines to find that Plaintiffs' claims fail by virtue of the CAC's length.

Additionally, Plaintiffs begin the Securities Act portion of their CAC with an explicit disclaimer[10] that they do not make "any allegations of fraud, scienter, or recklessness in connection with these non-fraud [Securities Act] claims." ECF No. 94 ¶ 254. But Plaintiffs do not merely rely upon this general disclaimer. *Cf. Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 155 (D. Conn. 2019) ("[A] boilerplate disclaimer is not enough to make out a claim for negligence." (citation omitted)). While Plaintiffs reference Skonnard and Budge's alleged knowledge of the falsity of their public statements regarding the growth trajectory of Pluralsight's sales force, Plaintiffs also clearly ensconce their Securities Act claims in negligence and strict liability. Plaintiffs allege that the Offering Documents at issue "were negligently

---

[10] Plaintiffs also begin the Exchange Act portion of their CAC with the following disclaimer:

> These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Sections 10(b), 20(a) and 20A of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

ECF No. 94 ¶ 235.

prepared," ECF No. 94 ¶¶ 302, 315, and that "these facts were readily apparent to the Securities Act Defendants or would have been had they done basic diligence," *id.* ¶¶ 315, 313, 318, 338, 342.

Finally, Plaintiffs' count-specific allegations clearly sound in negligence and strict liability. These allegations again include disclaimers that they "do not allege fraud scienter, or the intent of the [defendants] to defraud" Plaintiffs, *id.* ¶¶ 344, 357, 362, that their Section 11 claim "is predicated upon the Securities Act Defendants' liability for negligently making false and materially misleading statements in the Offering Documents," *id.* ¶ 344, and that "any implication of fraud or fraudulent intent is expressly disclaimed" as part of their Section 15 claim, *id.* ¶ 363. These allegations are also replete with references to strict liability, a failure to "make a reasonable and diligent investigation," and a failure to exercise reasonable care and diligence, *id.* ¶¶ 346, 349, 350, 351, 359, 361, 367. *See Schwartz*, 124 F.3d at 1252 (finding that a Securities Act claim did not sound in fraud when the complaint made numerous references to the defendants' lack of "reasonable grounds for belief," and failure to perform a "reasonable investigation" and to exercise "reasonable care").

After close examination of the CAC, the court finds that Plaintiffs' Securities Act allegations are not "the exact same factual allegations" as Plaintiffs' Exchange Act allegations. *Rubke*, 551 F.3d at 1161 (citation omitted). The Securities Act allegations focus on different alleged failures on the part of the Pluralsight Defendants than the fraud-based conduct alleged under the Exchange Act claims. Thus, the court cannot "assume" that Plaintiffs' Securities Act claims "sound[] in fraud," and finds that they in fact do not. *See id.*; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374–75 (S.D.N.Y. 2011) (holding that Section 11 claim was not subject to Rule 9(b) when plaintiffs segregated their Securities Act negligence claims from their fraud-based claims, and that plaintiffs' allegations that defendants engaged in fraud did not preclude

negligence-based claims against defendants as well). Plaintiffs' Securities Act claims sound in negligence and strict liability, and so they will be evaluated under Rule 8 below.

## II.    Exchange Act Claims

Plaintiffs allege three claims under the Exchange Act: violation of Section 10(b) and implementing Rule 10b-5 against Pluralsight, Skonnard, and Budge; violations of Sections 20(a) and 20A against Skonnard and Budge; and violations of Items 303 and 105 of Regulation S-K. The Pluralsight Defendants argue that Plaintiffs have failed to state a claim under Section 10(b). The Pluralsight Defendants also argue in a footnote that Plaintiffs' failure to state a claim under Section 10(b) results in the failure of their Section 20(a) and 20A claims because such claims require a "primary" and "predicate" Exchange Act violation, respectively. ECF No. 111 at 31 n.12. Finally, the Pluralsight Defendants argue that Plaintiffs have failed to plead violations of Items 303 and 105 of Regulation S-K. The court considers each argument in turn.

### A.  Section 10(b) and Rule 10b-5 Claim

"Section 10(b) [of] the [Exchange] Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent acts done in connection with securities transactions." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1094–95 (10th Cir. 2003). Under Section 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b-5 identifies certain actions that are prohibited by the statute." *Adams*, 340 F.3d at 1095. Specifically, Rule 10b-5 prohibits any person from making "any untrue statement of a material fact or [omitting] to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a claim under Rule 10b-5 for securities fraud, a plaintiff must allege the following:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading;
> (2) the statement complained of was made in connection with the purchase or sale of securities;
> (3) the defendant acted with scienter, that is, with intent to defraud or recklessness;
> (4) the plaintiff relied on the misleading statements; and
> (5) the plaintiff suffered damages as a result of his reliance.

*Adams*, 340 F.3d at 1095 (citation omitted). The Pluralsight Defendants argue only that Plaintiffs failed to plead the first and third elements of a Section 10(b) claim. Accordingly, the court only evaluates the sufficiency of the CAC with respect to each of these elements in turn.

1)    Whether Plaintiffs Adequately Pleaded that the Pluralsight Defendants

Made Untrue or Misleading Statements of Material Fact or Omissions

Although the sufficiency of a securities fraud claim was once evaluated under Rule 9(b), the PSLRA set a new pleading standard. *Adams*, 340 F.3d at 1095. The PSLRA heightened the pleading standard of the first Rule 10b-5 element listed above, regarding whether the defendant made an untrue or misleading statement of material fact or omission. *Id.* To satisfy this element, the PSLRA provides that every complaint alleging a violation of Section 10(b) must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA further states that "if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

"To satisfy the first element of a 10b-5 claim, a plaintiff must allege facts showing the defendant made an untrue statement of material fact, or failed to state a material fact necessary to make the statements that were made not misleading." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (citing 17 C.F.R. § 240.10b-5). Under Rule 10b-5, "[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Whether information is material also depends on other information already available to the market; unless the statement 'significantly altered the "total mix" of information' available, it will not be considered material." *Id.* (citation omitted).

"Rule 10b-5 'prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1164 (10th Cir. 2018) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (quoting *Brody*, 280 F.3d at 1006). "To require that statements be 'complete' would be to impose an excessive burden since '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Id.* (quoting *Brody*, 280 F.3d at 1006). Thus, to survive a motion to dismiss under the PSLRA's heightened pleading requirements, "the plaintiffs' complaint must specify the reason or reasons why the statements made by [the company] were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d at 1006 (citations omitted).

"In addition to misstatements or omissions of fact, statements of opinion or belief are also actionable under Section 10(b) and Rule 10b-5." *MF Glob.*, 982 F. Supp. 2d at 305 (citations omitted). "To plead a claim for such statements, a plaintiff 'must allege that [the] defendant's opinions were both false and not honestly believed at the time they were made.'" *Id.* (citation omitted); *accord Grossman*, 120 F.3d at 1119 n.6 ("[A] statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact." (citation omitted)). "[S]tatements of opinion or belief must rest on 'a factual basis that justifies them as accurate, the absence of which renders them misleading.'" *Hampton*, 897 F.3d at 1299 (citation omitted).[11]

There are numerous types of statements that are not actionable in a securities fraud case. First, "[i]t is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (collecting cases); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (finding that a company's "accurate reporting of its past results did not then require the company to speculate on the effect that a contract slowdown . . . would have on its future earnings" (citation omitted)). Such statements are thus "immaterial and not actionable as a matter of law." *McDonald*, 287 F.3d at 998.

Second, statements that "are only vague statements of corporate optimism" are "not considered materially misleading" under Rule 10b-5. *Grossman*, 120 F.3d at 1119. "Statements

---

[11] The Pluralsight Defendants argue that several statements listed in their Motion to Dismiss are unactionable opinion statements. ECF No. 111 at 20–21. However, the Pluralsight Defendants' arguments regarding this exception are conclusory and fail to identify exactly which portions of the several cited statements constitute opinions. Accordingly, the court finds that the Pluralsight Defendants have failed to adequately raise this exception.

classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Id.* (footnote and citation omitted). "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach*, 355 F.3d at 174 (citation omitted). "But statements are not puffery where they are 'misrepresentations of existing facts' made even though the speaker 'knew that the contrary was true.'" *MF Glob.*, 982 F. Supp. 2d at 305 (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). Thus, "'statements of optimism that are not capable of objective verification' are *not* material misstatements *unless* they inaccurately represent 'the speakers' beliefs concerning then-present factual conditions.'" *Hampton*, 897 F.3d at 1299 (citation omitted).

