FILED
2021 APR 9 PM 2:54
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH NORTHERN DIVISION


INDIANA PUBLIC RETIREMENT SYSTEM and      )

PUBLIC SCHOOL TEACHERS' PENSION AND        )

RETIREMENT FUND OF CHICAGO, individually )

and on behalf of all others similarly     )      Case No.

situated,                                 )   1:19-CV-128-JNP

      Plaintiffs,                        )

  vs.                                     )

PLURALSIGHT, INC., et al.,                 )

      Defendants.                        )

_____)


BEFORE THE HONORABLE JILL N. PARRISH

---------------------------------------

March 22, 2021

Motion Hearing

Hearing Conducted Through Zoom


REPORTED BY: Patti Walker, CSR, RPR, CP     801-364-5440

351 South West Temple, #8.431, Salt Lake City, Utah  84101

A P P E A R A N C E S


For Plaintiff:          Keith M. Woodwell
                        CLYDE SNOW & SESSIONS
                        201 S. Main Street, 13th Floor
                        Salt Lake City, Utah  84111

                        Carol V. Gilden
                        COHEN MILSTEIN SELLERS & TOLL PLLC
                        190 South LaSalle Street, #1705
                        Chicago, Illinois  60603

                        Megan Kinsella Kistler
                        COHEN MILSTEIN SELLERS & TOLL PLLC
                        1100 New York Avenue NW, #500
                        Washington, DC  20005

                        Joel P. Laitman
                        COHEN MILSTEIN SELLERS & TOLL PLLC
                        88 Pine Street, 14th Floor
                        New York, NY  10005

For Defendant:          Jason W. Hardin
                        FABIAN VANCOTT
                        215 S. Main Street, #1200
                        Salt Lake City, Utah  84111

                        Gregory L. Watts
                        Stephanie L. Jensen
                        Dylan Byrd
                        WILSON SONSINI GOODRICH & ROSATI
                        701 Fifth Avenue, #5100
                        Seattle, Washington  98104

                        Ignacio E. Salceda
                        WILSON SONSINI GOODRICH & ROSATI
                        650 Page Mill Road
                        Palo Alto, CA  94304

A P P E A R A N C E S

For Underwriter                 Erik A. Christiansen
Defendants:                     PARSONS BEHLE & LATIMER
                                201 S. Main Street, #1800
                                Salt Lake City, Utah  84111

                                Alexander Bystryn
                                DAVIS POLK & WARDWELL LLP
                                450 Lexington Avenue
                                New York, NY  10017

SALT LAKE CITY, UTAH; MONDAY, MARCH 22, 2021; 2:30 P.M.

PROCEEDINGS

THE COURT:  So let's go ahead and go on the record in the matter of Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago vs. Pluralsight, Inc. and others.  The docket number is 1:19-CV-128.

Let me begin by introducing myself.  My name is Jill Parrish and I am the judge assigned to preside over this matter.  We are conducting this hearing through the use of Zoom video technology.  We are doing so because the courthouse in Utah is still closed to civil hearings due to the COVID-19 pandemic.  I appreciate everyone's willingness to work with us in making this happen virtually.

Let me introduce for all of you the members of the court staff who are with us on this Zoom conference.  The conference has been set up by Ms. Stephanie Schaerrer, who is my courtroom deputy.  We are also joined by Ms. Patti Walker, who is my court reporter.  And I have two of my law clerks with us, Ms. Nicole Meier and Mr. Kris Bahr.

So let me turn the time over now to counsel for the parties to enter their appearances, please, for the record.

MR. WOODWELL:  For the plaintiffs Keith Woodwell, Clyde Snow, local counsel.

And then, Carol, do you want to introduce your team, national counsel?

MS. GILDEN:  Yes, I will.  Thank you, Keith.

So I'm Carol Gilden.  I'm a partner with Cohen Milstein Sellers & Toll.  I am here today on behalf of the Indiana Public Retirement System and the Public School Teachers' Funds of Chicago.  And with me as part of my team are my colleagues, Joel Laitman and Megan Kistler.

THE COURT:  Thank you, Ms. Gilden.

How about for defendants?

MR. HARDIN:  Your Honor, Jason Hardin here as local counsel for Pluralsight.  And then Greg Watts is the lead counsel and will introduce his team.

MR. WATTS:  Good afternoon, Your Honor.  Greg Watts of Wilson Sonsini for the defendants other than the underwriter defendants.  With me from my team is my partner Ignacio Salceda, of counsel Mike Burn, Stephanie Jensen, and associate Dylan Byrd.  Also in the gallery are my client, the general counsel, Matt Faulkner, of Pluralsight, and his associated general counsel Melanie Grayson.

THE COURT:  Thank you.

MR. CHRISTIANSEN:  Good morning, Your Honor -- or afternoon.  It's Erik Christiansen of Parsons Behle & Latimer, and I'm local counsel to Alexander Bystryn of Davis Polk on behalf of underwriter defendants.  Alex will

introduce himself.

THE COURT:  Thank you, Mr. Christiansen.

MR. BYSTRYN:  Good afternoon, Your Honor.  This is Alex Bystryn from Davis Polk & Wardwell for the underwriter defendants.

THE COURT:  All right.  Is that everyone?

It appears that it is.

My understanding is that we actually have two motions that are pending before the Court.  The first is the Pluralsight defendants' motion to dismiss corrected amended complaint.  That is document number 111 on the docket.  And the second is the Pluralsight defendants' request for judicial notice and consideration of documents incorporated by reference in the corrected amended complaint.  That's document 113 on the docket.

I suppose it makes some sense to start with the latter motion first since I didn't see any opposition memoranda filed with respect to that motion, and so I just want to make sure that there, in fact, was not an opposition that I happened to miss.

MS. GILDEN:  This is Carol Gilden on behalf of lead plaintiffs.  That is correct, Your Honor.  We do not object to the submission to Your Honor of the documents just for that purpose.  But as for anything else that's drawn from them, depending on how counsel uses them, we might or

might not take objection.

THE COURT:  All right.

And I guess what I indicated a moment ago was incomplete.  There's also on the docket document 126, which is a second request for consideration of documents incorporated by reference, and I'm assuming, Ms. Gilden, that the same response applies to that.  Am I correct?

MS. GILDEN:  That's correct, Your Honor.

THE COURT:  And I also failed to indicate that there is also document number 114 on the docket, which is the underwriter defendants' joinder in the Pluralsight defendants' motion to dismiss the corrected amended complaint, which I guess is also technically before the Court.

Have I missed anything that is pending that we need to take up today?

MR. WATTS:  No, Your Honor.

THE COURT:  All right.

So I suppose, then, we've taken care of the motions that relate to judicial notice.  So let's turn, then, to the Pluralsight defendants' motion to dismiss the correct amended complaint.

And who will be arguing that?  Will you be arguing that, Mr. Watts?

MR. WATTS:  Yes, I will, Your Honor.

THE COURT:  Let's turn the time over to you.

I suppose once we've heard from you, to the extent any of the counsel for the underwriter defendants wish to add anything, we'll let them do that.  Then we'll turn the time over to Ms. Gilden to respond.  And then since it's your motion, Mr. Watts, you'll have an opportunity to reply.

I have reviewed all of the memoranda that have been filed in connection with the motion, if that is helpful to you in presenting your argument.

So with that being said, the floor is yours, Mr. Watts.

MR. WATTS:  May it please the Court, I'd like to be respectful of Your Honor's time.  I don't believe I yet know what the time frame is for this hearing and how much time you'd like me to use.  If you would give me an idea, that would be appreciated.

THE COURT:  Well, I find with these things that sometimes if I give time limits, people feel like they need to use all of the time that I have allotted.  The reality is that I don't have any other matters scheduled this afternoon.  It's 2:45, approximately, Utah time.  I think it probably makes sense to try and conclude the hearing by five o'clock.  So I suppose that would give you roughly each an hour.  But again, don't feel compelled to use all of that time.  This is an important matter.  The briefing is

extensive.  So to the extent that you can provide me helpful information for an hour, you can have an hour.

MR. WATTS:  Okay.  I will not use all that time, Your Honor, and I have never felt the need to use all the time given to me.

THE COURT:  You'd be surprised at how many folks don't follow that same principle.

MR. WATTS:  My goal today is only to be useful to you, Your Honor, and if I stop being useful, you can shut me up, please.  So thank you.

May it please the Court, this is not a typical securities class action.  A typical securities class action lawsuit involves a company that has encountered a major business or financial disappointment, for example, a financial restatement, a government criminal or civil investigation by the Department of Justice or the SEC, a failed product, a drug not approved by the FDA, or a trial halted due to adverse events, or a failure by the company to meet its own projections for revenue, earnings, or some other key financial metric.

Here we have none of these, not even a missed the financial forecast.

THE COURT:  But I suppose what we do have is a precipitous drop in the stock price involving loss of, what, a staggering number, a billion dollars in capitalization in

a one-day period.  Now I'm not sure exactly what the trajectory was in terms of the recovery from that event, but I suppose that that involves a very large drop in share price.  So does that put this case in the same category as those you've just mentioned?

MR. WATTS:  It certainly does, Your Honor, when it comes to a stock price drop.  I think the reason does matter here, Your Honor, in that the stock drop, because investors were disappointed that their, in my view, exuberance -- self-created exuberance for the company's growth over time wound up being disappointed, even though the company did not provide the market with projections about that key metric of billings.

THE COURT:  And I suppose that that begs the question, then, was it the key metric of billings that resulted in that precipitous stock drop or was it the revelation that the sales force was inadequate to sustain the billings?

MR. WATTS:  I believe it certainly was the billings, Your Honor.  For example, if no one cares about sales headcount unless that sales headcount is somehow impacting the finances of the company, in particular billings.

Now to generate billings requires two sides of an equation.  One side is headcount.  The other is the

productivity of that headcount.  You take the number of sales representatives, multiply it by the billings for each representative, and you get basically a billings total.  If a sales force that remains flat is somehow more productive during that time period, they are generating more billings than they did in prior periods and therefore there is no cause for concern, that is oftentimes viewed as a good thing by a company because they are therefore getting more bang for their buck with respect to their billings, their sales force is more efficient, more productive, and oftentimes they are actually more profitable as a result.

