# Exhibit H

**COHEN**MILSTEIN

Jan Messerschmidt
(202) 408-3644
jmesserschmidt@cohenmilstein.com

June 14, 2023

Stephanie L. Jensen
Caitlin McKelvie
Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104-7036

      Re:    *Indiana Public Retirement System et al. v. Pluralsight, Inc. et al.,* 1:19-cv-00128 (D. Utah)

Dear Stephanie:

This letter memorializes Plaintiffs' understanding of the June 8, 2023, meet and confer between the Parties regarding Plaintiffs' First Set of Requests for Production ("Requests" or "RFPs").

## I.    Production Deficiencies

### A.  Production Quality Issues

We first asked for an update on certain production quality issues with Defendants' initial second and third production of documents that we raised in email correspondence with you on May 30 and 31, including: (a) image quality and legibility issues with emails, PowerPoint, and other documents that were produced in black-and-white TIFF image format (e.g., PS00001322, 1731); (b) documents produced in TIFF or JPEG format in which the underlying text is cut off or otherwise not visible (e.g., PS00002232); and (c) email chains produced in black-and-white TIFF format in which the context indicates that participants used colored fonts to identify their responses to previous emails (e.g., PS00000120).[1] You stated that Defendants were working on a comprehensive solution to reproduce these and similar documents and prevent these production quality issues from arising in future productions.

In addition to the above issues, since our June 8 meet and confer, we have also identified certain documents in which the text of the document was not extracted completely or properly so that it is searchable as required by ¶ 7.7 of the ESI Protocol. For instance, for many presentation documents originating as PDF or PowerPoint files that have been produced in TIFF or JPEG image format, the underlying text of the documents is only partially extracted (e.g., PS00002021, 2051) or was not properly extracted or OCR'd

---

[1] *See* Email from J. Messerschmidt to C. McKelvie (May 31, 2023).

COHENMILSTEIN

June 14, 2023
Page 2

(e.g., PS0002232, 2308). Please confirm that you will reproduce these and similar documents and that you will identify a solution to ensure documents are produced with complete and searchable text files.

While we will await your proposed solutions, we again note that producing these documents in native format would address these problems universally. If you cannot identify a solution that is economical, efficient, and adequate, we will ask you to produce these documents in native format in accordance with ¶ 9.1 of the ESI Protocol. Please provide the status of your proposed solutions by Friday, June 16.

### B. Google Drive and Other Cloud or Modern Attachments

We also raised Pluralsight's apparent practice of attaching files to communications via hyperlinks to cloud-based or other shared storage (often called "modern attachments"). We first noted in our May 31 email correspondence that emails you produced in TIFF format showed references to underlined hyperlinks to documents, and asked you to provide the underlying hyperlink information, in accordance with ¶ 9.3 of the ESI Protocol.[2] Though we have only received your limited initial production, those documents show that Pluralsight's employees routinely used modern attachments to share relevant documents—indeed, every produced email related to billings forecasts appears to have shared documents through use of modern attachments, sending hyperlinks to the attached file rather than attaching a copy of the document, such as the one excerpted below:[3]

| From: | Eric Teuscher <eric-teuscher@pluralsight.com> |
|---|---|
| To: | Leadership team |
| CC: | Mark Hansen; Dustin Skinner |
| BCC: | aaron-skonnard@pluralsight.com |
| Sent: | 1/11/2019 4:13:11 AM |
| Subject: | Billings Forecast (Week of 1/14) |

Team -

Here is the latest billings forecast, and look forward to talking with everyone on Monday.

During our June 8 meet and confer, you confirmed that Defendants would provide the underlying hyperlink information for any hyperlinks included in produced communications and noted that such hyperlinks typically linked to documents stored in Google Drive—that is, a modern attachment. We then asked you to confirm that, in accordance with paragraph 9.14 of the ESI Protocol, Defendants would preserve the parent-child relationships for all communications and attachments, including modern attachments that were attached via hyperlinks to Google Drive or other cloud-based storage. We also asked you to confirm that, in accordance with paragraph 9.15 of the ESI Protocol, all attachments to communications—regardless of whether the attachments were attached as copies or as hyperlinks to Google Drive or other cloud-based or other shared storage—would be considered members of the same Family Group. While you

---

[2] Email from J. Messerschmidt to C. McKelvie (May 31, 2023) (citing PS00000133, 1334).

