# Exhibit 2

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Utah

| | | |
|---|---|---|
| Indiana Public Retirement System, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  1:19-cv-00128 |
| Pluralsight, Inc., et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                Scott Dorsey, 6500 Amber Crest Street, Indianapolis, IN 46220

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A.

| Place: Clyde, Snow & Sessions, P.C.<br>201 South Main Street, Suite 1300<br>Salt Lake City, UT 84111 | Date and Time:<br><br>09/25/2023 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Jan E. Messerschmidt |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Lead Plaintiffs
_____ , who issues or requests this subpoena, are:

Jan E. Messerschmidt, 1101 New York Avenue NW, Washington, DC 20005, 202-408-3644

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

100

Exhibit 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:19-cv-00128

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

101
Exhibit 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Exhibit 2

## ATTACHMENT A

### DEFINITIONS

1.   The term "Action" means the action captioned *Indiana Public Retirement System et al. v. Pluralsight, Inc. et al.,* 1:19-cv-00128 (D. Utah), currently pending in the U.S. District Court for the District of Utah.

2.   "Board Materials" means all minutes of and documents provided at, considered at, discussed at, or prepared or disseminated, in draft or final form, in connection with, in anticipation of, or as a result of any meeting, whether formal or informal, of the members of the Board or any regular or specifically created committee thereof, including without limitation, all presentations, Board packages, recordings, agendas, preparation materials, summaries, memoranda, charts, transcripts, notes, minutes of meetings, drafts of minutes of meetings, exhibits distributed at meetings, summaries of meetings, and resolutions. This request includes Board materials hosted on electronic portals or platforms, including without limitation, any edits, notes, comments, or communications, hosted on such portal or platform.

3.   The term "Complaint" means the Second Amended Complaint filed in the Action on November 4, 2022 (ECF No. 173) and attached as Exhibit A.

4.   The term "Communication" includes any transmittal or receipt of information, whether by chance or prearranged, formal or informal, oral, written or electronic, and includes without limitation: conversations, meetings and discussions in person; conversations, meetings and discussions by telephone; and written correspondence through the use of the mails, courier services, electronic media (such as email and instant messages), and telephone lines and wires.

5.   The terms "concerning," "involving," and "relating to" mean describing, constituting, containing, discussing, embodying, evidencing, reflecting, identifying, stating, referring to, dealing with, bearing upon, or pertinent to.

2

6. The term "Defendants" means the Defendants in the Action, Pluralsight, Inc. (defined below), Aaron Skonnard, and James Budge.

7. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

8. The terms "Draft Registration Statement" or "DRS" mean the draft registration statement confidentially submitted by Pluralsight to the SEC on September 21, 2018.

9. The term "Electronically stored information" or "ESI" has the same meaning and is equal in scope to the usage of the term in the Sedona Conference Definitions (defined below), and includes, without limitation, the following:

   a. All items covered by Federal Rule of Civil Procedure 34(a)(1)(A);

   b. Information or data that is generated, received, processed, and recorded by computers or other electronic devices, including Metadata;

   c. Internal or external websites;

   d. Output resulting from the use of any software program, including but not limited to, any word-processing Documents, spreadsheets, database files, charts, graphs, outlines, electronic mail, instant messaging programs (including, but not limited to, Slack, Microsoft Teams, or other similar programs), bulletin-boards programs, operating systems, source codes, PDF files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, deleted file, or file fragment, and any other items stored on electronic media.

10. █████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

2

Exhibit 2

11. The term "key performance indicators" or "KPIs" mean any operating or other metrics, including GAAP and non-GAAP financial measures as well as nonfinancial reporting information, used by Pluralsight to evaluate, monitor, track, calculate, or disclose management or operational performance. Examples of KPIs include, but are not limited to, billings, billings growth, billings per customer, gross or net billings retention, revenue, deferred revenue, net revenue retention ("NRR"), annual recurring revenue ("ARR"), annual recurring revenue per sales and marketing spend ("ARR/S&M"), days sales outstanding ("DSO"), gross margin, non-GAAP gross margin, operating cash flow margin, free cash flow ("FCF"), number of customers, customer retention, customer growth, actual or total contract value, number of users, number subscriptions or subscription renewals, total employee count, sales or sales representative headcount, quota-bearing or quota-carrying sales headcount, billings per average quota-bearing representative, customer lifetime value ("LTV"), customer acquisition cost ("CAC").

12. The term "Metadata" has the same meaning and is equal in scope to the usage of the term in the Sedona Conference Definitions and means data that describes the characteristics, history, tracking, or management of ESI, including, but not limited to, all information concerning the dates and times the Documents were created, modified, or distributed, the format of the Documents, the owner or custodian of the Documents, the authors and recipients (including "bcc" recipients of the Documents), and the substance of changes to the Documents.

13. The term "Pluralsight" means Pluralsight, Inc. and all its agents, representatives, divisions, groups, parents, subsidiaries, subdivisions, predecessors, successors, and affiliated entities, and the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities.

14. The term "PwC" means PricewaterhouseCoopers LLP and all its agents, representatives, divisions, groups, parents, subsidiaries, subdivisions, predecessors, successors, and affiliated entities, and

2

the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities.

15. The term "Roadshow" means a "bona fide electronic road show" as defined in Rule 433(h)(5) under the Securities Act that has been made available to any person.

16. The term "SEC" means the U.S. Securities & Exchange Commission, including its regional and branch offices and its commissioners, associate and assistant directors, attorneys, accountants, staff, experts, employees or other persons acting or purporting to act on behalf of the foregoing.

17. The term "Sedona Conference Definitions" means The Sedona Conference Glossary: eDiscovery and Digital Information Management, Fifth Edition.

18. The terms "Secondary Public Offering" or "SPO" mean Pluralsight's public offering of shares of its Class A common stock and concurrent offering of convertible senior notes.

19. The term "Selling Stockholders" mean the stockholders who sold shares of Class A common stock in the SPO.

20. The term "SPO Lead Book-Running Managers" means J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, both individually and collectively, and all their respective divisions, groups, parents, subsidiaries, subdivisions, predecessors, successors, and affiliated entities, and the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities.

21. The term "SPO Book-Running Managers" means Barclays Capital Inc., Citigroup Global Markets Inc., and Bank of America Merrill Lynch, both individually and collectively, and all their respective divisions, groups, parents, subsidiaries, subdivisions, predecessors, successors, and affiliated entities, and the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities.

106

Exhibit 2

22. The term "SPO Co-Managers" means First Analysis Securities Corporation, KeyBanc Capital Markets Inc., Needham & Company LLC, Raymond James & Associates, Inc., SunTrust Robinson Humphrey, Inc., Robert W. Baird & Co. Incorporated, both individually and collectively, and all their respective divisions, groups, parents, subsidiaries, subdivisions, predecessors, successors, and affiliated entities, and the present and former officers, directors, employees, partners, principals, representatives, and agents of any of the foregoing entities.

23. The term "SPO Documents" means the documents filed by Pluralsight in connection with the SPO, including the Form S-1 Registration Statement and Preliminary Prospectus filed on March 4, 2019, and the Free Writing Prospectus and Prospectus filed on March 7, 2019, and any exhibits to the foregoing.

24. The term "SPO Underwriters" means the SPO Lead Book-Running Managers, SPO Book-Running Managers, and SPO Co-Managers, both individually and collectively.

25. The term "Testing-the-Waters Communication" means any oral or written communication with potential investors undertaken in reliance on Section 5(d) of the Securities Act.

26. The term "10b5-1 Plan" refers to any stock sales plan established pursuant to Exchange Act Rule 10b5-1, 17 C.F.R. § 240.10b5-1.

27. The term "You" and "Your" refers to the recipient of this subpoena and all their agents and representatives.

## INSTRUCTIONS

1. All requests must be construed under the applicable Federal Rules of Civil Procedure and Local Rules of this Court.

2. In producing Documents and other materials, furnish all Documents (including ESI) or things in Your possession, custody or control.

3.  Documents must be produced in native format, with all accompanying Metadata, as they are kept in the usual course of business so that Plaintiff can ascertain the files in which they were located, their relative order in the files, and how the files were maintained, and shall not be shuffled or otherwise rearranged. Documents that in their original condition were stapled, clipped, or otherwise fastened must be produced in that form.

4.  Unless otherwise agreed upon, Documents responsive to these requests, including ESI, must be produced via an online SFTP or similar secure online file transfer system.

5.  Documents shall be produced in such a fashion as to identify the department, branch, or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each Document's custodian(s). ESI shall be preserved in such a fashion as to identify the file path, the source or custodian, and all relevant Metadata. Electronic Media such as backup tapes shall be preserved to the extent that such media is the only source of ESI that is responsive to these requests.

6.  A copy of a Document that varies in any way whatsoever from the original or from any other copy of the Document – whether by reason of Metadata that differs in any respect, or by reason of any handwritten or other notation or any omission – constitutes a separate Document and must be produced, whether or not the original of the Document is within Your possession, custody, or control. Accordingly, all prior versions and all drafts of all Documents must be produced.

7.  If any otherwise responsive Document was, but is no longer in existence or in Your possession, custody, or control, state, in writing, whether the Document: (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred or delivered, voluntarily or involuntarily, to another

8.  Reference to a person shall also include that person's trusts, affiliates, employees, agents, partners, and independent contractors, as well as aliases, code names, trade names, or business names used by, or formerly used by, any of the foregoing.

2

108

Exhibit 2

9. Reference to an entity shall also include that entity's parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, partners, and independent contractors, as well as aliases, code names, trade names, or business names used by, or formerly used by, any of the foregoing.

10. The disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); and each of the functional words "each," "every," "any" and "all" shall be deemed to include each of the other functional words.

11. The use of the singular form of any word includes the plural and vice versa.

12. If you withhold any document based on a claim of privilege, including work product protection, or for any other reason, provide a log that includes all necessary information to evaluate a claim of privilege, including: (i) the specific privilege asserted or other particular reason relied upon for not producing the Document or information; (ii) the date of the Document and any different date when it was prepared; (iii) the author, addressee(s) and copyee(s) of each Document; (iv) the subject matter of the Document or information withheld; (v) the medium (e.g., paper or electronic); (vi) the type (e.g., letter, memorandum, presentation); (vii) any other information as is sufficient to identify the Document for a subpoena duces tecum, including the author of the Document, the addressees of the Document, any other recipients shown in the Document, and the relationship of the author, addressees, and recipient to each other; and (viii) every fact or basis upon which You claim any privilege.

13. Notwithstanding the assertion of any objection to production, any Document as to which an objection is raised containing non-objectionable matter that is responsive to these requests must be produced, but that portion of the Document for which the objection is asserted may be withheld or redacted provided that the Document is marked with the legend "Redacted" so as to reflect all portions that have been redacted, and provided that the requested information in the instruction above is furnished.

14. Unless otherwise specified or agreed to, all documents should be produced in native format with an accompanying load file in .DAT format that includes the metadata fields listed in Attachment B.

**RELEVANT TIME PERIOD**

Unless otherwise stated, these Requests seek copies of all responsive documents that were created or used during the time period from August 1, 2018, to January 31, 2020, inclusive (the "Relevant Period"), and include all documents and information concerning the Relevant Period, even though prepared, created, used, or published outside the Relevant Period. If a document prepared before or after this period is necessary for a correct or complete understanding of any document covered by a Request, You must produce the earlier or subsequent document as well. If any document is undated and the date of its preparation cannot be determined, the document must be produced if otherwise responsive to these Requests.

**DOCUMENTS REQUESTED**

1. All Documents concerning Pluralsight's revenue, billings, sales, sales headcount, capacity, or productivity, or any other KPIs.

2. All Documents concerning Board Materials for any formal or informal Board or committee meeting during the Relevant Period.

3. All Documents relating to the preparation, drafting, or submission of filings by Pluralsight with the SEC.

4. All Documents relating to the July 31, 2019, decision by Pluralsight's audit committee to dismiss PwC as Pluralsight's independent registered public accounting firm.

5. All Documents relating to the SPO, including all Documents relating to Communications with the SPO Underwriters.

6. All Documents relating to Pluralsight's processes, policies, and practices for insider trading, including the establishment, implementation, modification, and termination of 10b5-1 Plans.

2

110

Exhibit 2

7.   All Documents relating to Your establishment, implementation, modifications, or termination of any 10b5-1 Plan that was drafted, formed, modified, terminated, or in effect during the Relevant Period, including all drafts, final, or modified versions of any such 10b5-1 Plans.

8.   All Documents relating to Your exchange or redemption of LLC Units or shares of Class B or Class C common stock for cash or shares of Class A common stock.

