Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

*Lead Counsel for Lead Plaintiffs
and the Class*

Keith M. Woodwell (#7353)
CLYDE, SNOW & SESSIONS, P.C.
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 322-2516
Facsimile: (801) 521-6280
kmw@clydesnow.com

*Liaison Counsel for Lead Plaintiffs
and the Class*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## NORTHERN DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PLURALSIGHT, INC., *et al.*,<br><br>Defendants. | Case No. 1:19-cv-00128<br><br>District Judge Ted Stewart<br><br>Magistrate Judge Daphne A. Oberg |

**DECLARATION OF CAROL V. GILDEN IN SUPPORT OF:
(A) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION FOR
<u>AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

i

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     PROSECUTION OF THE ACTION ................................................................... 6
        A.    Background ............................................................................................... 6
        B.    Appointment of Lead Plaintiffs and Lead Counsel, Lead Counsel's
              Extensive Investigation, and Filing of the Amended Complaint ............ 8
        C.    Defendants' Motion to Dismiss and Lead Plaintiffs' Successful Appeal ............. 10
              1. Defendants' Motion to Dismiss ....................................................... 10

              2. The Court's Grant of Defendants' Motion to Dismiss ..................... 11

              3. Appeal of Motion to Dismiss Order and Filing of the Operative Complaint.... 12

        D.    Fact Discovery ...................................................................................... 13
        E.    Class Certification ................................................................................. 15
        F.    The Mediation/Settlement Process ....................................................... 17

III.    THE SETTLEMENT ....................................................................................... 19

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...................... 22

V.      PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ............. 25

VI.     THE FEE AND EXPENSE APPLICATION ................................................... 27
        A.    The Fee Application ............................................................................... 28
              1. Lead Plaintiffs Have Authorized and Support the Fee Application ............... 28

              2. The Time and Labor Devoted to the Action by Plaintiffs' Counsel ............... 29

              3. The Skill and Experience of Lead Counsel ...................................... 31

              4. The Standing and Caliber of Defendants' Counsel ........................... 31

              5. The Need to Ensure the Availability of Competent Counsel in High-Risk
              Contingent Securities Cases .......................................................... 32

              6. The Reaction of the Class to the Fee Application ........................... 34

        B.    The Application for Litigation Expenses .............................................. 34

VII.    CONCLUSION ................................................................................................ 37

I, Carol V. Gilden, declare as follows:

## I.    INTRODUCTION

1.    I am a member of the bars of the State of Illinois; the U.S. District Courts for the Northern District of Illinois, the Eastern District of Texas, and the District of Colorado; the U.S. Courts of Appeals for the Second, Seventh, Ninth, and Tenth Circuits; and the U.S. Supreme Court. I have been admitted to this Court *pro hac vice*. I am a partner in the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), the Court-appointed Lead Counsel ("Lead Counsel") in the above-captioned action (the "Action").[1] Cohen Milstein represents the Court-appointed Lead Plaintiffs and Class Representatives the Indiana Public Retirement System ("INPRS") and the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") (collectively "Lead Plaintiffs"). I have personal knowledge of the matters stated in this declaration based on my active supervision of and participation in the prosecution and settlement of the Action.

2.    I submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, as well as Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, including the expenses of Lead Plaintiffs under 15 U.S.C. § 78u-4(a)(4).[2]

3.    In entering the Settlement, Lead Plaintiffs and Lead Counsel were well-informed about the strengths and weaknesses of the Action. As detailed below, prior to entering the proposed Settlement, Lead Counsel:

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement dated May 1, 2024 (the "Settlement Stipulation" or "Stipulation"), and previously filed with the Court. *See* ECF No. 271-1.

[2] In conjunction with this declaration, Lead Plaintiffs and Lead Counsel are also submitting Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and Memorandum of Law in Support Thereof (the "Settlement Motion"); and Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, and Memorandum of Law in Support Thereof (the "Fee Motion").

a. conducted a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including consulting with experts and reviewing the voluminous public record;

b. identified numerous former employees and potential fact witnesses and conducted interviews with 33 of them in connection with the pre-filing investigation;

c. drafted and filed amended complaints based on the results of that investigation which incorporated material from conference call transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; securities analyst reports and advisories concerning Pluralsight and reports and other documents filed publicly by Pluralsight with the U.S. Securities and Exchange Commission ("SEC"), Pluralsight's corporate website, and other publicly available information;

d. briefed and argued an opposition to Defendants' motion to dismiss, which the Underwriter Defendants joined;

e. briefed and argued a successful appeal of the District Court's order granting Defendants' motions to dismiss, resulting in reversal of the full dismissal, such that the case was reversed and remanded in part;

f. negotiated a proposed protective order and protocol for the production of electronically-stored information ("ESI");

g. negotiated the scope of Lead Plaintiffs' document production, and reviewed and produced documents to Defendants;

h. prepared for and defended the depositions of both Lead Plaintiffs' representatives, and attended eight depositions of the third parties subpoenaed by Defendants;

2

i.   engaged in negotiations with counsel for Defendants to obtain agreements on the documents to be produced by Defendants, including the custodians to be searched and the search terms to be used to locate documents;

j.   conducted extensive non-party discovery, including serving subpoenas on 16 nonparties, including Pluralsight's outside auditors, PricewaterhouseCoopers and Ernst & Young;

k.   consulted with non-testifying experts who assisted Lead Counsel in evaluating accounting, insider-trading, damages, and loss causation issues, as well as e-discovery issues that were relevant to the case;

l.   briefed and argued three discovery motions, including a motion to compel on the discovery time period that the District Court granted in full;

m.   successfully moved for class certification, which included working with an expert financial economist to prepare a report on market efficiency;

n.   participated in a mediation process conducted by Jed D. Melnick, Esq. of Judicial Arbitration and Mediation Services, Inc. ("JAMS"), an experienced and highly respected mediator,[3] which included two full-day mediation sessions, taking place approximately one year apart, and the exchange of detailed mediation statements by the Parties;

o.   drafted and negotiated the Settlement Stipulation and related settlement documentation;

p.   hired a claims administrator utilizing a competitive bid process; and

---

[3] *See* Declaration of Jed. D. Melnick ("Melnick Decl."), Ex. 3, ¶¶ 4–8.

3

q. supervised the dissemination of the Notice and Summary Notice to Class Members and prepared final documentation of the Settlement, including the motion papers filed contemporaneously herewith.

4. Based upon our experience, the extensive discovery conducted, our evaluation of the facts and the applicable law, and our recognition of the risk and expense of continued litigation, Lead Plaintiffs and Lead Counsel submit that the Settlement is fair, reasonable, and adequate. In view of all these considerations, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result for the Class, considering the significant risks in the Action and the amount of the potential recovery. The Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay. As discussed in more detail below, had litigation continued, there were substantial risks to proving Defendants' liability, including the required elements of falsity, scienter, loss causation, and damages, each of which presented unique challenges.