Third, the PSLRA's safe harbor provides that "forward-looking statement[s] . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" do not subject a "person"[12] to liability. 15 U.S.C. § 78u-5(c)(1)(A)(i).[13]

---

[12] "Persons" that come within the protection of the PSLRA safe harbor include an issuer subject to certain reporting requirements, "a person acting on behalf of such issuer," "an outside reviewer retained by such issuer making a statement on behalf of such issuer," or "an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer." 15 U.S.C. § 78u-5(a).

[13] The PSLRA's safe harbor provision is the counterpart of the "bespeaks caution" doctrine, which provides that "forward-looking representations" are immaterial "when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading

Fourth, "'silence, absent a duty to disclose' cannot serve as the basis for liability under Rule 10b-5." *Grossman*, 120 F.3d at 1125 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). The Tenth Circuit has found that "[a] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald*, 287 F.3d at 998 (citation omitted). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); they "prohibit only misleading and untrue statements, not statements that are incomplete," *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (citation omitted). However, "if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." *Grossman*, 120 F.3d at 1125 (citation omitted). Additionally, when a party "elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information." *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (quoting *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) (unpublished)); *see also Nakkhumpun v. Taylor*, 782 F.3d 1142, 1152–53 (10th Cir. 2015). "[T]he requirement is not to dump all known information with every public announcement, but the law requires 'an actor to provide complete and non-misleading information with respect to the subjects

---

effect." *Grossman*, 120 F.3d at 1120–21 (adopting the "bespeaks caution" doctrine as "a valid defense to a securities fraud claim in the Tenth Circuit"). Under the "bespeaks caution" doctrine, "a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Id.* at 1120 (footnote and citation omitted).

18

*on which he undertakes to speak.*'" *In re K-tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (citation omitted).

Plaintiffs have provided the eighteen allegedly false statements that they assert are actionable under the Exchange Act in an exhibit attached to their Opposition to Defendants' Motion to Dismiss. *See* ECF No. 119-2.[14] The court evaluates each statement in turn to determine whether it is actionable under Section 10(b) and Rule 10b-5.

> a)  Statements 1–4

Statements 1–4[15] were made by Budge during the Class Period on January 16, 2019 at the Needham Growth Conference in discussing the company's past sales force investments:

> [1] [I]n 2017 through '18—well, first part of '18 and then the later part of '16 is when we went to a heavy investment in the enterprise, we actually saw that we had the product that would have—and the content capabilities that would appeal to that bigger enterprise. At the time, we had about 80 quota-bearing reps and little infrastructure around our sales reps, which in the world of SaaS you want to have a robust customer success organization, CSMs as they're affectionately called pre-sales, post-sales motion, all the digital

---

[14] Because Plaintiffs have limited their Exchange Act claims to the statements contained in an exhibit attached to their Opposition to Defendants' Motion to Dismiss (*see* ECF Nos. 119 at 17, 119-2) the court will accordingly limit its analysis of the sufficiency of Plaintiffs' Exchange Act claims to the statements contained therein. The court will cite to the statements contained therein according to the "Statement No." listed next to them.

Additionally, in their Motion to Dismiss, the Pluralsight Defendants argue that several statements in Plaintiffs' CAC are not actionable because they are statements from outside of the class period or are statements by non-party securities analysts. ECF No. 111 at 22. The statements to which the Pluralsight Defendants refer, however, are not listed in Plaintiffs' exhibit of allegedly actionable statements (*see* ECF No. 119-2), and Plaintiffs concede that they are not actionable (ECF No. 119 at 8 n.3). Accordingly, the court does not consider them as actionable under Section 10(b) or SEC Rule 10b-5. Plaintiffs argue that these statements "provide context for Defendants' misstatements . . . , demonstrate falsity and materiality, and bolster an inference of scienter." ECF No. 119 at 8 n.3. The court considers these statements for these limited purposes.

[15] Bracketed numbers are included in the quoted text below to indicate the portion of Budge's remarks associated with each Statement.

marketing to feed into that, the business development reps or inside sales reps, if you will. None of that infrastructure really existed at scale. Not to mention, we didn't have enough like quota-bearing reps on the ground. . . .

So we went from roughly 0 enterprise-class reps to today, we have about 120 of those reps. And the aggregate quota-bearing reps went from about 80 at that time to today we have about 250.

[2] We'll grow that to over 300 as we go through 2019. So while we'll continue to add a good 70 to 80 a year, it's lower as a percentage of the total growth that we have, which is a reason why you're seeing some of the efficiencies in the model.

[3] In the second quarter of this year—of last year, I should say, last year 2018, it was the first quarter in the previous 8 quarters where we actually grew our B2B billings number faster than our sales and marketing line. So we'd kind of crossed over into where we were starting to see some of the efficiencies of our models. We built out some of the infrastructure around sales to scale. We didn't have to keep growing it. . . .

[4] So it's work—it seems to be working. So we had a lot of great sales reps. They're killing it. And a lot of great infrastructure around them that has improved our retention massively and we're now at scale, we're starting to see the efficiencies around that.

**Statement 1.** The Pluralsight Defendants argue that Statement 1 is an unactionable accurate statement of historic fact. Plaintiffs respond that Statement 1—specifically that Pluralsight had "about 250" quota-bearing sales representatives—is false. Citing Budge's January 14, 2020 statement at the Needham Growth Conference that Pluralsight "came out of 2018 going into 2019 with about 200 quota-bearing sales reps" (ECF No. 94 ¶ 136), Plaintiffs argue that Statement 1 represents a 25% inflation of the number of quota-bearing sales representatives that Pluralsight actually had on January 16, 2019. Plaintiffs state that this misrepresentation is material because of Pluralsight's repeated linking of its sales force to its billings growth and how Pluralsight's being behind in sales representatives at the beginning of 2019 "expressed itself" in the billings growth drop in the second quarter. The Pluralsight Defendants respond that Statement

20

1 was not false, as it was couched in approximating language (i.e., "*about* 250"), is not inconsistent with Budge's Needham Growth Conference statement, and was accurate when made.

Plaintiffs appear to take principal issue with the final sentence of Statement 1—that Pluralsight then had "about 250" quota-bearing sales representatives. It is evident that the remainder of Statement 1 is a report on Pluralsight's historic success, recounting the company's sales representative growth from the end of 2016 up until January 16, 2019. The only issue with respect to the rest of Statement 1 is whether its reporting of historic success was "accurate" when made. *See McDonald*, 287 F.3d at 998. But Plaintiffs do not allege that this historic reporting was inaccurate. Accordingly, all but the final sentence of Statement 1 is unactionable as an accurate statement of historic success.

With respect to the final sentence of Statement 1, the Pluralsight Defendants have cited no authority for their proposition that the use of approximating language can in effect insulate a statement from being false or misleading. And while the Pluralsight Defendants are correct that Budge's January 14, 2020 statement that Pluralsight "came out of 2018 going into 2019 with about 200 quota-bearing sales reps" does not necessarily mean that the company did not have "about 250" quota-bearing sales representatives on January 16, 2019, Plaintiffs have sufficiently alleged at this stage that this statement was not "accurate" when made. Thus, Plaintiffs' allegations that Statement 1 was both false and material in light of how central Pluralsight's sales force numbers were to its billings growth are sufficient at this stage to render the final sentence of Statement 1 actionable.

**Statement 2.** The Pluralsight Defendants argue that Statement 2 falls within the PSLRA's safe harbor as a "forward-looking statement" accompanied by "meaningful cautionary statements." The Pluralsight Defendants argue that Statement 2 is "forward-looking," as it

expresses Pluralsight's plans for sales force growth, and contains "meaningful cautionary statements" because it was made at the Needham Growth Conference at which investors were referred to Pluralsight's "investor relations website containing links to SEC filings and an investor deck containing a Safe Harbor Statement." ECF No. 111 at 19–20. While the court agrees that Statement 2 is forward-looking, the court does not find that it was accompanied by the "meaningful cautionary statements" contemplated by the PSLRA's safe harbor provision. To satisfy the "meaningful cautionary statements" requirement, the Pluralsight Defendants cite a document from Pluralsight's presentation at the Needham Growth Conference, in which Budge stated the following:

> So this is my colleague—over here is Mark McReynolds, and if you have questions that we don't get to them in this session, you can always reach out to Mark or myself, and we're happy to dive in deeper. And Scott's obviously a great resource for reaching into questions about Pluralsight, and we have our – on our Investor Relations page of our website, you can get the full deck of a whole bunch of tidbits about the company. So encourage any and all of that.