THE COURT:  So do you have any authority that suggests a case has to fall into one of the categories that you've just mentioned before we can have a securities fraud, the 10b-5 claim, et cetera, or do we have to get away from that macro level and get down to examine each of the individual statements that are put at issue in the correct amended complaint?

MR. WATTS:  No, there is no such authority, Your Honor, and we do need to get down into the weeds, as it were, to talk about each of the particular statements.  I do just want to note at the outset, this is an unusual case relative to the others.

So here the punitive class period starts on January 16, 2019, and ends on July 31st, 2019.  During that

time, Pluralsight experienced enviable success.  Leading up to and throughout the class period, Pluralsight exceeded its revenue and earnings projections for each and every quarter. Pluralsight conservatively did not project billings on a quarterly or annual basis.  It simply reported billings results for the completed quarters.  Pluralsight did not forecast or guarantee that its billings growth or performance would continue at the same rate from quarter to quarter, not even for the next quarter.

On January 16, 2019, the first day of the putative class period, Pluralsight reported then record revenue for the fourth quarter in fiscal year 2018, beating its revenue and earnings projections.  Revenue grew 42 percent.  Total billings grew by 42 percent.  B2B billings grew by 51 percent.

In the middle of the class period, we have a May 1st, 2019 earnings call.  Pluralsight again reported that it had beaten its revenue and earnings projections for the first quarter of 2019.  Again, revenue grew 40 percent. Total billings grew by 41 percent.  And B2B billings grew by 48 percent.

And then at the end of the class period, on July 31st, 2019, again, the last day of the purported class period, Pluralsight exceeded its revenue and earnings projections yet again.  Then for the second quarter of 2019,

revenue grew by 42 percent.  Earnings per share grew by 71 percent.  But the so-called disappointment and the reason for the stock price drop was that Pluralsight achieved second quarter total billings growth of 23 percent, and B2B billings growth of 27 percent.

So what does that mean?  This disappointment, as it were, was not that billings decreased, but rather that the pace of billings growth had slowed slightly in that quarter.

Unfortunately, we are here because plaintiffs seek to punish defendants because Pluralsight did not grow as quickly in the second quarter of 2019 as it did in the first quarter, or the prior quarters.  But again, Pluralsight never guaranteed that it would continue to grow billings at this pace.  Pluralsight did not even project billings for that quarter, the second quarter of 2019.

THE COURT:  So is there any dispute as to the cause of the pace of billing growth?  Was it simply a function of the fact that that exponential growth couldn't be continued or was it the result of the problem with the sales force?

MR. WATTS:  So up to the end of the second quarter of 2019, when the company disclosed its disappointing second quarter results, the company had experienced, as disclosed and mentioned in the complaint, significant productivity,

increases among its sales force, and a steep ramp-up in billings growth for seven to eight quarters.  They then had disappointment in the second quarter, and that's why we are here today.

And the question really the plaintiffs -- we have to answer for ourselves is was this known to defendants before May 1st of 2019, and by this I mean were they aware that there was a significant delay in the hiring of sales per their hiring plan, were they behind schedule.  And, more importantly, was that behind schedule situation one that insiders knew or believed would result in a material negative impact on the company's billings.  That I believe is where the case falls apart, Your Honor.

THE COURT:  So I suppose you're talking, with respect to that second question, about the scienter requirement.  Am I right?

MR. WATTS:  Yes.

THE COURT:  And just so that I'm clear, is it your view, then, that they not only had to be aware of the decline in the sales force, but they also had to believe that that would result in a decrease in billings and revenue?

MR. WATTS:  In billings, yes, Your Honor.  Revenue did not go down.

THE COURT:  Okay.

MR. WATTS:  And that brings us back to the comment I made earlier, which is you can have flat headcount, but if your sales team is maturing and becoming better at their jobs as they sit in those roles, or your new hires are ramping up their productivity scale quicker than you anticipate, you can actually be getting more out of less, more billings out of the same or even fewer sales reps, and therefore you can achieve your internal projections, you can satisfy your internal quotas, and you can have successful quarters, even by getting behind slightly by a few weeks or few months when it comes to on-boarding new employees for the sales group.

THE COURT:  Okay.

MR. WATTS:  Your Honor, entering the class period, Pluralsight had been and continued to warn investors.  It did so in a 10-K filed on February 21st of 2019, a mere few weeks into the class period.  They did again in connection with their secondary offering, their registration statement and prospectus, which was effective on March 7 of 2019.  And they did again later in later statements, and they warned that there were business risks that could prevent them from continuing to experience fantastic performance.

I'll summarize.  They identified that selling business to business, or B2B, was a complicated sales process that involved a great deal of up-front sales costs.

It involved longer sales cycles.  It involved complex customer relationships.  And they disclosed a litany of risks associated with the hiring, training, on-boarding, and productivity of quality sales representatives.

They also disclosed and warned investors that they were investing in their sales and marketing infrastructure, but there would be a delay in knowing whether or not those investments were actually doing the job.  But you don't know whether you've hired the right salesperson until you get them into the job, after several quarters.

THE COURT:  So I suppose the question that I think keeps coming up is what is the effect of a blanket risk warning, like the one you have just described, in the face of particularized statements about the sales force?  And I suppose the one that comes to mind is there was some -- and I can't remember which statement it is off the top of my head, but one of the defendants had indicated we have about 250 -- I think it was sales folks, and the number was actually closer to 200, which seems to be off by about 25 percent.  How do we weigh a particularized statement like the number of sales folks against these more generalized risk warnings in evaluating the claims?

MR. WATTS:  Just one correction, Your Honor.  I don't believe plaintiffs are alleging that any of the numbers shared by defendants Skonnard or Budge where they

identified a headcount number at the company was false when made.  It was a different argument they're making, which is that if we said we were at 250, we should have said although we're at 250, we're 20 representatives behind our internal goal at being at 270.

THE COURT:  Okay.

MR. WATTS:  So there are no particularized statements by our defendants where they said a hard number of headcount that plaintiffs are arguing was false.  Plaintiffs are arguing there was an omission, which was that there should have been another enhanced disclosure in there saying, yeah, by the way, we're behind schedule a bit.

THE COURT:  All right.  So I guess I'll ask you the same question, then, with respect to the corrected version that you've just provided.  How do we weigh that kind of a statement with this more generalized risk warning?

MR. WATTS:  So those statements, like, for example, a statement about there being a particular headcount number at the company, were statements of historical fact, which were accurate and true when made.  The question then becomes were they somehow misleading by omitting additional, more detailed information about where the company might have been on its internal, undisclosed, untalked about ramp-up in hiring its sales representatives.

Defendants' position is that that was not required

to be disclosed.  Just because you speak about a historical fact headcount doesn't mean you have to get into the weeds and describe where you are on all of your internal plans for that quarter, that week, that day, and that that was a general statement about headcount that was accurate.

Now as far as the risks go, Your Honor, you know, when you make a forward-looking statement as a publicly traded company, that statement can be protected from liability if it is a company by meaningful cautionary language or a risk factor.

Here defendants' position is that some of these statements -- and I can tick through them if you'd like -- were forward-looking, and as a result those risk factors immunized those statements from any liability.

This was a bargain drawn by Congress to basically encourage corporations to speak and project about the future to help investors make decisions, but also include with those projections risk factors to caution about how they might not come true.

THE COURT:  Okay.

MR. WATTS:  I guess the bottom line, Your Honor, for defendants is, you know, since the company did not project billings and since the company did not speak ever to the market about its internal hiring plans or where it was with respect to those plans -- you never had Budge or

Skonnard say we are on pace, in March or April, to reach those goals, or we're off pace.

But if plaintiffs or other investors were disappointed by Pluralsight's billings growth in the second quarter of 2019, it was due to their own self-created expectations.  The federal securities laws were not meant to serve as a guarantee that every investor's wish will be fulfilled.

Your Honor, this is also not a typical securities class action complaint.  A typical securities class action complaint relies on particularized facts from internal documents, reports, or statements from former employees, sometimes identified as confidential witnesses, to plead a statement was false or misleading due to contemporaneous, contradictory information, or that an individual defendant knew his or her statement was false when made.

Here the complaint does not include a single confidential witness or internal report.  Instead it relies on unsupported, conclusory, and speculative allegations.  Such allegations do not satisfy Rule 8, let alone Rule 9(b), or the heightened requirements of the Reform Act.

Now in their papers, plaintiffs have clarified that they are not asserting any claim that Pluralsight's reported billings results were inaccurate.  Instead they have chosen to now focus their case on an alleged omission

by defendants to disclose portal sites, number of sales reps relative to the 2019 plan.  But as plaintiffs admit, the number of sales reps only matters if it impacts billings, and headcount is only half of the equation.  The other half, as I mentioned, Your Honor, is productivity.

Now the complaint highlights the importance of billings as a metric.  Paragraphs 258 through 267 do that.  The complaint also highlights that headcount and productivity per representative are key factors in achieving billings.  That is in paragraphs 263 through 266, and also paragraph 270.

So, you know, as I mentioned before, headcount can stay flat, productivity goes up, and the company is very happy because they're getting more out of their sales and achieving their results nonetheless.  The company indeed said as much in its 10-K filed on February 21st, 2019.  This is very early in the class period.  Pluralsight stated that its sales force had experienced, quote, substantial increases in productivity and effectiveness, close quote, but also warned that new hires might be, quote, unable to achieve desired productivity in a reasonable period of time, close quote.

Now as plaintiffs allege, Pluralsight's sales representative ramp-up from hire date to being a productive full quota bearing sales rep was between six months and 24

months, two years.  It is therefore reasonable to infer that the sales reps were ramping up and becoming more productive more quickly towards the end of 2018 and early 2019, and no reason to believe that it would not continue into the next quarter, the second quarter of 2019.

What is unusual about this complaint, Your Honor, is that the entirety of plaintiffs' case, focused Securities Act claims and the Exchange Act claims, hang on statements made by CEO Skonnard and CFO Budge made after the last allegedly misleading statement on May 1st, 2019, and after the end of the class period.