[3] PS00000120-28; *see also* PS00001312-1333, 1334-35.

**COHEN**MILSTEIN

June 14, 2023
Page 3

stated that Defendants would collect modern attachments, you represented that Defendants would not attempt to preserve the parent-child relationships of those attachments and would not produce them as members of Family Groups. Instead, you stated that Defendants would separately and independently review modern attachments for responsiveness, producing those that you deemed responsive without any metadata or other information that would link the files with their parent communication. In support of this position, you claimed that modern attachments were "links" and not "attachments," and that you were thus not required to produce them.

We do not agree. For decades, it has been a bedrock principle of discovery that attachments and their parent communications are considered a single document—a principle that has been repeatedly and consistently upheld by courts as essential to the rule of completeness and to ensure that communications and their attachments are both produced with the necessary context. That principle is reflected in the Federal Rules, which require parties to produce ESI "in a form or forms in which it is ordinarily maintained or in *a reasonably usable form or forms*." Fed. R. Civ. P. 34(b)(2)(E)(ii) (emphasis added). Failure to produce communications with their attachments, and with the information necessary to link the two, renders both documents unusable and places an impossible burden on the reviewing party.

That is why the Parties agreed in the ESI Protocol that (a) "[p]arent-child relationships (*the association between an attachment and its parent Document or between embedded Documents and their parent*) will be preserved," (b) "[u]nless otherwise indicated in this Order, emails and their attachments shall be treated as a single Family Group," and (c) "[t]o the extent one or more member of a Family Group is deemed responsive, the entire Family Group will treated as responsive." ESI Protocol ¶¶ 9.14-.15.

Your claim that modern attachments are "links" and not "attachments" flouts this fundamental principle, is contrary to your obligations under the Federal Rules, and is inconsistent with the ordinary meaning of attachment and good faith negotiation of and compliance with the ESI Protocol. From a custodian's perspective, there is no functional difference between attaching a document via a hyperlink to Google Drive (or other cloud-based or shared storage) and attaching a copy of that document. Indeed, Google *itself* explains that the primary method for sending "Google Drive *attachments* in Gmail" is to send the email with a "Drive link,"[4] and that this is the *only* method available for attaching files created using Google's document creation tools or are files which exceed 25 megabytes in size.[5]

Further, the experience of any user of Gmail and Google Drive shows that the ordinary meaning of attachment encompasses both traditional attachments of copies of documents and modern attachments of hyperlinks to cloud-based storage. For instance, if a Gmail user attaches a document to an email by sharing a hyperlink to Google Drive, the recipient will receive an email that automatically presents the hyperlinked file as an "attachment" in the exact same way it would present a traditional attachment of a copy of a document:

---

[4] Google, *Send Google Drive attachments in Gmail - Computer - Gmail Help*, https://support.google.com/mail/answer/2487407

[5] *Id.*

**COHEN**MILSTEIN

June 14, 2023
Page 4

**<u>Gmail Attaching File as a Copy</u>**  **<u>Gmail Attaching File via Link to Google Drive</u>**

 

Other prominent email providers likewise treat modern and traditional attachments as identical. For instance, Microsoft explains that to "attach a file to an email message" in Microsoft Outlook, the user can either "[s]end a link" or "send a copy,"[6] and refers to "links to documents that are typically stored in Sharepoint site and OneDrive" as "cloud attachments."[7] Thus, the common and ordinary understanding of modern attachments shows that they fall squarely within the plain meaning of the ESI Protocol. *See* ESI Protocol ¶¶ 9.14-.15; *see also id.* ¶ 7.7 & Attachment A.

Nor did you ever suggest otherwise. At no point during the Parties' negotiations of the ESI Protocol did Defendants ever suggest that they had a different and narrower understanding of the term "attachment," let alone propose specific language that excluded modern attachments from the scope of paragraphs 9.14 and 9.15. If Defendants privately believed that modern attachments should be excluded from the scope of those provisions, it was incumbent on them to communicate that position to Plaintiffs. Had you communicated that position, Plaintiffs would not have agreed and would have refused to accept an ESI Protocol that excluded modern attachments from the scope of paragraphs 9.14 and 9.15. Because Defendants never disclosed their position, they cannot now try to rewrite the meaning of the ESI Protocol.[8]

---

[6] Microsoft, *Attach files or insert pictures in Outlook email messages - Microsoft Support, available at* https://support.microsoft.com/en-us/office/attach-files-or-insert-pictures-in-outlook-email-messages-bdfafef5-792a-42b1-9a7b-84512d7de7fc

[7] Microsoft, *Collect cloud attachments in Microsoft Purview eDiscovery (Premium),* Feb. 20, 2023, *available at* https://learn.microsoft.com/en-us/microsoft-365/compliance/ediscovery-cloud-attachments?view=o365-worldwide.