9.   Without regard to time period, all Documents related to



## DOCUMENT PRESERVATION REQUEST

Please preserve until further notice all documents in your possession, custody, or control that are responsive to the following request:

1.   All Documents related to Defendants from August 1, 2018, to January 31, 2020.

2

Exhibit 2

**ATTACHMENT B**

The metadata of electronic documents should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
| --- | --- | --- |
| BEGBATES | EDC0000001 | First Bates number of native file document/email |
| ENDBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email **This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments **The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided Native: Name of the individual or department from whose files the document originated |
| DATE_HC | 10/12/2020 | The date a hard copy document was produced. |
| FROM | John Smith | Email: Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) |

2

112
Exhibit 2

|  |  | **semi-colon should be used to separate multiple entries |
|---|---|---|
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
| LINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the<br>FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document<br>as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or<br>native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be |

2

113

Exhibit 2

| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
|---|---|---|
| TIME_AC-CESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |
| HEADER | Return-Path: <example_from@dc.edu><br>X-SpamCatcher-Score:1[X]<br>Received:from[136.167.40.119] (HELO dc.edu)<br>by fe3.dc.edu (CommuniGate Pro SMTP4.1.8)<br>with ESMTP-TLS id 61258719 for example_to@mail.dc.edu;<br>Mon, 23 Aug 2004 11:40:10 -0400<br>Message-ID:<br><4129F3CA.2020509@dc.edu><br>Date: Mon, 23 Aug 2005 11:40:36 -400<br>From: Taylor Evans <example_from@dc.edu><br>User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1)<br>Gecko/20020823 Netscape/7.0<br>X-Accept-Language:en-us,en<br>MIME-Version:1.0<br>To: Jon Smith <example_to@mail.dc.edu><br>Subject:Business Development Meeting<br>Content-Type: text/plain;charset=us-ascii; format=flowed<br>Content-Transfer-Encoding:7bit | Email: The email header information<br>Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c<br>2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

2

Case 1:19-cv-00128-TS    Document 246-3    Filed 10/12/23    PageID.4618    Page 17
of 92

# Exhibit A

115
Exhibit 2

Keith M. Woodwell (#7353)
**CLYDE, SNOW & SESSIONS, P.C.**
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 322-2516
Facsimile: (801) 521-6280
kmw@clydesnow.com

Carol V. Gilden (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice*)
William Wilder (admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
wwilder@cohenmilstein.com

*Additional Counsel on Signature Page*

*Attorneys for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago and the Proposed Class*

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM and PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, individually and on behalf of all others similarly situated, | SECOND AMENDED COMPLAINT DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | Case No. 1:19-cv-00128 District Judge David Barlow Magistrate Judge Daphne A. Oberg |
| PLURALSIGHT, INC.; AARON SKONNARD; and JAMES BUDGE, | |
| Defendants. | |

116

Exhibit 2

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE .........................................................................10

III.  PARTIES ............................................................................................................10
    A.  Lead Plaintiffs...........................................................................................10
    B.  Exchange Act Defendants .........................................................................11
        1.  Corporate Defendant Pluralsight............................................................11
        2.  The Officer Defendants .........................................................................12

IV.  EXCHANGE ACT ALLEGATIONS ..................................................................16
    A.  Factual Allegations ...................................................................................16
        1.  From Its Inception as a Public Company, Pluralsight Was Unable to Report Profitability, So Instead It Repeatedly Touted Dramatic "Billings Growth"..........................................................................16
        2.  Pluralsight Repeatedly Told Investors Its Sales Force Was The Lynchpin Of Its Dramatic Billings Growth, Sparking Intense Investor Interest in its Sales Force ............................................................18
        3.  During the Class Period, Defendants Made A Misleading Positive Statement Regarding Pluralsight's Sales Force and Omitted That Sales Representative Capacity Was Woefully Insufficient to Sustain Billings Growth ........................................................................24
        4.  On July 31, 2019, Defendants Admitted the Shocking Truth That Deficiencies Had Existed in the Sales Force Since the Beginning of 2019 and Caused a Dramatic Decline in Billings Growth.........................33
        5.  The Market Was Blindsided by the Disclosure of an Insufficient Sales Force and the Admission that this Fact Was Known but Not Disclosed During the Class Period............................................................38
    B.  Scienter Allegations ..................................................................................41
        1.  Defendants' Scienter is Reflected in the Officer Defendants' Admissions That Since January 2019, They Knew Pluralsight Had Too Few Ramped Sales Representatives.................................................41
        2.  Defendants' Scienter is Further Demonstrated By Highly Suspicious Insider Trading during the Class Period.................................................43
        3.  Defendants' Scienter Is Further Demonstrated By The Officer Defendants' Admissions That They Focused on the Precise Issues That They Did Not Disclose .................................................................52

i

4.      Defendants' Scienter Is Evidenced By the Officer Defendants' Knowledge that the Status of Pluralsight's Sales Capacity Was Vital to its Investors and its Stock Price.............................................................54

5.      Defendants' Scienter is Demonstrated By Their Prior Admissions That the Capacity of the Sales Force to Generate Billings Was at the Core of Pluralsight's Business Model ......................................................55

C.      Defendants' Materially False and Misleading Statement and Omissions of Material Facts ...........................................................................................56

1.      January 16, 2019 Pluralsight at Needham Growth Conference ...............56

D.      Loss Causation.........................................................................................59

E.      Presumption of Reliance ..........................................................................61

F.      Inapplicability of The Statutory Safe Harbor ...........................................62

COUNT I...............................................................................................................................63

COUNT II..............................................................................................................................65

COUNT III ............................................................................................................................65

V.      CLASS ACTION ALLEGATIONS............................................................................67

VI.     PRAYER FOR RELIEF ..............................................................................................69

VII.    JURY DEMAND .........................................................................................................70

ii

118

Exhibit 2

Court-appointed Lead Plaintiffs the Indiana Public Retirement System ("INPRS") and the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, *inter alia*, the investigation of counsel, which includes review and analysis of (i) regulatory filings made by Pluralsight, Inc. ("Pluralsight" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by, disseminated by, or concerning the Company; (iii) securities analyst reports and advisories concerning the Company; (iv) transcripts of Pluralsight's investor conference calls and events; and (v) other public information regarding the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>INTRODUCTION</u>

1.    Lead Plaintiffs bring this federal securities class action against Defendant Pluralsight, Inc. and its Chief Executive Officer ("CEO") and Chairman Aaron Skonnard and Chief Financial Officer ("CFO") James Budge (Skonnard and Budge together, the "Officer Defendants") (collectively with Pluralsight, the "Defendants") under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5. These claims are brought on behalf of all persons other than Defendants and their affiliates who purchased Pluralsight Class A common stock between January 16, 2019, and July 31, 2019, inclusive (the "Class Period") and were damaged thereby.

119

Exhibit 2

2.      Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. The Company sells subscriptions to its platform to business customers and individuals. The platform provides customers access to a library of thousands of technology skills courses taught by Pluralsight-approved authors; skill and role assessments; learning paths designed to help users master particular subject areas; and business analytics tools to enable business customers to track and address the technology skills of their employees.

3.      From Pluralsight's inception as a public company in May 2018, through the Class Period (January 16, 2019, through July 31, 2019), it never achieved profitability. Instead, Pluralsight reported ever-increasing net losses.[1] Unable to attract investors by operating profitably, Pluralsight generated investor interest by repeatedly emphasizing that it consistently achieved exponential growth based on the metric of "billings." Billings, as explained by the Company, represented not merely revenue recognized ratably for the period subscription services were provided, but also new subscriptions and subscription renewals in future quarterly periods. Investors used the metric to evaluate the Company's deal volume and the amount that the Company would recognize as revenue over the next several fiscal quarters. For eight straight quarters leading up to the second quarter of 2019, Pluralsight achieved approximately 40-50% year-over-year billings growth, and, through the Class Period, told investors that this level of billings growth was built into the Company's long-term business model.

4.      While touting its billings growth, the Company made clear that billings were highly dependent on the capacity, including headcount, experience, efficiency and productivity of its sales

---

[1] In 2017, 2018 and 2019, Pluralsight reported net losses of ($96.53 million), ($128.58 million) and ($163.57 million).

force. When the Company presented its billings growth to investors in its SEC filings prior to and during the Class Period, the Company noted that at least 85% of its billings were derived from business customers and that sales to these business customers were achieved by Pluralsight's direct sales force.

5.      Because so much of the Company's positive spin on its financial performance was dependent on its sales force, the growth and capacity of the sales force was the subject of intense interest by securities analysts. To allay investor concerns prior to the Class Period, Defendants made detailed, positive statements about the growth in the number of sales representatives and about the sales force's increasing productivity and effectiveness. As early as August 2018, Defendants asserted that the Company achieved year-over-year billings growth because they had continued to grow the sales force. The Company also assured investors that because there was at least a six-month lag time between the hiring of a sales representative and when that representative would achieve full productivity in terms of being able to meet his or her sales quotas (or being "ramped"), it carefully tracked not only the absolute number of sales representatives, but also, importantly, *when* each of those sales representatives began work. Since the Company knew at any given point in time the status of the seasoning of its sales force, it also knew the sales force's true effectiveness and ability to achieve billings growth. As a result, it became highly relevant to investors to know if there were any material delays in hiring and ramping sales representatives, because those delays would necessarily impact sales force productivity and thus future billings growth.

6.      During the Class Period, in speaking on that precise topic, Defendants repeatedly failed to disclose a critical adverse fact: that by the end of 2018, Pluralsight was significantly

3

121

Exhibit 2

behind in its own plan for the number of seasoned sales representatives needed to sustain its 40-50% billings growth. For example, at the January 16, 2019 Needham Growth Conference, Budge represented that the sales force had grown to "*about 250*" representatives at that time, although as would later be revealed, this was not the case. In fact, Pluralsight had about 200 representatives at the start of 2019, about 25% less than represented.

7.      However, at no point during the Class Period did Defendants correct this materially false and misleading statement. To the contrary, for example, on February 13, 2019, the Company held an earnings call with analysts and investors during which Budge spoke in glowing terms about the sales force's productivity and efficiency and made no mention of any capacity gaps, difficulties in growing the sales force, or threats to billings, which, as the Company later admitted, it was then experiencing. Nor did Skonnard, who was also on the call, disclose a capacity gap. Instead, Skonnard spoke about how "our teams continue to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate reaching 128%." As another example, in an earnings call with securities analysts and investors on May 1, 2019, for the quarter ended March 30, 2019, Skonnard and Budge were exuberant about the purported strength and efficacy of the salesforce. Budge told investors: "we like where we are with our sales reps"; "love our growth there"; "We have a plan to grow . . . which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force"; "we do have a pace to [hiring]"; "we're on pace"; and "we like the direction we're going." Again, Defendants did not correct the earlier materially false and misleading statement about the size of Pluralsight's sales force.

4

122

Exhibit 2

8.      The timing of the material misrepresentation and omissions regarding the size and productivity of Pluralsight's sales force during the Class Period was no coincidence. Rather, they existed during the precise concentrated period of time in the Class Period when Skonnard and Budge, as well as the Company's Chief Revenue Officer, Joe DiBartolomeo (who headed Pluralsight's sales operations), were selling massive quantities of their own shares of Pluralsight stock at peak prices. In November and December 2018, Pluralsight's Class A common stock price traded as low as $19.01. By the end of 2018, all three individuals had created 10b5-1 trading plans through which massive quantities of their Pluralsight shares were sold during the Class Period. These planned sales, however, were highly suspicious. The quantities were far greater than the amount of stock the officers sold either before or after the Class Period, represented significant percentages of their respective holdings, and occurred within a concentrated period.

9.      Moreover, because of the magnitude of these sales and the potential for enormous profits, Skonnard and Budge were highly motivated to make false positive statements and conceal adverse facts regarding the sales force during the Class Period. This is exactly what happened. Defendants' material false statement and omissions allowed for a meteoric *58% rise* in Pluralsight's Class A common stock share price *in just two months, from $19.01 on December 24, 2018, to $29.99 on February 15, 2019*. With prices peaking, the Company's most senior officers began to unload their shares. On January 28, 2019, Skonnard sold *$1.47 million*[2] in Pluralsight shares at an average price of $29.36. Between February 19 and 22, 2019, Budge *sold*

---

[2] Unless otherwise noted, selling stockholders' alleged proceeds are net proceeds.

*$9.99 million* in Pluralsight shares at an average price of $29.44. On February 15 and 22, 2019, DiBartolomeo sold *$7.93 million* in Pluralsight shares at an average price of $29.81.

10.    Not satisfied with these enormous insider sales in January and February 2019 and the profits realized therefrom, Skonnard, Budge and DiBartolomeo proceeded to unload additional amounts of their holdings through Pluralsight's $456 million secondary public offering on March 7, 2019 (the "SPO" or "Secondary Offering").[3] On March 4 through 7, 2019, the Company filed the SPO Offering Documents with the SEC, selling to the investing public an additional 13,558,464 shares (as well as granting the underwriters the right to purchase up to an additional 2,033,770 shares), or $456 million of Class A common stock, held by certain "selling shareholders." The SPO offering price was at $29.25 per share—*a 95% increase* over the Company's $15 share price in its initial public offering just nine months earlier and a 54% increase over the Company's $19.01 share price in December 2018, just three months earlier. The SPO resulted in yet another insider trading windfall for Skonnard and Budge as well as for DiBartolomeo, with Skonnard selling an additional *$13.63 million* in shares; Budge selling an additional *$5.04 million* in shares; and DiBartolomeo (who, again, was responsible for sales team productivity and thus intimately familiar with the true condition of the Company's sales force at the time of his insider sales) selling an additional *$1.7 million* in shares. The Offering Documents, through which the three executive officers made these additional insider sales at the inflated price

---

[3] The SPO registration statement was filed with the SEC on Form S-1 on March 4, 2019 and was declared effective by the SEC on March 6, 2019 (the "Registration Statement"). The Registration Statement included a preliminary prospectus, which was amended by a free writing prospectus filed with the SEC on March 7, 2019, and a final prospectus filed with the SEC pursuant to Rule 424(b)(4) on March 7, 2019 (the "Prospectus").

6

of $29.25 per share, reiterated and echoed the prior statements about the sales force: that its size had been "significantly expanded" and that it was performing with substantially increased "productivity" and "effectiveness" to sustain billings growth in 2019, when, in fact, as of January 2019, there were too few ramped, seasoned sales representatives to sustain billings growth in the coming quarters.

11.     In total, the material non-disclosures and false statement regarding Pluralsight's sales force allowed Pluralsight's three most senior officers—Defendants Skonnard and Budge, as well as DiBartolomeo—to *sell $22.2 million, $15.1 million and $9.7 million of stock, respectively, at peak prices in the seven-month Class Period.*

12.     On July 31, 2019, after all the massive insider trading was completed at inflated prices—including an additional $2.57 million of insider sales by Skonnard on July 26, 2019, at $30.47 per share—Pluralsight, Skonnard, and Budge disclosed the true condition of the Company's sales force. During the Company's second quarter 2019 earnings call, Budge disclosed to securities analysts and investors that Pluralsight's sales force had lacked "*ramped capacity*" in the "*first and second quarter*," and that this "*expressed itself with the outcome you saw in the second quarter*": a *43.8% collapse* in B2B billings growth, from 48% to 27%, in just three months. Budge further revealed that as of the "*end of last year* [2018]" the Company had "*needed to bring on board*" "*dozens of reps*" "*so they would ramp and become fully productive in the second quarter*" but instead had been "*a few months behind*." Likewise, Skonnard also admitted that there "*was not enough capacity in the system to sustain our high-growth expectations as we entered the year* [2019]" and that the Company had fallen off its "*annual sales ramp capacity plan*,"

Exhibit 2

meaning that since the start of the year, the Company had lacked the ramped sales representatives needed to maintain its planned level of billings growth in 2019.