5. From the outset of this Action, Lead Plaintiffs supervised Lead Counsel. Lead Plaintiffs reviewed pleadings and all material filings, and remained informed throughout the Action. Lead Plaintiffs were also involved in the mediation process, including attending both mediation sessions, and ultimately reviewed and approved the proposed Settlement. *See* Declaration of Jeffrey Gill, INPRS Chief Legal Officer, submitted on behalf of INPRS (the "INPRS Decl."), and Declaration of Carlton W. Lenoir, Sr., CTPF's Executive Director, submitted on behalf of CTPF (the "CTPF Decl."), attached hereto as Exhibits 1 and 2, respectively.

6.      In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. Lead Counsel engaged Jeremy Marmer, PhD, CFA, of Peregrine Economics, in preparing the proposed Plan of Allocation. Dr. Marmer has significant experience in drafting plans of allocation. *See* Resume of Jeremy Marmer, PhD, CFA, *available at* https://www.globaleconomicsgroup.com/wp-content/uploads/Jeremy-Marmer-CV.pdf. Under the proposed Plan of Allocation, the Settlement Amount (plus interest accrued and after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to Class Members who timely submit valid Proof of Claim Forms based on their Recognized Loss amounts as calculated under the Plan of Allocation.

7.      Lead Counsel requests an award of attorneys' fees of 20% of the Settlement Fund, reimbursement of Plaintiffs' Counsel's (Lead Counsel's and Liaison Counsel's) Litigation Expenses in the amount of $276,166.46, and reimbursement of Lead Plaintiffs' costs, expenses, and lost wages under 15 U.S.C. § 78u-4(a)(4) in the amount of $39,620.66.

8.      Lead Counsel submits that the fee and expense application is fair and reasonable. As explained in the accompanying brief in support of Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses, the requested fee of 20% of the Settlement Fund is consistent with and even below fees awarded by courts in this Circuit and elsewhere in comparable securities and other complex class actions. Moreover, the reasonableness of the fee is further confirmed because an analysis of the lodestar in this Action would result in Lead Counsel receiving a negative multiplier of approximately 0.66, which means that, if awarded, the requested 20% fee will result in a discount on Plaintiffs' Counsel's time.

## II.    PROSECUTION OF THE ACTION

### A.  Background

9.      At all relevant times during the Class Period, Pluralsight was a software company that sold a cloud-based technology platform offering skills courses, skill and role assessments, learning paths, and business analytic tools. Second Amended Complaint ("SAC") ¶ 2, ECF No. 173. The Company sought to attract investors with a metric called "billings." *Id.* at ¶ 3. "Billings . . . represented not merely revenue . . . but also new subscriptions and subscription renewals in future quarterly periods." *Id.* Investors relied heavily on the billings figure to "evaluate the Company's deal volume and the amount that the Company would recognize as revenue over the next several fiscal quarters." *Id.* Pluralsight indicated that the primary factor in billings was the health of its sales force, both in terms of its size and experience. *Id.* at ¶ 4. The sales force represented at least 85% of total billings. Consequently, market analysts closely scrutinized Pluralsight's sales force because "so much of the Company's positive spin on its financial performance" depended on the sales force's health. *Id.* at ¶¶ 4–5. To ease investors' and analysts' concerns, Pluralsight "made detailed, positive statements about the growth in the number of sales representatives and about the sales force's increasing productivity and effectiveness." *Id.* at ¶ 5.

10.     This certified securities class action asserts claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors who purchased Pluralsight common stock during the period from January 16, 2019, through July 31, 2019, inclusive (the "Class Period"), and who were allegedly damaged thereby (the "Class").

11.     As set forth in the Second Amended Complaint, Lead Plaintiffs allege that Pluralsight as well as Aaron Skonnard, Pluralsight's Chief Executive Officer and Chairman, and James Budge, Pluralsight's Chief Financial Officer (together, "Individual Defendants," and collectively "Defendants"), made a false and misleading statement concerning Pluralsight's sales

6

force. Specifically, Lead Plaintiffs allege that on January 16, 2019, the start of the Class Period, Budge informed investors that the sales force had grown to "about 250" representatives, despite knowing that Pluralsight had only about 200 sales representatives at that time. SAC, ¶¶ 6, 57–58. Lead Plaintiffs allege that Defendants never corrected this materially false and misleading statement and continued to paint a positive picture of the sales force in their later statements during the Class Period and did not disclose the capacity gap. SAC, ¶¶ 7, 61, 80–81.

12.    Additionally, Lead Plaintiffs allege that Skonnard and Budge acted as controlling persons of Pluralsight by virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Pluralsight. SAC, ¶ 157.

13.    Finally, Lead Plaintiffs allege that Skonnard and Budge sold Pluralsight stock while in possession of material non-public information about the Company's sales capacity. In particular, the material misrepresentation and omission discussed in ¶ 11 allowed for the continued increase in stock price, which Skonnard and Budge benefited from by selling their stock at artificially inflated prices, selling $22.2 million and $15.1 million of stock at peak prices, respectively, despite knowing and failing to correct an inaccurate picture of the sales force and therefore billings growth. SAC, ¶¶ 8, 10, 11, 30, 34, 70, 108, 109, 115, 117. After Defendants announced disappointing second-quarter earnings and a 43.8% drop in business-to-business billings growth and were forced to admit that the disappointing earnings release was due to a known shortage of sales representatives, Pluralsight's common stock plummeted immediately by almost 40 percent. SAC, ¶¶ 17, 94.

**B. Appointment of Lead Plaintiffs and Lead Counsel, Lead Counsel's Extensive Investigation, and Filing of the Amended Complaint**

14.      On August 13, 2019, the original Complaint in this matter was filed in the U.S. District Court for the Southern District of New York, styled *City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Pluralsight, Inc., et al.*, No. 1:19-cv-07563-AKH, naming Pluralsight, Aaron Skonnard, and James Budge as Defendants and alleging violations of the federal securities laws. ECF No. 1. Following the filing of the initial Complaint, Lead Plaintiffs chose Cohen Milstein to represent them in this Action, and on October 15, 2019, filed a motion and supporting brief, along with exhibits, seeking to be appointed as lead plaintiffs under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. ECF Nos. 26–28. Competing movants subsequently withdrew and filed notices of non-opposition. ECF Nos. 47, 50.

15.      On October 31, 2019, following briefing on Defendants' motion to transfer venue, the case was transferred to the U.S. District Court for the District of Utah ("the Court"). ECF Nos. 49, 50.

16.      On March 3, 2020, Lead Plaintiffs re-filed their motion for appointment of lead plaintiffs and lead counsel. ECF No. 76, and on March 25, 2020, the Court appointed INPRS and CTPF as Lead Plaintiffs in the Action, and approved Lead Plaintiffs' selection of Cohen Milstein as Lead Counsel for the putative class and Clyde, Snow & Sessions P.C. ("Clyde Snow") as Liaison Counsel. ECF No. 87.