ECF No. 112-5 at 5. This court cannot imagine, and the Pluralsight Defendants provide no authority to support, that a statement this vague could be regarded as "meaningful cautionary language" within the meaning of the PSLRA safe harbor. And the Pluralsight Defendants did not provide the court with copies of the language on Pluralsight's website or Investor Relations page, preventing the court from assessing the adequacy of the cautionary language contained therein. But regardless of the language on the website, the court is wary of concluding that referring investors to an external website to unearth cautionary statements that would clarify oral statements they were hearing live at the conference is the sort of "accompanying" contemplated by the PSLRA's safe harbor. Nevertheless, the court finds that Budge's projections about Pluralsight's future growth in quota-bearing sales representatives are unactionable statements of optimism and

puffery. *See Raab*, 4 F.3d at 289 (holding that a company's projection of "an expected annual growth rate of 10% to 30% over the next several years" and statement that it was "poised to carry the growth and success of 1991 well into the future" were "hardly material" and "soft," "puffing" statements that "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth" (citation omitted)). Moreover, even assuming that Pluralsight was behind in its sales ramping capacity and Budge knew of this, these allegations do not render his future projections incorrect or even misleading. Budge was permitted to "be confident about [his] stewardship and the prospects of the business that [he] manage[d]." *See Rombach*, 355 F.3d at 174.

Additionally, Plaintiffs appear to argue that Budge's touting of Pluralsight's efficiencies gave rise to a duty to disclose Pluralsight's alleged capacity gap at the beginning of 2019. However, Plaintiffs do not allege that the efficiencies mentioned in Statement 2, or any of the information mentioned in Statement 2, were false. Accordingly, Budge did not incur a duty to correct any allegedly misleading impression left by Statement 2. *See Grossman*, 120 F.3d at 1125. Moreover, in choosing to discuss efficiencies, Budge did not incur a duty to discuss every factor bearing upon those efficiencies. *See K-tel Int'l*, 300 F.3d at 898. Accordingly, Statement 2 is unactionable under Section 10(b) and Rule 10b-5.

**Statement 3.** The Pluralsight Defendants argue that Statement 3, which discusses Pluralsight's historic B2B billings growth, is an unactionable accurate statement of historic fact. Plaintiffs have conceded that they do not allege that Statement 3 is false. *See* ECF No. 119 at 19 n.13. The court agrees with the Pluralsight Defendants and finds that Statement 3 is not actionable under Section 10(b) and Rule 10b-5.

**Statement 4.** The Pluralsight Defendants argue that Statement 4 is an unactionable statement of corporate optimism and opinion. Plaintiffs respond that Statement 4 is not immaterial puffery because of the essential role that Pluralsight's sales force plays in its billings growth. The court agrees with the Pluralsight Defendants. Statement 4 is entirely composed of "generalized statements of optimism that are not capable of objective verification," s*ee Grossman*, 120 F.3d at 1119, such as: "it seems to be working," "we have a lot of great sales reps," "[t]hey're killing it," "a lot of great infrastructure around them that has improved our retention massively," "we're now at scale," and "we're starting to see the efficiencies around that." Accordingly, Statement 4 is not actionable under Section 10(b) and Rule 10b-5.

b)  Statement 8

Statement 8 was made by Budge on February 13, 2019 on an earnings call with analysts and investors in response to a question about sales force hiring trends and how Pluralsight's sales force was positioned at the end of the fourth quarter of 2018:

> Total quota-bearing reps closing in at around 240, we expect that to grow to probably over 300 as we roll through 2019. . . . So more reps to come, more on quota on the Street and more goodness from them.

The Pluralsight Defendants argue that Statement 8 is an unactionable accurate statement of historic fact and expression of optimism and puffery. Plaintiffs argue that Statement 8 is actionable because, in discussing Pluralsight's headcount, hiring trends, and sales growth plans, Budge had a duty to disclose that the company was behind on its annual sales ramp capacity plan. Plaintiffs argue that this statement is material because of the importance of Pluralsight's sales ramp capacity to its billings growth.

24

The court finds that Statement 8 is not actionable. Statement 8 contains forward-looking statements of optimism and puffery that are not capable of objective verification (e.g., "we expect that to grow to probably over 300 as we roll through 2019," "more reps to come, more on quota on the Street and more goodness from them"). Plaintiffs do not allege that any part of Statement 8 was false. And in choosing to discuss how Pluralsight's sales force was positioned at the end of 2018 and the company's hiring plans for 2019, Budge did not incur a duty to "dump all known information" related to the sales force capacity. *See K-tel Int'l*, 300 F.3d at 898. Moreover, even assuming that Pluralsight was behind in its sales ramp capacity plan at the time and Budge knew of this information, such does not alter the meaning of the positive future projections that Budge made for 2019. Accordingly, Statement 8 is not actionable under Section 10(b) and Rule 10b-5.

c)   Statement 11

Statement 11 was made in Pluralsight's February 21, 2019 Form 10-K, which was signed by Skonnard and Budge, under a section titled "Growth Strategy":

> We have a large direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective. We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform. We intend to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship. As an example of our ability to increase customer engagement, as of December 31, 2018, our 25 largest customers had expanded their annual spend by 19.6 times the amount they spent in the year of initial purchase. We will continue to expand our platform capabilities to deliver additional value to our customers. Our sales force educates business customers on the strengths of our platform to help customers make informed decisions and create a customized and unified end-to-end learning experience for their businesses.

The Pluralsight Defendants argue that Statement 11 is an unactionable accurate statement of historic fact and a statement of corporate optimism and puffery. Plaintiffs concede that the Pluralsight Defendants have not falsely stated the historic increases in Statement 11. *See* ECF No. 119 at 19 n.13. Plaintiffs also do not dispute the last sentence of Statement 11 regarding the function of Pluralsight's sales force or contend that this statement is false or misleading. The court therefore finds that Statement 11 is unactionable as an accurate statement of historic fact (regarding the increase in annual spending by Pluralsight customers) and as a statement of corporate optimism and puffery (regarding Pluralsight's "large direct sales force," ability "to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform," intent "to pursue a greater proportion of large scale, recurring business transactions and to more effectively drive business customer engagement throughout the life of the relationship," and plan to "continue to expand our platform capabilities to deliver additional value to our customers").

d)   Statement 12

Statement 12 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" on February 21, 2019:

> As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and there is no guarantee that our investments will succeed and contribute to additional customer acquisition and revenue growth.

The Pluralsight Defendants argue that Statement 12 is protected under the PSLRA's safe harbor provision. The statement is forward-looking, as it expresses Pluralsight's need to "continue to increase the investments we make in sales and marketing." However, the statement is not accompanied by the requisite meaningful cautionary statements. "Cautionary words about future

26

risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 (citing *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")). Plaintiffs allege that, at the time Statement 12 was made, the Pluralsight Defendants knew or recklessly disregarded that the company was behind in its sales representative ramping capacity plan and was experiencing sales execution failures. Thus, Plaintiffs argue that the risk that the company was warning against had already materialized, rendering its warning ineffectual. Plaintiffs have alleged sufficient facts at this stage to prevent the application of the PSLRA safe harbor provision, and so the cautionary words in Statement 12 do not insulate the Pluralsight Defendants from liability.

However, apart from its inability to insulate the Pluralsight Defendants from liability, Statement 12 is still not independently actionable as a false or misleading statement or omission. Plaintiffs do not argue that any part of Statement 12 is false. Rather, Plaintiffs contend that Statement 12 is an actionable omission because, in discussing its efforts to expand and invest in its sales and marketing and warning that there is no guarantee that these investments will succeed, Pluralsight incurred a duty to disclose that it was then behind in its sales ramp capacity plan and that this could negatively impact the company's billings growth. The court disagrees. Statement 12 does not explicitly discuss Pluralsight's sales force hiring or capacity plan. In making a high-level statement about Pluralsight's expansion of and investments in its sales and marketing, the company did not incur a duty to "disclose any and all material information" related to these general subjects. *See Matrixx Initiatives*, 563 U.S. at 44. While an actor must provide "complete and non-misleading information with respect to the subjects *on which he undertakes to speak*," *K-tel Int'l*,

300 F.3d at 898 (citation omitted), Pluralsight was not discussing its sales ramp capacity plan in this statement. To construe this full and complete disclosure requirement so broadly as to require an actor to disclose any and all material information when the actor so much as vaguely or generally references subject matter related to the material information would impose an impossible burden. The court declines to impose that burden here.