Hindsight is always 20/20, Your Honor.  It is natural, if not expected, that a CEO or a CFO will spend time after a business disappointment to understand its cause and ensure or prevent it from happening again.  That Skonnard and Budge reached certain conclusions a month or more after the end of the second quarter of 2019 as to the cause, the second quarter disappointment, does not mean they knew these facts or had reached these conclusions in the first quarter or by May 1st, 2019.

Plaintiffs' efforts to spin these after-the-fact analyses, these post hoc analyses by these two men into admissions should not be countenanced.  If these statements are not admissions, as plaintiffs characterize, then their entire case crumbles.

So what were these two statements, or these two speaking opportunities?  Plaintiffs point to a July 31st, 2019 earnings call that took place three months after the last alleged false statement and a month after the end of the second quarter.  There is no indication in this earnings transcript that Skonnard or Budge were aware that the company was slower in hiring new sales reps in the first quarter or through May 1st, 2019.  And if they were aware of there being a slowness in hiring of those reps, there is no indication that they believed in the first quarter or up to May 1st of 2019, that it would have had a materially negative impact on billings.

In that July 31st earnings call -- it's revealing, Your Honor -- Skonnard, the CEO, begins the earnings call by stating that sales execution challenges impact the second quarter and that he, quote, liked to share what we've learned and what we are doing to strengthen and improve execution moving forward, close quote.  It is reasonable to infer from that statement that Skonnard was reporting what he had learned after the quarter closed, what he had learned about what the cause was of the disappointment in the second quarter.

So what did Skonnard learn?  He learned, with the benefit of hindsight, that Pluralsight did not have enough capacity in the system.  He learned, with the benefit of

hindsight, that Pluralsight needed more investment in sales enablement. This is the infrastructure around a sales organization, around sales reps. And, three, he learned that Pluralsight needed more leaders with experience at scale. There is, again, no indication from this July 31st statement that Skonnard or Budge were aware of these things, these three learnings in the first quarter of 2019 or before May 1st, 2019.

As I've mentioned, Your Honor, you know, they had an amazing first quarter. The company's billings results for the first quarter were spectacular. Total billings growth of 41 percent. B2B billings growth of 48 percent. Even assuming the company was short a few dozen sales reps at the start of that quarter, the first quarter of 2019, and that defendants were aware of the shortage, the company continued to grow billings at roughly the same high percentage despite this shortage. In other words, they were getting more out of less, or more out of the same.

Budge said, in that same July 31st, 2019 earnings call, that very thing. He said, quote, we were hitting our numbers. We were still realizing what we needed on our retention rates with our expanded opportunities, and we were seeing kind of an accelerated productivity out of our reps, close quote.

So that's the first discussion by management post

class period that plaintiffs argue is an admission which defendants will posit is nothing more than an after-the-fact analysis trying to figure out what went wrong in the prior quarter and how they could avoid it from happening in the future.

The second event was on January 14th, 2020. Plaintiffs point to statements made by CFO Budge at a January 2020 investors conference, and that was eight months after the last allegedly false statement and six months after the end of the class period -- or the end of the second quarter of 2019. He makes no statements indicating that he or Skonnard were aware that the company was slower in hiring sales reps in the first quarter of 2019, and if they were aware of being slower, there is no indication from that statement in that investor conference that they believed that those shortages would result in a negative impact on billings.

Now, Your Honor, one thing I think that might be useful, and I'm cognizant of the fact that this was not in the papers, but I would like to point Your Honor to a case recently decided by Judge Kimball. A decision was issued on December 15th, 2020, after briefing was completed on this motion to dismiss. The decision is Exkae vs. Domo, and that's 2020 WL 7352735. And again, December 15th, 2020.

I will not cite the decision in connection with

any particular argument or discuss it at length here today since the parties have not had the chance to brief the issue, but I do want to at least point out and note that Judge Kimball granted defendant's motion to dismiss in that case, which was -- and here are the similarities -- a securities class action against a software as a service company -- like Pluralsight -- for violations of Securities Act and Exchange Act violations -- as alleged here -- in which the company reported disappointing billings at the end of a class period -- as alleged here -- in which the plaintiff conceded that the company's reported billings were accurate -- as plaintiffs do here -- but that the company failed to disclose business challenges that put continued billings growth in jeopardy -- as here.

So I believe it's a good case to kind of read -- a very recent case, as Your Honor considers these issues.

You know, we've spent a lot of I think ink, Your Honor, on the 10(b) claim, the Exchange Act claim in the briefing, and I think we may have given the Securities Act claims a short shrift in light of that due to page limitations. So if I may, I'd like to discuss, maybe at greater length for a moment or two, the Securities Act claim.

THE COURT: And I suppose to the extent that I find that any of the 10(b) claims survive, do the Securities

Act claims automatically survive as well?

MR. WATTS:  No.  The Securities Act claims only cover those statements made in the offering documents.  So those are statements, I believe, 17 through 23 in that chart we attached as Exhibit 12 to our second request for judicial notice and declaration.

So it is possible, Your Honor, for you to conclude that some non-offering document statements were false or misleading, but if they were not in the offering document, that would not mean that the Securities Act claim survives. In fact, it would have to be dismissed because there were no false statements in that offering document.

THE COURT:  All right.  Okay.  I'll just let you focus on these, and then if I have questions, I'll jump in.

MR. WATTS:  Okay.

Plaintiffs' Securities Act claims, which are Sections 11, 12(a)(2), and 15, are implausible on their face.  Plaintiffs allege material false statements or omissions in Pluralsight's March 7, 2019 offering documents because it did not disclose that the company's lower than planned sales force headcount in the first quarter doomed the company to slower billings growth.

Now the secondary public offering documents went effective, again, on March 7th, three weeks before the end of the first quarter of 2019.  If sales force headcount was

behind plan throughout the first quarter, as plaintiffs allege, and doomed Pluralsight to a drop in billings growth, then one would expect to see that drop in that quarter, because they were without those reps for the entirety of that quarter.

The problem for plaintiffs here is that Pluralsight experienced the same fantastic billings growth in the first quarter that it experienced in the fourth quarter of 2018, again, 41 percent billings growth for total billings and 48 percent billings growth for B2B billings for the first quarter.

This is, quite frankly, Your Honor, for plaintiffs an inconvenient truth.  Plaintiffs, accordingly, jump right over the first quarter in their complaint.  You will note, Your Honor, if you look at paragraphs 302 through 303, after decrying the false statements made in the offering documents, plaintiffs jump over the first quarter, and that's the quarter in which the secondary offering took place, and they jump ahead to the second quarter, a quarter that did not start until April 1st of 2019 and did not end until the end of June of 2019.

Now plaintiffs allege seven misstatements in the offering documents.  They are identified on the Exhibit 12 chart we provided to Your Honor, and they are identified as statements 17 through 23.  Five of the seven statements were

risk factors, and I will address the non-risk factor statements first.

It's hard to remember, Your Honor, the Tenth Circuit's decision in McDonald, at 998, which says, quote, accurate recitations of historical successes are not actionable as a matter of law, close quote. And we also cited Your Honor to the Alfus and Wenger decisions from a federal court in California, which says, quote, reporting past favorable results does not imply future growth or success, nor may such an inference be drawn, close quote.

Now let's go through -- as you said, you want to go through -- get down into a low level and talk about each of these statements here. So statement 17, statement 17 says, quote, we have significantly expanded our direct sales force to focus on business sales. That statement was demonstrably true in that Pluralsight sales force had tripled from 80 reps in 2017 to 240 reps by mid February 2019. That's again in the complaint, paragraph 114 and paragraph 87.

Plaintiff claims that this statement was misleading because it did not also state that Pluralsight was behind in its 2019 hiring plan and that this put the continuation of their billings growth in jeopardy. But statement 17 said nothing about projected billings growth and certainly it did not predict or guarantee continued

billings growth on that same pace.

Statement 17 said nothing about whether its sales force headcount was sufficient for its needs.  Statement 17 said nothing about whether Pluralsight would or would not need to continue hiring to meet its internal sales goals.  And statement 17 said nothing about Pluralsight's 2019 hiring plan.

The bottom line, Your Honor, is that making a bland, historical statement about an expanded direct sales force does not trigger a duty to speak in minute detail about current internal hiring plans or whether the company's hiring was on pace with that plan.  And the absence of this information does not alter the meaning of the statement made.

Statement 18, Your Honor, has two parts.  The first part is, and I'll quote, we have a large direct sales force, close quote.  Well, again, as with statement 17, this was demonstrably true, it was large, and it was not misleading by omission.  I mean was it not large because the company was slightly behind its internal hiring goal?  No.  Again, it said nothing about whether the sales force was larger than when the year started, just that it was large.

The second half of statement 18 is the following quote.  We have been able to, quote, drive substantial increases in productivity and effectiveness of our sales

personnel over time as they gain more experience selling subscriptions to our platform, close quote.

Plaintiffs' own allegations of the low plan headcount but a continuation of the record billings growth prove the statement to have been true when made, and there was no reason to believe that it would not continue as the existing sales force matured into the second quarter and those delayed hires joined the company in the second quarter.

Statement 19, Your Honor, is not really a statement. It's just plaintiffs previewing that they believe the risk factors were inadequate in the offering document.

So I'll drop down. I'll talk about statements 20 through 23.

I think it's important to note now plaintiffs' theory. Plaintiffs' theory is that these risk factors, which were intended to warn investors, somehow were transmodified into an actual false statement because the risk of which it warned had materialized when the risk was put in the offering document. That's their theory, okay? But no reasonable investor would interpret a warning about risks to be a guarantee that those conditions do not currently exist.

We cited the Court to the Yum! Brands decision

from the Sixth Circuit, the Lululemon case from the Federal Court in New York, and then we also used as support the Spiegel decision from the Tenth Circuit.

This makes sense, Your Honor.  If a car manufacturer has a risk factor in their offering document stating that defects could result in a recall of their cars that could harm the company's productivity or profitability, has the car manufacturer guaranteed that its cars have no defects and has it guaranteed that it will not have any recalls, or has had no recalls?  Of course not.

THE COURT:  I suppose it could not be interpreted as a statement that it would never have something like that occur.  But I think the more pointed question is if, in fact, a major recall had been announced or made known to the car company a month before this statement, would the statement have been misleading by using the term if such a thing would occur when we knew that, in fact, it had already occurred in the past?