[8] For this reason, this case is unlike the one federal district decision that adopted a distinction between modern and traditional attachments, *Nichols v. Noom Inc.*, 2021 WL 948646, at *1 (S.D.N.Y. Mar. 11, 2021), a decision that has been widely criticized by experts on evidentiary, logical and technological grounds. In that case, the parties agreed to an ESI Protocol *after* the court had previously ruled on a dispute between the parties as to their obligations with respect to modern attachments. But here, unlike in *Noom,* neither Plaintiffs nor the Court had any reason to even suspect that Defendants had a different and narrower understanding of the term "attachment" before the ESI Protocol had been agreed to and approved by the Court.

**COHEN**MILSTEIN

June 14, 2023
Page 5

Nor would complying with the ESI Protocol as written be especially burdensome.[9] To be sure, preserving the parent-child relationships of modern attachments may require a different process, but that burden is Defendants' responsibility, not Plaintiffs. Further, there are cost-effective and commercially available tools that can be used to collect and produce modern attachments consistent with the ESI Protocol, and which are routinely used by prominent law firms in the Am Law 100, Big 4 accounting firms, and established litigation support and forensic services companies.[10]

For these reasons, we expect that you will comply with the ESI Protocol's plain terms and ask you to confirm the following:

1. Defendants are using or will use methods to collect and preserve the parent-child relationships of all communications and their attachments, including both traditional attachments and modern attachments, such as files attached via hyperlinks to Google Drive or other cloud-based storage;

2. Defendants will treat communications and their attachments, including both traditional attachments and modern attachments, as members of the same Family Group and if one or more members of a Family Group is considered responsive, the entire Family Group will be treated as responsive;

3. If Defendants determine that any modern attachments were deleted or are otherwise no longer available, Defendants will provide Plaintiffs with "information as to when the documents were deleted" or "otherwise became unavailable" and "the steps it took to determine this information";[11] and

4. Defendants will promptly collect and produce all nonprivileged traditional and modern attachments to communications that have already been produced, including communications bearing Bates numbers PS00000120, 1312, and 1334, as well as any other traditional and modern

---

[9] To be clear, it was Defendants' responsibility to raise any burden concerns during the negotiation of the ESI Protocol. But at any rate, any burden that Defendants would face is far outweighed by the potential burden on Plaintiffs, who would face the impossible task of linking modern attachments with their parent communications. *See IQVIA, INC. v. Veeva Sys., Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) ("While, as Veeva argues, the linked documents are not stored with emails in the ordinary course of business, IQVIA has no way to link the documents, only Veeva is capable of linking the emails to the Google Drive documents. The Special Master is not convinced that relinking these 2,200 documents is unduly burdensome in light of the issues at stake in this matter, the resources of the parties, and the amount in controversy.").

[10] For instance, Metaspike's Forensic Email Collector ("FEC")—which "automatically detects and acquires Google Drive attachments and revisions of emails during Gmail and Google Workspace acquisitions" to "maintain parent/child relationships" between modern attachments and their "parent emails"—is used by Paul Weiss, Clifford Chance, Winston & Strawn, Deloitte, PricewaterhouseCoopers, and FTI Consulting. *See* Metaspike, *Forensic Email Collector,* https://www.metaspike.com/forensic-email-collector/.

[11] *IQVIA, INC. v. Veeva Sys., Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) (ordering parties to link modern attachments to their parent communications and disclose information about any modern attachments determined to have been deleted or that otherwise had become unavailable).

**COHEN**MILSTEIN

June 14, 2023
Page 6

> attachments to lesser included or earlier-in-time communications in the same thread or conversation of any other produced communication.

We view your compliance with all the above as essential and required by both the Federal Rules and the ESI Protocol. But we are also happy to meet and confer on a mutually acceptable solution, including alternative but comparable proposals. Please let us know by June 16 whether you agree with the above or if you would like to discuss further.