13.    This disclosure was so fundamentally contrary to what Pluralsight, Budge, and Skonnard had led analysts and investors to believe about the sales force over the last seven months that analysts and investors were shocked and troubled by the failure to disclose these adverse facts. A J.P. Morgan securities analyst on the call directly asked why Defendants had not disclosed these crucial issues (which Budge and Skonnard admitted had existed as of the beginning of 2019) at the very least on the May 1, 2019 earnings call: "*I know I'm playing Monday morning quarterback on this by* [sic] *why is this – when we're hearing it, why didn't we hear this on last quarter's call?*" Budge's immediate response revealed that Defendants essentially had hoped that they could mask their understaffed and underequipped sales force for as long as possible: "*Well, we were still hitting our numbers, and we felt like we had things broke, right.*"

14.    The next day, SunTrust issued an analyst report titled with the stark question: "*Where Did That Come From?*" The report further characterized the under-capacity of sales representatives as revealing "*shocking sales execution issues.*" J.P. Morgan noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "*hiring issue was known earlier*" and that "*[m]anagement pointed out that it saw it was behind on sales hiring coming into the year.*"

15.    A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be

126

Exhibit 2

felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million ***implies a sharp revenue deceleration to just 30% y/y growth***."

16.     On September 4, 2019, *Seeking Alpha* published an article that again called out the Company and its senior officers for their deceit: "While sales productivity is a concern, we think there is greater concern around management's ***lack of transparency*** in information sharing." The article noted that "[i]t was revealed during Q2 earnings call that Q2's sales issue was actually an extension from Q1." The article also discussed Skonnard and Budge's evasiveness on the earnings call: "During the earnings call, we found multiple occasions where the management brushed aside concerns raised by analysts while also added a bit of an unexpected surprise." The article concluded: "***With the issue getting bigger and affecting its billings growth in Q2, there was nowhere to hide.*** To us, this is the biggest risk in Pluralsight. We are further made curious as to ***how deep this lack of transparency has probably rooted itself into the culture of the organization***."

17.     The price reaction to the July 31, 2019 disclosures mirrored the shock of the securities analysts. Pluralsight's shares dropped a massive ***39.52%,*** in a single day, f***rom $30.69 to $18.56 at the close of the market on August 1, 2019***, on trading volume of 22.135 million shares, ***13 times its daily average of 1,701,468 shares per day during the Class Period***. This collapse in Pluralsight's stock price represented a one-day market capitalization loss of ***$1.23 billion***.

9

127

Exhibit 2

## II.    JURISDICTION AND VENUE

18.    The claims asserted in this action arise under Sections 10(b), 20A, and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t-1, and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa),

20.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because Pluralsight is headquartered and conducts business here, all the defendants had agents or transacted or conducted business in this District, and many of the alleged acts and omissions giving rise to the violations complained of in this action, including the preparation and dissemination to the public of materially false and misleading statement, occurred in this District.

21.    In connection with the acts alleged in this Second Amended Complaint, all the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

22.    Co-Lead Plaintiff INPRS is a $34.2 billion pension fund operated for the benefit of members and retirees of public universities, schools, municipalities, and state agencies. As shown in the certification previously filed in ECF 94-1, INPRS purchased shares of Pluralsight Class A common stock during the Class Period, including shares of Pluralsight Class A common stock

issued pursuant and/or traceable to the SPO. For instance, on the March 7, 2019 offering date and at the $29.25 offering price, INPRS purchased 65,200 shares of Pluralsight Class A common stock in the SPO, and directly from Morgan Stanley & Co. LLC, a lead underwriter of the SPO, in the United States.

23.    Co-Lead Plaintiff CTPF is a defined benefit public employee retirement system that provides retirement, survivor and disability benefits for certain certified teachers and employees of the public schools in Chicago, Illinois. CTPF maintains approximately $10.4 billion in assets. As set forth in the certification previously filed in ECF 94-2, CTPF purchased Pluralsight Class A common stock during the Class Period. These purchases included the purchase of 7,900 shares of Pluralsight Class A common stock on the same day as the SPO, March 7, 2019, from KeyBanc Capital Markets, Inc., one of the underwriters of the SPO.

24.    As a result of the material misstatement and omissions made by the Defendants, Lead Plaintiffs purchased or otherwise acquired Pluralsight Class A common stock at artificially inflated prices. When the relevant truth concerning the material misstatement and omissions was revealed to the market on July 31, 2019, the price of Pluralsight's Class A common stock fell, causing Lead Plaintiffs and the Class to suffer losses.

### B.    Exchange Act Defendants

#### 1.    Corporate Defendant Pluralsight

25.    Defendant Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. Pluralsight is incorporated in Delaware and headquartered in Farmington, Utah.

129

Exhibit 2

26.    During the Class Period and at all relevant times, Pluralsight had three authorized classes of common stock: Class A, Class B, and Class C. Pluralsight Class A common stock traded on the NASDAQ Global Select Market under the ticker symbol "PS." Class A common stock and Class B common stock carried one vote per share, while Class C common stock carried ten votes per share. Defendant Skonnard, personally and through associated entities, held all of the Class C common stock and, after the SPO, held approximately 53.6% of the combined voting power of the Company's outstanding capital stock, and therefore, controlled the Company. According to the Company's annual 10-K report for 2018, filed with the SEC, as of January 31, 2019, the Company had 137,488,519 shares of Pluralsight common stock outstanding, consisting of 66,639,109 shares of Class A common stock, 56,206,481 shares of Class B common stock, and 14,642,929 shares of Class C common stock. Pluralsight sold 13,558,464 Class A shares[4] in its March 7, 2019 secondary public offering. As of June 30, 2019, according to the Form 10-Q that the Company filed with the SEC on July 31, 2019 (the last day of the Class Period), the Company had 101,096,472 shares of Class A common stock issued and outstanding; 24,664,113 shares of Class B common stock issued and outstanding; and 14,186,856 shares of Class C common stock issued and outstanding.

### 2.    The Officer Defendants

#### a.    Aaron Skonnard

27.    Defendant Skonnard co-founded Pluralsight in 2004. He has served as its Chief Executive Officer since October 2009, and at all relevant times served as Chairman of its board of directors since the board's inception in December 2017. During the Class Period and at all relevant

---

[4] The selling stockholders also offered an additional 2,033,770 shares to the SPO underwriters, for a total of 15,592,234 sold in the SPO.

times, according to a biography previously available on Pluralsight's website, "[o]n a day-to-day basis, he works closely with the entire executive team in different capacities, including recruiting . . . marketing, [and] sales."

28.    Throughout the Class Period, Skonnard signed Pluralsight's filings with the SEC, including the Registration Statement and Pluralsight's annual report on Form 10-K for the year ended 2018. Skonnard also signed a certification filed as part of Pluralsight's annual report on Form 10-K for the year ended 2018, attesting to the truthfulness of the Company's filings and claiming that the report "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Skonnard was one of the Pluralsight representatives principally responsible for communicating with investors, including securities analysts, both before and during the Class Period. Skonnard regularly spoke directly to analysts and investors about the details of the Company's performance and the importance of the Company's sales force, saying, for instance, that the Company was "able to keep attracting all the talent we need," that "[r]evenue and billings growth continue to be strong with both up over 40% year over year," and "[w]e continue to demonstrate the efficiency in our model."

29.    In 2019 and 2018, Skonnard's primary source of compensation was from stock and option awards. In 2018, the total value of his annual compensation, including the estimated value of stock and option awards, was $12,951,975. In 2019, the total value of his annual compensation package was $6,476,664.

30.    Skonnard was one of the "Selling Shareholders" in the $456 million SPO during the Class Period, selling 480,618 shares of Class A common stock at $29.25 per share ($28.37 per

share net of the underwriters' discount), for net proceeds of $13,636,334.21. Including the $13.6 million that he received from the SPO, during the seven-month Class Period, Skonnard sold $22,187,840.52 in Pluralsight Class A common stock, or 171% of his total 2018 compensation and 342% of his total 2019 compensation.

**b.      James Budge**

31.      During the Class Period and at all relevant times, Defendant Budge served as Pluralsight's Chief Financial Officer since joining the Company in April 2017. According to a biography previously available on Pluralsight's website, Budge "act[ed] as the financial and operational advisor to the Pluralsight executive team" and was "responsible for the company's financial, data and information technology teams."

32.      Throughout the Class Period, Budge signed Pluralsight's filings with the SEC, including the Registration Statement and Pluralsight's annual report on Form 10-K for the year ended 2018. Budge also signed a certification filed as part of Pluralsight's annual report on Form 10-K for the year ended 2018, attesting to the truthfulness of the Company's filings and claiming that the report "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Budge was one of the Pluralsight representatives principally responsible for communicating with investors, including securities analysts, both before and during the Class Period. Budge regularly spoke directly to analysts and investors about the details of the Company's performance and the importance of the Company's sales force.

33.      In 2018, the total value of Budge's annual compensation, including the estimated value of stock and option awards, was $7,427,500; in 2019, it was $2,830,594.

34.     Budge was one of the "Selling Shareholders" in the $456 million SPO during the Class Period, selling 177,854 shares of Class A common stock at $29.25 per share ($28.37 per share net of the underwriters' discount), for net proceeds of $5,046,162.62. During the seven-month Class Period, Budge sold $15,102,980.54 in Pluralsight Class A common stock, representing 203% of his total compensation in 2018 and 533% of his total compensation in 2019.

35.     Defendants Skonnard and Budge (the "Officer Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Pluralsight's reports to the SEC and investors, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this complaint before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representation about the size of the sales force and the omissions that were being made were then materially false and misleading.

36.     As officers and controlling persons of a publicly held company whose common stock was registered during the Class Period with the Securities and Exchange Commission pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, earnings and present and

15

133

Exhibit 2

future business prospects and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's publicly traded Class A common stock would be based on truthful and accurate information.

## IV.    EXCHANGE ACT ALLEGATIONS

### A.    Factual Allegations

#### 1.    From Its Inception as a Public Company, Pluralsight Was Unable to Report Profitability, So Instead It Repeatedly Touted Dramatic "Billings Growth"

37.    Pluralsight is an enterprise software company that offers a cloud-based technology skills platform. The platform provides users with a library of thousands of technology skills courses taught by Pluralsight-approved authors; skill and role assessments; learning paths designed to help users master particular subject areas; and business analytics tools to enable business customers to track and address the technology skills of their employees.

38.    On May 17, 2018, Pluralsight went public in an initial public offering ("IPO"), issuing 23.8 million shares at $15 per share. The Company raised $332.1 million in net proceeds, increasing its market capitalization to approximately $2 billion, which, as *Forbes.com* noted, "far exceed[ed] its last private valuation of about $1 billion."[5] Pluralsight used the proceeds to purchase LLC units in its holding company, Pluralsight Holdings, which the holding company then used to repay the offering's expenses, pay down Pluralsight's outstanding indebtedness, and for working capital and other general corporate purposes.

---

[5] Alex Konrad, *Utah Ed Tech Leader Pluralsight Pops 33% In First-Day Trading, Keeping Window Open for Software IPOs*, Forbes.com, May 17, 2018.

134
Exhibit 2

39.     After becoming a public company in May 2018, the Company garnered investor interest not by its ability to achieve profitability—which it has never done—but rather by promoting the Company and its sales force's ability to achieve dramatic sales growth each quarter, as measured by its "billings."

40.     The Company defined billings as "total revenue plus the change in deferred revenue in the period." As a "Software-as-a-Service" ("SaaS") business, the Company derived substantially all its revenue from the sale of annual or multi-year subscriptions to the platform to business customers (its "B2B" or "Business-to-Business" segment) and monthly or annual subscriptions to individual consumers (its "B2C" or "Business-to-Consumers" segment). Within the B2B segment, the Company had a "commercial" segment, for businesses with less than approximately 4,000 users, and an "enterprise" segment, for businesses with more than approximately 4,000 users. The B2B enterprise segment was the chief growth engine for the Company. As of the start of the Class Period, according to the SPO Offering Documents, the Company claimed as customers "more than 340 of the 2018 Fortune 500." Over the course of the Class Period, Defendants repeatedly emphasized the importance of these larger "enterprise" customers to the Company's sustained growth.

41.     The Company typically invoiced its customers in advance installments (annually for business customers, and monthly or annually for individuals) and recorded those up-front payments as deferred revenue, which it then recognized ratably as revenue throughout the subscription period.

42.     The billings amount in a given financial quarter therefore represented the amounts invoiced to customers that quarter and reflected subscription renewals, sales of additional products

17

Exhibit 2

or services to existing customers, and sales to new customers. While revenue in a given quarter provided investors with a snapshot in time, billings were a crucial indicator of the future revenue and cash flow that the Company would realize from deals that the sales representatives had executed in that quarter. More importantly, Defendants used billings in their dealings with analysts and investors as the key measure of Pluralsight's performance and success given that the Company had yet to turn a profit.

43.     In this regard, in Pluralsight's SEC filings, earnings calls, and presentations, Defendants repeatedly told investors that billings growth was Pluralsight's "***key business metric***" and a "***key factor affecting [its] long-term performance***." From the date of the Company's IPO, and for each subsequent quarter through the end of the Class Period, Defendants touted the Company's exponential year-over-year billings growth to investors. Defendants attributed Pluralsight's dramatic billings growth rate to the capacity, experience, efficiency, and productivity of the sales force that the Company had built. The link between billings and the sales force was clear: sales representatives were responsible for generating sales to business customers, who accounted for at least 85% of the Company's billings during the Class Period.

> **2.      Pluralsight Repeatedly Told Investors Its Sales Force Was The Lynchpin Of Its Dramatic Billings Growth, Sparking Intense Investor Interest in its Sales Force**

44.     The Company employed a direct sales team that focused on landing new business customers, renewing existing subscriptions, and expanding usage of Pluralsight's platform within the business customers over time. It also employed a field sales team that sourced new prospects and upsell opportunities (meaning, the opportunity to encourage a customer to purchase a more expensive version of the Company's product, more licenses for the product, or more services

18

Exhibit 2

within the product). The Company supported its sales representatives (whom the company also called "account executives") through its sales "infrastructure." This infrastructure included "sales enablement" employees who provided training, deal support, best practices insights, and other assistance to sales representatives as they joined the Company and "ramped" up to full sales-quota-carrying capacity. The Company's sales infrastructure also included its customer success management ("CSM") team, which was responsible for retaining customers won by the sales team, to cut down on the Company's customer "churn," or the loss of customers who canceled or failed to renew their subscriptions. CSM employees worked to ensure that customers were having positive experiences with the Pluralsight platform and identify and address any problems, so that customers would renew, upgrade, and expand their subscriptions, thereby further driving billings growth for the Company.