17.      Lead Counsel continued conducting its comprehensive factual investigation and detailed analysis of potential claims that could be asserted on behalf of investors in Pluralsight securities. This investigation included, among other things:

   a.   reviewing and analyzing regulatory filings made by Pluralsight with SEC;

   b.   conducting an in-depth investigation of Pluralsight and its business;

c.  preparing to interview, attempting to contact, and interviewing individuals from a list of former employees of Pluralsight that Lead Counsel researched and compiled through its own investigation, all of whom were believed to have personal knowledge of the transactions and events that were relevant to claims alleged in this Action;

d.  reviewing and analyzing public statements made and distributed by Defendants, including press releases and media reports, and transcripts of Pluralsight's investor conference calls and events;

e.  reviewing and analyzing securities analyst reports and advisories concerning the Company;

f.  consulting with damages and accounting experts; and

g.  conducting an analysis of trading activity by the Individual Defendants in consultation with an expert.

18.    Based on that extensive investigation, on June 3, 2020, Lead Plaintiffs filed an Amended Complaint alleging violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and U.S. Securities and Exchange Commission Rule 10b-5 promulgated thereunder, as well as violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") in connection with Pluralsight's $456 million secondary public offering on March 7, 2019 (the "SPO"). ECF No. 93. In addition to Pluralsight, Aaron Skonnard, and James Budge, the Amended Complaint named as defendants the signatories to the registration statement filed in connection with the SPO, namely Gary Crittenden, Scott Dorsey, Arne Duncan, Ryan Hinkle, Leah Johnson, Timothy Maudlin, Frederick Onion, Brad Rencher, Bonita Stewart, and Karenann Terrell (the "Signer Defendants"); and the SPO's co-lead underwriters, Morgan Stanley & Co. LLC and J.P.

9

Morgan Securities LLC (the "Underwriter Defendants"). Shortly thereafter, on June 9, 2020, Lead Plaintiffs filed a Corrected Amended Complaint ("CAC") to revise the caption to reflect the operative parties. ECF No. 94.

## C. Defendants' Motion to Dismiss and Lead Plaintiffs' Successful Appeal

### 1. Defendants' Motion to Dismiss

19.     On August 14, 2020, Defendants, together with the Signer Defendants, filed a 35-page motion to dismiss the CAC and an accompanying declaration attaching 11 exhibits totaling 261 pages ("Defendants' Motion to Dismiss"), ECF Nos. 111, 112, as well as a request for judicial notice, ECF No. 113. Additionally, the Underwriter Defendants filed a joinder in Defendants' Motion to Dismiss. ECF No. 114. Defendants' wide-ranging motion challenged virtually every aspect of Lead Plaintiffs' claims. Defendants argued, *inter alia*, that:

a.  the CAC failed to state an Exchange Act claim because INPRS and CTPF failed to plead inaccurate statements of historical fact (to which the PSLRA's safe harbor does not apply), while also pleading statements that were inactionable expressions of optimism or inactionable opinions or were outside the Class Period or not made by Defendants;

b.  Lead Plaintiffs failed to allege scienter and instead relied on conclusory and uncorroborated allegations regarding "supposed" knowledge with no "particularized" facts, citing only forecasts and statements of optimism instead of "detailed knowledge" about Pluralsight's hiring process and sales pipeline; and

c.  the CAC also failed to state a claim under Sections 11 or 12(a)(2) because (1) INPRS failed to meet the heightened pleading requirements of Rule 9(b) for claims that sound in fraud, and (2) none of the challenged statements are false or misleading.

20.     On October 16, 2020, Lead Plaintiffs filed a 42-page opposition to Defendants' motion to dismiss, including three exhibits. Lead Plaintiffs' opposition argued, *inter alia*, that:

   i.   the CAC identified each instance in which Defendants made materially false and misleading statements as well as statements that omitted key facts conveying a positive, false and misleading message about the then-present sales force and that were not protected by the PLSRA's safe harbor;

   ii.  Defendants' statements were not inactionable optimism or opinions and were in fact material, fact-based statements, and Defendants had admitted the existence of material, undisclosed, adverse facts;

   iii. the CAC adequately pled scienter based on (1) Defendants openly and repeatedly admitting to significant sales capacity and execution problems, (2) misstatements tied directly to suspicious trading, (3) stock sales far exceeding compensation, and (4) the amount of stock holdings sold; and

   iv.  the CAC made clear that Defendants' risk factors were misleading and that Defendants affirmatively created an impression of a healthy, growing sales force that differed in a material way from the truth, thus demonstrating the risk factors' supposed warnings were not enough to render what was not disclosed, not misleading.

**2.  The Court's Grant of Defendants' Motion to Dismiss**

21.     On March 22, 2021, the Court held a hearing on Defendants' Motion to Dismiss and requests for judicial notice, and the Underwriter Defendants' Joinder in Defendants' Motion to Dismiss. ECF No. 134. On March 31, 2021, the Court issued orders granting Defendants' Motion to Dismiss, along with the Underwriters' Joinder, and Defendants' requests for judicial notice. ECF Nos. 136, 137.

11

22.     In ruling on the motion to dismiss, the Court found that Lead Plaintiffs had adequately alleged that Defendants made a materially false statement, finding that Defendant Budge's statement that Pluralsight had "about 250" quota-bearing sales representatives "was both false and material in light of how central Pluralsight's sales force numbers were to its billings growth." *Indiana Pub. Ret. Sys. v. Pluralsight*, No. 1:19-cv-00128, 2021 WL 1222290, at *21 (D. Utah Mar. 31, 2020). Nonetheless, the Court dismissed the CAC because it found that Lead Plaintiffs did not adequately plead scienter. *Id.* at *24.

### 3.     Appeal of Motion to Dismiss Order and Filing of the Operative Complaint

23.     Lead Plaintiffs appealed the District Court's dismissal to the Tenth Circuit. After the District Court clarified that its dismissal was with prejudice and entered final judgment, ECF Nos. 146–55, the Parties fully briefed the appeal, and a group of professors, scholars, financial economists, and former federal securities regulators filed a brief of *amici curiae* regarding Rule 10b5-1 plans. ECF No. 271 at 5–6. The Tenth Circuit held oral argument, and ultimately reversed the full dismissal in part and remanded for further proceedings. *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1271–72 (10th Cir. 2022). In so doing, the appellate court affirmed that "Plaintiffs adequately alleged Mr. Budge's statement that Pluralsight had 'about 250' sales representatives was both false and material." *Id.* at 1251. The Tenth Circuit also reversed the District Court's holding on scienter, finding that Lead Plaintiffs' "allegations strongly support the inference that Mr. Budge knew his January 16, 2019, statement was false or misleading when he made it; the statement presented an obvious risk of misleading buyers or sellers; and Mr. Budge had a financial motive for making the misleading representation." *Id.* at 1260. The Tenth Circuit also found the lower court had erred when it found that Defendants' use of a predetermined trading plan automatically removed their motive to manipulate the company's stock price. *Id.* at 1266–67. Specifically, the Tenth Circuit held that the existence of a Rule 10b5-1 trading plan does "not *per*

*se* rebut the inference of scienter where … a defendant was allegedly motivated to misrepresent or withhold material information to affect a stock price." *Id.* at 1266.