Even when a generic risk factor cannot protect a company "from liability for other misstatements or omissions," such does not mean that the generic risk factor can "be the basis for liability." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 480 F. Supp. 3d 1050, 1061 (N.D. Cal. 2020). Statement 12 was labeled a "Risk Factor" on Pluralsight's Form 10-K, and several courts have found that risk disclosures are not independently actionable under Section 10(b) and Rule 10b-5. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008) ("Though ubiquitous in securities filings, cautionary statements of potential risk have only rarely been found to be actionable by themselves." (citations omitted)). For example, in *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (unpublished), plaintiffs contended that a company's risk disclosures in its Form 10-K were actionable under Section 10(b) because the disclosures communicated that the risks were "only *possible*" when, "in fact, [the risks] had already come to pass and were presently harming investment in [the company]." The Sixth Circuit held that the company's risk disclosures were not actionable under Section 10(b):

> Risk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently *prospective* in nature. They warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company. This is apparent from any dictionary definition of "risk." For example, Webster's Third New International Dictionary lists the primary definition of "risk" as a "*possibility* of loss, injury, disadvantage, or destruction." *Webster's Third New International Dictionary* 1961 (1986) (emphasis added). For these reasons, a

28

> reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms.

*Id.* at 491. Other courts have agreed. *See, e.g.*, *Volkswagen*, 480 F. Supp. 3d at 1061–62 (finding that "generic warnings" in Risk Factor statements couched in hypothetical language were not independently actionable even though plaintiffs alleged that those risks had already "begun to materialize"); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) ("[Risk Factors in SEC filings] constitute defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results." (citations omitted)); *FBR Inc.*, 544 F. Supp. 2d at 360, 362 (finding a company's "boilerplate description of its regulatory risks" in its SEC filings was not actionable in part because the description "said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance," and "significantly" because the company never claimed to be "in 'full compliance with all regulations, or that it had no outstanding regulatory issues'" (citations omitted)).

Still, "there may be circumstances under which a risk disclosure might support Section 10(b) liability." *Bondali*, 620 F. App'x at 491. This is not one of those circumstances. The court finds that Statement 12—a generic Risk Factor in Pluralsight's Form 10-K—"could not have been misleading to a reasonable investor." *FBR Inc.*, 544 F. Supp. 2d at 362. A reasonable investor would be unlikely to read Statement 12's generic language about Pluralsight expanding its sales efforts and investing in sales and marketing and be misled into thinking that Pluralsight either was or was not behind in its sales force ramping capacity. Accordingly, Statement 12 is not independently actionable under Section 10(b) and Rule 10b-5.

e)   Statement 13

Statement 13 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "Failure to effectively expand our sales and marketing capabilities could harm our ability to increase our customer base and achieve broader market acceptance of our platform." It further stated:

> If we are unable to hire, develop, and retain talented sales or marketing personnel, if our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time, or if our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

The court incorporates its analysis of Statement 12 here. Additionally, although Statement 13 addresses Pluralsight's sales force more directly than Statement 12, the court still does not find Statement 13 actionable under Section 10(b) and Rule 10b-5. While Plaintiffs argue that the risk that Pluralsight's sales capacity gap posed to the company's billings growth had already materialized, it is not evident that this is true. *See Bondali*, 620 F. App'x at 491 (declining to find risk disclosures actionable when plaintiffs failed to "allege[] facts showing any investment risk had already materialized"); *FBR Inc.*, 544 F. Supp. 2d at 362 (finding risk factors unactionable when, "[a]t the time that the cautionary statements were made, the risk that [the company's] noncompliance with securities regulations would actually cause a loss to the company or its shareholders had neither 'transpired' nor become a 'near certainty'" (quoting *Rombach*, 355 F.3d at 173)). Pluralsight made Statement 13 in its 2018 Form 10-K, which was filed on February 21, 2019. As the Pluralsight Defendants underscore, however, Pluralsight reported the following results for the first quarter of 2019 on May 1, 2019: a "total billings growth of 41% compared to 1Q18 and B2B billings growth of 48%." ECF No. 111 at 13. The effect of the company's sales

30

capacity gap did not materialize until the second quarter of 2019, when Pluralsight reported only "23% year-over-year growth in total billings and 27% growth in B2B billings" on July 31, 2019. *Id.* at 14. Thus, it is not apparent that the risk entailed by Pluralsight being behind in its sales ramp capacity plan had manifested at the time that the company filed its 2018 Form 10-K. At oral argument, the Pluralsight Defendants argued that billings were fueled by two factors: first, the number of sales representatives, and second, by the productivity of those sales representatives. As a result, even though the company was behind in its sales ramp capacity plan going into 2019, the smaller number of sales representatives were still being productive, thereby obscuring the risk that the smaller numbers created.

Thus, the court finds that Plaintiffs have not sufficiently alleged that the risk created by Pluralsight's sales capacity gap had materialized at the time that Statement 13 was made, and Statement 13 is therefore unactionable.

f) Statement 14

Statement 14 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "If we fail to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed." It further stated:

> As we expand our business, our continued success will also depend, in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base.

For the same reasons set out in its analysis of Statements 12 and 13, the court finds Statement 14 unactionable.

g)   Statement 15

Statement 15 was also made in Pluralsight's Form 10-K under a section titled "Risk Factor" and was captioned: "If we fail to effectively manage our growth, our business and results of operations could be harmed." It further stated:

> We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . If we do not achieve the benefits anticipated from these investments, or if the achievement of these benefits is delayed, our results of operations may be adversely affected.

For the same reasons set out in its analysis of Statements 12 and 13, the court finds Statement 15 unactionable.

h)   Statement 17

Statement 17 was made in Pluralsight's Registration Statement filed on March 4, 2019 and the Prospectus filed on March 7, 2019 as part of the company's SPO Offering Documents:

> We have significantly expanded our direct sales force to focus on business sales and have aligned our sales team's compensation structure to fit this objective.

The Pluralsight Defendants argue that Statement 17 is an unactionable accurate statement of historic fact. Plaintiffs argue that Statement 17, "is an actionable half-truth and omission" because Pluralsight was then contending with significant hiring and on-boarding delays with its sales force. ECF No. 119 at 20. The Pluralsight Defendants argue that Statement 17 was true based on the information contained in Statements 1 and 2 about Pluralsight's sales force growth since 2017. The court finds that Statement 17 is not actionable. To the extent that Statement 17 is a statement of Pluralsight's historic success in significantly growing its sales force, Plaintiffs do not dispute that Pluralsight's sales force had grown overall—only that it had not grown sufficiently. Thus, Plaintiffs fail to allege that Statement 17 is historically inaccurate. *See McDonald*, 287 F.3d

32

at 998. Additionally, in speaking generally about how it had structured its business model with respect to its sales force, Pluralsight did not incur a duty to "dump all known information" about the state of its sales force. *See K-tel Int'l*, 300 F.3d at 898. The court also finds that Statement 17 contains a "generalized statement[] of optimism that [is] not capable of objective verification," *Grossman*, 120 F.3d at 1119, as it communicates that Pluralsight has "significantly" expanded its direct sales force and "aligned" its sales team's compensation. Accordingly, Statement 17 does not support liability under Section 10(b) and Rule 10b-5.

i)   Statement 18

Statement 18 was contained in Pluralsight's Offering Documents as well, and it repeats Statement 11 from the company's Form 10-K. The court incorporates its analysis with respect to Statement 11 here and accordingly finds Statement 18 unactionable for the same reasons.

j)   Statements 19 and 25

Statements 19 and 25 were contained in Pluralsight's Offering Documents as well and are composed of the same Risk Factors from the company's Form 10-K, as reflected in Statements 12, 13, 14, and 15. The court incorporates its analyses with respect to Statements 12, 13, 14, and 15 here and accordingly finds Statements 19 and 25 unactionable for the same reasons. That Statements 19 and 25 were made on March 4 and 7, 2019, as compared to Statements 12, 13, 14, and 15, which were made on February 21, 2019, does not alter the court's analysis because Pluralsight was still reporting strong billings growth and productivity on May 1, 2019, and the sales capacity gap did not express itself in billings growth until months later.

k) Statement 27

Statement 27 was made by Budge during Pluralsight's first-quarter 2019 conference call

on May 1, 2019 in response to a question from a securities analyst about Pluralsight's progress in

hiring sales representatives by the end of the year:

> Look, we like where we are with our sales reps. We're committed to
> continue to grow the sales force. We have a plan to grow into the
> high 200s, even cross over 300s in quota bearing reps this year 2019
> which continues on the really outstanding progression we've had
> over the last few years where we've massively expanded our sales
> force from 80 quota bearing reps two years ago to—at this point
> over—at the end of this year over 300. So love our growth there.
> Our retention is excellent. I think compared to industry average,
> we'd always like it to be higher and the churn to be lower,
> particularly with our sales reps. But it's a function when there is a
> little bit more turnover in sales, often in the first quarter or so. We've
> experienced some of that. It's normal. We planned for that and
> that's—we're still committed, and we see a clear path to having 300-
> plus reps by the time we exit the year. So the short answer is we're
> on pace.