MR. WATTS:  So I do not think so, Your Honor.  I believe that risk factors cannot be turned into false statements.  We've cited the Yum! Brands decision and Lululemon for that proposition.

To me, if a risk factor fails to identify a materialized risk that is significant, that is impacting the company's business in a negative way and is known to

management, then that removes the protective effect of that risk factor over the forward-looking statements.  In other words, the vaccine doesn't work.  The risk factor is of no event.  It doesn't protect the company as to its forward-looking statements.  It loses that protective halo around the company's statements.  It doesn't itself become a false statement.

Now plaintiffs could have certainly argued, though, that the omission, whatever the omission is, is nonetheless required in the document, but that doesn't turn the risk factor into a false statement itself, if that makes sense.

THE COURT:  Okay.

MR. WATTS:  You know, the risk factors are intended to inform investors of the risks of investing in a company.  If risk factors can so easily become misleading due to an alleged omission, then public companies will stop providing detailed risk factors.  This, of course, is contrary to public policy and to the intent behind the risk factors.

Let me turn to statement 20.  Statement 20 is a puzzler for me, Your Honor.  Plaintiffs claim that this risk factor was false or misleading, and here's what it was.  Pluralsight warned that it would need to continue to increase its investment in sales and marketing and that

there was no guarantee that these investments would be successful, close quote.

Plaintiffs do not deny that this was a risk, obviously, faced by the company.  But with a straight face, plaintiffs contend that Pluralsight's warning that there was no guarantee that its investments in sales would be successful somehow guaranteed that current efforts were and would be successful and that Pluralsight would continue with the same billings growth.  How an expressed denial that there could be a guarantee becomes a guarantee is baffling to me, Your Honor.

Turn to statement 21.  Statement 21 is basically risk factors, warning that failures of, one, to effectively expand the sales and marketing or, two, to hire, develop, and retain competent sales representatives or, three, for sales reps to achieve desired productivity could harm the business, but that in no way was a guarantee that those risks had not materialized in some form or fashion at that time.

Plaintiffs quibble with the use of the word if as a guarantee that no such condition exists at the time.  But again, per our case law we've cited, no reasonable investor would have come to that conclusion or interpretation.

This same analysis applies to statements 22 and 23 as well.

Turning now, Your Honor, to sort of a sidecar argument to the Securities Act claims, is our argument on Section 12(a)(2).  Section 12(a)(2) of the Securities Act, quote, provides that a person who offers or sells newly issued securities by means of a prospectus that misrepresents or omits a material fact is liable to the person purchasing such security from him, close quote.  And that's from Spiegel at 1268.

So to be liable under Section 12(a)(2), a defendant must have, one, offered or sold securities by means of a prospectus and, two, the plaintiff must have bought the security from the defendant.  This has been interpreted by courts, including the Tenth Circuit, in the Joseph v. Wilds decision as a privity requirement.

Plaintiffs here assert their Section 12(a)(2) claim against Pluralsight and the underwriter defendants.  They do not assert it against the individual defendants.

As to Pluralsight, plaintiffs concede that the company did not sell a single share of stock in the secondary offering.  The list of selling shareholders does not include the company and, as shown in the prospectus, is not identified as a selling shareholder.  Again, they did not sell a single share, not to plaintiffs, not to anyone.  And the prospectus makes clear -- on the very first page of the prospectus, the second line says, quote, Pluralsight,

quote, will not receive any proceeds from the offering, close quote.

So the obvious corollary to this, Your Honor, is that Pluralsight, not having sold stock in the secondary offering, is that plaintiffs did not buy their stock from Pluralsight in that offering either.  It was impossible, because they weren't selling to anyone.  Therefore there is no privity between Pluralsight and plaintiffs, or anyone for that matter.

So what are plaintiffs left to argue?  All they can argue is that Pluralsight was a solicitor, meaning that Pluralsight was soliciting the purchases of someone else's shares, and to do so for Pluralsight's own financial benefit.  That's what's required for a solicitor.

So here's the problem for plaintiffs.  Under the Tenth Circuit's decision in Spiegel, at 1269, Section 12(a)(2) liability, quote, does not extend to someone who was merely a substantial factor in a stock sale.  The person must have had a, quote, direct and active participation in the solicitation of the immediate sale, close quote.

Here, plaintiff merely alleges in conclusory fashion that Pluralsight issued the prospectus and, quote, promoted the offering.  That's paragraph 358.  This is not enough to allege direct and active participation.  It was not enough in Spiegel.

The other infirmity, Your Honor, is that Pluralsight is not alleged to have received any financial benefit from this alleged solicitation, not from the secondary offering or from any purchase by plaintiffs specifically.  It was not a selling shareholder.  It did not receive a penny in proceeds from the secondary offering. And plaintiffs do not allege that Pluralsight received any other financial benefit.

So in light of these facts -- or alleged certain facts, the Section 12(a)(2) claim can be dismissed at well.

Now plaintiffs have a couple of sidecar arguments to both their 10(b) claim and their Section 11 claim where they focus on items 303 and 105 to Regulation S-K.  I want to address those now for a moment, if I could.

Let's deal with item 303 first.  So item 303 in Regulation S-K requires corporations to disclose known trends or uncertainties that have had or the company reasonably expects will have a material effect, favorable or unfavorable, on net sales or revenue or income from continuing operations.

Instruction 3 to item 303(a) states that there is a duty to disclose, quote, where a trend or uncertainty is both, one, presently known to management -- this is where sometimes intent can be imported into a claim under the Securities Act if they're relying upon item 303 -- or, two,

reasonably likely to have a material effect on the company's financial conditions or results of operations.  Those are the two requirements, again, known to management and reasonably likely to have material effect on the business.

Here there is no indication that there was a negative trend in early March of 2019, let alone a trend known to Pluralsight's management.  At the time of the secondary public offering, the trend was, in fact, the opposite, positive for the company.

As I've discussed before, they had a fabulous first quarter that ended weeks after the secondary public offering.  As the complaint shows, Pluralsight's fourth quarter 2018, the last reported quarter before the secondary offering, marked the seventh consecutive quarter of year-over-year B2B billings growth greater than 50 percent, and year-over-year billings growth greater than 40 percent.

As the complaint shows, Pluralsight's first quarter 2019 results, again, the quarter that ended three weeks after that offering, that secondary offering, marked the eighth consecutive quarter of year-over-year billings growth greater than 40 percent, and B2B billings growth of nearly 50 percent.

Here, even if being slightly behind internal hiring goals constituted a negative trend in early March 2019 and was known to management, correct -- neither

is true but assuming that for the case -- it was not reasonably likely at the time to have had a material effect on Pluralsight's business.  Why?  Because they knocked the cover off the ball in that very quarter.  They had incredible results in the first quarter.

Now plaintiffs, in light of the disappointing second quarter, would like to say that was a trend.  Now one disappointing quarter does not a trend make.  Plaintiff leans into Mr. Budge's July 2019 post-class period statement, that he made with the benefit of hindsight, that there was a, quote, sales capacity gap at some point in the first part of 2019, but that does mean that he or anyone else at management believed that they had a material gap as of March 2019.

Item 303 requires disclosure of information presently known to management, not information they subsequently learn.  Therefore the item 303 claim should be dismissed.

On item 105, item 105 of Regulation S-K requires that a registrant provide under the cash and risk factors a discussion of the, quote, most significant material factors that make the investments speculative or risky.

Here Pluralsight clearly provided these risk factors in the manner required by item 105.  Just the reading of one page of the registration statement, page 27,

which is attached as Exhibit 2 in our motion to dismiss, reveals this.  I discussed these risks earlier in this argument, but the company, again, made many warnings about if we are unable to hire, develop, and retain talented sales and marketing personnel, if our new sales or marketing personnel are unable to achieve desired productivity in a reasonable period of time, or if our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

So these risk factors moored to the precise risks that wound up coming to fruition in the second quarter of 2019, and therefore there was no deficiency or failure to comply with item 105.

Your Honor, I think we've briefed ad nauseam both plaintiffs' and defendants' falsity as to the 10(b) claim. I can answer any questions.  If not, I may turn to scienter for a moment as to the 10(b) claim.

THE COURT:  Why don't you go to scienter.

MR. WATTS:  Thank you, Your Honor.

So unlike the Securities Act claims, the Exchange Act claims have an additional element, and that is the scienter element.

As Your Honor may be very familiar, to plead scienter, plaintiff must state with particularity facts

giving rise to a strong inference that the defendants acted with a mental state embracing an intent to deceive, manipulate, or defraud, or recklessness, close quote. That's from Smallen at 1304 and 05. And in the securities context, recklessness is, quote, akin to conscious disregard, close quote. Same case, page 1305.

Now in conducting a scienter analysis, courts must consider plausible, non-culpable explanations for the defendant's conduct as well as inferences favoring plaintiff. That's from Tellabs, a Supreme Court decision. For an inference to be strong, it must be cogent and compelling, and at least as compelling as any opposing inference of nonfraudulent intent. Again, Tellabs.

Now as I stated earlier, Your Honor, this is not a typical securities case. There are no allegations premised on former employee confidential witnesses, or any internal documents, and those are oftentimes present, not required, but are most frequently present in these types of cases. For example, just ticking through the Tenth Circuit cases that the parties have cited in their briefs, there were confidential witnesses in Smallen, Level 3, Fleming, Anderson, and Taylor.

Now hindsight evaluations are not admissions. Plaintiffs' entire case, again, hinges on alleged omissions by Skonnard and Budge in July 2019 and January 2020, both at

or after the end of the class period.  But these hindsight disclosures do not suggest that defendants knew or recklessly disregarded information contrary to public statements.  That's a quote, Your Honor, from Level 3 at page 1346, a Tenth Circuit case.

When Mr. Budge said, quote, we were still hitting our numbers, he was not saying he knew of a sales capacity gap in the first quarter or before May 1st of 2019 and withheld it.  He was explaining that sales productivity prevented him from realizing it until the end of the second quarter.  The Tenth Circuit was clear that such hindsight review, quote, contributes nothing to an inference of scienter, close quote.  Level 3 at 1347.

THE COURT:  Just so that I'm clear, I suppose there are two inferences that could be drawn.  One is that he was aware and the second was that he wasn't aware.  I suppose the only way to get to the bottom of that would be discovery.  So is it your argument, then, that as long as we have two plausible inferences, we don't get to discovery because the case is dismissed?