## II.  Unresolved Disputes

We discussed two disputes about the Requests—the relevant time period and the specific requests for audit-related documents—that the Parties have been unable to resolve. We agreed that the Parties have reached an impasse on these issues and that Plaintiffs would seek a court order to resolve the disputes. Plaintiffs' understanding is that Defendants agree that the Parties have satisfied the all the conferral requirements under Federal Rule 37(a)(1) and DUCivR 37-1(a). We summarize these two disputes below.

### A.  Time Period

Plaintiffs' Requests seek documents created or used during the period from August 1, 2018, to January 31, 2020 ("Relevant Time Period"). Defendants have objected to that period, arguing that it should be 5 months shorter, starting on October 1, 2018 and ending on September 30, 2019. Defs. Apr. 4 Ltr. at 1-2. Plaintiffs have responded that the Relevant Time Period is firmly grounded in specific factual allegations in the Second Amended Complaint and well within the time periods typically found by courts to be both appropriate and reasonable. Pls. Apr. 15 Ltr. at 2; Pls. May 3 Ltr at 2 (informing Defendants that Plaintiffs intended to move to compel if Defendants would not agree).

Defendants confirmed during our June 8 meet and confer that their position had not changed and Plaintiffs responded by confirming they would seek a court order to resolve the dispute. Plaintiffs do not believe that Defendants' position on the Relevant Time Period is substantially justified and reserve their right to seek an order requiring Defendants to pay Plaintiffs' costs incurred in bringing a motion to compel.

### B.  Audit-Related Documents

In their responses to the Requests, Defendants objected to Request Nos. 17 and 18—which seeks documents relating to audits and reviews by Pluralsight's outside auditors of Pluralsight's accounting for, disclosure of, or internal control over financial reporting of revenue, billings, and other key business metrics—refusing to produce any responsive documents. Defs. R&Os at 20-21. Plaintiffs have sought to address many of Defendants' objections and concerns about these two request, including by offering to narrow their scope to specific metrics and measures disclosed in Pluralsight's annual reports for the 2018 fiscal year. Pls. Apr. 15 Ltr. at 5. Defendants have continued to object, however, refusing to produce documents responsive to this request unless such documents are also responsive to another request agreed to by the Parties, emphasizing that they would not agree to include search terms that referred to Pluralsight's outside auditors, PricewaterhouseCoopers and Ernst & Young. Pls. May 3 Ltr. at 2-3.

COHENMILSTEIN

June 14, 2023
Page 7

During our June 8 meet and confer, you confirmed that Defendants' position had not changed, and Plaintiffs then represented they would seek a court order to resolve the dispute. We note that Ernst & Young has since produced its first set of documents responsive to Plaintiffs' nonparty document subpoena, which we have reproduced to Defendants, and which show that its audits and reviews are relevant. For this reason, Plaintiffs do not believe that Defendants' refusal to produce documents responsive to these requests is substantially justified and Plaintiffs thus reserve their right to seek an order requiring Defendants to pay Plaintiffs' costs incurred in bringing a motion to compel.

### III. Specific Requests

The following section memorializes Plaintiffs' understanding of the Parties' agreements as to each of the Requests in Plaintiffs' first RFPs, including those discussed during our June 8 meet and confer. Please confirm your agreement or disagreement with any of the below no later than Friday, June 16.

#### A. Request No. 1 (Organizational Charts)

The Parties have agreed to limit the scope of this Request to Pluralsight's corporate structure chart and organizational charts for the seven persons identified in your initial disclosures, and with that limitation and subject to the Court's ruling on the Relevant Time Period, Defendants would produce documents responsive to the request in full as written. Pls. Apr. 15 Ltr. 3.

#### B. Request No. 2 (Responsibilities of Certain Employees)

The parties have agreed to limit the scope of this Request to the seven persons identified by Defendants in their initial disclosures and that, with that limitation and subject the Court's ruling on the Relevant Time Period, Defendants would produce documents responsive to the request in full as written. Pls. Apr. 15 Ltr. 3.

#### C. Request No. 3 (Employment Agreements)

We agreed to limit this Request to the employment agreements, including drafts, for Budge, Skonnard, and DiBartolomeo that were drafted, prepared, or in effect during the Relevant Time Period. Pls. Apr. 15 Ltr. 3. During our April 27 meet and confer, you agreed to produce final employment agreements for Budge, Skonnard, and DiBartolomeo stated that you would continue to consider whether you would agree to produce drafts. Pls. May 3 Ltr. 2. Please confirm by June 16whether you agree to produce all drafts of employment agreements for Budge, Skonnard, and DiBartolomeo that were drafted or prepared during the Relevant Time Period.