45.    To grow its billings, the Company looked to expand its sales force and increase their productivity, particularly that of the new hires. With more quota-bearing sales representatives came the ability to sell more subscriptions and generate the billings growth of near–40% to 50% from one quarter to the next that Defendants promoted to investors each financial reporting period. Because the sales force drove the Company's key business metric—billings—Defendants closely monitored the ability of Pluralsight's sales representatives to take on a "full quota." As part of its internal planning and forecasting, Defendants closely tracked a sales representative's progression from hiring through ramping up to take on a full sales quota, a process that, according to Budge, took between six months and two years. Defendants repeatedly told investors that the increased productivity of Pluralsight's sales representatives translated into greater efficiency and money saved—meaning, more value for investors.

137

Exhibit 2

46.    Defendants fastidiously tracked the growth and ramping of the sales force toward achieving full productivity because those metrics were crucial to the Company's current and future sales activity, including Pluralsight's much-touted billings metric. Defendants used "pipelines" to closely follow the progression of deals that its sales teams were working on at any given time, from identifying a potential customer to closing the deal. The pipeline indicated how many deals were expected to close within a given amount of time and how sales representatives were performing in relation to their sales quotas. Using this information, Defendants could accurately track the Company's current and future billings growth.

a.    **August 2018 Statements Attributing Billings Growth to Pluralsight's Heavy Investment in the Sales Force**

47.    Well before the commencement of the Class Period, Pluralsight attributed billings growth to its sales force. On August 1, 2018, the Company announced that in the second quarter of 2018, it had achieved total billings growth of 42% and B2B billings growth of 52%–the Company's "fifth consecutive quarter of greater than 50% growth." Skonnard and Budge led the earnings call that day with analysts and investors. In response to a question about "*the efficiency of the sales force as it matures and how you measure that*," Budge attributed the dramatic billings growth to the Company's "*heavy*" investment in "sales and marketing" and the "*efficiencies*" that resulted from having more "*tenured sales reps*."

48.    Likewise, at the Company's August 2018 investor and analyst meeting at its annual conference "Pluralsight Live,"[6] Budge emphasized how the Company was able to generate billings

---

[6] "Pluralsight Live" is the Company's annual conference that brings together customers, content authors, investors, and analysts for a multi-day extravaganza in Salt Lake City. The event features presentations by Pluralsight's executive officers, including a "special meeting for investors and analysts," and speeches from celebrities, public figures, and technology industry leaders.

from existing customers because of how heavily it had invested in "*all of the support functions that wrapped around*" the quota-bearing sales representatives, including the "critical" CSM team, which the Company had "*built [] out through 2017*," and which showed a "really great amount of focus."

49. Further, at the same conference, to allay any potential concerns about the Company's ability to recruit talented people—and therefore, its ability to continue to grow billings—Skonnard stated that the Company was having terrific success in this regard and that "*we'll be able to keep attracting all the talent we need*." He said that the Company was "*very proactive about bringing that talent to Utah*" and that the Company has "*access to talent everywhere, and we do a good job of managing that*."

50. These statements regarding successful investments in the sales force had the desired effect. For example, an August 2, 2018 J.P. Morgan analyst report titled "*2Q18: Companies Can Learn From PS First Quarter Post IPO*" noted: "*We believe the heavy investments undertaken by the company last year to ramp up its sales force is starting to pay off*." In an August 29, 2018 report titled "*Lots of Positive Takeaways at Pluralsight Live; Strong Upside Potential*," SunTrust noted that the Company's strong billings growth in its B2B segment of 60% year over year, following "*an aggressive hiring cycle in 2016 and 2017, along with building out a [CSM] group, has led to overall top-line growth acceleration*." The report also flagged Defendants' much-trumpeted "*positive trends in sales force productivity*."

> **b.** **August 2018 Statements Touting Pluralsight's Close Monitoring of its Pipeline and Quota-Bearing Sales Representatives Needed to Achieve Consistent Billings Growth**

51.     Investors were also assured that management had clear visibility—five or six months in advance—regarding the deals needed to achieve consistent quarterly billings growth. On the August 1, 2018 earnings call, Budge explained that to meet its quarterly billings "targets," the Company relied on deals that he called "doubles and triples," as opposed to "home runs," and that these deals typically took "5 to 6 months" to progress through the pipeline. According to this timeline, Pluralsight could reliably approximate from at least six months before the end of a quarter the billings and revenue it could expect to achieve in that upcoming quarter. He further explained that because the Company closely monitored the composition of its billings pipeline, including the amount of time the sales team took to close deals, management felt "great" about the pipeline for the "next several quarters."

52.     Significantly, at the August 2018 conference, Budge also made clear to investors that to achieve consistent billings growth, the Company well understood that it needed to take into account not just the sales representative headcount, but also whether those sales representatives were sufficiently prepared to meet their sales quotas. Budge stated that it measured the "productivity of our sales reps" by their ability to take on a full quota, which the Company carefully tracked: "At about that . . . 15- to 18-month mark, they are producing enough annual quota to meet the internal budgets that we have. At around the 2-plus year mark, they are starting to achieve their full quota. . . . And you'll start to see that benefit pay off in the bottom line." As a result, investors were led to believe, prior to the commencement of the Class Period, that when the Company touted the size, efficiency, productivity, and effectiveness of its sales force, that it meant that the sales

22

140

Exhibit 2

representatives were adequately seasoned, or "ramped," and that the Company was closely following their progression and factoring their output into evaluating the deal pipeline.

> **c.** **On Their October 24, 2018 Earnings Call, Defendants Told Investors that the Sales Force Was Well-Ramped and Executing at "Scale" Heading Into 2019**

53.    On October 24, 2018, in a conference call discussing Pluralsight's financial results for the third quarter of 2018 ("Q3 2018"), including overall billings growth of 44% year-over-year and B2B billings growth of 53% year-over-year, Skonnard began by highlighting for investors that it was the "sixth consecutive quarter of greater than 50% growth in B2B billings" and trumpeted the "***strong focus and commitment***" of the Company's sales and customer success teams.

54.    When Budge was asked by an analyst on the call, "where you are in the ramping of the productivity of sales reps? And where are you in terms of your hiring plans?", Budge stated that the Company was achieving "economies of scale," or "efficiencies," meaning the Company needed to spend less on sales and marketing as a percentage of revenue to achieve exponential 53% growth in B2B billings, as it had that quarter. He concluded: "So across the board, we're starting to see some of those efficiencies that we've talked about in past discussions, and they really came out in a big way in the third quarter, and we expect to see that continue through the fourth quarter."

55.    Skonnard also promoted the effectiveness of the Company's then-existing sales team in generating new billings, telling investors that the Company was winning bigger deals because its enterprise account executives had the "***experience***" and "***capability***" to help him get "***above the power line immediately***" with C-suite-level decision-makers at Fortune 500 companies.

141

Exhibit 2

56.    Budge's and Skonnard's positive statements about the successful ramping and productivity of Pluralsight's sales force had a strong impact on analysts. J.P. Morgan, for instance, in a report titled "*3Q18: B2B Delivers Big Beat and Raise*," stated that "*[s]ales productivity has hit an inflection point* and deals are coming in on higher price points all leading to exceptional B2B results again this quarter with billings growth over 50%." The report also noted that "*[t]he company's investments in its channels aimed at enterprise sales over the last year are now ramping up and would continue to drive this growth as the sales force matures*."

3.    **During the Class Period, Defendants Made A Misleading Positive Statement Regarding Pluralsight's Sales Force and Omitted That Sales Representative Capacity Was Woefully Insufficient to Sustain Billings Growth**

a.    **Misleading Positive Statement and Omissions About Sales Force Execution at January 16, 2019 Investor Conference**

57.    The Class Period begins on January 16, 2019, when Budge, on behalf of Pluralsight, spoke to analysts and investors at the Needham & Company, LLC Growth Conference and highlighted the strength, efficiency, and capacity of its sales force. During the conference, according to a transcript of the session, Budge represented that the sales representatives were "killing it" and that the "great infrastructure around them," which the Company "didn't have to keep growing," had "improved our retention massively and we're now at scale."

58.    Budge also emphasized the dramatic growth in the Company's sales force, particularly in the high-billings-generating B2B enterprise segment. He explained how the Company had grown from zero enterprise sales representatives and "about 80 [aggregate] quota-bearing" representatives, which was not "enough . . . quota-bearing reps on the ground," to, as 2019 began, having 120 enterprise-class sales representatives and, he claimed, "*about 250*"

aggregate quota-bearing representatives. Budge represented that the Company had a carefully calculated plan to efficiently grow its sales force to 300 aggregate quota-bearing sales representatives through 2019 while maintaining its capacity to increase billings: "while we'll continue to add a good 70 to 80 [sales representatives] a year, it's lower as a percentage of the total growth that we have, which is a reason why you're seeing some of the efficiencies in the model." What Budge did not tell investors was that the Company was dozens of representatives behind in its sales ramping plan.

59.     Budge also made statements concerning the existing "infrastructure" around the sales team. He told investors that the Company went from having "little infrastructure around our sales reps" to building out "some of the infrastructure around sales to scale." He claimed that this past investment had resulted in "efficiencies" while maintaining a high level of B2B billings growth, and that as a result, the Company "didn't have to keep growing" the sales infrastructure.

60.     On February 13, 2019, Pluralsight issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2018. In the release, which the Company filed as an exhibit to a Form 8-K, Pluralsight announced that it had grown fourth quarter billings 42%, fourth quarter billings to B2B customers 51%, and full year 2018 billings 43% year-over-year. It was the Company's "seventh consecutive quarter of greater than 50% growth in B2B billings," Skonnard said.

61.     That day, the Company held an earnings call with analysts and investors. Budge continued to speak in glowing terms about the sales force's productivity and efficiency and made no mention of any capacity gaps, difficulties in growing the sales force, or threats to billings, which, as the Company later admitted, it was then experiencing. Nor did Skonnard, who was also

on the call, disclose a capacity gap. Instead, Skonnard spoke about how "our teams continue to execute with strong focus and commitment to customer success as demonstrated by our dollar-based net retention rate reaching 128%."

62.     On February 13, 2019, SunTrust issued a report titled "*Billings Momentum Continues in 4Q,*" reiterating its "buy" rating and its price target of $40, citing the Company's "***growth investments***" as "***driving top-line growth acceleration***." On February 14, 2019, Bank of America raised its target price for the Company's stock from $32 to $35.

63.     On February 21, 2019, the Company filed with the SEC its Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by Skonnard and Budge.[7] In the 2018 Form 10-K, Defendants presented the following chart to investors that demonstrated that not only had billings in 2018 increased 43% as compared to billings in 2017 (from $205.80 million to $293.58 million), but that ***85% of the 2018 billings were from "business customers"***—the portion of Pluralsight's business that was dependent on the capacity of the direct sales force to generate billings:

---

[7] On June 17, 2019, the Company filed with the SEC a Form 8-K announcing that its board of directors (of which Skonnard was the chair) had determined that the Company's 2018 Form 10-K had materially understated the Company's net losses, which was related to the incorrect timing of recognition of certain expenses beginning in the second quarter of 2018. The Form 8-K was signed by Budge. On June 27, 2019, the Company filed an amended Form 10-K for the fiscal year ended December 31, 2018, which was signed by Skonnard and Budged. In the report, the Company announced, "we identified a material weakness in our internal control over financial reporting, and as such, our disclosure controls and procedures were determined to be ineffective for the quarters ended June 30, 2018, September 30, 2018 and March 31, 2019 and for the year ended December 31, 2018."

26

| | | | | | | | Growth Rate | |
| | | Year Ended December 31, | | | | | Year Ended December 31, | |
| | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 |
| | | | (dollars in thousands) | | | | |
| Business customers (end of period) | 16,756 | 14,463 | 12,043 | 10,517 | 16% | 20% | 15% |
| Billings | $ 293,583 | $ 205,807 | $ 149,231 | $ 130,043 | 43% | 38% | 15% |
| *Billings from business customers* | $ 248,159 | $ 162,965 | $ 104,861 | $ 83,663 | 52% | 55% | 25% |
| *% of billings from business customers* | 85% | 79% | 70% | 64% | | | |

64.     The Form 10-K stressed to investors that Pluralsight expected billings from business customers to continue to increase as a percentage of billings, and that this would be a "significant source of future revenue growth and a key factor affecting our long-term performance." The Company assured investors that its leaders monitored "business customers, billings, and certain related key business metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions."

65.     On February 27, 2019, Seeking Alpha published an article titled "*Pluralsight: The Sight Of All Of Those Beat And Raise Quarters*." The article reported that "***[t]he picture being painted remains one of hyper-growth***" and that "[s]ince touching bottom along with most everything else in early January, the shares have appreciated by about 50%."

**b.      Massive Insider Selling by Company Insiders as Pluralsight's Share Price Shoots Up 56% in Just Two Months**

66.     The aforementioned positive billings growth, purportedly driven by a growing and increasingly effective and productive sales force, allowed for a dramatic ***56%*** increase in the Company's stock price in less than two months: from $19.01 per share on December 24, 2018, to $29.65 per share on February 20, 2019. During that time, as Defendants touted the size and productivity of the sales force and as Pluralsight's share price appreciated, its insiders began to cash out.

27

145

Exhibit 2

67.    From January 7 through 9, 2019, Skonnard sold 74,600 shares of Pluralsight Class A common stock at an average price per share of $26.06, for total proceeds of $1,944,014.19. On January 28, 2019—after Budge had told investors at the Needham Conference how much the sales force had grown—Skonnard sold 50,000 shares of Pluralsight Class A common stock at an average price per share of $29.36, for a total profit of $1,468,000.08.

68.    On February 15, 2019, DiBartolomeo made a massive sale of his own stock. He exercised 255,720 options to acquire an equivalent number of shares of Class A Common Stock. He sold the shares that day in two tranches: 254,920 shares at an average price per share of $30.1258, and 800 shares at $30.87, for a total profit of $7,704,364.94.

69.    On February 19 and 20, 2019, Budge exercised 333,091 options to acquire the same number of shares of Class A Common Stock. Budge then sold the shares in three tranches: 199,400 shares at an average price per share of $29.2674; 133,091 shares at an average price per share of $29.67, and 600 shares at $30, for a total profit of ***$9,806,296.37***.

70.    On February 22, 2019—one day after Pluralsight filed its 2018 Form 10-K touting the size and productivity of its sales force—Budge continued to sell his stock. Budge sold 6,206 shares at an average price per share of $29.66, for a total profit of $184,072.44. Thus, ***in the span of just four days, Budge reaped over $9.9 million*** from selling his Pluralsight Class A common stock.