24. On September 19, 2022, the Action was reassigned to the Honorable David Barlow. ECF No. 159. Plaintiffs subsequently filed the operative SAC on November 4, 2022 reflecting the narrowed alleged misstatement underlying claims against only Pluralsight, Skonnard, and Budge. ECF No. 173. Defendants filed their answer on December 9, 2022. ECF No. 174.

### D. Fact Discovery

25. Lead Plaintiffs and Defendants then embarked on discovery, serving detailed document requests and sets of interrogatories on one another. Lead Plaintiffs also served 16 document subpoenas on third parties, and Defendants served third-party deposition and document subpoenas on five parties. Extensive disputes ensued, accompanied by lengthy negotiations concerning responses and objections. Additionally, extensive negotiations took place regarding the protective order and ESI protocol for the case, which were submitted to and entered by the Court on May 1, 2023 and May 22, 2023, respectively. ECF Nos. 183, 188. Defendants and third parties subsequently made productions of documents to Lead Plaintiffs in connection with ongoing and detailed negotiations. Lead Plaintiffs similarly produced documents to Defendants and served interrogatory responses in connection with lengthy negotiations. Defendants also conducted Rule 30(b)(6) depositions of the Lead Plaintiffs and their three investment managers, deposing a total of eight individuals, which depositions Lead Counsel attended and, as to the Lead Plaintiffs' representatives, defended.

26. In connection with discovery, the Parties exchanged numerous, detailed letters concerning discovery issues and disputes and engaged in numerous and extensive meet and confer conferences regarding document production and disputes over the scope of discovery. Two of those topics were as follows:

a. <u>Noncustodial data sources</u>: After discovery commenced, Defendants disclosed 16 non-custodial, third-party, and inaccessible data sources ("non-custodial data sources" or "sources") that were likely to contain information potentially responsive to Plaintiffs' discovery requests. The Parties spent months in late 2023 negotiating Defendants' proposed methods of data collection from the various non-custodial data sources. By early February 2024, the Parties had reached substantial agreement on the scope and process for data collection from at least seven of the 16 sources and Defendants had finally begun data collection from most of the seven sources with negotiations continuing regarding the other nine sources.

b. <u>Modern attachments</u>: After reviewing Defendants' limited initial document production in May 2023, Lead Plaintiffs noticed that Pluralsight routinely used modern attachments (documents or files shared via a hyperlink) to share relevant documents, and requested that Pluralsight produce the modern attachments found in their initial document production. Because courts are just beginning to grapple with this novel and highly technical e-discovery issue in a way that has resulted in inconsistent case law, the Parties began intensive negotiations and both sides retained technical experts to advise them. At the time the Parties reached an agreement to settle this Action, the Parties had reached an impasse regarding the treatment and production of modern attachments.

27. Although the Parties were able to resolve many of their disputes, several were raised to the Court, and the Court conducted a hearing on a subset of those disputes. Specifically, the Parties filed a series of discovery motions with the Court, including: (1) Lead Plaintiffs' motion to compel discovery from a broader period than the Class Period based on concrete allegations

recognized by the Tenth Circuit (ECF No. 201), which Defendants opposed (ECF No. 205); (2) Defendants' motion to compel Lead Plaintiffs to produce documents relating to portfolio monitoring agreements and other financial contracts (ECF No. 210), which Lead Plaintiffs opposed (ECF No. 216), and which Defendants later withdrew after Lead Plaintiffs provided satisfactory information via declaration (ECF No. 248); (3) Lead Plaintiffs' motion to compel Defendants to produce documents regarding audits and interim reviews by PricewaterhouseCoopers and Ernst & Young (ECF No. 225), which Defendants opposed (ECF No. 236); and (4) Defendants' motions for a protective order and to quash a subpoena to third-party Cadence Group, who audited Pluralsight's internal controls (ECF Nos. 246, 247), which Lead Plaintiffs opposed (ECF No. 249), and which Defendants withdrew after extensive negotiations between the parties (ECF Nos. 250, 251). During the Court's October 4, 2023 discovery motion hearing, the Court denied Lead Plaintiffs' audit-related motion to compel without prejudice based on extensive negotiations and compromise between the Parties. ECF No. 241. A few months later, the Court granted Lead Plaintiffs' motion regarding the appropriate discovery period. ECF No. 259.

### E. Class Certification

28.     On March 3, 2023, Lead Plaintiffs filed their motion for class certification ("Class Certification Motion") requesting that the Court certify a class comprised of all persons and entities who purchased or otherwise acquired shares of Pluralsight common stock between January 16, 2019 and July 31, 2019, inclusive, and were damaged thereby. ECF Nos. 177, 178. In addition, Lead Plaintiffs sought appointment as Class Representatives and the appointment of Cohen Milstein as Class Counsel. *Id.*

29.     Lead Plaintiffs' Class Certification Motion was supported by the expert report of Chad Coffman, CFA who opined that Pluralsight common stock traded in an efficient market

15

during the Class Period, and that class-wide damages in the matter could be calculated on a class-wide basis using a common methodology.

30.    Defendants took extensive class discovery, which included: (1) interrogatories; (2) document requests; and (3) subpoenas to and Rule 30(b)(6) depositions of Lead Plaintiffs' three investment managers, the scope of which the Parties negotiated extensively. Defendants ultimately conducted Rule 30(b)(6) depositions of the Lead Plaintiffs and their three investment managers, deposing eight individuals in total.

31.    On August 14, 2023, Defendants did not oppose class certification, instead filing a three-page response to Lead Plaintiffs' motion stating that "Defendants take no position on the Motion at this time." ECF No. 213.

32.    Lead Plaintiffs filed a reply to Defendants' response on September 13, 2023, arguing that the case was "ideally suited for class treatment" and easily satisfies each of Rule 23's requirements, all reasons why Defendants took no position. ECF No. 223.

33.    On December 27, 2023, the Court entered a Memorandum and Order ("Class Certification Order") granting Lead Plaintiffs' Class Certification Motion, appointing INPRS and CTPF as Class Representatives, and appointing Cohen Milstein as Class Counsel. ECF No. 252.

34.    Defendants followed by filing a motion to amend/correct the Court's order on class certification on January 24, 2024, in which they asked the Court to use the singular "misstatement" instead of "misstatements," delete references to particular statements, and add a footnote regarding previous rulings in the case before the District Court and on appeal before the Tenth Circuit. ECF No. 255.