The Pluralsight Defendants argue that this is an unactionable statement of accurate historic

fact, is an expression of optimism and puffery, and falls within the PSLRA's safe harbor provision.

Plaintiffs argue that Statement 27 is actionable because Budge had a duty to disclose that the

company was behind on its annual sales ramp capacity plan. Plaintiffs argue that this statement is

material because of the importance of Pluralsight's sales ramp capacity to its billings growth.

The court finds that Statement 27 is not actionable. Statement 27 does not fall within the

PSLRA safe harbor provision. Although Statement 27 contains forward-looking remarks (e.g.,

"[w]e have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year

2019;" "we're still committed, and we see a clear path to having 300-plus reps by the time we exit

the year") it was not accompanied by meaningful cautionary language.[16] Nevertheless, a portion

of Statement 27 is an unactionable statement of accurate historic fact. Statement 27 references

Pluralsight's growth from "80 quota bearing reps" from two years prior, and Plaintiffs do not allege

that this figure is inaccurate. Additionally, Statement 27 is replete with unactionable optimism and

puffery: "we like where we are with our sales reps;" "[w]e have a plan to grow into the high 200s,

even cross over 300s in quota bearing reps this year 2019;" "[s]o love our growth there;" "we're

still committed, and we see a clear path to having 300-plus reps by the time we exit the year;"

"we're on pace." Although some statements that are "particularly concrete" can "cross the line

from corporate optimism and puffery to objectively verifiable matters of fact," *Level 3*, 667 F.3d

at 1340, Statement 27 does not cross that line. The most specific statement of optimism and puffery

---

[16] Statement 27 was made on an earnings call that began with the following cautionary language
by Mark McReynolds:

> Some of our remarks will include forward-looking statements within
> the meaning of the federal securities laws. Actual results may differ
> materially from those contemplated by these forward-looking
> statements. Factors that could cause these results to differ materially
> are set forth in today's press release and in our SEC filings. Any
> forward-looking statements that we make on this call are based on
> information and assumptions as of today, and we assume no
> obligation to update these statements.

ECF No. 112-6 at 5. These cautionary remarks are insufficient for the same reasons set forth in the
court's analysis of Statement 12's cautionary statements. This cautionary language is insufficient
because Plaintiffs have alleged that the risk that the language cautions against had already
materialized, rendering the warning ineffectual for purposes of the PSLRA safe harbor provision.
*See Rombach*, 355 F.3d at 173.

is "[w]e have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019," but this statement is unactionable puffery. *See Raab*, 4 F.3d at 289.[17]

l)   Statement 28

Statement 28 was also made by Budge during Pluralsight's first-quarter 2019 conference call on May 1, 2019 in response to a question from a securities analyst about the "limiting factor on the pace of sales headcount growth" (ECF No. 94 ¶ 208):

> Yes. Look, it's probably a combination of both of those. Not probably, it is a combination of both of those. We—there's probably only so many reps we could hire in any given year. We do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization. And we like the direction we're going on both a top and bottom line. We like the fact that we've been cash flow profitable for three straight quarters now. We would like to continue that. As long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time. And we think that will grow a long and sustainable business model for us.

The Pluralsight Defendants argue that Statement 28 is not actionable because it is an expression of optimism and puffery (e.g., "[w]e do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization," "we like the direction we're going on both a top and bottom line," "[a]s long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time," "we think that will grow a long and sustainable business model for us") and that the PSLRA safe harbor applies. The court finds that Statement 28

---

[17] Budge also appears to acknowledge a "turnover in sales" in the first quarter of 2019. Plaintiffs do not allege that this statement was false or misleading and do not make any specific arguments related to this statement. The court finds that this portion of Statement 27 is also unactionable.

is unactionable for the same reasons set forth in its analysis of Statement 27. Plaintiffs argue that, in answering a question referencing "sales headcount growth" and "sales management's capacity," Budge incurred a duty in Statement 28 to disclose Pluralsight's sales ramp capacity issue. The court disagrees. Although Plaintiffs characterize Budge as "respond[ing] in detail" to this question, Budge's statements in Statement 28 only discuss hiring sales representatives at a high level of generality and are otherwise vague statements of optimism and puffery. *See Raab*, 4 F.3d at 289. Accordingly, Statement 28 is unactionable.

m) Statements 29–30

Statements 29 and 30[18] were made by Skonnard in Pluralsight's May 1, 2019 press release regarding the company's first quarter results and on an earnings call with analysts:

> [29] Our Q1 financial results marked a great start to 2019. Revenue and billings growth continue to be strong with both up over 40% year over year. We continue to demonstrate the efficiency in our model with our third consecutive quarter of positive cash flow.

> [30] And our teams continue to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate of 128%.

**Statement 29.** The Pluralsight Defendants argue that Statement 29 is an unactionable accurate statement of historic fact. Plaintiffs argue that Statement 29 is actionable because of the misleading impression that Skonnard created with his May 1, 2019 statements, as they communicate that Pluralsight was then doing well when that was not the case. Plaintiffs allege that at the time these statements were made, Pluralsight was behind in its sales representative capacity, and this ultimately resulted in a 40% decline in billings growth. However, Statement 29 does not

---

[18] Bracketed numbers are included in the quoted text below to indicate the portion of Skonnard's remarks associated with each Statement.

address Pluralsight's sales representative capacity. And, as the Pluralsight Defendants underscore in their Reply Brief, Plaintiffs have not alleged that any of the information in Statement 29 is false. *See* ECF No. 120 at 8. Accordingly, court finds that Statement 29 is unactionable as an accurate statement of historic fact regarding Pluralsight's revenue and billings growth (i.e., "Revenue and billings growth continue to be strong with both up over 40% year over year."). The court also finds Statement 29 unactionable as an expression of corporate optimism and puffery (i.e., "[o]ur Q1 financial results marked a great start to 2019," "[w]e continue to demonstrate the efficiency in our model").

**Statement 30.** The Pluralsight Defendants argue that Statement 30 is an unactionable accurate statement of historic fact because it communicates Pluralsight's dollar-based net retention rate, and an unactionable expression of optimism and puffery. The court agrees. Statement 30 is unactionable as an accurate statement of historic fact (i.e., Pluralsight's "dollar-based net retention rate of 128%") and as an expression of corporate optimism and puffery (i.e., "our teams continue to execute with strong focus and commitment to customer success").

In sum, the court finds that Plaintiffs have only adequately alleged that the last sentence in Statement 1 is actionable under Section 10(b) and Rule 10b-5. In order to survive the Motion to Dismiss, however, Plaintiffs also must adequately plead scienter.

> 2)    Whether Plaintiffs Adequately Pleaded that the Pluralsight Defendants
>        Acted with the Requisite Scienter

The PSLRA also heightened the pleading standard for the third element of a 10b-5 claim regarding the defendant's requisite scienter. *Adams*, 340 F.3d at 1095–96. Under the PSLRA, the plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u-4(b)(2)(A). "In a securities fraud case, the appropriate level of scienter is 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Adams*, 340 F.3d at 1105 (citation omitted). "Recklessness in the context of securities fraud is a high bar. It is 'defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (citation omitted). "Negligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113 (10th Cir. 2015) (citation omitted).

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Still, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted). To determine whether scienter is present, the court must "engage in a comparative evaluation," considering the plaintiff's inferences as well as "competing inferences rationally drawn from the facts alleged." *Id.* at 314. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (citation omitted). As part of this evaluation, "omissions and ambiguities count against inferring scienter." *Id.* at 326.

In the Tenth Circuit, a plaintiff claiming securities fraud based on nondisclosure of potentially material facts must allege the following to establish scienter:

> (1) the defendant knew of the potentially material fact, and (2) the
> defendant knew that failure to reveal the potentially material fact
> would likely mislead investors. The requirement of knowledge in
> this context may be satisfied under a recklessness standard by the
> defendant's knowledge of a fact that was so obviously material that
> the defendant must have been aware both of its materiality and that
> its non-disclosure would likely mislead investors.

*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). In alleging

scienter, "[a]llegations of motive and opportunity may be important," but they are "typically not

sufficient in themselves to establish a 'strong inference' of scienter." *Id.* at 1262. Nevertheless,

evidence of motive and opportunity "may be considered as part of the mix of information that can

come together to create the 'strong inference' of scienter required by the PSLRA." *Id.* at 1263.