MR. WATTS:  No, Your Honor.  What I'm saying is that if there are two plausible inferences that are a tie, equally plausible, that tie goes to plaintiff.  But if the non-culpable inference is even marginally more plausible than the one proffered by plaintiff, then defendants win and

the case should be dismissed.

My argument here today, Your Honor, is that in the way they've pled this case and in light of the fact that the first quarter results were so spectacular, despite the company being behind on its hiring plan for 2019, it is more plausible to infer that management did not see or did not appreciate that being a few -- couple dozen sales reps behind their plan would have any negative impact on their billings.  Why?  Because they were already behind in the first quarter and they were, as they said, killing it.  They were achieving the same record billings growth in that quarter.  Why would they think that wouldn't continue in the second quarter?  They were seeing increased productivity among their sales reps, and they also had the new reps coming on at the start of the second quarter.  And those previously already successful reps were one more quarter mature in their role and would assume be better at their job.

You know, on scienter, plaintiffs lean heavily into insider stock sales as an indication of motive by Messrs. Skonnard and Budge to commit securities fraud.  It is important to note, Your Honor, two things at the outset.  That is that the sales made by Skonnard and Budge during the class period were predominantly -- in fact, vastly done for two reasons, none of which shows or supports the inference

of scienter.

One, they were transaction sales pursuant to a 10b-5-1 trading plan.  Plans like that are put in place quarters beforehand so that the broker will automatically do those transactions without any investment decision by the holder, by Skonnard or Budge here.  And the securities laws say that if the 10b-5-1 is put in place and a trade is made or a sale is made pursuant to those plans, they do not support an inference of scienter because there was no motive.  The trade was made absent any decision by the defendant.

The second reason those trades were made -- the predominant reasons those trades were made in the class period was because they were merely covering taxes.  They would get a vested grant of security and they would have to pay taxes on that vested grant.  So they had instructions to the broker to only sell a sufficient number of shares to cover their tax obligation.  So basically the shares were sold and the money was then given to the government to pay for taxes for the rest of their vested shares.

The Court has held -- the Tenth Circuit has held in Level 3, at 1346 and 47, that those kinds of transactions do not support an inference of scienter.  And this district court in the Skullcandy case, at page 7, discussed the fact that 10b-5-1 plans rebut an inference of scienter from those

trades as well.  So that's at the outset.

Now let's just talk about, even ignoring that the 10(b)(5)(i) plan is only done to cover their taxes, here, a sale of stock is not suspicious unless it is a big percentage of the individual defendants' holdings.  Here, Skonnard and Budge both retained a substantial percentage for the Pluralsight holdings.  For Skonnard, the CEO, he retained 95 percent of his holdings, selling only five percent.  For Budge, he retained 88 percent of his holdings, selling only 12 percent of his stock.

The case law we've cited to Your Honor shows that cases even up to 30 percent of holdings do not qualify as being suspicious.

Plaintiffs argue that the timing is suspicious because there were no trades leading up to the class period. Well, that's easily explained, Your Honor.  When there's an initial public offering, the insiders are locked up.  By that I mean their shares cannot be sold for 180 days.

Here, the lock-up expired two months before the start of the class period here.  So, as a result, they only had a two-month window to sell any shares before the class period started.  So to look at the pre-class period lack of sales doesn't say much.  And we cited the Shaw Group decision, Your Honor, for that point.

So I do want to talk, finally, Your Honor, on

scienter, about the non-culpable inference here.  To my mind, Your Honor, the more plausible inference is that in the second quarter of 2019, defendants discovered that Pluralsight had a billings growth rate that was lower than anticipated, and although strong enough to achieve 23 percent and 27 percent year-over-year billings growth, respectively, defendants conducted an after-the-fact analysis of this deceleration, and, with the benefit of hindsight, realized they should have brought more sales reps on earlier and deployed them differently.  The fact that they did not see this issue sooner is because Pluralsight's sales team experienced, again, record productivity in the first quarter.

There's a famous quote from the Ranconi decision from the Ninth Circuit we cited to Your Honor, which is, quote, honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness, and that's what happened here.  Not only were they optimistic, they were justifiably optimistic because they had a quarter under their belt, even though they were behind in their hiring goals, and were still achieving their record billings growth rates.

You know, under any applicable standard, Your Honor, Rule 8, Rule 9(b) for the Reform Act's heightened pleading requirements, the complaint should be

dismissed.

The Securities Act claim should be dismissed because the complaint fails to plead a materially false statement or omission in the offering documents.

The Exchange Act claims should be dismissed because the complaint fails to plead a materially false, misleading statement or omission during the class period, and fails to plead a strong inference of scienter.

Thank you, Your Honor.

THE COURT:  Thank you very much.

Let me turn the time over at this point to Ms. Gilden to respond.

MS. GILDEN:  Thank you, Your Honor.

So I listened with interest to defendants' argument and, needless to say, we have quite a few responses to them.  I'm cognizant of the time of day, Your Honor, and that we've had very extensive briefing that I think addresses many of defendants' points, so I won't go through everything, but I do want to touch on a few of the highlights here in terms of some of the claims that defendants have made.

First of all, as our papers made clear, this is not a case about billings growth projections.  The inescapable fact here is that Pluralsight was never profitable.  It never generated income.  And, in fact, if

you look at its losses over the 2017 to 2019 time period, they kept increasing.

So how did Pluralsight generate investor interest? How did it get the analysts revved up and the investing market revved up?  It did it by really emphasizing that it was achieving exponential growth based on the metric of billings.  And when the gig was up and the billings declined, and the defendants were forced to report this for the second quarter of 2019, there was, as Your Honor recognized, a massive stock drop-off that was fueled really by Pluralsight, Skonnard, and Budge's admission as to the cause of the billings decline.

THE COURT:  I guess I'm interested -- one thing that strikes me in the argument that we just heard is these metrics of number of sales personnel were just internal metrics but were never publicized to the market, and that strikes me as an important fact.  If, in fact, what was driving the stock price was billings, as long as there weren't false projections made about billings, how do we premise an entire case based on missing an internal projection that had never been shared with the market?

MS. GILDEN:  Okay.  So these were not -- this is not a projection case.  I just want to be very, very clear about this.  What this case is about is the defendants not being truthful with the market, not giving investors

information that they needed to evaluate defendants' statements as to their billings.

And the metrics concern, sales reps, and infrastructure -- because, after all, that's what fueled billings, that's what fueled the metrics -- so to investors, when they were investing in this company, they were investing based on what they thought the company had by way of its sales structure, strength of its infrastructure, and the number of sales people because in order to grow billings, you have to have the sales force in place.

And what defendants were not truthful with the market about is that they did not have the number of sales reps in place that they claimed.  They did not have this strong infrastructure.

THE COURT:  Let me jump in right there because a moment ago when I asked Mr. Watts about this alleged misrepresentation in terms of number of sales folks, he told me that I had that wrong, and, in fact, you're not claiming that there was misinformation given to the market about the number of sales reps.  Now so who's right on that?

MS. GILDEN:  Okay.  So, Your Honor, that's not right.  And, in fact, I'm going to just put a pin in that for a minute to also digress for a moment to their chart because what I would encourage Your Honor to do is not take the word of counsel.  I would encourage you not to focus on

their charts which distort what our complaint clearly alleges was false and misleading, and was omitted, but to focus on the actual complaint allegations.

THE COURT:  Right.  And I guess I need some help in that regard because, as you know, the complaint is, what, 150 pages long, and clearly much of what is alleged in the complaint is puffery, inaccurate statements of historical fact.  So I need to get down in the weeds and I think what would be helpful to me is identify for me your three best examples, three best claims of statements that you believe were false and misleading that did not give, as you said, investors the information necessary to evaluate billing growth.

MS. GILDEN:  Sure.  And so if I can turn for a minute to the complaint, I want to direct Your Honor to what I think will be some very relevant provisions.

So if you begin, for example, you know, defendants say on January 16, 2019 --

THE COURT:  Can you give me a paragraph number, please.

MS. GILDEN:  Yes.  Let me get that for you.

So one of the paragraphs would be paragraph 9. There's a series of paragraphs.  Paragraph 173.  Paragraph 174-B.

THE COURT:  So are those your three best examples?

MS. GILDEN:  That's where it starts, Your Honor.

THE COURT:  Well, I want your three best because I want to delve into those.

MS. GILDEN:  Sure.  And so what the defendants say is they say, in paragraph 173, today we have about 250, and they're talking about 250 representatives.  And they're saying that -- they're saying that -- so we'll continue to add a good 70 to 80 a year, it's lower than the percentage growth we have, which is why you are seeing good -- you're seeing some efficiencies in the model.

So what defendants are doing is they are telling the market that they have all these representatives in place.  And keep in mind that there's a pipeline here, that you need a certain number of months in order for deals to come forward.  So when they say to the market, and analysts react they're thrilled with the statements that are being made, you can see in their reports, you can see exactly how they incorporate in and focus on the sales reps, on the sales infrastructure on, you know, what this company has to offer investors.

So those are some of the statements that they make, and they say, you know, we have great sales reps, we have a lot of great infrastructure that has improved our retention massively, and we're now at scale.  We're now starting to see efficiencies.

THE COURT:  So I guess my question to you is if we look at the numbers -- I'm just looking at the quantitative information provided because I think that's easier to measure truth and falsity, quantitative information.  Did they, in fact, have about 80 quota-bearing reps, you know, in the latter part of '16, and did they, in fact, then go to about 250 on the date this statement was made, and did they, in fact, grow that to over 300?  Are any of those statements false?

MS. GILDEN:  So when the company is talking about 2017 through 2018, we're not focused on those statements as being false.  When the company says in January 2019 that they have 250 representatives, that's false.  They absolutely did not.

THE COURT:  How many did they have?

MS. GILDEN:  They later admit that they had about 200 at that point in time.

And, you know, in this regard, Your Honor, I would just also note that the case law is clear that you should not look to defendants', necessarily, interpretation of conflicting facts.  This is on a motion to dismiss.  We stated our allegations.  The allegations should be construed in the manner most favorable to us.  And we have made it clear in the complaint that defendants later admitted that when their billings dropped off and they announced this in

July of 2019, it was because they did not have the representatives in place that they said.