#### D. Request Nos. 4 (Resumes for Certain Employees)

Defendants undertook to consider whether they would agree to produce documents responsive to this Request. Please confirm your agreement by June 16.

#### E. Requests 5, 6, 9, 15, 16, 19-22, 27, 29, 32-33, 37-38

**COHEN**MILSTEIN

June 14, 2023
Page 8

The Parties have agreed that Defendants' responses to these requests amounted to an agreement to produce documents responsive to the Requests in full as written, subject to an agreement on search terms and custodians and a Court ruling on time period. Pls. Apr. 15 Ltr. 3. During our April 27 meet and confer, you did not seek to revisit these requests, which we memorialized in our correspondence a week later. Pls. May 3 Ltr. at 3.

During our June 8 call, however, you stated that you wanted to clarify your agreement as to the scope of some of these requests and were preparing a letter to that effect. You stated that you did not intend to revisit any objections that you had asserted to these requests, but only wanted to clarify certain statements about what you agreed to produce. While we will consider your clarifications, given that it has been nearly two months since we first confirmed the Parties' agreement as to these requests, we will not agree to reopen negotiations that would materially limit or alter the scope of these Requests. Please provide any clarifications no later than June 16.

### F.  Request No. 7 (Sales Headcount Metrics)

The Parties agreed to limit this request to documents sufficient to identify the total headcount of sales representatives, quota-bearing sales representatives, enterprise sales representatives, and tenured sales representatives for each day it was calculated during the Relevant Time Period, subject to an agreement on search terms or other proportional search and retrieval methods. Pls. May 3 Ltr. at 2.

### G.  Request No. 8 (Sales Reporting Policies)

Defendants agreed to produce written policies, procedures, or guidelines concerning the recording, reporting, tracking, categorizing, or accounting for sales and billings to the extent such policies exist. Pls. May 3 Ltr. at 2. For the avoidance of doubt, we understand that Defendants agree to produce all communications with or violations of such policies, procedures, or guidelines, subject to an agreement on search terms and custodians and a Court ruling on time period. Please confirm your agreement by June 16.

### H.  Request No. 10 (Applications and Database Access and Logs)

Plaintiffs agreed to defer negotiations on the scope of this request until Defendants disclosed information about data sources likely to contain responsive documents.

### I.  Request Nos. 11 and 12 (Custodian Accounts and Assistants)

The Parties agreed to limit Request No. 11 to the electronic devices, accounts, and addresses for each of the Individual Defendants and current or former employees identified in Defendants' initial disclosures to the extent such devices and accounts were used to conduct Pluralsight business or are otherwise likely to contain potentially relevant information. Pls. May 3 Ltr. at 2. The Parties also agreed to limit Request No. 12 to documents sufficient to identify the executive assistants or chiefs of staff for any of the seven individuals mentioned in the Initial Disclosures to the extent such individuals had executive assistants or chiefs of staff. *Id.* Defendants otherwise agreed to produce documents responsive to these requests in full as written.

**COHEN**MILSTEIN

June 14, 2023
Page 9

Given that your disclosure of priority document custodians differs from your initial disclosures, we are willing to amend the scope of this agreement to encompass the current or former employees identified in your disclosures of priority document custodians. Please confirm your agreement by June 16.

### J.  Request No. 13 (Calendars, Appointments, and Phone Records)

Defendants agreed to produce calendars, appointment books, telephone logs, or other business, personal, or mobile phone records for each Individual Defendant and each current or former Pluralsight employee identified in Defendants' initial disclosures, subject to an agreement custodians and search terms or other proportional search and retrieval methods and a Court ruling on time period. We are also willing to amend the scope of this agreement to encompass the current or former employees identified in your disclosures of priority document custodians. Please confirm your agreement by June 16.

### K.  Request No. 14 (Accounting Principles)

The Parties agreed that Defendants will produce documents responsive to the Requests in full as written, subject to an agreement on search terms and custodians and a Court ruling on time period.

### L.  Request Nos. 17-18 (Audit-Related Documents)

As noted above, the Parties have reached an impasse on these Requests and Plaintiffs intend to seek a court order to resolve the dispute.