71.    On March 4, 2019, Pluralsight filed the registration statement and preliminary prospectus on a Form S-1 with the SEC, signed by Skonnard and Budge, for the secondary public

offering of 13,558,464 shares[8] of Class A common stock by company insiders, including Skonnard, Budge, and DiBartolomeo (the "SPO").[9] The Company announced that the proceeds of the SPO would go to the selling stockholders, and none would go to the Company.[10]

72.     On March 7, 2019, pursuant to Rule 433, the Company filed a free writing prospectus (dated March 6) relating to its preliminary prospectus, announcing that the shares offered in the SPO would be priced at $29.25—*a 95% increase* over the Company's $15 share price in its initial public offering just ten months earlier. The prospectus announced a trade date of March 7, 2019, and a settlement date, upon which the underwriters would deliver the shares to purchasers, of March 11, 2019. The free writing prospectus reiterated that the "selling stockholders will receive all the net proceeds from the offering of Class A Common Stock and the Issuer will not receive any proceeds from the sale of the shares in the offering of Class A Common Stock." On March 7, 2019, pursuant to Rule 424(b)(4), the Company filed a final prospectus with the SEC (the Prospectus, referred to herein with the Registration Statement, as the "Offering Documents").

---

[8] Including additional shares that the Company granted underwriters the option to purchase from the selling stockholders, the total amount of securities to be registered was 15,592,234.

[9] According to available SEC records, this was not the first time that Defendants contemplated an SPO. On September 21, 2018, Pluralsight confidentially filed a draft registration statement for a secondary offering of an as-yet-undetermined amount of Class A common stock. Through the rest of the September and October, however, the Company's share price dropped along with the share prices of other technology companies, and the Company did not follow through on a secondary offering in 2018.

[10] The Company also announced that separately but concurrently with the Class A common stock offering, it was offering to qualified institutional buyers $450 million in convertible senior notes; in its subsequent free writing prospectus and final prospectus, the Company raised the amount of that offering to $550 million, or $633.5 million if the initial purchasers exercised an option to purchase additional notes.

73.     In the Offering Documents, Defendants drove home the points that billings from business customers—which were generated by the sales force—had risen to 85% of the Company's billings in 2018 and continued to increase, and that billings from business customers had grown at over 50% year-over-year in 2017 and 2018:

| | Year Ended December 31, | | | Growth Rate Year Ended December 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2017 | 2018 |
| | (dollars in thousands) | | | | |
| Business customers (end of period) | 12,043 | 14,463 | 16,756 | 20% | 16% |
| Billings | $ 149,231 | $ 205,807 | $ 293,583 | 38% | 43% |
| Billings from business customers | $ 104,861 | $ 162,965 | $ 248,159 | 55% | 52% |
| % of billings from business customers | 70% | 79% | 85% | | |

74.     The SPO grossed approximately $456 million in proceeds for Company insiders and related parties. Skonnard sold 480,618 shares for a total of $13,636,334.20 and Budge sold 177,854 shares for a total of $5,046,162.62. Thus, taking into account the additional sales in January and February, the Officer Defendants sold over $32 million of their Pluralsight stock for their own personal financial benefit in just two months.

75.     April 1 marked the start of the second quarter of Pluralsight's fiscal year 2019. As the quarter progressed, analysts continued to credit Defendants' statements about the existing strength of the Company's sales force, including the "*significantly expanded sales capacity*" Defendants stated in the SPO Offering Documents, and the sales force's ability to consistently generate high billings growth. On April 11, 2019, SunTrust issued a note titled "*List of Upside Drivers Just Got Bigger With Google Partnership; Reiterate Buy*" in which SunTrust reiterated its $40 price target. SunTrust emphasized Defendants' previous statements about their success in expanding the Company's sales force as proof of the stock's value:

> [T]he company has also benefited from *significantly expanded sales capacity*. The company ended 2018 with approximately 240

30

148

Exhibit 2

quota-carrying sales headcount and is expected to expand to 300-plus quota-carrying sales reps in 2019. *It is important to note increased productivity of the expanded sales force, along with partner-influenced activities and new product interest, contributed to large new billings pipeline in excess of $50 million coming out of last August's customer event.* All of these factors could contribute to significant upside to billings estimates, and consequently, *sustained high revenue growth in 2019 and 2020*.

76.    SunTrust recommended the stock "as a core holding for software investors."

77.    On May 1, 2019, SunTrust issued a report titled "*Customer Conversation Reflects Well on Key Growth Engine, B2B Segment; Reiterate Buy*," saying that it was "enamored with Pluralsight" and that it "believe[d] the company [could] sustain 30%-plus revenue growth and drive material upside to our estimates" in part due to its "*aggressive growth investments*." SunTrust maintained its price target of $40.

78.    On May 1, 2019, after SunTrust issued its report, the Company announced its earnings for the first quarter of 2019 ("Q1 2019"), which ended on March 31, 2019. In its Form 10-Q filed with the SEC, which Skonnard and Budge signed, and in a press release filed with the SEC as an exhibit to a Form 8-K, the Company announced total billings growth of 41% compared to the same period in the previous year and B2B billings growth of 48%. The Company also reported that B2B billings—which were generated by the sales force—had increased to 86% of the Company's overall billings, underscoring the importance of the capacity of the sales force to the Company's sustained 2019 billings growth:

|  | Three Months Ended March 31, | |
|  | 2019 | 2018 |
| | (dollars in thousands) | |
| Billings | $ 77,928 | $ 55,419 |
| *Billings from business customers* | $ 67,156 | $ 45,252 |
| *% of billings from business customers* | 86% | 82% |
| ***Billings*** | | |

79.     Analysts absorbed management's positive statements about the expansion of Pluralsight's sales capacity and the sales force's efficacy. In a May 1, 2019 report titled "*1Q19: Customer Additions and 128% Net Retention Highlight the Quarter*," J.P. Morgan increased its price target from $40 to $44. On May 2, 2019, SunTrust issued another report, titled "*Reports 1Q19; Higher Growth Theme Intact; Strategic Acquisition; Reiterate Buy*," in which it maintained its price target of $40.

80.     That same day, Skonnard and Budge spoke to analysts on the earnings call. According to the transcript, Budge told investors: "we like where we are with our sales reps"; "love our growth there"; "We have a plan to grow . . . which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force"; "we do have a pace to [hiring]"; "we're on pace"; and "we like the direction we're going."

81.     Budge's glowing assurances, which gave no hint that since January 2019 or earlier the Company had been behind its plan for sale representative hiring and ramping, came in response to pointed questions from analysts about the sales force's status. SunTrust analyst Terrell Tilman queried Budge about Defendants' progress in sales hiring, asking him "where are you or how are you doing in terms of the hiring to your targeted sales headcount by the end of the year?" and to "talk about the retention of existing sales reps." Budge responded that "we like where we are with our sales reps" and that the Company's hiring and retention "plan" was proceeding well on track.

82.     Budge also told investors, in response to another question about sales headcount, that the Company had a carefully calculated "pace" to hiring, which was well-managed by the sales enablement teams, that was designed to "continue to drive growth of greater than 40% and near 50% on B2B" as part of a "long and sustainable business model."

32

83.    On June 24, 2019, SunTrust issued a report ("Highlighting Three Billings/Growth Catalysts; Reiterate Buy and Raising PT") raising its price target for Pluralsight from $40 to $41. The reported listed "three key points make us incrementally more positive on sustained B2B billings momentum and overall beat-and-raise dynamics in 2019 and 2020." One of the "key points" was the "benefits still to accrue from sales capacity expansion":

> Benefits of Expanded Sales Capacity and Evolving Go-to-Market Initiatives - The company has expanded its sales capacity over a multi-year basis and we estimate total sales headcount to approximate 300 by the end of 2019. Several years of significant growth in sales headcount and increasing productivity from tenured sales reps bodes very well for B2B billings activity this year. We believe the company is also continuing to refine large enterprise sales teams that are bifurcated between new customer business and selling back to the installed base customers. We believe evolving sales processes like hunter and farmer selling and overall ramp in increased sales capacity bodes very well for upside performance to billings estimates this year and next.

**4.    On July 31, 2019, Defendants Admitted the Shocking Truth That Deficiencies Had Existed in the Sales Force Since the Beginning of 2019 and Caused a Dramatic Decline in Billings Growth**

**a.    Results Revealed a 21% Drop in B2B Billings Growth in Just Three Months**

84.    On July 31, 2019, after the close of the markets, the Company announced its financial results for the second quarter of 2019, which ended on June 30, 2019. According to the Form 10-Q that Pluralsight filed with the SEC that day, which Skonnard and Budge signed, as a result of "sales execution challenges," the Company had dismal total billings growth of 23% year-over-year, and B2B billings growth of 27% year-over-year. These results were an abrupt and

33

151

Exhibit 2

dramatic departure from the Company's performance in previous quarters, as demonstrated by the following charts[11]:

| | Q2 2018 | Q3 2018 | Q4 2018 | FE 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| **B2B Billings** | 52% | 53% | 51% | 52% | 48% | **27%** |
| **Total Billings** | 42% | 44% | 42% | 43% | 41% | **23%** |
| **Revenue** | 38% | 42% | 42% | 42% | 40% | 42% |



85.    The Form 10-Q revealed for the first time that the Company had been "slower in hiring additional sales representatives than planned for 2019" and that "[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods."

---

[11] The numbers in this chart are gathered from the Company's Form 10-Q and/or 10-K filings for the relevant time period and the Officer Defendants' statements on quarterly earnings calls.

>    b.    **Budge and Skonnard Admitted that the Sales Force Deficiencies Existed Since the Beginning of 2019**

86.    Skonnard and Budge spoke on the earnings call to analysts and investors that day. A *Seeking Alpha* analyst later commented that "we have not sat in at a worse one."[12] According to the publicly available transcript of the call, Skonnard and Budge admitted that they had known that the sales force lacked capacity and was not properly ramped *since at least the beginning of 2019*, and that this deficiency early in the year had translated into the billings collapse announced seven months later. Further, Budge admitted that the Company had taken "too long" to hire and place sales representatives and that "we suffered from that in the first half [of the year]." The analysts on the call openly struggled to understand how the Company could have had "sales execution challenges" when all they had heard from Defendants to that date was how well the sales team was executing.

87.    As Skonnard admitted, there "*was not enough capacity in the system to sustain our high-growth expectations as we entered the year*." Because the Company's deal cycle lasted approximately five to six months, to sustain those high-growth expectations through June 2019, the Company would have needed to hire and place enough sales representatives to fuel its deal pipeline as of in or around January 2019—in time for the deals in the pipeline to be ready to close in the spring of 2019.

88.    Budge admitted that the quota-bearing sales representatives that the Company had needed and had planned to have ramped in time to close deals in the second quarter "*didn't come into the year early enough in the year*" and that billings had suffered dramatically as a result:

---

[12] Tech and Growth, *Pluralsight: Good Problems to Have, But Needs To Address A Major Concern*, Seeking Alpha, Sept. 4, 2019.

"We're about 250 quota-bearing reps right now. And that's about the number of bodies *we wanted to have at this time in the year*, *but they didn't come into the year early enough in the year*. *So the ramp time to get them trained up and ready to go, be effective with salaries, we're a few months behind there, that's been the big impact.*"

89.    Likewise, Budge admitted that Pluralsight's sales force had lacked "*ramped capacity*" since the "*end of last year*," which had prevented the Company, "*beginning into this year*," from generating the deal pipeline activity necessary to sustain its customary and expected high level of billings growth in the second quarter of 2019:

> The productivity we're seeing on the tenured reps is the same where it historically has been. ***Simply put, there was dozen—there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.*** The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, ***but we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter.*** Good news is we feel, with where we are, ***we're caught up to some extent.*** For the most part still, we're up by a few heads, but not a material amount like we were through Q2. So we feel like we're in a great spot going into the second half.

90.    Despite having never told investors that the Company was off track with its sales force ramping in the first place, Skonnard now told investors that "*we've nearly caught up with our annual sales ramp capacity plan*, which will strengthen the balance of the year and into 2020." Budge echoed him, telling investors that the Company had "*nearly caught up on our sales capacity gaps*."

36

154

Exhibit 2

91.    Given Defendants' admissions that they had known about the sales capacity problem, and the concurrent threat to billings, for *several months*, an analyst asked a logical question: "**[W]hy *didn't we hear this on last quarter's call*?**" Budge acknowledged that Defendants had not told analysts about the capacity problem—even when analysts directly asked them detailed questions about the status of the sales force—but it was not because they had not known about the problem. Instead, Budge indicated, Defendants had unreasonably hoped that they could paper over the "capacity gap" without having to admit that they had misled investors: "***Well, we were still hitting our numbers, and we felt like we had things broke, right***. We were still realizing what we needed with on our – what we need on our retention rates with our expand opportunities, and we were seeing kind of an accelerated productivity out of reps ***that was not sustainable in the second quarter***. ***We just needed more bodies to soak that up***."

92.    Skonnard reiterated that management had monitored the sales force's retention rate and growth over the first six months of 2019 and was resolute that the billings collapse had been due to sales capacity problems, not an unexpected loss of sales representatives: "We actually—***we have benchmarks that we look out regularly for what happens in the software industry***, where we have historically been much better than those benchmarks and that continued through the first 6 months."

93.    Skonnard also informed analysts and investors that "the type of fast growth we've enjoyed requires us to provide prescriptive and effective sales enablement, and ***we didn't invest enough in that area of our business***," and announced that the Company would be "adding key people and investing in sales operations, customer success and sales enablement to support our newly hired sales teams." Skonnard also announced that DiBartolomeo was leaving the Company

37

155

Exhibit 2

after three years as CRO and that the Company needed its new leadership to help its sales teams to "execute *more effectively*." Skonnard stated that he was "confident these are the right changes for the business and that they'll get it quickly *back to our expected long-term growth trajectory*." Despite speaking on the topic multiple times during the Class Period, Defendants never disclosed to investors that they had fallen off that trajectory in the first place.

     **5.**     **The Market Was Blindsided by the Disclosure of an Insufficient Sales Force and the Admission that this Fact Was Known but Not Disclosed During the Class Period**

94.     In response to the July 31, 2019 disclosures, Pluralsight shares plummeted, dropping a massive 39.52%, from $30.69 to $18.56 at the close of the market on August 1, 2019, on unusually high trading volume of 22 million shares. The crash entirely erased the stock's year-to-date gains and amounted to a loss in market capitalization of approximately $902 million.

95.     Pluralsight and the Officer Defendants' false statement and omissions during the Class Period caused the artificial inflation of the Company's share price, which Defendants took advantage of by engaging in massive sales of their own stock, as described in Sections IV.A.3.b and IV.B.2 herein.