35.    On February 9, 2024, Lead Plaintiffs filed an opposition to Defendants' motion to amend/correct, arguing, among other things, that Defendants' motion did not seek to "alter or

16

amend . . . the Court's class certification ruling," did not assert any change in the law or new evidence that was not previously available, and did not establish the need to correct a clear error or injustice. ECF No. 260. Further, Lead Plaintiffs' opposition pointed out that the references in the Court's opinion to certain of the SAC's allegations provided factual context for the Lead Plaintiffs' claims and that the Court's reference to "omissions" was appropriate given the SAC's allegations explaining how the false and misleading statement at issue omitted facts that rendered it misleading. *Id.* On February 23, 2024, Defendants filed their reply in further support of their motion to amend/correct the Court's order. ECF No. 264.

36.     On April 2, 2024, after the Parties notified the Court that they had reached an agreement in principle to settle this Action, the Court denied Defendants' motion to amend or correct without prejudice to it being refiled if a final settlement was not reached. ECF No. 269.

37.     Pursuant to the Court's order granting class certification, ECF No. 252, the Parties negotiated a form and manner of notice to the Class and filed an unopposed motion to approve the form and manner of notice on February 26, 2024. The Court granted the unopposed motion on March 12, 2024, ECF No. 266, but later vacated this order after the Parties filed their Notice of Settlement (ECF No. 267). ECF No. 268.

### F.  The Mediation/Settlement Process

38.     During the course of the litigation, the Parties engaged in two separate mediations, which took place approximately eight months apart. In April 2023, the Parties agreed to engage in a private mediation in an attempt to resolve the Action and retained Jed D. Melnick, Esq., of JAMS to act as mediator. In advance of this mediation, Defendants made a substantial document production at Lead Plaintiffs' request. On May 31, 2023, Lead Counsel, along with Lead Plaintiffs, Defendants' Counsel, a representative of Pluralsight, and Defendants' insurers participated in a full-day mediation session before Mr. Melnick. In advance of that session, the Parties submitted

detailed mediation statements to Mr. Melnick, together with numerous supporting exhibits, which addressed both liability and damages issues. After extensive negotiation, that mediation session ended without resolution.

39.    Nearly eight months later, in January 2024, the Parties agreed to conduct a second private mediation session with Mr. Melnick in an attempt to resolve the Action. On March 8, 2024, Lead Counsel, along with Lead Plaintiffs, Defendants' Counsel, a representative of Pluralsight, and Defendants' insurers participated in a full-day mediation session before Mr. Melnick. In advance of that session, the Parties submitted mediation statements to Mr. Melnick, which addressed both liability and damages issues.

40.    Ultimately, after extensive negotiation, the Parties reached agreement on the Settlement Amount, namely $20 million in cash. *See* Melnick Decl., ¶ 15. The Parties thereafter negotiated a term sheet to memorialize their agreement-in-principle to settle the Action, which was executed by the Parties on March 12, 2024 (the "Term Sheet"). The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants in the Action in return for payment of the Settlement Amount, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

41.    On May 1, 2024, the Parties executed the Stipulation and Agreement of Settlement ("the Stipulation"), which embodies the final and binding agreement to settle the Action. *See* ECF No. 271-1. That same day, the Parties also executed a confidential Supplemental Agreement which provides that Defendants have the option to terminate the Settlement if persons who request exclusion from the Class exceed a certain threshold.

42.    The Stipulation provides that Pluralsight will pay or cause to be paid $20 million in cash (the "Settlement Amount").

### III.   THE SETTLEMENT

43.      Defendants agreed to settle this Action for $20 million in cash to be paid into the Escrow Account for the benefit of the Class in accordance with the terms of the Settlement. The Settlement Amount (plus accruing interest) provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured. Lead Counsel and Lead Plaintiffs believe that the Settlement is fair, reasonable, and an excellent result for Class Members considering the risk of an adverse judgment and recovering nothing or less after substantial delay, particularly given that Pluralsight has since been taken private, and public information—including news reports and record searches—and other information obtained indicated that the Company's financial condition was uncertain such that any future recovery might realistically be limited solely to insurance proceeds available then.

### A.   Reasons for the Settlement

44.      Based on knowledge of the facts developed during investigation and litigation of this Action, as well as a recognition of the substantial risks that continued litigation posed, Lead Plaintiffs and Lead Counsel determined that the Settlement was in the best interests of the Class and thus fully endorse the Settlement. Both Lead Plaintiffs and Lead Counsel have significant experience to make such an assessment. Lead Plaintiffs are sophisticated institutional investors that have actively overseen the prosecution of this Action and other securities fraud class actions, while Lead Counsel is a national law firm that specializes in complex securities litigation and is highly experienced in this type of litigation. *See* Ex. 3, Cohen Milstein firm resume.

45.      The factual issues raised in this Action were complex, and the Settling Parties engaged in meaningful discovery before beginning the mediation process, including the production, and Lead Counsel's review, of a substantial number of documents produced by Defendants and non-parties. Moreover, Lead Counsel was well positioned to analyze these

documents because of its investigation prior to the filing of Lead Plaintiffs' amended complaints. Lead Counsel also consulted non-testifying experts who assisted Lead Counsel in evaluating accounting and insider trading theories, as well as damages and loss causation issues. That the Settlement followed this informal and formal discovery demonstrates that the Settling Parties— and Lead Plaintiffs and Lead Counsel in particular—had extensive information to properly evaluate the strengths and weaknesses of the claims and defenses asserted in the Action, as well as the potential additional cost and duration of the litigation if the Action did not settle.

46.     Given such discovery and factual analysis, Lead Plaintiffs and Lead Counsel had an informed view of the factual strengths and weaknesses of the Action. Although Lead Counsel believed, for example, that the evidence demonstrated falsity, as well as scienter and loss causation, Lead Counsel recognized these issues were vehemently disputed by defense counsel and that the evidence could be subject to differing interpretation by a jury at trial.

47.     In particular, while the alleged false and misleading statement concerned a specific number of sales representatives, Defendants argued that determining the number of quota-bearing sales representatives was a time-consuming, manual process that involved significant judgment and discretion about how the number should be calculated, and which often resulted in multiple different numbers at any given time. Further, Defendants also argued that documents and testimony would show that Defendants reasonably believed that the statement that Pluralsight had "about 250" quota-bearing sales representatives was accurate when made and that Defendants reasonably believed at the time that Pluralsight would continue to achieve historical billings growth.

48.     Lead Plaintiffs faced additional risks associated with proving loss causation, as Defendants would continue to argue that the stock price decline on the alleged corrective disclosure date could not be connected to the fraud alleged. In particular, Defendants would argue that any

20

damages attributable to the statement that Pluralsight had "about 250" quota-bearing sales representatives would need to be disaggregated from damages attributable to a host of other "sales execution" challenges that were revealed to the market on July 31, 2019. If successful, Defendants' arguments would significantly limit recoverable damages in the case, if not eliminate damages entirely.