Plaintiffs allege that the Defendants acted with the requisite scienter when they "knowingly

or recklessly misrepresented and omitted material facts about the capacity of [Pluralsight's] sales

program." ECF No. 94 ¶ 138. As evidence for this allegation, Plaintiffs cite the statements set forth

above regarding Pluralsight's sales capacity, Skonnard and Budge's alleged admissions regarding

Pluralsight having been behind in its sales ramping capacity at the beginning of 2019, Skonnard

and Budge's trading during the Class Period,[19] the Pluralsight Defendants' alleged personal and

detailed knowledge of Pluralsight's ramping of sales representatives and deal pipeline, and the

Pluralsight Defendants' prior statements that the generation of billings from Pluralsight's sales

force was central to the company's business model. The Pluralsight Defendants argue that

Plaintiffs have failed to plead scienter because none of their allegations relies upon internal reports

---

[19] As part of these allegations, Plaintiffs also cite DiBartolomeo's concurrent trading activities.
However, DiBartolomeo is not a party to this litigation, his conduct is not imputed to Skonnard
and Budge, and Plaintiffs concede that their allegations related to DiBartolomeo only provide
"context" for Skonnard and Budge's trading. ECF No. 119 at 34 n.29.

or witnesses demonstrating the Pluralsight Defendants' state of mind or gives rise to a strong inference of scienter.

As a preliminary matter, the Pluralsight Defendants have not provided any authority that Plaintiffs must provide internal reports or witnesses to sufficiently plead scienter and survive a motion to dismiss, and the court does not find that such is required of Plaintiffs. Turning to Plaintiffs allegations of scienter, the court will consider each allegation in turn and determine whether all of the scienter allegations, taken together, "give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23.

a)  Skonnard and Budge's July 31, 2019 Statements

In support of their scienter allegations, Plaintiffs first cite Skonnard and Budge's July 31, 2019 statements during an earnings call. On the call, Skonnard told investors that there "was not enough capacity in the system to sustain our high-growth expectations as we entered the year." ECF No. 94 ¶ 139(a). Budge added that "we just didn't have enough ramped capacity in our system in really the first and second quarter," that "there were dozens of reps that we needed to bring on board at the end of last year . . . [a]nd there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter." *Id.* ¶ 139(b). Budge further explained that the lack of ramped sales capacity in the first and second quarter "expressed itself with the outcome you saw in the second quarter"—the drop in billings. *Id.* In response to a question about why Skonnard and Budge did not disclose this information earlier, Budge explained that Pluralsight was "still hitting" its numbers in the first quarter. *Id.* ¶ 139(c). Budge also stated that Pluralsight "didn't come into the year early enough in the year" and that the company was "a few months behind there, that's been the big impact." *Id.* ¶ 139(d).

Plaintiffs argue that Budge's response about the company "still hitting" its numbers in the first quarter is not a denial of knowledge of the problem at the time that it was occurring and therefore supports that Skonnard and Budge "actually knew of the problem and deliberately chose not to tell investors." *Id.* ¶ 139. The Pluralsight Defendants respond that Budge did not admit on July 31, 2019 that he knew prior to June 2019 that Pluralsight's sales challenges would result in lower billings growth in the second quarter of 2019, and his statement "we were still hitting our numbers" cannot be construed as an admission. Rather, the Pluralsight Defendants argue that this statement supports that there was no reason to believe that they lacked sufficient sales capacity and productivity to achieve their billings growth in the second quarter of 2019.

Although Plaintiffs contend that Skonnard and Budge's July 31, 2019 statements are "admissions" of their knowledge of Pluralsight's sales ramp capacity gap from the beginning of 2019, these statements could just as well be cast as—and appear to this court to more accurately be—nonculpable, hindsight expressions of what caused the company's second quarter billings to drop. Hindsight expressions do not support an inference of scienter. *See Fleming*, 264 F.3d at 1260 ("Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight,' . . . because corporate officials should be liable for failing to reveal only 'those material facts reasonably available to them.'" (citation omitted)). The most compelling statement in support of a scienter inference is Budge's response to the question of why they did not disclose the sales ramping issues earlier: "we were still hitting our numbers." But even this statement is ambiguous as to whether it indicates knowledge of the sales capacity gap at the beginning of 2019 or is a hindsight conclusion formed upon investigation of what caused the second quarter drop in billings. And ambiguities do not support an inference of scienter. *Tellabs*, 551 U.S. at 326.

As the Pluralsight Defendants stated at oral argument, regardless of whether these statements support that Budge and Skonnard knew or were reckless as to Pluralsight being behind in its sales ramping capacity plan at the beginning of 2019, Plaintiffs have failed to adequately allege that Skonnard and Budge knew or were reckless to the materiality of this information or that failing to reveal it to investors would likely mislead them. Budge's response that the company was "still hitting [its] numbers," coupled with Pluralsight's strong billings and B2B billings growth in the first quarter of 2019 despite the alleged sales capacity gap supports that the company did not have reason to believe that the gap would have a material impact on billings. Without indication that the sales capacity gap would negatively impact billings growth, the Pluralsight Defendants argue that Budge and Skonnard did not know that a failure to disclose the gap would mislead investors. The court agrees. Here, the culpable inference is not "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Accordingly, the court finds that these statements provide marginal, if any, support for a scienter inference.

b) Budge's January 14, 2020 Statements

Plaintiffs also cite Budge's statements at the Needham Conference on January 14, 2020, where he acknowledged that it was "somewhat well documented [Pluralsight] had a capacity gap in the first half of 2019" and that the company "came into the year with fewer sales reps than we had planned—than we had hoped for" and did not "decide where they should go early enough in 2018 leading into 2019." ECF No. 94 ¶ 140. Budge also stated that "we feel much better focused from our sales leaders going into 2020 than we had going into 2019." *Id.*

Plaintiffs allege that these statements support that the Pluralsight Defendants were aware of their sales force deficiencies at the beginning of 2019 and that sales leaders "had not engaged in the process of hiring high-quality sales representatives ['going into 2019']." *Id.* The Pluralsight

43

Defendants respond that Budge did not admit that he knew prior to June 2019 that Pluralsight's second quarter 2019 billings disappointment would occur, and that this statement is merely a "hindsight review . . . [which] contributes nothing to an inference of scienter." *Level 3*, 667 F.3d at 1347. The court agrees with the Pluralsight Defendants. These January 14, 2020 statements could be stretched to indicate culpability, but the court finds the nonculpable inference far more compelling for the same reasons the court set forth in its analysis of Skonnard and Budge's July 31, 2019 statements. In short, these post-class period statements are more likely hindsight statements, and even if they are interpreted as supporting prior knowledge of the sales capacity gap, Plaintiffs have failed to adequately allege that Budge knew or was reckless to the materiality of these statements and that failing to disclose this information would likely mislead investors given Pluralsight's 2019 quarter one billings growth even with the alleged sales capacity gap. Accordingly, Budge's January 14, 2020 statements provide minimal, if any, support for an inference of scienter. *See Level 3*, 667 F.3d at 1347 ("Plaintiff also alleges that defendants' disclosures after the class period revealed their knowledge of integration issues during the class period. . . . But the disclosures do not suggest that defendants knew or recklessly disregarded information contrary to their public statements.").

c)   Skonnard and Budge's Stock Trading During the Class Period

Plaintiffs also cite Skonnard and Budge's stock trading during the class period as support for an inference of scienter. Plaintiffs allege that Skonnard and Budge's trading evinces "a motive to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making false and misleading statements and withholding material adverse facts from the market." ECF No. 94 ¶ 141. Plaintiffs aver that Skonnard and Budge sold substantially more stock during the Class Period than they did before or after the Class Period, and this resulted in sales at higher

prices than prior or subsequent stock sales that far exceeded their total compensations. Plaintiffs argue that Skonnard and Budge had a motive to make positive statements that would artificially inflate share prices so that they could personally profit.

The Pluralsight Defendants argue that Skonnard and Budge's stock sales do not support an inference of scienter. The Pluralsight Defendants aver that many of Skonnard and Budge's sales were triggered automatically pursuant to a Rule 10b5-1 plan and thus are not evidence of scienter. The Pluralsight Defendants also state that still more sales were made automatically by Pluralsight as part of an agreement to satisfy its tax liability. Further, the Pluralsight Defendants point out that it is not suspicious that Skonnard and Budge earned more from their stock sale proceeds than from their annual compensation because neither one received a base salary in 2018 or 2019. The Pluralsight Defendants also argue that the timing of the sales was not suspicious—Skonnard and Budge sold more during the Class Period than before because Pluralsight had been in a "customary 180-day post-IPO lock-up period" up until two months prior to the Class Period. ECF No. 111 at 27. Finally, with respect to the number of shares sold, the Pluralsight Defendants argue that Skonnard sold less than 5% of his total holdings, and Plaintiffs' statement that Budge sold 39.9% of his holdings is an oversimplification. The Pluralsight Defendants point out that Budge also vested into additional shares, and the majority of his sales were pursuant to his Rule 10b5-1 plan and for taxes, leaving only the 11.8% of the shares that Budge sold in the SPO.