And you can see that the market reacted very drastically to this. It dropped precipitously, the price, and analysts said, quote, where did this come from. I can see that we have a problem with this company being truthful. And the analysts' reaction was really very harsh.

And I will say this, Your Honor: Counsel makes a big push to try and say this case is so out of the ordinary. This case is actually very typical of what one sees in securities fraud cases. Investors are led to believe the facts are one thing. Defendants, in fact, know them to be other than what they portray. And that disconnect is what drives up the price of the stock because the defendants are not being truthful with the market.

And if I may, you know, counsel made some claims about, well, there are no CWs, that this is so out of the ordinary. Actually that's not out of the ordinary. When you have companies that have nondisclosure agreements, like this company here, it's not unusual that former employees are afraid to talk to plaintiff's counsel. In fact, if we had confidential witnesses, you would have defendants attacking them, claiming they didn't know what they were talking about and trying to disabuse them from their statements.

But what we do have here is we have admissions, and you don't normally see that in a securities fraud case. I think it was Skonnard -- Skonnard or Budge was pressed at the conference in July of 2019, and the analyst was like, well, what happened. And the analyst was giving all sorts of questions, well, was it productivity. And Skonnard said no, it wasn't lack of productivity. We didn't enter the year with the representatives that we thought we were going to have.

So when you look at all the statements, both in 2020 -- because that's where you have -- these are not sort of looking back statements. These are statements saying no, as we've told you before, we really didn't have 200 reps in place and that was the cause of why the billings declined. And this was material to investors. Investors had the right to know since this is a company that doesn't generate earnings -- or I should say income and has never generated income -- positive income, billings became all the more important, and that's why information about how those billings were achieved, what the condition of its sales force was, what the numbers of its sales force was, what the condition of its infrastructure was to support the billings, that's what was material to investors. Again, when they learned otherwise, the price of the stock dropped quite precipitously.

THE COURT:  All right.  So we have the allegation in paragraph 173 about having about 250 and the fact that they really only had 200.  What are your other two best allegations?

MS. GILDEN:  Sure.  So if you turn to paragraphs 205 and 209 -- and actually we can even start with paragraph 204, which was the May 1 analyst call, and notice in these calls what the analysts were focused on.  They were focused on the sales reps.  Why?  Because everyone knew in order to get billings, you had to have the sales reps in place.

And so Terrell Tillman asked Budge about the progress in hiring sales reps and says where are you or how are you doing in terms of the hiring of your targeted sales headcount by the end of the year.  You know, and maybe also just talk about retention.  And so Budge then even talks about how the numbers were doing great.  It looks like where we are, he responds, in 205.

And if you look at and read the paragraphs 205 through 209, you know, that's where he is saying, look, we like where we're at.  Our annual sales ramp-up capacity plan is basically, you know, where they need to be.  He says, you know, we're still committed.  We see a clear path to having 300 plus representatives.

And in 207 is where we say what he knew or recklessly disregarded about the statements, why he had

scienter there.

So if I can for just a minute in terms of our complaint. So as in everything, there is context, and what we have done in this complaint, Your Honor, is we've set out the context of the statements that were made by giving the history of the company, by giving the statements that were made. And in each of the statements, the section of the complaint -- and this is the section of the complaint that I would encourage Your Honor to spend time with after this argument -- we lay out what the statement was. Then we lay out the particular part of the statement that's false and misleading and why we believe it's false and misleading, and those statements are of historical fact. They're objectively verifiable.

In other words, when we get into discovery, we're going to have the documents to back that. But even without that, we have defendants' admissions as to the falsity and misleading nature of the statements.

So you have statements, you have why we've alleged it's false and misleading, and the particular parts of the statement, and then we say why defendants knew or recklessly disregarded. So I think if you look at that part of the complaint, that will be very helpful in parsing through the complaint.

And in parsing through, you know, certainly for

the Securities Exchange Act claims as well as parsing through the claims which deal with the Securities Act, which are subject to a different standard, and actually in that regard, I just want to note, Your Honor, the law is very clear.  You can have one set of facts that gives rise to different claims, that a plaintiff is not bound to one claim and one claim alone, because the same conduct can be actionable for different reasons.

And so we did what really good plaintiff's counsel generally do in these situations.  We set out the part of the complaint that we allege is fraud in theory, and then we set out separately how the -- some of those allegations separately, how the allegations form negligence claims, and we did that in two separate parts of the complaint.

And I will tell you, Your Honor, that is very common.  Courts have upheld that, because it makes it -- although it makes a longer complaint, it makes it easier to focus on what are the allegations that I need to look at for purposes of determining the '34 Act claims, which in this case have scienter, and what are the allegations that I have to focus on in dealing with the '33 Act claims which arise out of a $450 million secondary offering to investors, and that involves different defendants.  Some of the same, but also involves the two underwriters, the lead and the left lead underwriter, as well as everyone who signed the

registration statement.

Again, so while there's some overlap in terms of underlying facts, it's not uncommon that you're going to have two separate parts to the complaint. And I think, you know, if Your Honor spends some time with it, it will become easier to see how the elements are satisfied for the different claims.

Turning, if I can, for a moment to scienter -- so I have to say, Your Honor, the scienter allegations here are very strong -- exceedingly strong as a matter of fact. Not only do you have these admissions where you have Budge and Skonnard admitting that they were not truthful with the market in terms of the sales force and in terms of the infrastructure, which is why one of the analysts says in September 2019, and comments on the lack of credibility and transparency of the company, that there's, you know, obviously some problems that go deeper and they're concerned with that, but you also have insider sales.

Now the insider sales allegations are also very, very strong when you look at the timing for when these plans were put into place, the number of sales that took place, you know, supposedly pursuant to the plans, and then how much money was raised outside of the plans through the secondary offering.

And the secondary offering -- you know, this was a

company that went public, you know, just a little bit less than a year earlier, in 2018. And then they have a secondary offering where $450 million of securities are sold to investors. Not one penny of it goes to the company. Not one penny of it goes to operations. Not one penny goes to anything having to do with the company. It all goes into the pockets of the insiders, in particular the pockets of Skonnard and Budge.

And so, you know, when you look at those particular sales and you take into account their sales -- and, again, we have charts on this, which appear in paragraphs 143 and 151, which lay out and compare and contrast the pre-period sales and the post-period sales, as well as the sales that took place during the class period, and what you can see, for example, for Mr. Skonnard is he raised 22 million -- or I should say obtained $22 million through that secondary offering, which was about 60 percent of how much he made on sales during the class period.

Now while motive is not required for a securities case when one is looking at scienter, one looks at it holistically. One looks at all the facts and circumstances. You don't have to have motive, but sometimes you do. And here what was the motive?

Well, the motive was to make sure that the price of that stock stayed up nice and high. Why? Because

defendants knew they had plans to sell the stock that they put into place shortly before the class period. And they didn't have a regular pattern of sales during the class period.

And, by the way, we haven't gotten discovery on this yet, but we've seen certainly a lot from what did transpire that is very suspicious and gives rise to an inference of motive and an inference of scienter.

So the plans are put into place shortly before the class period starts. You had huge sales, you know, very circumspective to the interesting time periods when you juxtapose them with the disclosures that were being made.

And we do, by the way, at the end of our complaint, we have that graph that lays out -- and that may be also helpful, Your Honor, as you're going through the complaint allegations -- that lays out what was going on with the stock chart, the stock price, that also lays out what were the misrepresentations and omissions, the facts being concealed, and what were the sales that were taking place. And that has to do with -- you know, obviously the chart reflects sales both in the plan as well as pursuant to the secondary offering.

But the secondary offering was not pursuant to a plan and the defendants sold huge -- millions of dollars. So they had motive. They had motive to withhold from the

market that they were having problems, were struggling, which they admitted they were struggling, and they hoped somehow would all right itself.  And hope, Your Honor, is certainly not a defense to securities fraud.

They were able to profit by not being truthful with the market.  They were able to profit tremendously.  Again, as a result of not profiting with the market, during the class period, Skonnard realized $22.1 million from the sales of his stock while the market was under this illusion that everything with the company sales reps was going right along, that they had this huge number, the infrastructure was in place, that billings would continue the way they had been continuing in prior months.

And similarly, Budge made 15.1 million in sales during the class period.  And, again, I'd say his sales during the secondary offering, about 33 percent of the money he made was sold during the secondary offering.

So the defendants had every reason not to be truthful, and that includes -- if I may for a minute turn to risk factors.

The law is very, very clear, and Rombach vs. Chang is the perfect example and is sort of black letter law on this, that you can't hide behind existing facts by claiming that you put out risk factors.  There's different language.  It's one thing -- and one of the Second Circuit cases says,

well, it's one thing to say there's a risk, that there's a canyon ahead.  It's another thing when you know that there is a canyon ahead and that the person is heading right into it.

And so what we have alleged in terms of the risk factors is the reason they do not provide defendants with immunity is because the facts had already occurred, and that's why you can't hide behind risk factors.  If the facts exist, then that has to be disclosed to investors.  And, you know, that's what made the risk factors false and misleading in the 10-Ks.  That's what made the risk factors false and misleading in the SPO documents, the offering materials.

THE COURT:  So I think a point Mr. Watts was making -- and maybe I don't have this down correctly, and, if so, I'm sure Mr. Watts can correct me on reply -- is that the risk factors themselves can't constitute a false and material statement.  If, in fact, they are warning of something that had already transpired, they wouldn't then immunize that other statement.  But that a statement of risk factors itself cannot constitute a false and misleading statement for purposes of a 10(b)(5) claim.

MS. GILDEN:  I don't agree with that, Your Honor.  It's an omission.  You know, a company puts out a false and misleading risk factor and says there's a risk and doesn't tell investors that the facts have already transpired

underlying the risk, there's liability, and they have concealed material information that investors would want to know.

And here it was very important to investors what the condition was of the company's sales force, the number they had in place, the infrastructure, because that was -- why was it important?  Why did investors care?  Because that was critical to sustaining billings growth.  And, remember, that's what -- you know, that's what investors look to.

So if the metric is billings growth, any fact bearing on billings growth negatively needs to be disclosed, because that would, in turn, affect the investors' assessment of the investment.