### M.  Request Nos. 23-25 (SPO-Related Documents)

Defendants agreed during the April 3 meet and confer to consider whether they would agree to produce documents responsive to these requests. Defs. Apr. 4 Ltr. at 2. In our April 15 letter, we asked you to confirm your agreement by April 21. Pls. Apr. 15 Ltr. at 3. Please confirm your agreement to produce documents responsive to these Requests in full as written, subject to an agreement on search terms and custodians and a Court ruling on time period.

### N.  Request No. 26 (SEC & NASDAQ Communications)

You stated that you had been unable to confirm whether SEC or NASDAQ contacted Pluralsight during the Relevant Time Period but would do so as soon as possible. Please provide this information by June 16.

### O.  Request No. 28 (Pluralsight Securities)

The Parties agreed to defer further consideration of this Request to a future discussion about search terms and custodians. Pls. May 3 Ltr. at 3.

### P.  Request Nos. 30 (10b5-1 Trading Plans)

COHENMILSTEIN

June 14, 2023
Page 10

The Parties have agreed that Defendants will produce documents responsive to this Request in full as written subject to an agreement on search terms and custodians and a Court ruling on time period. Pls. May 3 Ltr. at 3.

### Q. Request No. 31 (Individual Defendants' Securities Transactions)

The Parties have agreed to limit this Request to documents sufficient to show the Individual Defendants' holdings and transactions of Pluralsight securities, subject to an agreement on search terms and custodians and a Court ruling on time period.

### R. Request No. 34 (DiBartolomeo Termination)

The Parties have agreed that Defendants will produce documents responsive to this Request in full as written subject to an agreement on search terms **and** custodians and **a** Court ruling **on** time period. Pls. May 3 Ltr. at 3.

### S. Request No. 35 (Documents Produced in Civil, Criminal, or Regulatory Proceedings)

The Parties have agreed to keep discussing this Request after Defendants confirm whether the SEC or NASDAQ communicated with or investigated Pluralsight between August 1, 2018 and January 30, 2020. Pls. Apr. 15 Ltr. 6.

### T. Request No. 36 (Insurance Policies)

Plaintiffs understand that Defendants have produced all documents responsive to this request in full as written. Pls. Apr. 15 Ltr at 6.

### U. Request No. 39 (Preservation Notices and Recipients)

Plaintiffs have agreed to defer this Request, but reserve their right to insist on its production at a later date. Pls. Apr. 15 Ltr. at 6.

### V. Request No. 40 (Documents Defendants Intend to Use to Support Claims or Defenses)

The Parties have agreed that Defendants will produce documents responsive to this request in full as written.

## IV. Custodians, Data Sources, and Search Terms

### A. Custodians

Defendants proposed to limit the custodians used to collect potentially responsive documents to the eight persons identified in their disclosure of priority document custodians. Defendants stated that, for different reasons, they did not include two individuals, Archana Daniels and Mark McReynolds, both of whom Defendants had identified in their initial disclosures as likely to possess discoverable information that

**COHEN**MILSTEIN

June 14, 2023
Page 11

Defendants may use to support their defenses. As for Daniels, Defendants represented that after further review, they have determined that she is unlikely to possess relevant information. As for McReynolds, Defendants acknowledged that he is likely to possess relevant information, but proposed excluding him as a custodian because they believed any responsive documents in McReynolds' possession would be duplicative of documents in Budge's or Skonnard's possession.

Plaintiffs are continuing their review and preparation of a proposed list of custodians, which Plaintiffs will endeavor to provide to Defendants in the next week.

### B. Non-Custodial, Third Party, and Inaccessible Data Sources

Plaintiffs asked if Defendants were prepared to disclose the non-custodial, third-party, and inaccessible data sources likely to contain information that is potentially responsive to a discovery request in accordance with ¶ 5.2 of the ESI Protocol. Defendants stated that they had not yet completed their review, but would endeavor to disclose this information by this week, adding that they would disclose these data sources for each document request. Please let us know if you will be unable to make these disclosures by June 16.

### C. Search Terms

The Parties agreed that Defendants would prepare an initial proposed list of search terms after they completed their disclosures of non-custodial, third party, and inaccessible data sources and after Plaintiffs had provided their initial counterproposal for custodians.

Sincerely,

*/s/ Jan Messerschmidt*
Jan Messerschmidt

Cc: Counsel to all parties