96.     As reflected by the share price's nosedive, investors and analysts were shocked by the news. On August 1, 2019, SunTrust issued a report titled: "*Where Did That Come From?*" J.P. Morgan similarly noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "***hiring issue was known earlier***" and that "***[m]anagement pointed out that it saw it was behind on sales hiring coming into the year***, but we are now just hearing about it since they were able to deliver on 1Q19 numbers ***and hoped that quarter's execution would continue***."

97.    A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that the Company had "been an investor darling for much of its lifetime as a public company" but that its "bullish case broke down" in the second quarter. Alexander observed that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million implies a sharp revenue deceleration to just 30% y/y growth."

98.    On August 5, 2019, another *Seeking Alpha* article further analyzed the earnings announcement:

> [T]he 23% increase in billings to $80.6 million is a major disappointment as continued elevated spending should result in faster sales growth (and billings growth), which is now clearly falling short. While the company maintained the full year guidance, it is very clear that the situation is far from rosy. Not only are risks related to the full year guidance up in a major way, realistic losses still coming in rapidly above the $100 million mark, mostly because of a run rate of $85 million in stock-based compensation.

99.    On September 4, 2019, *Seeking Alpha* published an article that called out Defendants for their deceit: "While sales productivity is a concern, we think there is greater concern around management's lack of transparency in information sharing." The article noted that "[i]t was revealed during Q2 earnings call that Q2's sales issue was actually an extension from Q1." The article also discussed Skonnard and Budge's evasiveness on the earnings call:

> During the earnings call, we found multiple occasions where the management brushed aside concerns raised by analysts while also added a bit of an unexpected surprise. Some of these instances were when questions about gross retention, sales productivity, and sales organization structure came up. When asked a deeper question about

39

157

Exhibit 2

the possible factor causing the billings growth slowdown in Q2, for instance, the CFO indicated the lack of sales ramp capacity in Q1 that extended into Q2. This led to one of the analysts calling him out for not sharing this information as soon as it happened during the Q1 earnings call.

100.    The article concluded that the material problem with the Company's sales capacity that existed early in the year had caused billings growth to evaporate by the second quarter, leaving Pluralsight with "*nowhere to hide*." The author wondered "how deep this lack of transparency has probably rooted itself into the culture of the organization."

101.    On January 14, 2020, Budge returned to the Needham Growth Conference to speak to analysts and investors on behalf of the Company. Analyst Scott Randolph Berg asked him about the failures in 2019. Budge reiterated and elaborated on his prior admissions, acknowledging that the Company had known that it had too few adequately productive "quota-bearing" sales representatives from the start of the Class Period:

> *I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned—than we had hoped for.* And the reason for that is we didn't—*while we planned for, we didn't execute to those reps*. We didn't decide where they should go early enough in 2018 leading into 2019. We were experimenting with a hunter-farmer model in 2019. *We didn't do a good enough job planning early and enough and executing early and enough in deciding who would fit into what slot as we rolled through 2019. And as a result, we had some capacity challenges in our sales force. We just didn't have enough reps.*
>
> So we've put the gas pedal down hard in the second half in the last kind of 3 quarters in 2019. *We came out of 2018 going into 2019 with about 200 quota-bearing sales reps*. And we're now going into 2020, a year later, with about—we have about 320 reps right now, which is pretty close to what the target was for us going—exiting 2019.

40

158

Exhibit 2

So I think with the new leadership, and frankly, I give all the credit to the new sales leadership that we have. They've done a remarkable job. You can have a really great recruiting engine. You can have a great planning engine. ***But unless the sales leaders engage in the process of hiring high-quality sales reps, it's not going to go anywhere. And we feel much better focused from our sales leaders going into 2020 than we had going into 2019.***

102.   As noted above, the aforementioned facts present a clear timeline of how Defendants' false and misleading statement and material omissions regarding the sales force allowed the Company's most senior officers to reap massive profits from insider sales at peak prices, only for those prices to collapse in a single day when the true condition of the sales force was finally revealed.

**B.      Scienter Allegations**

103.   Defendants knowingly or recklessly misrepresented and omitted material facts about the capacity of the Company's sales program. The facts discussed above—many of which include specific admissions by Skonnard and Budge about what they knew and when they knew it—support a strong inference of scienter and are incorporated herein by reference. In addition:

> **1.      Defendants' Scienter is Reflected in the Officer Defendants' Admissions That Since January 2019, They Knew Pluralsight Had Too Few Ramped Sales Representatives**

104.   On July 31, 2019, Skonnard and Budge admitted that the problems had existed since the end of 2018 and did not deny that they had known about them since then; in fact, their statements indicated that they actually knew of the problem and deliberately chose not to tell investors:

> a.      Skonnard began the earnings call by telling investors that there "was not enough capacity in the system to sustain our high-growth expectations ***as we entered the year***."

b.    Budge admitted that "*we just didn't have enough ramped capacity in our system in really the first and second quarter*" and that this led to the massive drop-off in billings growth:

*Simply put, there was dozen—there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.* The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, but *we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter*.

c.    When asked why Pluralsight, Skonnard and Budge did not tell investors earlier, for instance, on the Q1 2019 earnings call, that the Company was behind on its sales representative ramping, Budge did not say that they had not known about the problem. He said that they did not tell investors because the Company was "still hitting" its numbers in the first quarter.

d.    Budge admitted that the problem began early in the first quarter: "*[T]hey didn't come into the year early enough in the year.* So the ramp time to get them trained up and ready to go, be effective with salaries, *we're a few months behind there, that's been the big impact*."

105.    At the Needham investor conference on January 14, 2020, Budge again admitted that Pluralsight had knowledge of the sales force's under-capacity going into 2019: "*I think it's somewhat well documented we had a capacity gap in the first half of 2019. We came into the year with fewer sales reps than we had planned—than we had hoped for*. And the reason for that is we didn't—while we planned for, we didn't execute to those reps. We didn't decide where they should go early enough in 2018 leading into 2019." He also admitted that "*we feel much better focused from our sales leaders going into 2020 than we had going into 2019*," implying that the sales leaders "going into 2019" had not engaged in the process of hiring high-quality sales

42

160

Exhibit 2

representatives, thereby underscoring the previously admitted deficiencies in the sales force's capacity.

### 2.    Defendants' Scienter is Further Demonstrated By Highly Suspicious Insider Trading during the Class Period

106.    As alleged herein, Skonnard and Budge's trading activities, including those taken pursuant to 10b5-1 trading plans, which both individuals (as well as DiBartolomeo) adopted shortly before the start of the Class Period, were highly suspicious and indicate that the Officer Defendants had a motive to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making false and misleading statements and withholding material adverse facts from the market.

107.    The sales of stock far exceeded the amounts the Officer Defendants sold when their lock-up period ended to the start of the Class Period, and during the post-class Class Period. The Officer Defendants garnered profits during the Class Period that far exceeded their total compensation, and they sold their shares at prices far higher than those of prior or subsequent sales. Once the Officer Defendants knew when their trades were scheduled to occur, they had every incentive to make false and misleading statements, and conceal material adverse information, to artificially boost the Company's share price. The Officer Defendants then personally profited from that inflation by engaging in massive stock sales in the first half of the year, before time ran out on their billings growth and the sales force problems were revealed to the market.

      **a.**    **Scienter Evidenced by Skonnard's Highly Suspicious Insider Trading**

           **i.**    **Skonnard's Class Period Sales Far Exceeded His Pre- and Post-Class Period Sales**

108.    Skonnard's trading activity during the Class Period was suspicious in timing and amount when compared to his trading activity before and after the Class Period. Skonnard made no open market purchases of Pluralsight stock before, during, or after the Class Period. The following chart lists and summarizes the number of shares he sold, the average price at which the shares were sold, and the total proceeds that Skonnard received during each period, based on Form 4s filed with the SEC:

44

162

Exhibit 2

| Period | Date of Transaction | Number of Shares Sold | Price Per Share | Total Sale Value |
|---|---|---|---|---|
| **Pre-Class Period**<br><br>**11/13/18 – 1/15/19** | 11/16/2018 | 25,000 | $22.14 | $553,417.50 |
| | 11/30/2018 | 409 | $24.09 | $9,852.81 |
| | 12/4/2018 | 400 | $26.03 | $10,412.00 |
| | 1/7/2019 | 18,130 | $26.06 | $472,400.72 |
| | 1/8/2019 | 100 | $26.00 | $2,600.00 |
| | 1/9/2019 | 56,370 | $26.06 | $1,469,013.47 |
| | **TOTALS:** | **100,409** | **$25.07** | **$2,517,696.50** |
| **Class Period**<br><br>**1/16/10 - 7/31/19** | 1/28/2019 | 49,900 | $29.36 | $1,465,024.08 |
| | 1/28/2019 | 100 | $29.76 | $2,976.00 |
| | 3/11/2019 | 480,618 | $28.37 | $13,636,334.21 |
| | 4/26/2019 | 83,395 | $33.70 | $2,809,994.53 |
| | 4/26/2019 | 50,000 | $33.74 | $1,687,080.00 |
| | 6/3/2019 | 274 | $31.32 | $8,581.82 |
| | 7/26/2019 | 84,594 | $30.47 | $2,577,849.88 |
| | **TOTALS:** | **748,881** | **$29.63** | **$22,187,840.52** |
| **Post-Class Period**<br><br>**8/1/19 – 6/3/20** | 10/25/2019 | 83,063 | $18.32 | $1,521,714.16 |
| | 12/2/2019 | 109 | $16.99 | $1,851.91 |
| | 1/27/2020 | 83,404 | $19.77 | $1,648,897.08 |
| | 3/2/2020 | 9,024 | $17.83 | $160,897.92 |
| | 4/27/2020 | 83,063 | $14.77 | $1,226,840.51 |
| | **TOTALS:** | **258,663** | **$17.63[13]** | **$4,560,201.58** |

ii.   **Skonnard Sold $2.6 Million in Shares at Inflated Prices Just Five Days Prior to the July 31 Disclosure When He Obviously Knew the True Condition of the Sales Force**

109.   On July 26, 2019, in brazen disregard of the fact that the Company was days away from shocking the market with the truth about the condition of its sales force, just *five days before the disastrous Q2 2019 earnings call*, Skonnard sold 84,594 shares of Class A common stock at an average price of $30.47, for a total value of $2,577,849.88. Had he sold at the lowest point on

_____

[13] The average trading price in the 90 days after Defendants revealed the fraud was even lower: $16.65.

45

163

Exhibit 2

August 1, 2019 ($18.16), he would have received $1,536,227.04—meaning that *by trading before he disclosed the truth, he profited by an additional $1,041,622.84*.

110.    Skonnard also made insider sales close to the share price high of the Class Period. In April 2019, during the second quarter, when he knew of but decided not to disclose material adverse information about the Company's sales force, Skonnard engaged in highly irregular trading. On April 26, 2019, he sold two large blocks of shares, for a total of $4,497,074.53. *Just four days later*, on April 30, 2019, Pluralsight's stock reached its highest share price of the Class Period, of $35.49.

### iii.    Skonnard's Insider Sales Far Exceeded His Total Compensation

111.    During the Class Period, Skonnard sold over $22 million in Pluralsight Class A common stock—*approximately 342% of, or 3.4 times, the value of his total compensation package in 2019* ($6,476,664), and 171% of the value of his total compensation package in 2018 ($12,951,975).

### iv.    The Price at which Skonnard Made Insider Sales During the Class Period Was 78% Higher Than The Price He Received After the Class Period

112.    The average price at which Skonnard sold his shares during the Class Period ($29.63) was 18.2% higher than the average price at which he sold before the Class Period, and 78% higher than the average end-of-day trading price in the 90 days after Defendants revealed the fraud ($16.65).

164

Exhibit 2

     **v.**   **Skonnard Sold a Substantial Amount of His Tradeable Holdings During the Class Period**

113. During the Class Period, Skonnard sold a substantial amount of his tradeable Class A shares at inflated prices to maximize his profits. According to the Company's 2019 Proxy Statement filed with the SEC on March 14, 2019, as of January 31, 2019, Skonnard beneficially owned (personally and through an LLC that he controlled and through trusts) 841,883 shares of Class A common stock. Skonnard did so while maintaining voting control over the Company through his holdings of Class C common stock, of which he was the only shareholder. Class C common stock was not tradeable, so before Skonnard could sell on the open market, he had to convert shares of Class C common stock to Class A shares (or sell from his existing Class A shareholdings). According to the SPO Offering Documents, as of January 31, 2019, Skonnard held 14,642,929 Class C shares, and 841,883 Class A shares. Including the 50,000 shares that Skonnard held before his January 28, 2019 sale, as of the start of the Class Period, Skonnard held a total of 15,534,812 Class C and Class A shares. Overall, the total number of shares that he sold during the Class Period (748,881 shares), when calculated as a percentage of his total holdings, was relatively small: approximately 4.8%.

114. But importantly, Skonnard could not have converted and sold a large percentage of his overall shareholdings, that is, including his Class C shares, if he wanted to maintain his control of the Company. For instance, Skonnard controlled 54.7% of the total voting power of the prior to the SPO. After he sold 480,618 shares (just 3% of his total holdings) in the SPO, he controlled 53.6% of the total voting power. Therefore, he could not have sold millions of shares and held onto his majority. Instead, during the Class Period, he sold nearly as many Class A shares as he held at the beginning of it (748,881 shares out of 841,883 shares), while still maintaining total

47

165

Exhibit 2

voting power, to maximize his profits while the Company's stock was artificially inflated because of his false and misleading statement and omissions.

> **b.      Scienter Evidenced by Budge's Highly Suspicious Insider Trading**
>
> > **i.      Budge's Class Period Sales Far Exceeded His Pre- and Post-Class Period Sales**

115.    Budge's trades during the Class Period dwarfed his pre- and post-Class Period trades, and he executed them at times and in quantities that raise a strong inference of his scienter.