49.    In addition, Lead Counsel and Lead Plaintiffs assessed the risks that they would face in pursuing further litigation were a reasonable settlement not reached as part of mediation. The procedural risks that remained were numerous. There remained several stages of litigation, including summary judgment, pre-trial motions, and trial, as well as post-trial motions and possible appeals. Although Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit, they recognize the substantial risks that the Class could recover far less (or even nothing) if litigation were to continue to trial. By any measure and against this backdrop, the $20 million proposed Settlement represents a very good recovery for the Class.

50.    Lead Counsel retained a well-regarded and experienced expert to conduct an analysis of damages suffered by the Class. According to Lead Plaintiffs' expert's analysis, the Settlement represents between 3.0% and 3.4% of an estimate of Lead Plaintiffs' maximum possible recoverable damages of $593 to $658 million (or 4.1% of Defendants' expert's calculation of maximum possible damages of $485 million). Importantly, these estimates assume Lead Plaintiffs' complete success in establishing Defendants' liability on the remaining claims at every remaining stage of the litigation, and that the trier of fact would reject Defendants' falsity, scienter, loss causation, and damages arguments. In the latter regard, Defendants asserted that, even if Lead Plaintiffs were able to prove their claims, they would be required to disaggregate factors other than salesforce headcount, *which would reduce damages to well below Defendants' $485 million*

*maximum damages estimate*. In any event, settlements in the aforementioned range of recovery have routinely received approval by courts as representing recoveries that are fair, reasonable, and adequate. The proposed Settlement is also well within the range of reasonableness given "all the attendant risks of litigation," because it will allow the Class to recover a significant portion of their damages now rather than a possible recovery after years of uncertain litigation and a far-from-guaranteed jury verdict. Indeed, even if Lead Plaintiffs were to obtain a favorable jury verdict that would survive the inevitable round of appeals, there could be insufficient Company assets or insurance policy proceeds to satisfy a substantial judgment—or fund a settlement of greater or even equal size to the proposed Settlement—years down the road. Pluralsight has since been taken private, and public information—including news reports and record searches—and other information obtained indicated that the Company's financial condition is uncertain such that any future recovery might be limited solely to any insurance proceeds available at that time.

51.     Given these significant litigation risks and the immediacy and amount of the $20 million recovery for the Class, Lead Plaintiffs and Lead Counsel believe the Settlement represents an excellent result; is fair, reasonable, and adequate; and is in the best interest of the Class as it also eliminates the substantial delay and expense of continued litigation, particularly in light of Pluralsight's financial condition.

## IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

52.     On May 1, 2024, Lead Plaintiffs filed their unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 271) ("Preliminary Approval Motion"), which included a copy of the Stipulation. ECF No. 271-1.

53.     On August 2, 2024, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 274) (the "Preliminary Approval Order"), which among other

things: (i) preliminarily approved the Settlement, finding that "pursuant to Rule 23(e)(1)(B)(i) of the Federal Rules of Civil Procedure, [] it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Class, subject to further consideration at the Settlement Hearing"; (ii) approved the form of the Notice, Summary Notice, and Claim Form, and authorized notice to be given to Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on the Settlement website, and publication of the Summary Notice in the *Wall Street Journal* and over *PR Newswire*; (iii) established procedures and deadlines by which Class Members could participate in the Settlement or object to the Settlement, the proposed Plan of Allocation, or the Fee and Expense Application; and (iv) set a schedule for the filing of opening and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also set a time and date for the Settlement Hearing, to determine, among other things, whether the Settlement should be finally approved as fair, reasonable, and adequate.[4]

54.    In compliance with the Preliminary Approval Order, the Court-approved Claims Administrator, SCS ("SCS" or the "Claims Administrator"), has disseminated copies of the Notice and the Claim Form by mail and has published the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Class. The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an

---

[4] The Settlement Hearing was originally scheduled for January 23, 2025 at 10:30 a.m. before the Honorable David Barlow (ECF No. 274), who subsequently rescheduled the Settlement Hearing for February 4, 2025 at 10:30 a.m. due to a Court calendar conflict (ECF No. 276). The case was then reassigned twice (ECF Nos. 277, 279); the new and current judge, the Honorable Ted Stewart, maintained the Settlement Hearing's rescheduled date of February 4, 2025 at 10:30 a.m. (ECF No. 282).

amount not to exceed 20% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $350,000. To disseminate the Notice, SCS obtained information from Defendants and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. *See* Declaration of Sarah Evans Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("SCS Decl."), attached hereto as Exhibit 4, at ¶ 4.

55.     Defendants also disseminated notice pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, *et seq.* ("CAFA"). *See* Declaration of Tyre L. Tindall Regarding Compliance with Class Action Fairness Act Notice Requirements, ECF No. 275.

56.     SCS began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominee owners on August 23, 2024. *See* SCS Decl. ¶ 5. To date, SCS has disseminated a total of 26,219 Notice Packets to potential Class Members and nominees, of which 19,440 have been sent by mail and 6,779 by email. *Id.* at ¶¶ 7–9.

57.     In accordance with the Preliminary Approval Order, on September 9, 2024, SCS caused the Summary Notice to be published in the *Wall Street Journal* and to be transmitted over *PR Newswire*. *Id.* at ¶ 20.

58.     Lead Counsel also caused SCS to establish a dedicated Settlement website, www.PluralsightSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation and Preliminary Approval Order. *Id.* at ¶ 12. That website became operational on August 15, 2024. *Id.* Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, https://www.cohenmilstein.com/.

59. As set forth above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application is January 14, 2025. To date, no objections to the Settlement, the Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before January 28, 2025 that will address any objections that are received.

## V.    PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

60. The proposed Plan of Allocation was prepared with the assistance of Lead Plaintiffs' consultant, Jeremy Marmer, PhD, CFA, of Peregrine Economics, described *infra* ¶¶ 63–66, who has significant experience in drafting plans of allocation. The Plan of Allocation provides a fair and rational basis for Class Members to recover their *pro rata* share of the Settlement Fund.

61. In accordance with the Preliminary Approval Order, and as provided in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked (if mailed), or submitted online, no later than December 21, 2024. As provided in the Notice, the Net Settlement Fund will be distributed among Class Members according to the plan of allocation approved by the Court.

62. The proposed Plan of Allocation is set forth as Appendix A of the Notice. *See* ECF No. 271-1, Ex. 1, Appendix A. As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among Class Members who suffered economic losses as a proximate result of the alleged wrongdoing. The calculations under the Plan of Allocation are intended as a method to weigh the claims of Class Members against one another for

purposes of making an equitable and *pro rata* allocation of the Net Settlement Fund. *See* Notice ¶ 2.