"[M]otive can be a relevant consideration" in making the scienter determination, and "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. However, defendants engaging in stock sales but "retain[ing] a substantial percentage of their . . . holdings" and in stock sales "made pursuant to 'automatic transactions' set up prior to the class period to pay withholding taxes that became due . . . rebut any inference of scienter we might

otherwise draw regarding these sales." *Level 3*, 667 F.3d at 1346–47 (citations omitted). Because the Pluralsight Defendants argue that Skonnard and Budge retained substantial portions of their Pluralsight stock holdings and that their stock trading was primarily made pursuant to Rule 10b5-1 plans and "automatic transactions" to pay withholding taxes, this "rebut[s] any inference of scienter." *See id.* Plaintiffs' inference that these stock sales demonstrate scienter is thus not "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Accordingly, the court finds that Skonnard and Budge's stock sales only provide minimal support for an inference of scienter.

### d)   Skonnard and Budge's Knowledge of Sales Representative Ramping and Deal Pipeline

Plaintiffs cite several statements made by Skonnard and Budge before and during the class period regarding Pluralsight's sales force ramping process and progress and the company's deal pipeline as support that Skonnard and Budge knew that Pluralsight was behind in its sales ramping capacity and did not disclose this information to investors. According to Plaintiffs, because Skonnard and Budge spoke in detail and positively about Pluralsight's process of recruiting and ramping sales representatives, this supports an inference that they were therefore aware of the company's sales force issues at the beginning of 2019 but made no effort to correct their allegedly misleading public statements that the company was "on pace." Plaintiffs also argue that Skonnard and Budge made several statements indicating that they were aware of the company's deals, and this in turn supports that the two knew how many deals Pluralsight were likely to close in the second quarter of 2019 and that the company was behind.

The Pluralsight Defendants argue that Plaintiffs only cite "statements of optimism and forecasting" as evidence of Skonnard and Budge's allegedly "detailed knowledge" of Pluralsight's

hiring process and sales pipeline, and that knowledge cannot be imputed to Skonnard and Budge based solely on their positions in Pluralsight. ECF No. 111 at 24. *Anderson v. Spirit Aerosystems Holdings, Inc.*, establishes that scienter cannot be inferred "based only on a defendant's position in a company or involvement with a particular project. . . . [A]dditional particularized facts are necessary for an inference of scienter." 827 F.3d 1229, 1245 (10th Cir. 2016) (citations omitted). Plaintiffs allege more here. Plaintiffs argue that Skonnard and Budge had detailed knowledge of Pluralsight's sales force ramping and billing based on several specific statements that the two made on earnings calls and at conferences and presentations. In those statements, Skonnard and Budge discussed details and metrics associated with these subjects: *see, e.g.*, ECF No. 94 ¶ 164(a) (discussing the fifteen- and eighteen-month and two-year benchmarks of Pluralsight sales representatives); 164(e)–(g) (discussing Pluralsight's number of quota-bearing sales representatives; 164(h) (discussing Pluralsight's B2B billings growth). Additionally, while "mere attendance at meetings does not contribute to an inference of scienter," *Anderson*, 827 F.3d at 1246, Plaintiffs allege that Skonnard and Budge did far more than attend meetings. Plaintiffs provide undisputed evidence that Skonnard and Budge spoke at length during various meetings about Pluralsight's sales force ramping and productivity.

The Pluralsight Defendants also argue that Plaintiffs failed to allege that Skonnard and Budge had access to particular documents with "red flags." ECF No. 111 at 24. While the Tenth Circuit acknowledged in *Anderson* that the plaintiffs did not allege that the executives "actually reviewed" relevant data, the court stopped short of making the review of data a requirement to allege scienter and only cited the absence of this allegation as further support that the plaintiffs' otherwise already sparse scienter allegations were insufficient. *See* 827 F.3d at 1246. Accordingly,

Plaintiffs' allegations do not fail simply because they have not alleged that Skonnard and Budge had access to particular reports.

Nevertheless, even if Skonnard and Budge had access to and knowledge of Pluralsight's sales representative ramping and deal pipeline, and even if this indicates that Skonnard and Budge knew of the company's sales capacity gap at the beginning of 2019, as the court reasoned above, such does not necessarily mean that the two knew of or were reckless to the materiality of the information and the likelihood that they would mislead investors by not disclosing it. Thus, on balance, the court finds that Plaintiffs' allegations regarding Skonnard and Budge's knowledge of and access to Pluralsight's information related to its sales force ramping and deal pipeline provides tangential support at best for an inference of scienter.

e)   Skonnard and Budge's Statements Regarding the Central Nature of Sales Force to Pluralsight's Investors, Stock Price, and Business Model

Plaintiffs allege that the high frequency with which Pluralsight's sales capacity and sales representative growth were discussed during earnings calls, investor meetings and presentations, and conferences supports an inference of scienter. This topic was often discussed and touted by Skonnard and Budge, Plaintiffs argue, because it was closely linked to billings growth and therefore revenue growth. Accordingly, Plaintiffs argue that it was at least reckless for Skonnard and Budge not to disclose Pluralsight's sales capacity issues occurring at the beginning of 2019 at the time that they were occurring. Plaintiffs argue that this is true especially because billings were the company's "key business metric," and billings were in turn dependent upon the company's sales force capacity. The court finds that these allegations do not support a strong inference of

scienter for the same reasons stated above in its analysis of Plaintiffs' preceding scienter allegations.

In "assess[ing] all the allegations holistically," Plaintiffs have not alleged facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 326, 324. Instead, Plaintiffs' allegations require the court to "stack inference upon inference to even conclude . . . that defendants knew or were reckless in not knowing," *Level 3*, 667 F.3d at 1345, that Pluralsight was behind in its sales force ramping capacity plan, that this alleged sales capacity gap would materially impact billings, and that a failure to reveal this information was likely to mislead investors. Plaintiffs' allegations do not support a strong, cogent inference of scienter. Accordingly, Plaintiffs have failed to adequately plead scienter. Although the court found above that a portion of Statement 1 was actionable under Section 10(b) and Rule 10b-5, because Plaintiffs have failed to adequately plead scienter, Plaintiffs' Section 10(b) and Rule 10b-5 claim fails and is dismissed.

### B. Items 303 and 105 Claims

"Regulation S-K is a set of rules that sets forth reporting requirements applicable to various filings . . . including registration statements." *In re HEXO Corp. Sec. Litig.*, No. 19 Civ. 10965, 2021 WL 878589, at *10 (S.D.N.Y. Mar. 8, 2021) (unpublished). Plaintiffs allege that the Pluralsight Defendants violated Items 303 and 105 of Regulation S-K because they failed to disclose that Pluralsight was behind in its sales ramp capacity plan at the beginning of 2019, knowing how closely the company's billings growth rate was tied to its sales representative capacity and the negative impact that this was having on the company's deal pipeline.

1) Item 303

Item 303 requires a public company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii); *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). Additionally, if the company "knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." 17 C.F.R. § 229.303(b)(2)(ii). This "duty to disclose arises 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Slater*, 719 F.3d at 1197 (citation omitted). "Item 303 require[s] more than the mere identification of trends that were occurring in the defendant's business"; "the relevant question under Item 303 is whether [the company] reasonably expects the impact to be material." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 509 (S.D.N.Y. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011)).

Plaintiffs allege that the Pluralsight Defendants violated Item 303 when they knew that Pluralsight was behind in its sales ramp capacity in the first quarter of 2019 and that this would negatively impact the company's billings growth rate and sales cycle, but failed to disclose this information in their 2018 Annual Report on Form 10-K, Offering Documents, and Form 10-Q from the first quarter of 2019. The Pluralsight Defendants argue that Plaintiffs have failed to plead a violation of Item 303 because they have failed to allege facts showing that Pluralsight's sales capacity gap was a "known trend" to the Pluralsight Defendants in the first quarter of 2019 that

they knew would "reasonably likely" have a material unfavorable impact on the company's billings growth. The Pluralsight Defendants underscore that Pluralsight still "posted 41% total billings growth and 48% B2B growth" in the first quarter of 2019 even with the alleged sales capacity gap. ECF No. 111 at 30. The Pluralsight Defendants also argue the two months during which they allegedly knew of this sales capacity gap is insufficient to establish a "trend" within the meaning of Item 303.

The court finds that Plaintiffs have failed to adequately plead an Item 303 violation. That Pluralsight still "posted 41% total billings growth and 48% B2B growth" in the first quarter of 2019 during the alleged sales capacity gap strongly cuts against Plaintiffs' allegation that the Pluralsight Defendants knew that the alleged gap would materially impact billings growth. Regardless of whether two months is a sufficient amount of time to constitute a "trend" within the meaning of Item 303 or whether the alleged sales capacity gap is regarded as an "uncertainty," Pluralsight's strong billings growth in the first quarter of 2019 despite the alleged sales capacity gap did not render it reasonably likely that the sales capacity gap would materially impact billings growth—in fact, it provided evidentiary support for the opposite result.