And, you know, the law on materiality in In re Level 3 basically says, look, a statement or omission is material if a reasonable investor would consider it important in determining whether to buy.  And so here investors would have wanted to know that the company was struggling.  And they admitted they were struggling.  They just hoped to catch up.  Again, hope is no defense to fraud.

But in any event, investors would have wanted to know, look, the company was struggling to hire and ramp-up, because ramping took a certain amount of time, was struggling to hire the sales reps, to have the right structure in place.  It was not going smoothly and they were

having problems. And that, in turn, was going to affect billings six months out because that's what was in the pipeline.

THE COURT: Well, I suppose Mr. Watts' point would be that the number of reps was only half of the equation, and that if they were making up with productivity and maturity in the sales force for the lack of new hires, it would not necessarily have an impact on billings growth.

MS. GILDEN: Well, again, what would investors want to know? Because we're not claiming that defendants were not truthful with the market about billings growth. What we're saying is that they withheld material information from investors about the facts that led to billings growth.

THE COURT: Is your point, then, that any time a company misses any kind of an internal target, an internal mark, has any kind of an internal struggle, even if they don't think it will affect billings or revenue, they have an affirmative obligation to bring all of that information to the market?

MS. GILDEN: I look at it differently and I think the law is a little different than that in the sense that no -- again, this is not a projections case. This is not a billings case. What it is about is if defendants are holding out to the investing public, this is the only thing that the company has going for it, the only reason that

investors were interested investing, because this company didn't make a dime of profit, was not generating income. What it was generating was billings growth. That was the proxy, that was what was important to investors.

But if the defendants know facts that are going to bear negatively on the billings growth, and that's what is important to investors, and an analyst made it very, very clear, Your Honor, that that was very important, so tell us how you're doing. And then to withhold adverse information, to make the decision we don't have to tell you this, we don't have to tell you the bad facts, we don't have to tell you that, well, it's not so good really, that's not -- companies can't hide behind that. Those are facts that need to be -- that need to be disclosed.

And by the way, I will say that -- if I may. Your Honor raised a question about, you know, what Mr. Watts said in terms of productivity. When the defendants -- when Budge and Skonnard were forced to fess up -- and, notably this is after, by the way, another major sale that took place, coincidentally -- let's see -- just actually a few days -- yes, a few days earlier. So on July 26th, Skonnard sells about another $2.5 million worth of stock -- actually close to 2.6. A few days later he admits that billings is not where they hoped it would be. The billings rate is down and, by the way, they didn't have the number of reps they

told everyone they had at the beginning of the year.

One of the analysts says something about, well -- you know, is questioning him and Budge about productivity, and they're like no, it wasn't productivity. It was the number of reps and it was the infrastructure because that's what was relevant. That's why -- quite frankly, that's why the analysts kept questioning -- at all these conferences, kept questioning the company, and Budge and Skonnard, about how things were ramping up, because that's what was material to investors. That's what investors considered important in this company in terms of deciding whether or not to buy.

And there are a few other statements that, you know, we might want to take a look at. And that's really the question of what statements were -- you know, the difference between puffery, the difference between optimism and whether something is a fact. And what the case law in the Tenth Circuit is very clear on is whether or not the facts are objectively capable of verification, and that's how you parse it out.

And here the company's statements about its sales force capacity, about its infrastructure, those are statements that are capable of objective, verifiable facts. And that's one of the ways we know as well that they're more than optimism. They're more than puffery. It's either you have a certain number of reps or you don't. Either you have

a functioning infrastructure -- sales infrastructure -- and there were two parts to the sales infrastructure that helped fuel the growth.  Either you have it in place and it's working or it's not.

THE COURT:  I don't know, is that a zero sum game? I suppose that you could have different levels of infrastructure with different levels of success and different levels of productivity.  I mean it's not either you have a hundred percent fully effective infrastructure or none at all.  That to me seems like a much harder fact to measure objective falsity on than the number of sales reps, for example.

MS. GILDEN:  Well, it's a different -- it's a different representation.  Your Honor is right.

THE COURT:  What's your best example of a historically false statement, verifiably false statement about infrastructure?

MS. GILDEN:  Give me a moment.

If we go to paragraph 209 -- so give me one moment because there are a few things I want to point out, because the infrastructure is what bolstered the claims about the sales force being strong, and so I want to get to that.

So I think if Your Honor reviews the paragraphs between, you know, 205 to 209.  So in 208 he's asked -- and this is a question posed to Budge.  So he's asked, you know,

just what is -- just what is the limiting factor, you know, on the pace of sales headcount growth.  Is it sales management's capacity.  And what Budge says is, look, he says, well, there's probably only so many reps we could hire in any given year.  We do have a pace to it that, between our people team and our sales management team, puts people through good rigor on the kind of reps we would like to hire, and we like the direction we're going in.  So we'd like to continue that.

And so basically what he's saying is that, look, that they are on pace.  That's what he's telling the analysts.  He says it's a combination of both of those things.

THE COURT:  But he also says we like the fact that we've been cash flow profitable for three quarters.  We'd like to continue that.  If we can drive growth greater than 40 percent, then that will be a longer sustainable business.

I mean I'm really struggling in that to find an objectively false historical statement about the state of the infrastructure.  I mean to me it seems kind of like a rambling thing that says, yeah, we've got a pace.  We can only hire so many people.  We want to put people through good rigor.  There's a certain kind of reps we want to hire. I just don't see anything there that could be deemed verifiably false.

MS. GILDEN:  Well, I think it can be deemed false in terms of the sales ramp capacity plan.  And the sales ramp capacity plan, which we, you know, address in -- you know, really the concept of it is in -- you know, we address it in paragraph 210, and in particular we focus on -- if you look at 210, subparagraph b, the sales ramp capacity team will help support the sales representatives and help support the sales.

So while Budge was basically portraying the sufficiency and the productivity of the people team and the sales management team, that really also required sale reps to be moved, as we explained, through the hiring and ramping process, which the defendant said was a process that basically took about six months.

So if you start with reps and you have the right number in place in January and you have the sales ramping process working, then you're going to have the right numbers to drive the right billings six months later.  And if they had had, in fact, the number of reps that they claimed at the beginning of the year and they had the support for those reps, they would not have had the billings miss in January.

But the infrastructure that's in place supported and ramped up the representatives to get them really up to speed, fully functioning, driving the sales, and it supported their sales.

THE COURT:  So what description of this sales report component is objectively false?  I mean I think you've given me a good explanation as to why you think that infrastructure to support the sales force was important. But who said what about it that was objectively false?

MS. GILDEN:  So in paragraph 213, we talk about the fact that Budge later admitted that the company was months behind in hiring and ramping its sales representatives according to its annual sales ramp capacity plan.

THE COURT:  You've previously talked about the number of sales reps, but I thought you had drawn a distinction between that claim and the infrastructure claim.

MS. GILDEN:  Well, it's another component and it's part of the whole sales machinery.  You have the number of reps demonstrably, objectively verifiable, and then you have what type of sales infrastructure was in place, and that's part of the sales ramp capacity plan.  I mean they had a sales ramp capacity plan.

THE COURT:  But identify for me the statement that somebody made about the sales infrastructure that you contend to be objectively and verifiably false.

MS. GILDEN:  If we turn to paragraph 173 -- and this is the start of the class period.  It is the Needham Grow Conference.  And at the end of paragraph 173, Budge is

saying we have a lot of great sales reps, they're killing it, and a lot of great infrastructure around them that has improved our retentions massively and we're now at scale. We're starting to see efficiencies around that.

Then in paragraph 174 is where we tie those statements to the eventual disclosure of the true state of affairs at that point in time.  Subparagraph E of 174, as well as also 174 -- so 174 D and E.

And keep in mind, in July they announced that they were parting ways, one of those situations where there was the head of the -- the chief revenue officer was leaving the company and was being replaced, which, again, is one of those facts you look at when you look at the complaint holistically.  Those are the sort of facts that are suspicious.

And the reality is at that point in time, you know, looking back in January, the company was not at scale, and this is because they were missing dozens of reps and they were facing a sales capacity gap.

THE COURT:  You may continue.  I think you've answered my question.  So you may continue with your argument.  I didn't mean to imply that I was expecting something more.

MS. GILDEN:  Okay.  And so, you know, in terms of -- in terms of the allegations, we have stated -- again,

construing all the allegations in the light most favorable to the plaintiffs, we have stated claims as to the misrepresentations and omissions concerning sales force. We believe we have sufficiently alleged concern in the infrastructure. We believe we have sufficiently alleged that the risk factors were false and misleading and omitted material facts because they didn't disclose the truth about the condition of the sales force, about the strength of the sales force, about the infrastructure.

And those facts appear, and those misrepresentations and omissions appear both in statements that the company and its officers made to the market in analyst conferences, in the 10-K for 2018, also in the company's secondary public offering materials. That's where those statements appear.

And the secondary public offering, the SPO as we've called it, that is another misrepresentation and omission and source of liability for defendants as to the Exchange Act claims. It's a separate source of liability for the company and the two officer defendants. And then as I've discussed, and it's in our papers, as to the underwriters and as to the signers of the registration statement. So to that end, you know, the misrepresentations that appear in the offering materials do give rise to different types of claims.

So turning for a moment to -- turning for a moment back to scienter. So the scienter is established -- as a recap, is established really by the company's admissions, by the defendants' admissions -- the officer defendants' admissions. It's established by the disconnect between facts on the ground and what facts were really existing and what would be material to investors. It's established by suspicious sales that were occurring during these questionable plans, 10(b)(5) plans that were enacted shortly before the start of the class period.

We haven't seen the plans, but obviously in discovery those would be the documents we would get. So we would have the facts and circumstances. But just looking at the timing for and the amounts of the sales, it's rather suspicious that they would allow for the types of sales and the timing that took place.

In terms of defendants' claim about whether or not they were sold for tax reasons, well, you know, that's something that, you know, one shouldn't take defendants' word for it. We don't have evidence on that. That's a disputed fact. And we're not at summary judgment where we've had full discovery. We're at the motion to dismiss stage. So defendants are trying to rest on information that we have no facts to support it, just their suppositions. You know, those should be seriously discounted and certainly

do not weigh -- over-weigh what is a very plausible inference of scienter.  And, again, when one does look at competing inferences, the tie does go to the plaintiff, and I think we have more than amply satisfied that standard.