116.    Budge has made only one purchase of shares on the open market: on December 6, 2018, he bought 750 shares at an average price of $23.29 for a total of $17,467.50 (depicted in blue in the chart below). The following chart lists and summarizes the number of shares he sold, the average price at which the shares were sold, and the total proceeds that Budge received during each period, based on Form 4s filed with the SEC:

48

166

Exhibit 2

| Period | Date of Transaction | Number of Shares Sold | Price Per Share | Total Sale Value |
|---|---|---|---|---|
| **Pre-Class Period** 11/13/18 – 1/15/19 | 11/30/2018 | 271 | $24.09 | $6,528.39 |
| | 12/6/2018 | 750 | $23.29 | ($17,467.50) |
| | **TOTALS:** | 271 | $24.09 | $6,528.39 |
| **Class Period** 1/16/19 – 7/31/19 | 2/19/2019 | 199,400 | $29.27 | $5,835,919.56 |
| | 2/19/2019 | 600 | $30.00 | $18,000.00 |
| | 2/20/2019 | 133,091 | $29.70 | $3,952,376.81 |
| | 2/22/2019 | 6,206 | $29.66 | $184,072.44 |
| | 3/11/2019 | 177,854 | $28.37 | $5,046,162.62 |
| | 5/22/2019 | 1,823 | $33.34 | $60,780.10 |
| | 6/3/2019 | 181 | $31.32 | $5,669.01 |
| | **TOTALS:** | 519,155 | $29.09 | $15,102,980.54 |
| **Post-Class Period** 8/1/19 -- 6/3/20 | 8/22/2019 | 1,535 | $15.72 | $24,136.80 |
| | 11/21/2019 | 1,462 | $17.78 | $25,994.36 |
| | 12/2/2019 | 109 | $16.99 | $1,851.91 |
| | 1/2/2020 | 12,082 | $17.21 | $207,931.22 |
| | 2/24/2020 | 1,462 | $19.18 | $28,041.16 |
| | 3/2/2020 | 2,650 | $17.83 | $47,249.50 |
| | **TOTALS:** | 19,300 | $17.37[14] | $335,204.95 |

> ii. **Budge Reaped $15 Million in Three Weeks at Inflated Prices While in Possession of Material Adverse Information**

117. The timing and amounts of Budge's trades were highly suspicious. He adopted a trading plan on November 28, 2018, but according to the Forms 4 he filed with the SEC, *he has only traded pursuant to it once, less than three months after he adopted it*, in a series of transactions on February 19 and 20, 2019, from which he made *$9,990,368.81*. Budge executed these trades less than a week after he told investors, in response to a question during an earnings

---

[14] The average trading price in the 90 days after Defendants revealed the fraud was even lower: $16.65.

call about "***hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how we should think about that in 2019***," that the Company was growing its sales force according to plan and that analysts should look forward to "***more reps to come, more on quota on the street and more goodness from them***." In making these statements, knowing that he would be selling hundreds of thousands of shares just days later, Budge had every incentive not to disclose the problems with the sales force.

118.    Two weeks after these massive sales, Defendants announced the SPO, and Budge reaped another ***$5,046,162.62***, for a total of ***$15,036,531.43 in proceeds in less than three weeks***. The average price at which Budge sold these shares was $29.08—a 74.7% increase over the average end-of-day trading price in the 90 days after Defendants revealed the fraud ($16.65).

### iii.    Budge's Insider Sales Far Exceeded His Total Compensation

119.    During the seven months of the Class Period, Budge made over ***$15 million*** in sales of his Pluralsight stock at artificially inflated prices, ***an amount 533.6% of, or 5.3 times, the value of his total compensation package for all of 2019***, which was $2,830,594,[15] and 203% of the value of his total compensation package for 2018, which was $7,427,500.

### iv.    Budge Sold His Shares at an Average Price 74.7% Higher than the Price After the Class Period

120.    The average price per share at which Budge liquidated his holdings during the entire Class Period was $29.09—a 74.7% increase over the average end-of-day trading price in the 90 days after the disclosure.

---

[15] According to the Company's 2020 Proxy Statement filed with the SEC, his total non-stock-based compensation was $497,030. The value of Budge's stock sales during the Class Period was ***30 times*** the value of this compensation.

     **v.**    **Budge Sold a Substantial Percentage of His Holdings During the Class Period**

121.    Budge also sold a substantial portion of his shareholdings, which strengthens an inference of scienter. According to the SPO Offering Documents, as of January 31, 2019, Budge held 1,094,358 Class B shares and 205,726 Class A shares, for a total of 1,300,084 shares. The Class B shares were convertible to Class A shares on a share-for-share basis. ***During the Class Period, therefore, Budge sold 39.9% of all of his shares***.[16] [17] According to his Form 4s filed with the SEC in connection with the SPO, as of March 6, 2019, Budge owned 354,412 shares of Class A common stock (which included 163,460 Class B shares that he converted to Class A shares for the SPO), and sold 177,854 shares in the offering; therefore, ***on just one day, he sold half of his then-tradeable shares***.

---

[16] For sake of comparison, the percentage of Budge's total holdings that he sold after the Class Period is much lower. Beginning with the number of Class A and Class B shares that Budge held as of the start of the Class Period (1,300,084 shares) (a number that is generous to Budge, because it includes non-vested shares) and subtracting the number of shares that he sold during the Class Period (519,155 shares), Budge sold only 2.4% of his total holdings after the Class Period (19,300/780,929)—compared to 39.9% during the Class Period. This calculation does not take into account the fact that Budge was granted new stock options as part of his 2019 compensation package; as of February 2020, according to the Company's 2020 Proxy Statement, his total shareholdings were 1,204,212.

[17] According to the SPO Offering Documents, of the 1,094,358 Class B shares that Budge held, as of the SPO, 597,807 of the shares had not vested and were subject to a right of repurchase in favor of the Company, meaning that by another measure, during the Class Period, he held 496,551 Class B shares, 205,726 Class A shares and a total of 702,277 then-tradeable shares. ***Budge sold 73% of these tradeable shares during the Class Period***.

51

Exhibit 2

**3.    Defendants' Scienter Is Further Demonstrated By The Officer Defendants' Admissions That They Focused on the Precise Issues That They Did Not Disclose**

122.    As alleged in detail above and herein, Skonnard and Budge knew or had access to facts contradicting their public statements about the capacity and execution of their sales program.

**a.    Scienter From Defendants' Detailed Knowledge of Ramping of Sales Representatives**

123.    On the occasions listed below and others alleged herein, Budge and Skonnard made statements on behalf of the Company evidencing their personal knowledge about the sales representative ramping process, expressing their confidence in the sales force's capacity, offering detailed headcount data, and characterizing the process as proceeding "on pace" during analyst conference calls and investor presentations:

a.    **August 29, 2018**: Prior to the start of the Class Period, during a presentation at Pluralsight Live, according to a transcript of the event, Budge, referring to the information being displayed to investors, commented:

This gives you a view into the productivity of our sales reps. At about that kind of 18-month mark, 15- to 18-month mark, they are producing enough annual quota to meet the internal budgets that we have. At around the 2-plus year mark, they are starting to achieve their full quota. And with the experience levels that we now have as some of the folks— all those folks that we hired in 2017 and the beginning parts of 2018, as they are starting to become—even 2016—as they are starting to become more tenured, we're getting more productivity out of them, which is why we don't have to double our sales force every single year. And you'll start to see that benefit pay off in the bottom line.

b.    **August 29, 2018**: According to the transcript of the Pluralsight Live investor and analyst session, Skonnard spoke extensively about the Company's success in recruiting talented employees, including sales and marketing employees, repeatedly describing the company as "winning" and describing himself and the other leaders of the Company as "very proactive"

52

170

Exhibit 2

about bringing "talent" to Utah and the Company and "do[ing] a good job of managing" the hiring efforts.

c.   **October 24, 2018**: According to a transcript of the earnings call that day, Budge told investors that he and the Defendants felt "really good" about the ramping of the Company's sales representatives and its hiring plans.

d.   **October 24, 2018**: According to the same transcript, Skonnard told investors that "because of our enterprise account executives, who are joining the team, who have been joining the team over the last 2 years with that experience and with that capability," he personally was "getting above the power line immediately" with "the large Fortune 500 C-level execs."

e.   **January 16, 2019**: According to a transcript of the Needham investor and analyst conference, Budge offered specific data regarding sales representative headcount, telling them that the Company currently had "about 250" quota-bearing sales representatives, whom he said were "killing it," and explained how the Company's hiring plan demonstrated "some of the efficiencies in the model."

f.   **May 1, 2019**: According to a transcript of the Q1 2019 earnings call, Budge reiterated that the hiring plan was "on pace" and said he "love[d] our growth there."

g.   **July 31, 2019**: According to a transcript of the Q2 2019 earnings call, Budge told investors that he and the other executives monitored the "***metrics around how quickly a sales rep [was] ramped***" during the Class Period. He described those "metrics" as the amount that the sales representatives sold within the first three, six, and nine months of the ramping process. He told investors that the Company would have had to have brought on "dozens" of sales representatives at the end of 2018 to have them "ramp and become fully productive in the second quarter" of 2019.

h.   **July 31, 2019**: On the same call, according to the transcript, Skonnard told investors that "we have benchmarks that we look out regularly for" regarding the retention of sales representatives.

> **b.   Scienter From Defendants' Detailed Knowledge of the Company's Deal Pipeline**

124.   Skonnard and Budge had direct access to the Company's deal pipeline and frequently commented on its strength during earnings calls and investor meetings and presentations, indicating that they were fully aware of the deals (and therefore billings and

revenue) progressing through it, such that they knew how many deals were reasonably likely to close in the second quarter of 2019. Speaking with Skonnard on the earnings calls and at investor meetings, Budge regularly discussed how "we" viewed the pipeline:

a.  **August 1, 2018**: According to a transcript of the Q2 2018 earnings call, Budge told investors: "[T]he pipeline looks great and we feel really good about that for the next several quarters."

b.  **August 1, 2018**: On the same call, Budge told investors: "The deal cycle . . . [is] probably measured more in 5 to 6 months and we have deals in our midmarket segment that close as quickly as a month. So I would say that's the same or similar as it's been for the last several quarters. We are seeing the same kind of velocity there."

c.  **October 24, 2018**: Budge told investors that "given the results of Q3 and our outlook for Q4, we feel even more confident going into 2019."

d.  **February 13, 2019**: Budge described the "emphasis we put into new [business], driving more pipeline there and sensing a lot of our sales force to drive more new, that's certainly going to be a feeder for us over time as we continue to grow."

e.  **July 31, 2019**: Budge told investors that Defendants monitored the closing pace of deals and had not seen "material change in the timing of getting deals over the finish line" during the Class Period.

**4.    Defendants' Scienter Is Evidenced By the Officer Defendants' Knowledge that the Status of Pluralsight's Sales Capacity Was Vital to its Investors and its Stock Price**

125.    The Company's sales capacity figured prominently in earnings calls and investor meetings and presentations beginning from August 1, 2018 and continuing throughout the Class Period. Specifically, among other things, analysts asked about: "the efficiency of the sales force as it matures and how you measure that" (Q2 2018); "where are you in the ramping of the productivity of sales reps? And where are you in terms of your hiring plans?" (Q3 2018); about "hiring trends for the sales force, where did we end in the fourth quarter and any thoughts on how

54

172

Exhibit 2

we should think about that in 2019" (Q4 2018); and "where are you or how are you doing in terms of the hiring to your targeted sales headcount by the end of the year?" (Q1 2019).

126.   In addition, at the Pluralsight Live conference (on August 29, 2018) and the Needham Growth Conference (January 16, 2019, the first day of the Class Period), Budge offered specific headcount numbers and spoke of how Pluralsight had built out the infrastructure around the sales representatives (the sales enablement and customer success teams). He represented to investors and analysts at the conferences that this information showed how productive the sales representatives were and how the sales program was operating "at scale."

127.   Analysts asked these questions, and Budge offered this information, for a reason: the growth of the sales program was inextricably linked to the growth of billings and therefore the growth of revenue. Given how important the subject was to the market, it was at a minimum reckless for Budge and Skonnard to misrepresent to the market during the Class Period, without checking their facts, the size of the sale force.

> **5.**   **Defendants' Scienter is Demonstrated By Their Prior Admissions That the Capacity of the Sales Force to Generate Billings Was at the Core of Pluralsight's Business Model**

128.   Billings were the Company's "key business metric," representative of the Company's growth to investors, and the sales force was what ultimately generated billings, which further supports a strong inference that the Officer Defendants knew, or recklessly disregarded that, their sales capacity was not what they represented to investors it was in terms of the sale force's size and that their sales execution problems posed a grave risk to billings and revenue through the first half of 2019.

173

Exhibit 2

129.    In addition, the sales program and its ability to consistently deliver a high level of growth were issues of utmost importance to Defendants during the Class Period, and the Officer Defendants repeatedly emphasized this point to analysts and investors in response to questions about headcount, retention, efficiency, and productivity. This likewise further supports a strong inference that Skonnard and Budge were aware of, or recklessly disregarded the Company did not have about 250 sales representatives at the start of 2019, as claimed.

**C.    Defendants' Materially False and Misleading Statement and Omissions of Material Facts**

130.    The aforementioned positive statement and omissions about the Company's sales force during the Class Period were blatantly false and misleading, as set forth below.

**1.    January 16, 2019 Pluralsight at Needham Growth Conference**

131.    On January 16, 2019, Budge, on behalf of Pluralsight, participated in a question-and-answer session with analysts and investors, led by Needham & Company, LLC Senior Analyst Scott Randolph Berg, as part of the annual Needham Growth Conference held in New York, NY. A transcript of the session was made publicly available after the conference.

132.    Regarding the Company's past investments in its sales force, Budge said:

> [I]n 2017 through '18—well, first part of '18 and then the later part of '16 is when we went to a heavy investment in the enterprise, we actually saw that we had the product that would have—and the content capabilities that would appeal to that bigger enterprise. ***At the time, we had about 80 quota-bearing reps . . . . Not to mention, we didn't have enough like quota-bearing reps on the ground. . . .***
>
> So we went from roughly 0 enterprise-class reps to today, we have about 120 of those reps. And the aggregate quota-bearing reps went from about 80 at that time ***to today we have about 250***. We'll grow that to over 300 as we go through 2019. . . .

174

Exhibit 2

In the second quarter of this year—of last year, I should say, last year 2018, it was the first quarter in the previous 8 quarters where we actually grew our B2B billings number faster than our sales and marketing line.

So it's work—it seems to be working. So we had a lot of great sales reps. They're killing it. And a lot of great infrastructure around them that has improved our retention massively and we're now at scale, we're starting to see the efficiencies around that.