63.     In developing the Plan of Allocation in conjunction with Lead Counsel, Lead Plaintiffs' consultant determined estimated artificial inflation in Pluralsight common stock allegedly caused by Defendants' alleged misrepresentation. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentation, Lead Plaintiffs' consultant considered price changes in Pluralsight common stock in reaction to public disclosure of the truth concerning Defendants' alleged misrepresentation, adjusting for price changes that were attributable to market or industry forces. *See* Notice ¶ 6.

64.     Claimants who purchased and sold all their shares of Pluralsight common stock before August 1, 2019 will have no Recognized Loss under the Plan of Allocation with respect to those transactions. *Id.* ¶ 5.

65.     Once the Claims Administrator has processed all submitted claims, it will make the *pro rata* distributions to Authorized Claimants, until additional re-distributions are no longer cost effective. *Id.* ¶ 4. At such time, any remaining balance will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) selected by Lead Counsel. *Id.*

66.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in Pluralsight common stock that were attributable to the conduct alleged in the SAC. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

67.     As noted above, as of the deadline to file Claims, 26,219 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed

Plan of Allocation, had been sent to potential Class Members. *See* SCS Decl. ¶ 8. To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

68.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel are applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees of 20% of the Settlement Fund. Lead Counsel also request payment for Litigation Expenses incurred by Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $276,166.46. Lead Counsel further request reimbursement to Lead Plaintiffs of a total of $39,620.66 in costs, expenses, and lost wages that Lead Plaintiffs incurred directly related to their representation of the Class, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4). The requested attorneys' fees, Litigation Expenses, and PSLRA awards are to be paid from the Settlement Fund, as disclosed to Class Members in the Notice.

69.    As noted above, Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the Notice and, to date, no objections to Lead Counsel's request for attorneys' fees and Litigation Expenses has been received.

70.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in this Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Application.[5]

---

[5] The Tenth Circuit has stated that in determining the appropriate percentage of attorneys' fees in common fund cases, the Court should consider the factors set forth in the Fifth Circuit's decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974): "(1) The time and labor required. . . . (2) The novelty and difficulty of the questions . . . . (3) The skill requisite to perform the legal service properly. . . . (4) The preclusion of other employment. . . . (5) The customary fee. . . . (6) Whether the fee is fixed or contingent. . . . (7) Time limitations imposed by the client or the circumstances. . . . (8) The amount involved and the results obtained. . . . (9) The experience, reputation, and ability of the attorneys. . . . (10) The "undesirability" of the case. . . . (11) The nature and length of the professional relationship with the client [and] (12) Awards in similar cases." *See Gottlieb v. Barry*, 43 F.3d 474, 483

27

### A. The Fee Application

71.     For the efforts of Plaintiffs' Counsel on behalf of the Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee and Expense Application, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the Class's interest in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the Tenth Circuit for cases of this nature.

72.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee and Expense Application, a 20% fee award is well within the range of percentages awarded in securities class actions in this Circuit and elsewhere in comparable settlements.

### 1. Lead Plaintiffs Have Authorized and Support the Fee Application

73.     Lead Plaintiffs are sophisticated institutional investors that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* INPRS Decl. ¶ 3, Ex. 1; CTPF Decl. ¶ 3, Ex. 2. Lead Plaintiffs have evaluated the Fee and Expense Application and fully support the fee requested. *See* INPRS Decl. ¶ 5; CTPF Decl. ¶ 5. After the agreement to settle the Action was reached, Lead Plaintiffs approved the proposed fee and believe it is fair and reasonable in light of the quality of the result obtained, the work counsel performed,

---

(10th Cir. 1994) ("the court must consider the twelve *Johnson* factors" to determine the reasonableness of a common fund fee award).

and the risks of the litigation. *See* INPRS Decl. ¶¶ 6–11; CTPF Decl. ¶¶ 6–11. Lead Plaintiffs' endorsements of Lead Counsel's fee request further demonstrate its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor Devoted to the Action by Plaintiffs' Counsel

74. As defined above, Plaintiffs' Counsel are the Court-appointed Lead Counsel Cohen Milstein and Liaison Counsel Clyde Snow.

75. As described above in greater detail, the work that Lead Counsel performed in this Action included, among other things: (i) conducting an extensive pre-suit investigation that included a detailed review and analysis of the voluminous public record, including public filings by Pluralsight with the SEC, conference call transcripts, press releases, news articles, and analyst reports and advisories; (ii) interviews of former Pluralsight employees; (iii) consultations with damages, accounting, insider trading, and e-discovery experts; (iv) preparing and filing multiple detailed complaints; (v) opposing Defendants' motion to dismiss the CAC; (vi) successfully appealing the District Court's dismissal order, whereby the Tenth Circuit concluded that one of Defendants' statements was false, misleading and actionable, leading to a reversal of the full dismissal in part and a remand for further proceedings; (vii) obtaining certification of the Class; (viii) serving, responding to and negotiating the parties' extensive discovery requests, including engaging in robust negotiations regarding complex, technical discovery protocols, reviewing and producing Plaintiffs' documents to Defendants and reviewing Defendants document productions; (ix) serving subpoenas on numerous third parties, negotiating those productions and reviewing documents produced; (x) defending and attending depositions; (xi) briefing and arguing three discovery motions; (xii) engaging in multiple extensive, arm's-length settlement negotiations to achieve the Settlement, including two all-day, in-person mediation sessions; (xiii) selecting a

29

claims administrator through a competitive bid process; and (xiv) drafting and negotiating the Stipulation and related settlement documentation.

76.     Liaison Counsel provided advice to Lead Counsel on local rules and procedures, assisted with the drafting of pleadings and motions, assisted with discovery, and worked with Lead Counsel on strategy and negotiations with opposing counsel.

77.     Attached hereto as Exhibits 5A and 5B, respectively, are my declaration on behalf of Cohen Milstein and the declaration of Keith M. Woodwell on behalf of Clyde Snow, in support of Lead Counsel's Fee Motion (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes schedules summarizing the lodestar of the firm and the Litigation Expenses it incurred, delineated by expense category. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. Timekeepers who billed less than ten hours to the case have been omitted. The Fee and Expense Declarations were prepared from contemporaneous daily time records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

78.     Exhibit 5 contains a chart that summarizes the information set forth in Lead Counsel's and Liaison Counsel's Fee and Expense Declarations (Ex. 5A and Ex. 5B), listing the total hours expended, lodestar amounts, and Litigation Expenses for each of Plaintiffs' Counsel, and gives totals for the numbers provided.

79.     As set forth in Exhibit 5, Plaintiffs' Counsel expended a total of 7,585.85 hours in the investigation, prosecution, and resolution of this Action through November 30, 2024 (7,279.75 from Lead Counsel and 306.10 from Liaison Counsel). The resulting lodestar is $6,036,206.25— $5,896,838.75 from Lead Counsel and $139,367.50 from Liaison Counsel. The vast majority of

the total lodestar—approximately 97.7%—was incurred by Lead Counsel. Lead Counsel has and will continue to invest substantial time and effort in this case after the November 30, 2024 cut-off imposed for their lodestar submissions on the Fee and Expense Application, including by overseeing the claims administration process and distribution of funds to Authorized Claimants.