2)      Item 105

Plaintiffs also allege that the Pluralsight Defendants violated Item 105 of Regulation S-K because their Offering Documents did not mention "the substantial, materialized risks posed by the sales capacity gap to Pluralsight's billings growth, much less provide[] an adequate description of those risks," even though the Pluralsight Defendants knew of these risks. ECF No. 94 ¶ 222. Item 105 requires that offering documents contain, "under the caption 'Risk Factors[,]' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

The Pluralsight Defendants argue that Plaintiffs' Item 105 claim fails because the Offering Documents at issue contained a "Risk Factors" section with warnings that "[f]ailure to effectively expand our sales and marketing capabilities could harm our ability to increase our customer base," that customer growth would be affected "[i]f we are unable to hire, develop, and retain talented sales or marketing personnel," and that the time necessary to train sales representatives made it "difficult to determine in a timely manner if we are efficiently allocating our resources in these areas." ECF No. 111 at 31. These "Risk Factor" warnings, the Pluralsight Defendants argue, do not provide for liability under Item 105, as they precisely warn of the risk that a sales capacity gap posed to billings growth. The court agrees. These warnings are sufficient under Item 105, and they need not have been more specific because the Pluralsight Defendants did not have reason to believe that those risks had in fact materialized and would negatively impact billings growth.

C.   Section 20(a) and Section 20A Claims

To state a claim under Section 20(a) of the Exchange Act for control person liability, 15 U.S.C. § 78t(a), a plaintiff "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Fleming*, 264 F.3d at 1270–71 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)). Similarly, courts have interpreted a claim under Section 20A of the Exchange Act for insider trading liability, 15 U.S.C. 78t-1(a), "as requiring the plaintiff to plead a predicate violation of the [Exchange] Act or its rules and regulations." *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1244 (D. Utah 1999) (quoting *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998)). Although the Tenth Circuit has not formally adopted this "predicate violation" standard for a Section 20A claim, this

court will adopt it when, as here,[20] "both sides agree that a Section 20A claim is dependent on a violation of the [Exchange] Act." *Id.* at 1245.

In a footnote, the Pluralsight Defendants argue that Plaintiffs' Section 20(a) and Section 20A claims should be dismissed because they have failed to state a "primary violation" and a "predicate violation," respectively, under the Exchange Act. ECF No. 111 at 31 n.12. As detailed above, the court finds that Plaintiffs have not sufficiently alleged Exchange Act claims. Accordingly, Plaintiffs' Section 20(a) and Section 20A claims are dismissed.

## III.    Securities Act Claims

Plaintiffs allege three claims under the Securities Act: violation of Section 11 against Pluralsight, the Signer Defendants, and the Underwriter Defendants; violation of Section 12(a)(2) against Pluralsight and the Underwriter Defendants; and violation of Section 15 against the Signer Defendants. As part of their Securities Act claims, Plaintiffs also allege violations of Items 303 and 105 of Regulation S-K. The Pluralsight Defendants argue that Plaintiffs' Section 11 and Section 12(a)(2) claims fail because Plaintiffs have failed to plead any material misstatement or omission. The Pluralsight Defendants also argue that Plaintiffs' Items 303 and 105 claims fail for the same reasons stated under the Exchange Act analysis and that Plaintiffs' Section 12(a)(2) claim should also fail because Plaintiffs lack standing to assert such a claim. Finally, the Pluralsight

---

[20] In their Opposition Brief, Plaintiffs do not refute the Pluralsight Defendants' argument that a "predicate violation" under the Exchange Act is required for their Section 20A claim to survive a motion to dismiss. *See* ECF No. 119 at 40 n.39. Rather, Plaintiffs argue that their Section 20A claim should not be dismissed because they have adequately alleged an "underlying violation[]" of Section 10(b). *Id.* Accordingly, the court finds that the parties agree on the "predicate violation" standard and apply it here to Plaintiffs' Section 20A claim. *See Karacand*, 53 F. Supp. 2d at 1245.

Defendants argue in a footnote that Plaintiffs' Section 15 claim should be dismissed because Plaintiffs have failed to plead a predicate Securities Act violation. ECF No. 111 at 34 n.13.

As stated above, the court finds that Plaintiffs' Securities Act claims are only subject to Rule 8's pleading requirements instead of those of Rule 9(b). However, even under this lesser pleading standard, the court still finds that Plaintiffs' Securities Act claims fail and are accordingly dismissed.

A.  Sections 11 and 12(a)(2) Claims

"The Securities Act of 1933, 48 Stat. 74, 15 U.S.C. § 77a *et seq.,* protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) (citation omitted). Section 11 of the Securities Act "imposes liability on issuers, directors of issuers, and other signers of a registration statement that contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted). In relevant part, Section 11 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may . . .  sue.

15 U.S.C. § 77k(a). Section 11 accordingly provides for two types of liability: "one focusing on what the statement says and the other on what it leaves out." *Omnicare*, 575 U.S. at 179. Section 12(a)(2) of the Securities Act imposes liability upon someone who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). As with Section 11, a Section 12(a)(2) claim can be satisfied by showing that "the relevant communication either misstated or omitted a material fact." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements[.]"). Because of the parallels between a Section 11 and a Section 12(a)(2) claim, "[a] plaintiff who fails to plead a [Section] 11 claim necessarily fails to plead a [Section] 12(a)(2) claim as well." *MF Glob.*, 982 F. Supp. 2d at 308 (citation omitted). Further, the same analysis of alleged misstatements or omissions under the Exchange Act "applies equally to Securities Act claims," although Securities Act claims do not require proof of scienter, reliance, or loss causation, nor do they require pleading with particularity unless they sound in fraud. *Id.* As previously discussed, because Plaintiffs' Securities Act claims do not sound in fraud, but rather in negligence and strict liability, they are subject to the pleading requirements of Federal Rule of Civil Procedure 8(a). *See* Section I.B.

The Pluralsight Defendants argue that Plaintiffs' Sections 11 and 12(a)(2) claims fail because the statements in Pluralsight's Offering Documents that Plaintiffs cite as the basis of their claims[21] are not actionable under Sections 11 and 12(a)(2) for the same reasons that the Pluralsight

---

[21] In their Motion to Dismiss, the Pluralsight Defendants identify seven statements contained in Pluralsight's Offering Documents as the basis of Plaintiffs' Securities Act claims. ECF No. 111 at 33. However, in their Opposition to Defendants' Motion to Dismiss, Plaintiffs provide a chart identifying the allegedly actionable Securities Act Allegations and reducing the number of actionable statements to six: Statements 17, 18, 20, 21, 22, and 23. ECF No. 119-3. Accordingly, the court will consider these six statements in evaluating the sufficiency of Plaintiffs' Securities Act claims.

Defendants argued that they were not actionable under Section 10(b) of the Exchange Act. The court agrees with the Pluralsight Defendants. Accordingly, the Pluralsight Defendants' Motion to Dismiss on this ground is granted.[22]

B.  Section 15 Claim

Under Section 15 of the Securities Act, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator." *Maher*, 144 F.3d at 1304–05; *see also* 15 U.S.C. § 77o. "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305 (citations omitted). The Pluralsight Defendants argue in a footnote that Plaintiffs' failure to plead a primary Securities Act claim precludes a Section 15 claim. ECF No. 111 at 34 n.13. The court agrees. Accordingly, the Motion to Dismiss on this ground is granted.

C.  Items 303 and 105 Claims

The Pluralsight Defendants also argue that Plaintiffs' claims under Regulation S-K Items 303 and 105 related to their Securities Act claims should fail for the same reasons that their Items 303 and 105 claims related to their Exchange Act claims should fail. The court agrees, and the Motion to Dismiss with respect to these claims is granted.

---

[22] Because the court finds that Plaintiffs have failed to allege actionable statements under Section 12(a)(2), the court does not reach the Pluralsight Defendant's argument that Plaintiffs lack standing to sue them under Section 12(a)(2).

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

1.  The Pluralsight Defendants' Motion to Dismiss Corrected Amended Complaint (ECF No. 111) is GRANTED. All claims are DISMISSED without prejudice.

2.  The Underwriter Defendants' Joinder in the Pluralsight Defendants' Motion to Dismiss Corrected Amended Complaint (ECF No. 114) is GRANTED. All claims are DISMISSED without prejudice.

DATED March 31, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

57