Just looking at my notes.  I'm cognizant of the time.  Let me see if there is anything else.

303, which deals -- item 303 and item 105 of Regulation S-K, those are -- you know, those are trends that one has to -- one has to disclose under Regulation S-K.  And the trend that we have said defendants did not disclose related to the ramping, and the number, and the hiring, and the condition of the sales force, that was then present facts that the defendants knew.  They knew they were off target.  They knew they were struggling.  They admitted it later that they were struggling during the first half of the year, but they withheld that information, and that's what gives rise to claims under 303 and 105.  303 is a trend. 105 certainly is something that as well is going to affect the company's financials and they are required to disclose that.

In terms of cases, one case that -- defendants mentioned the Domo case, which is -- I think it's Exkae vs. Domo.  That case, Your Honor, which came out, according to defendants, in December of 2020, they don't go into it in detail during their argument.  And we can certainly address

it more fully for Your Honor post-argument, but let me just say Domo is very different from this case. It's completely distinguishable.

Domo involved business strategy and facts that were developing going forward. It is not at all similar to our case. It involved really strategies that didn't pan out. Our case, in contrast, is really about the specific status of the company's sales force. You know, we're not challenging statements about the company's business strategy, which seems to have been the essence of what the Domo case was focused on.

And here, you know, when asked -- again, in contrast to Domo. Here, as we've gone over, when defendants were asked why their billings suffered, they again pointed to the sales capacity gap and they did point to some infrastructure limitations.

Another case that actually is very recent that Your Honor may want to take a look at, that I think is very salient to the situation here, is a case called In re Myriad Genetics, Inc. That's 2021 WL 977770, and that decision was just issued last week. In that decision, the Court notes that, first, it's not going to apply -- and I think this is very relevant -- Myriad's interpretation of statements. The court there was just noting that -- again, it was a motion to dismiss, and it was not going to rest on their

interpretation or interpretive arguments.

THE COURT:  Which court was this case in?

MS. GILDEN:  Okay.  So this is a case in the District of Utah by Judge Barlow.  It just came out, and the court there focuses on -- you know, focuses on non-actionable -- the difference between non-actionable opinions and actionable statements, and parses out issues about in evaluating falsity and materiality, whether the omission or misstatement would be viewed by a reasonable investor to alter the mix of information, which is exactly what we're saying.  The withheld information, misleading information, half-truths here would have altered the total mix of information available to investors.

So that's a decision.  Again, like defense counsel, I'm not going to go into it in a lot of detail because it just came out, but certainly the parties can address that for Your Honor in a supplemental submission.

And then I think lastly, with respect to solicitation and whether the company has liability under -- if I can switch back to the '33 Act.  Pluralsight was not sort of an innocent bystander in the secondary public offering.  It was at the heart of the solicitation.  It enabled the solicitation because it filed the registration statement.  It worked with the lawyers.  It worked with the underwriters.  And in that context, it would have been a

solicitor, and that can give rise to liability as, you know, as we've discussed.

And for purposes of the underwriters, the underwriters have a duty to do due diligence to ensure themselves that the registration statement and offering materials do not contain misstatements or omissions that are material.  And here, as we have alleged and I think as our complaint does very carefully set out, the secondary offering materials do contain misrepresentations and omissions of facts as to the risk factors concerning then existing facts.

And I think if Your Honor doesn't have any other questions for me, I will stop here.

THE COURT:  All right.  Thank you very much.

And your last comment reminded me that I neglected to ask counsel for the underwriters if they had anything to add following Mr. Watts' presentation.  And so I realize that I'm kind of out of order here but, Mr. Bystryn, I see you've just unmuted yourself, which leads me to believe you may have something to add.  And I suppose what we could do is we'll let you speak.  If Ms. Gilden wants to respond to what you say, we can do that.  Then we'll turn the time over to Mr. Watts for reply.

MR. BYSTRYN:  Thank you, Your Honor.

I just wanted to say that on behalf of the

underwriter defendants, we're joining in the arguments made by Mr. Watts with respect to the Securities Act claims, we have nothing further to add at this point.

THE COURT:  Okay.  Well, that makes it easy.  It makes my oversight in asking for your position earlier I suppose of less consequence.  So thank you for that.

And with that, let me turn the time over to Mr. Watts to reply.

MR. WATTS:  Thank you, Your Honor.  I will be very brief.  I would estimate less than five minutes.  You've been very patient.  It's been a long afternoon.  We greatly appreciate it.

So I want to address only a couple of points plaintiffs made in their argument.  The first is with respect to scienter.  So plaintiffs stated that, you know, their belief was that there were, quote, facts on the ground, her term phrase, within Pluralsight that were showing that they were behind plan and that they were behind plan in a way that would cause the company to miss billings. That's fine as a statement, but there's no support for that statement, none.

For plaintiffs to plead scienter as to Pluralsight, Mr. Skonnard or Mr. Budge, they must plead that there were facts that they knew, Skonnard and Budge, that were contradictory to their statements.  She has nothing

like that in her complaint.  There may have been someone within the sales organization who knew they were behind plan.  There is no statement within this complaint, even the so-called admissions after the class period, which indicate that Budge or Skonnard knew, during the class period, before they said so in the end of the second quarter, that they were behind plan.  The company may have been behind plan, doesn't mean that Skonnard and Budge knew they were.

Also under scienter, plaintiffs mention sales -- stock sales again, and I have addressed that already, Your Honor.  I will make one point, though.

Mr. Skonnard, the CEO, again, retained 95 percent of his substantial holdings in Pluralsight.  He is the single largest individual investor in the company.  So no one lost more money on paper when this stock price declined when the class period ended than Mr. Skonnard, nobody.

Pivoting now to plaintiffs' discussion of falsity, you challenged counsel to identify where in their complaint plaintiffs were alleging that Pluralsight had said they had 250 reps, but actually only had 200.  So counsel pointed you to paragraphs 173 through 175.  I've taken the time to reread those paragraphs.

173, 175, and 174 are the statements themselves. 175 is where plaintiffs identify why those statements -- those prior two paragraphs were false.  Nowhere in paragraph

175 does plaintiff allege that the number was not true, that the number was actually 200, or even any number less than 250.  They don't allege that.  The same is true for the --

THE COURT:  But I suppose there's discrepancy if we look in paragraph 173 where it's discussing the question and answer session with Needham Company and Budge says today we have about 250, speaking of the number of sales reps. And then in paragraph 174, subparagraph (b), it says that he later admitted to investors that they came out of 2018 with about 200 quota-bearing sales reps.  So there is a discrepancy there of 50 sales reps between the statement that was made in January of 2019 and the statement that was later made about 200 sales reps.

MR. WATTS:  I believe, Your Honor, that statement identified in 174-B comes from the January 2020 statement by Mr. Budge.  That statement was made again a year after the -- a year after the -- nearly a year after the close of the class period.  And, again, Mr. Budge is speaking generally about what they had entering into the year.  I don't think he was intending to speak with precision about what was actually on the ground January 1, 2019.  He's speaking, again, in retrospect, many, many, many months and quarters later of that fact.

If you look at paragraph 175, Your Honor, what plaintiffs are really saying is that Pluralsight said they

had 250 sales reps, but they should have also said 250 won't be enough or may not be enough to accomplish our billings goals.  That's really what they're arguing here I think, Your Honor, in paragraph 175.

Again, in paragraph 207, which is that other range counsel gave you -- again, she identified paragraphs 205 through 207, and 207 is the paragraph in which they described why they believed those statements were false. Again, no statement here alleging that the number was lower than what they said, only that they had reason to believe or should have had reason to believe the number was insufficient to meet their needs.

My point, Your Honor, which I've said previously, is that defendants did not know that 250 would not be enough.  And why did they not know?  Because they were already behind plan in the first quarter of 2019 and, nonetheless, it was enough.  They continued to achieve those record billings growth percentages.

Now plaintiffs also pointed you to paragraph 209 in their complaint during her argument.  When you were trying to get her to explain where is the indication there were facts at the time showing insufficient sales infrastructure, she pointed you to paragraph 209.  And I think Your Honor, in one of your questions to her, in response indicates these statements in this paragraph are

merely aspirational. This is Mr. Budge saying that we'd like to continue this rigor with our sales folks in training them up and we'd like to continue this kind of billings growth because that would be a sustainable business, not any statement that they were going to achieve those percentages.

Pivoting now from falsity to my last point, Your Honor, which is on the fact that Pluralsight was not profitable during this time period. Plaintiff mentioned that several times. I will, quite frankly, wear that as a badge of honor. Many high growth companies are not profitable for many years. Those include companies such as Amazon and Tesla. So I don't think that that is any reason to believe that Pluralsight has done anything wrong here.

With that, I thank you for your time, Your Honor.

THE COURT: Thank you very much.

I very much appreciate all of your preparation for the argument today. It has been very helpful to me in sorting through the matters that I need to dive into much deeper than I did in my initial review of your memoranda. And so what I would like to do is take this motion under advisement and take a look at the case law and at the allegations, again, in light of what you have pointed out to me today, and I will issue a written opinion shortly.

Is there anything else that we need to address before we adjourn?

MR. WATTS:  No, Your Honor.  Thank you.

MS. GILDEN:  No, Your Honor.  I think that covers it.

THE COURT:  All right.  Thank you, again, very much.

And I will note that I think both of you have pointed out some additional cases that were recently issued by some of my colleagues on this court.  I don't think there's a need for you to brief those, but I do plan on reviewing them.  I think I can review them and take them for what they're worth.

So, again, thank you very much for your time.

And we're adjourned.

MR. WATTS:  Thank you.

MS. GILDEN:  Thank you, Your Honor.

(Whereupon, the proceeding was concluded.)

C E R T I F I C A T E


        I hereby certify that the foregoing matter

is transcribed from the stenographic notes taken by me and

is a true and accurate transcription of the same.


PATTI WALKER, CSR-RPR-CP     DATED: 4-8-2021
Official Court Reporter
351 South West Temple, #8.431
Salt Lake City, Utah  84101
801-364-5440