133.   Budge's statement that "today we have about 250" [quota-bearing sales representatives] in Paragraph 132 was materially false and misleading and omitted material facts, as follows:

(a)   In discussing how the Company went from **not having "enough"** quota-bearing sales representatives through 2017 and the early part of 2018, Budge's statement about Pluralsight having **"today . . . about 250"** was false and misleading because it created an impression for investors that the sales force had sufficient capacity to sustain Defendants' high-growth expectations as the Company entered the year. The truth was, as Defendants later admitted, that from the beginning of January 2019, there was an insufficient number of ramped, productive sales representatives capable of meeting the quotas that were necessary for the Company to continue to achieve its historic level of billings growth in 2019. In fact, in Budge's own words on July 31, 2019: "**[T]here were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter**." Further, in Skonnard's words, there "**was not enough capacity in the system to sustain our high-growth expectations as we entered the year**."

(b)   Budge's statement about the absolute quota-bearing sales representative headcount being "**about 250**" was additionally false because Budge later admitted to investors that "[w]e came out of 2018 going into 2019 **with about 200** quota-bearing sales reps."

(c)   By choosing to speak about the specific number of sales representatives Budge incurred a duty to speak accurately and truthfully on the topic and tell investors that the Company had begun 2019 with a "**capacity gap**" of dozens fewer sales representatives than for which it had "planned." By omitting this material information, and not correcting the statement about the number of sales representatives, Defendants continued to misled investors.

57

175

Exhibit 2

(d)    Budge's statement about the 250 sales representative headcount conveyed that the sales representatives were or would be generating high levels of billings growth, when in reality the Company had already fallen off track of its "***annual sales ramp capacity plan***" and its "***expected long-term growth trajectory***" of continued billings growth of "greater than 40% and near 50% on B2B"; had approximately ***50 less sales representatives*** than the 250 sales representatives Budge claimed it did at that point in time; and was taking too long to hire and place representatives. This lack of capacity meant that Defendants were in serious jeopardy of soon not being able to rack up additional consecutive quarters of billings growth greater than 40% and near 50% on B2B billings.

134.    Budge knew or recklessly disregarded that the statement that Pluralsight had 250 sales representatives was false and misleading. In particular, and in addition to the foregoing allegations, (i) Budge later admitted that Defendants knew, at the end of 2018, that the Company was off its annual sales representative capacity ramping plan by "***dozens***" of representatives and that the sales leaders at that time had not been focused on "hiring high-quality sales reps"; (ii) Budge later admitted that the number of quota-bearing sales representatives that the Company "***wanted to have at this time in the year . . . didn't come into the year early enough in the year***," so that they were "***a few months behind***" in being ramped and "***trained up and ready to go***" and "***effective***"; (iii) after being confronted by analysts on the July 31, 2019 call about why Defendants did not disclose these material problems earlier, Budge never denied that he or the other Defendants had known about the sales execution problems at the beginning of 2019; (iv) Budge regularly spoke extensively, often in response to analysts' questions, about the sales force capacity in the form of headcount, productivity, and the efficiencies in the Company's business model; and (v) Budge claimed to be knowledgeable about the sales ramping process, including about the timeline for how many months it took for a sales representative to fully ramp up to taking on a full quota.

176

Exhibit 2

**D.      Loss Causation**

135.     During the Class Period, as detailed herein, Pluralsight and the Officer Defendants engaged in a scheme to defraud the market and a course of conduct that artificially inflated and/or maintained the price of Pluralsight's Class A common stock and operated as a fraud or deceit on Class Period purchasers of Pluralsight's Class A common stock. This scheme was accomplished by Defendants' failing to disclose, misrepresenting, and concealing Pluralsight's true number of sales representatives and sales capacity during the Class Period. Defendants' false and misleading statement and omissions had their intended effect and caused Pluralsight Class A common stock to trade at artificially-inflated and/or maintained levels throughout the Class Period, reaching as high as $35.49 on April 30, 2019. As a result of their purchases of Pluralsight Class A common stock during the Class Period and Defendants' material misstatement and omissions, Lead Plaintiffs and the other Class members suffered real economic loss, *i.e.* damages, under the federal securities laws.

136.     When Defendants' July 31, 2019 corrective disclosure regarding the sales execution failures entered the market, the price of Pluralsight's Class A common stock declined precipitously as the prior artificial inflation came out of Pluralsight's Class A common stock price. Specifically, the artificial inflation in Pluralsight's stock price was removed when the sales execution failures and risks misstated and omitted by Defendants were revealed to the market on July 31, 2019. That day, Pluralsight reported shockingly bad billings growth for the second quarter of 2019, including a 43% decrease in B2B billings growth and a 44% decrease in total billings growth from their respective growth rates in the previous quarter. Defendants further disclosed

that "[w]e expect that the decline in our billings growth rate during the three months ended June 30, 2019 will have a negative impact on our revenue in future periods."

137. In response to the July 31, 2019 disclosures, Pluralsight shares dropped nearly 40% on August 1, 2019, from $30.69 at the end of day on July 31 to $18.56 at the end of day on August 1, on heavy trading volume of more than 22 million shares traded.

138. Investors and analysts were shocked by the news. On August 1, 2019, SunTrust issued a report titled: "*Where Did That Come From*?" J.P. Morgan similarly noted in its August 1, 2019 report (titled "*2Q19: Reaction Overdone*") that the "**hiring issue was known earlier**" and that "***[m]anagement pointed out that it saw it was behind on sales hiring coming into the year***, but we are now just hearing about it since they were able to deliver on 1Q19 numbers ***and hoped that quarter's execution would continue***."

139. A *Seeking Alpha* article published by author Gary Alexander on August 1, 2019, titled "*Pluralsight: Nobody Wants To Hear About Sales Execution Issues*" noted that the Company had "been an investor darling for much of its lifetime as a public company" but that its "bullish case broke down" in the second quarter. Alexander observed that "[r]esults like these are deserving of an explanation," and "Skonnard offered a mild one at best." Alexander also pointed out the implications for the deceleration in billings on revenue: "The impacts will be felt beginning next quarter, where Pluralsight's Q3 guidance range of $79.5-$80.0 million implies a sharp revenue deceleration to just 30% y/y growth."

140. On August 5, 2019, another *Seeking Alpha* article further analyzed the earnings announcement:

> [T]he 23% increase in billings to $80.6 million is a major disappointment as continued elevated spending should result in

60

178

Exhibit 2

> faster sales growth (and billings growth), which is now clearly falling short. While the company maintained the full year guidance, it is very clear that the situation is far from rosy. Not only are risks related to the full year guidance up in a major way, realistic losses still coming in rapidly above the $100 million mark, mostly because of a run rate of $85 million in stock-based compensation.

141. Pluralsight's July 31, 2019 disclosures corrected Defendants' prior materially misleading statement and omissions concerning their sales force. The decline in Pluralsight's share price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Pluralsight's stock price decline negate any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Pluralsight-specific facts unrelated to Defendants' fraudulent conduct.

**E.    Presumption of Reliance**

142. At all relevant times, the market for Pluralsight's Class A common stock was efficient for the following reasons, among others:

(a)    Pluralsight's stock met the requirements for listing and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

(b)    As a regulated issuer, Pluralsight filed periodic public reports with the SEC and the NASDAQ Stock Market;

(c)    Pluralsight regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Pluralsight was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

61

179

Exhibit 2

143. Because of the foregoing, the market for Pluralsight securities promptly digested current information regarding Pluralsight from all publicly available sources and reflected that information in the price of Pluralsight's Class A common stock. Under these circumstances, all purchasers of Pluralsight Class A common stock during the Class Period suffered similar injury through their purchase of Pluralsight Class A common stock at artificially inflated prices, and the presumption of reliance applies.

144. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are also grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Pluralsight's business operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the capacity of the Defendants' sales program to the Company's key business metric of billings, as alleged above, that requirement is satisfied here.

**F.      Inapplicability of The Statutory Safe Harbor**

145. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the false statement described in this complaint. The specific false and misleading statement described in this complaint was not identified as "forward-looking" when made. To the extent the statement was purportedly forward-looking, there was no meaningful cautionary language identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statement. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement described in this complaint, Defendants are liable for that statement because at the time it was made, Defendant Budge knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Pluralsight who knew that the statement was false or misleading when made.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against Pluralsight and the Officer Defendants (Skonnard and Budge)**

146.    Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

147.    During the Class Period, Pluralsight and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged in this complaint; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Pluralsight Class A common stock at artificially inflated prices.

148.    Pluralsight and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made an untrue statement of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for Pluralsight Class A common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

63

181

Exhibit 2

149.    Pluralsight and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

150.    During the Class Period, Pluralsight and the Officer Defendants made the false statement specified above, which they knew or recklessly disregarded to be false or misleading in that the statement contained a misrepresentation and failed to disclose material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading.

151.    Pluralsight and the Officer Defendants had actual knowledge of the misrepresentation and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal Pluralsight's true condition from the investing public and to support the artificially inflated prices of the Company's Class A common stock.

152.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pluralsight Class A common stock. Lead Plaintiffs and the Class would not have purchased the Company's Class A common stock at the prices they paid, or at all, had they been aware that the market prices for Pluralsight Class A common stock had been artificially inflated by Pluralsight and the Officer Defendants' fraudulent course of conduct.

153.    As a direct and proximate result of Pluralsight and the Officer Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in

connection with their respective purchases of the Company's Class A common stock during the Class Period.

154.   By virtue of the foregoing, Pluralsight and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants (Skonnard and Budge)**

155.   Lead Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

156.   As alleged above, Pluralsight violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

157.   The Officer Defendants acted as controlling persons of Pluralsight within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Pluralsight, the Officer Defendants had the power and ability to control the actions of Pluralsight and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

**COUNT III**
**For Violations of Section 20A of the Exchange Act**
**Against the Officer Defendants (Skonnard and Budge)**

158.   Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

65

183

Exhibit 2

159.    As set forth in the paragraphs above and below, the Officer Defendants committed underlying violations of Section 10(b) and Rule 10b-5 by selling Pluralsight Class A common stock while in possession of material, nonpublic information about the Company's sales capacity. Consequently, they are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.

160.    On March 11, 2019, as part of the SPO, while Pluralsight's securities traded at artificially inflated and distorted prices, while in possession of adverse, material non-public information about Pluralsight, the Officer Defendants personally and illegally profited in the following amounts, by selling the following shares of Pluralsight Class A common stock, at a price of $28.3725 per share.[18]

      a.    Defendant Skonnard sold 480,618 shares, for a profit of $13,636,334.21; and

      b.    Defendant Budge sold 177,854 shares, for a profit of $5,046,162.62.

161.    Under Section 20A of the Exchange Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a).

162.    Contemporaneously with the Officer Defendants' insider sales, Lead Plaintiff INPRS purchased a total of 65,200 shares of Pluralsight Class A common stock for a total of

---

[18] This amount represents the public offering price of $29.25 less the underwriters' discount.

$1,907,100, and Lead Plaintiff CTPF purchased a total of 7,900 shares of Pluralsight Class A common stock for a total of $228,016.91.

163.	Lead Plaintiffs and other Class members who purchased shares of Pluralsight Class A common stock contemporaneously with the Officer Defendants' insider sales suffered damages because (i) in reliance on the integrity of the market, they paid artificially inflated prices for those shares as a result of Pluralsight and the Officer Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act; and (ii) they would not have purchased Pluralsight Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Pluralsight and the Officer Defendants' false and misleading statement and omissions.

## V.	CLASS ACTION ALLEGATIONS

164.	Lead Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the Class A common stock of Pluralsight during the Class Period (January 16, 2019, through July 31, 2019, inclusive) and were damaged thereby. Excluded from the Class are (i) all defendants; (ii) members of the immediate families of the defendants; (iii) any of the selling stockholders listed in the Offering Documents; (iv) members of the immediate families of any of the selling stockholders listed in the Offering Documents; (v) the subsidiaries and affiliates of any defendants or the selling stockholders listed in the Offering Documents; (vi) any person or entity who is a partner, executive officer, director or controlling person of any defendants or selling stockholders listed in the Offering Documents (including any of their subsidiaries or affiliates); (vii) any entity in which any defendant has a controlling interest; and (viii) the legal representatives, heirs, successors and assigns of any such excluded party.

185

Exhibit 2

165.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. According to Pluralsight's Q2 2019 Form 10-Q, as of June 30, 2019, the Company had approximately 101,096,472 shares issued and outstanding owned by many thousands of investors. The precise number of Class members is unknown to Lead Plaintiffs at this time, but it is believed to be in the thousands. Members of the Class may be identified by records maintained by Pluralsight or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

166.    Common questions of law and fact exist as to all members of the Class, predominate over questions that may affect individual Class members and include:

a.    whether Pluralsight and the Officer Defendants violated the Exchange Act as alleged herein;

b.    whether Pluralsight and the Officer Defendants omitted and misrepresented material facts during the Class Period;

c.    whether Pluralsight and the Officer Defendants knew or recklessly disregarded that their statement and omissions were false and misleading;

d.    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972);

e.    whether and to what extent the market price of Pluralsight Class A common stock was artificially inflated during the Class Period due to the non-disclosures and/or misrepresentation complained of herein;

f.    whether, with respect to Lead Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, the defendants named in those claims are controlling persons of the Company;

g.    the extent of damages sustained by Class members and the appropriate measure of damages.

186

Exhibit 2

167.    Lead Plaintiffs' claims are typical of those of the Class because all members of the Class arise from and were caused by and have sustained damages as a result of Pluralsight and the Officer Defendants' wrongful conduct in violation of the Exchange Act, as complained of herein.

168.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class-action securities litigation. Lead Plaintiffs have no interests that conflict or are antagonistic with those of the Class.

169.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    awarding compensatory damages in favor of Plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

187

Exhibit 2

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 4, 2022

By: */s/ Carol V. Gilden*
**COHEN MILSTEIN SELLERS & TOLL PLLC**

Carol V. Gilden (admitted *pro hac vice*)
cgilden@cohenmilstein.com
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll (admitted *pro hac vice)*
William Wilder (admitted *pro hac vice)*
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
wwilder@cohenmilstein.com

Norhan Bassiouny (admitted *pro hac vice*)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
nbassiouny@cohenmilstein.com

**CLYDE SNOW & SESSIONS, P.C.**

Keith M. Woodwell (#7353)
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 322-2516
Facsimile: (801) 521-6280
kmw@clydesnow.com

70

188

Exhibit 2

*Counsel for Lead Plaintiffs Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago and the Proposed Class*

71

189

Exhibit 2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2022, I electronically filed the foregoing Second Amended Complaint with the Clerk of Court using the CM/ECF system which sent notification of such filing to all parties of record.

<i>/s/ Carol V. Gilden</i>