80. The requested fee of 20% of the Settlement Fund represents $4 million plus interest at the same rate as earned on the Settlement Fund and therefore represents a "negative" multiplier of approximately 0.66 on Plaintiffs' Counsel's lodestar. As discussed in further detail in the Fee and Expense Application, the negative multiplier here is far less than the kinds of "positive" multipliers that are routinely approved and awarded in contingent class action litigation in this Circuit and elsewhere.

### 3. The Skill and Experience of Lead Counsel

81. As demonstrated by the firm résumé attached as Exhibit 3 hereto, Cohen Milstein is among the most experienced and skilled law firms in the field of securities litigation, with a long and successful track record representing investors in cases of this kind, and is consistently ranked among the top plaintiffs' firms in the country. Last year, as co-lead counsel in a securities fraud class action against Wells Fargo, Cohen Milstein obtained approval of a $1 billion settlement—the 17th largest in U.S. history. *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-JLR-SN (S.D.N.Y. Sept. 8, 2023), ECF No. 207 (Ex. 6). Cohen Milstein was also named as a 2023 Securities Practice Group of the Year. Law360, Law360 Names Practice Groups; *see also* Cohen Milstein Firm Resume (Ex. 5A-3).

### 4. The Standing and Caliber of Defendants' Counsel

82. The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of their opposition. Defendants were represented by attorneys from Wilson Sonsini Goodrich & Rosati—a large, highly experienced, and highly

skilled international law firm that zealously represented its clients. In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Class.

### 5. The Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

83.     The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

84.     From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of multiple years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the nearly five-year duration of the Action and yet has devoted 7,279.75 hours and has incurred $274,292.36 in Litigation Expenses in prosecuting the Action for the benefit of the Class.

85.     Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have precluded recovery.

32

86.     As noted above, the Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss the CAC by successfully achieving reversal and remand at the Tenth Circuit on Lead Plaintiffs' key misstatement claim, and had conducted substantial fact discovery. However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact discovery (including taking depositions of the Individual Defendants and other Pluralsight officers and third parties); conduct substantial expert discovery; oppose Defendants' anticipated motion for summary judgment; and prepare and take the case to trial, with no guarantee of a favorable verdict. Moreover, even if the jury returned a favorable verdict, it is likely that any verdict would be the subject of post-trial motions and appeals. And, as noted above, the Class faced the risk that it ultimately would not be able to recover due to Pluralsight's financial condition.

87.     Lastly, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

88.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class. In these circumstances and in consideration of the hard work and the excellent result achieved, I believe that the requested fee is reasonable and warrants approval.

33

### 6.    The Reaction of the Class to the Fee Application

89.    As noted above, to date (as of the deadline to file Claims), 26,219 Notice Packets had been sent to potential Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 20% of the Settlement Fund. *See* SCS Decl. ¶ 8 and Ex. A (Notice ¶ 3). In addition, the Court-approved Summary Notice has been published in the *Wall Street Journal* and transmitted over *PR Newswire*. *See* SCS Decl. ¶ 10. To date, no objections to the request for attorneys' fees have been received.

90.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that the requested fee is fair and reasonable.

### B.    The Application for Litigation Expenses

91.    Lead Counsel also seeks payment from the Settlement Fund of $276,166.46 for Litigation Expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action.

92.    From the outset of the Action, Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

34

93.     As set forth in the Fee and Expense Declarations included in Exhibit 5, Plaintiffs' Counsel have incurred a total of $276,166.46 in unreimbursed Litigation Expenses ($274,292.26 from Lead Counsel and $1,874.10 from Liaison Counsel) in connection with the prosecution of the Action. The expenses are summarized in Exhibits 5A and 5B, which identifies each category of expense, *e.g.*, expert fees, mediation fees, online legal and factual research, e-discovery/document management costs, copying costs, and travel costs, and the amount incurred for each category. These expenses are reflected on the books and records maintained by Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are recorded separately by Plaintiffs' Counsel and are not duplicated by the firms' hourly rates.

94.     Of the total amount of expenses, $162,189.72 was expended for the retention of experts. As discussed above, Lead Counsel consulted with experts in the areas of damages, accounting, insider trading, and e-discovery during its investigation and the preparation of the complaints in this Action and during the course of discovery. These experts' advice was instrumental in Lead Counsel's evaluation of the claims and in helping achieve the favorable result.

95.     The Notice informed potential Class Members that Lead Counsel would be seeking payment of Litigation Expenses in an amount not to exceed $350,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class. Notice ¶ 5. The total amount requested, $315,787.12, which includes $276,166.46 for expenses incurred by Plaintiffs' Counsel[6] and $39,620.66 for costs and expenses incurred by Lead Plaintiffs,[7] is well below the total amount that Class Members were

---

[6] *See* Fee Motion at 17.
[7] *See* INPRS Decl. ¶ 2; CTPF Decl. ¶ 2.

advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

96.    The expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

97.    Attached to this declaration are true and correct copies of the following documents previously cited in this declaration, the Settlement Motion, or the Fee Motion:

Exhibit 1:    Declaration of Jeffrey Gill on Behalf of the Indiana Public Retirement System in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsels' Motion for an Award of Attorneys' Fees and Litigation Expenses ("INPRS Decl.")

Exhibit 2:    Declaration of Carlton W. Lenoir, Sr. on Behalf of Public School Teachers' Pension and Retirement Fund of Chicago in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsels' Motion for an Award of Attorneys' Fees and Litigation Expenses ("CTPF Decl.")

Exhibit 3:    Declaration of Jed D. Melnick, Esq. in Support of Lead Plaintiffs' Motion for Final Approval of Settlement ("Melnick Decl.")

Exhibit 4:    Declaration of Sarah Evans Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("SCS Decl.")

Exhibit 5:    Summary of Plaintiffs' Counsel's Lodestar and Expenses

Exhibit 5A:    Declaration of Carol V. Gilden in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Cohen Milstein Sellers & Toll PLLC

Exhibit 5B:    Declaration of Keith M. Woodwell in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Clyde, Snow & Sessions, P.C.

36

Exhibits 6–15:   True and correct copies of the non-published slip opinions cited in Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and Memorandum of Law in Support Thereof (the "Settlement Motion"); and Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, and Memorandum of Law in Support Thereof (the "Fee Motion")

## VII.   CONCLUSION

98.   For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 20% of the Settlement Fund should be approved as fair and reasonable, and the request for payment of Litigation Expenses in the amount of $276,166.46, and for $39,620.66 for reimbursement of Lead Plaintiffs' costs and expenses incurred related to their representation of the Class, should also be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 30th day of December, 2024.

*/s/ Carol V. Gilden*
Carol V. Gilden